IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| KATHLEEN PAINE, as Guardian of the Estate of CHRISTINA ROSE EILMAN, a Disabled Person, | ) ) ) ) |
| Plaintiff, | ) Case No. 06 C 3173 ) ) Judge Virginia M. Kendall |
| v. | ) ) |
| OFFICER JEFFREY JOHNSON, OFFICER RICHARD CASON, OFFICER ROSENDO MORENO, LIEUTENANT CARSON EARNEST, SERGEANT DAVID BERGLIND, DETENTION AIDE SHARON STOKES, OFFICER TERESA WILLIAMS, DETENTION AIDE CYNTHIA HUDSON, DETENTION AIDE CATONIA QUINN, OFFICER DEBORAH MABERY, OFFICER PAMELA SMITH, OFFICER BENITA MILLER, OFFICER PAULINE HEARD, and CITY OF CHICAGO, a municipal corporation, | ) ) ) ) ) ) ) ) ) ) ) ) ) |
| Defendants. | ) ) ) |

## MEMORANDUM OPINION AND ORDER

Plaintiff Kathleen Paine, as Guardian of the Estate of Christina Rose Eilman ("Eilman"),

filed this suit against various members of the Chicago Police Department and the City of Chicago,

alleging civil rights violations and violations of Illinois law in a forty-count Amended Complaint.

Pursuant to Fed. R. Civ. P. 12(b)(6), Defendants moved to dismiss. For the reasons stated, with

respect to Counts II, VI, X, XV, XVIII, XX, XXII, XXIV, XXVI, XXVIII, XXXIII (claims against

Defendants Cason, Moreno, Earnest, Berglind, Stokes, Williams, Hudson, Quinn, Mabery, Smith

and Heard for failure to provide medical care), XXXIV (claim against Heard for failure to respond

after creating increased risk) and XXXVIII (*Monell* claim against the City of Chicago), the motions

to dismiss are denied. With respect to all other Counts, the motions to dismiss are granted.

## PLAINTIFF'S ALLEGATIONS

On May 5, 2006, Eilman, a twenty-one year old woman from Los Angeles, California who suffers from bipolar disorder, traveled to Chicago, Illinois. (Compl. ¶¶ 8-9.)[1] On May 6, 2006, Eilman found herself stranded in Chicago, so she went to Midway Airport in an attempt return to California. (Compl. ¶ 9.) At the airport, she became involved in a verbal altercation at the Frontier Airlines ticket counter. (*Id.*) Upon observing the incident, Defendant Chicago Police Officer Jeffrey Johnson ("Johnson") determined that Eilman posed a threat to other passengers, and he ordered her to leave the airport. (*Id.*) After she left the airport, Eilman placed a telephone call to her parents to obtain their assistance in returning to California. (Compl. ¶ 10.) Her parents arranged for her to take a Southwest Airlines flight from Midway Airport to Burbank, California on May 7, 2006. (Compl. ¶ 11.)

While at the Southwest Airlines gate at Midway Airport on May 7, 2006, Eilman became involved in another verbal altercation. (Compl. ¶ 12.) When she pet a blind man's guide dog, the man's caretaker asked her not to touch the dog. (*Id.*) In response, Eilman became hostile and aggressive towards the caretaker, yelling rap lyrics at him and screaming that the blind man had been exposed as a phony. (Compl. ¶¶ 12, 49) Johnson arrived on the scene, and learned that Eilman had been dancing in a circular motion around the gate area while yelling obscenities very loudly. (Compl. ¶ 50.) After observing Eilman become hostile, aggressive and combative, he spoke with her and determined that she was not intoxicated. (Compl. ¶ 52.) He observed her take a pill from a prescription medication bottle. (*Id.*) Eilman told Johnson that she took medication and that she was trying to return home to California. (Compl. ¶ 53.) Johnson did not ask Eilman why she took

---

[1] Citations to "Plaintiff's First Amended Complaint at Law" have been abbreviated "Compl. ¶ __."

the medication or whether she had a psychiatric history. (Compl. ¶ 54.) Johnson determined that Eilman again posed a threat to other passengers, so he ordered her to leave the airport. (Compl. ¶ 13, 48.) He did not inform his superiors at the police department of his confrontation with Eilman the previous day and he did not recommend transporting her to a mental health facility. (Compl. ¶ 54.)

After Eilman left the airport, she went to Midway Airport's Chicago Transit Authority ("CTA") train and bus station. (Compl. ¶ 14.) While at the CTA station, she created another disturbance. This time, Defendant Chicago Police Officers Richard Cason ("Cason") and Rosendo Moreno ("Moreno") responded to the situation. (Compl. ¶¶ 14-15.) Cason and Moreno observed Eilman chastising people for smoking cigarettes, yelling at people about the price of oil, and warning that the United States is too dependent on oil. (Compl. ¶ 64.) They also observed her acting aggressively towards people at the CTA station, getting very close to them while yelling, and attempting to remove a cigarette from someone's mouth. (Compl. ¶¶ 64, 123) The officers then informed Eilman that she could not scream and yell on CTA property. (Compl. ¶ 123.) When she began dancing in the CTA station's lobby, Cason and Moreno told Eilman that she had to leave the station. (Compl. ¶ 66.) They observed an instant change in her behavior; she became aggressive and confrontational towards them. (*Id.*) Eilman approached the officers, screaming obscenities at them. (*Id.*) She then threatened to take Cason's gun and shoot him with it. (*Id.*) In response, Cason and Moreno placed Eilman under arrest for the misdemeanor offense of criminal trespass to property and took her into the police office at the CTA station. (Compl. ¶¶ 17, 67.) On the way to the police office at the CTA station, Eilman began dragging her feet, kicking, howling, and screaming bizarre and vulgar statements at Cason and Moreno. (Compl. ¶ 68.) She also threatened to "get" the

officers. (*Id.*) Cason learned that Eilman had medication in her possession, but he did not ask her what it was or why she took it. (Compl. ¶ 74.)

While inside the office at the CTA station, Cason and Moreno called for a squad car to take Eilman to the police station located at 3515 West 63rd Street in Chicago ("Eighth District Station") for processing on the criminal trespass charge. (Compl. ¶¶ 18, 71.) At the Eighth District Station, Cason asked Defendant Sergeant David Berglind ("Berglind") to look into Eilman's actions because he thought something was wrong with her based on her behavior, even though he did not suspect that she was under the influence of alcohol or drugs. (Compl. ¶ 75.) Cason observed Eilman experiencing mood swings at the Eighth District Station, where she would act calm and friendly and then suddenly become abusive towards him. (Compl. ¶ 76.) She asked Eilman six times why he arrested her. (Compl. ¶ 110.) While handcuffed in the holding area, Cason saw Eilman repeatedly stand on top of a bench and spontaneously sit down while her eyes roamed all over and she acted "more fidgety than most arrestees." (Compl. ¶ 80.) She also exhibited spontaneous screaming and yelling fits. (Compl. ¶ 129.)

A few hours after Cason and Moreno arrested Eilman, Officer Yvonne Delia ("Delia")[2] telephoned Eilman's parents to inform them of Eilman's condition. (Compl. ¶ 20.) In a voicemail message, Delia informed them that officers had difficulty understanding Eilman and that other officers "did not know what they had on their hands" with respect to her behavior. (*Id.*) Eilman's father called Delia back and informed her that Eilman suffered from bipolar disorder and may be experiencing a psychiatric episode. (Compl. ¶ 21.) In addition, Eilman's father told Delia that Eilman had been institutionalized for the condition in the past, that she may not be taking her

---

[2] Delia is not a defendant in this action.

medication, and that she was from California not Chicago. (*Id.*) In response, Delia told him that the Chicago Police would assist Eilman in her return to California. (*Id.*) After the phone call, Delia told Cason that Eilman suffered from bipolar disorder, and as a result, experienced mood swings. (Compl. ¶ 79.) Cason and Moreno did not transport Eilman to a mental institution. (*Id.*)

Defendant Lieutenant Carson Earnest ("Earnest") was the Watch Commander at the Eighth District Station on May 7, 2006. (Compl. ¶ 159.) Cason informed Earnest that Eilman had been "acting goofy" while in custody. (Compl. ¶ 160.) Delia reported to Earnest that she had concerns about Eilman's mental health and erratic behavior. She also informed Earnest that Eilman's parents had informed her that Eilman suffered from bipolar disorder. (*Id.*) In response to the reports from Cason and Delia, Earnest ordered Berglind to speak with Eilman. (Compl. ¶ 161.) As Watch Commander of the Eighth District Station, Earnest had the authority to order the transfer of Eilman to a mental health facility for an evaluation and treatment. (Compl. ¶ 164.) Earnest made no such order. (Compl. ¶ 167.) Earnest asked Berglind to determine if Eilman knew basic facts including where she was and why she was in custody. (*Id.*) Berglind did not have specialized training in assessing the mental health of individuals. (*Id.*) During the interview, he did not ask Eilman if she had been hospitalized for psychiatric or psychological problems, or if she took psychotropic medication. (Compl. ¶ 229.) Berglind did not attempt to contact Eilman's parents before or after the interview. (Compl. ¶ 230.) During the interview, she repeatedly complained about the price of oil, stated that the United States was too dependent on oil, and sang rap and hip-hop lyrics. (Compl. ¶ 231.) Berglind did not arrange for her transfer to a mental health facility for evaluation or treatment. (Compl. ¶ 238.)

Because the Eighth District Station did not have a female holding facility, Earnest ordered Eilman transferred to the station located at 5101 South Wentworth Avenue in Chicago ("Second District Station"), approximately five miles away. (Compl. ¶¶ 22-23.) Her luggage remained at the Eighth District Station. (Compl. ¶ 24.)

Defendant Detention Aide Sharon Stokes ("Stokes") worked the female lock-up in the Second District Station on May 7, 2008. (Compl. ¶ 241.) Detention aides have the responsibility to report unusual occurrences or irrational behavior to the desk sergeant or lock-up keeper. (Compl. ¶ 243.) When Eilman arrived at the Second District Station, Stokes searched Eilman and inventoried her personal property which included $7.00 in United States currency. (Compl. ¶ 244.)

On May 7, 2006, Defendant Officer Teresa Williams ("Williams") served as the lock-up keeper for the Second District Station's female lock-up area. (Compl. ¶ 258.) As lock-up keeper, Williams had responsibility for processing and monitoring detainees in the female lock-up area. (Compl. ¶¶ 259-260.) Stokes observed Williams process Eilman when she arrived at the Second District Station. (Compl. ¶ 246.) Williams conducted an assessment of Eilman, including a visual check and an interview. (Compl. ¶ 261.) Stokes observed Eilman refuse to cooperate with Defendant Officer Teresa Williams when Williams attempted to question Eilman. (Compl. ¶ 246.) Stokes also observed Eilman decline a sanitary napkin, although her clothing had menstrual blood stains on it. (Compl. ¶ 246.) Officers escorted Eilman to Cell 8 within the Second District Station, a cell reserved for uncooperative prisoners. (Compl. ¶ 247.) In the "Arrest Processing Report," Williams noted that Eilman appeared to be "irrational" and under the influence of drugs and alcohol. (Compl. ¶¶ 263-264.) A detainee who traveled from the Eighth District Station to the Second

District Station with Eilman informed Williams that Eilman could not understand Williams because Eilman was "not right" and suffered from bipolar disorder. (Compl. ¶ 265.)

While in her cell, Eilman continued to behave erratically and demonstrate abnormal behavior. (Compl. ¶ 25.) Stokes observed Eilman standing on the bench in her cell and later holding hands with another detainee located in the adjacent cell while singing a song. (Compl. ¶ 248.) She also continued to exhibit mood swings. (Compl. ¶ 266.) Williams heard Eilman yell that she needed to go to the hospital. (Compl. ¶ 267.) When another lock-up employee informed Williams that Eilman was acting crazy and asking to go to the hospital, Williams responded "ain't nothing wrong with her and she ain't going to the hospital and if she keeps screaming, we are going to send her to the crazy hospital." (Compl. ¶ 273.) Despite Eilman's erratic behavior and her requests to go to the hospital, Stokes and Williams did not transport Eilman to a mental health facility or to any hospital for an evaluation. (Compl. ¶ 250.)

On May 7, 2006 and May 8, 2006, Detention Aides Cynthia Hudson ("Hudson") and Catonia Quinn ("Quinn") worked the female lock-up in the Second District Station. (Compl. ¶¶ 284, 313.) They each had the responsibility to report any unusual occurrences to the desk sergeant or lock-up keeper. (Compl. ¶¶ 286, 315.) When Hudson reported to the Second District Station for her shift at 10:00 pm on May 7, 2006, she noticed that other officers placed Eilman inside the cell reserved for uncooperative detainees. (Compl. ¶ 287.) During the course of her shift, Hudson and Quinn observed Eilman behaving erratically and irrationally. (Compl. ¶¶ 288, 322.) Hudson saw Eilman alternate her behavior from being calm to yelling and screaming inside her cell. (Compl. ¶¶ 289-290.) Additionally, Hudson and Quinn observed Eilman kicking and banging the bars of her cell and yelling that dead rap musicians were going to come and rescue her. (Compl. ¶¶ 291-292, 322-

324.)  Eilman's cell mate reported to Hudson and Quinn that Eilman had been acting "crazy" and "finger painting" her menstrual blood on the walls, bench and cell bars in the cell.  The detention aides also each observed the blood smeared on the walls.  (Compl. ¶¶ 293-294, 318-319.)  Upon viewing the blood smeared inside of the cell, Hudson called Eilman a "crazy bitch" and instructed her to clean the blood off the walls.  (Compl. ¶ 295.)  Eilman's cell mate requested a transfer to a different cell because of Eilman's behavior.  (Compl. ¶ 320.)  In response, Quinn removed Eilman's cell mate and placed her in a different cell.  (Compl. ¶ 321.)  Eilman then asked Quinn to take her to a hospital because of heart murmurs.  (Compl. ¶ 325.)  Hudson reported to Williams that Eilman had been "acting crazy."  (Compl. ¶ 296.)  Hudson and Quinn did not order Eilman transported for medical treatment or evaluation.  (Compl. ¶¶ 299-304, 326-332.)

On May 8, 2006, Defendant Officer Deborah Mabery ("Mabery") worked the second watch in the Second District Station's female lock-up.  (Compl. ¶ 341.)  In that role, she had responsibility for the well-being and safety of female detainees in the lock-up and she had an obligation to report any unusual occurrences to the desk sergeant or lock-up keeper.  (Compl. ¶¶ 342-342.)  During her shift on May 8, 2006, Mabery saw Eilman behaving erratically, screaming and yelling, and kicking the bars of her cell.  (Compl. ¶¶ 344-346.)  Mabery also heard Eilman yell for a period of thirty minutes that she needed an ambulance because she had heart murmurs and difficulty breathing.  (Compl. ¶¶ 347-351.)  In response, Mabery told Eilman to "shut the fuck up" because there was nothing wrong with her and told her that she was not going to the hospital.  (Compl. ¶ 352.)  Despite seeing Eilman's behavior and hearing Eilman's requests for medical treatment, Mabery did not arrange for Eilman to receive either medical treatment.  (Compl. ¶¶ 353-356.)

On May 8, 2006, Defendant Officer Pauline Heard ("Heard") worked as a lock-up employee at the Second District Station. (Compl. ¶ 405.) During her shift, she heard Eilman repeatedly yelling to no one in particular, "Bitch, feed me." (Compl. ¶ 406.) Heard also listened to Eilman yell for thirty minutes that she wanted to make a phone call, that her heart hurt, and that she could not breathe. (Compl. ¶ 407.) As she yelled, Eilman pounded on the metal bars of her cell. (*Id.*) Heard and other lock-up personnel ignored Eilman's cries. (*Id.*)

On May 8, 2006, Defendant Officer Pamela Smith ("Smith") was the officer assigned to work the front desk at the Second District Station. (Compl. ¶ 362.) On that afternoon, Smith received a phone call from Plaintiff Kathy Paine ("Paine"), Eilman's mother. Paine informed Smith that she felt worried about Eilman's release from police custody because she did not want the police to release Eilman if she was suffering a psychiatric episode. (Compl. ¶ 363.) After receiving that information, Smith did not interview Eilman or investigate her behavior in the lock-up. (Compl. ¶ 364.) Smith then prepared Eilman's personal recognizance bond, which lead to Eilman's release from police custody. (Compl. ¶ 365.) Smith did not transfer Eilman to a medical facility or a mental health facility nor did she contact Paine regarding Eilman's release. (*Id.*)

On May 8, 2006, Defendant Officer Benita Miller ("Miller") worked the third watch at the Second District Station as the acting desk sergeant. (Compl. ¶ 378.) As the acting desk sergeant, Miller had responsibility for overseeing bonding procedures, personally inspecting the prisoners and ensuring that all cells remained in clean and sanitary condition. (Compl. ¶ 379.) Miller signed Eilman's personal recognizance bond which enabled Eilman to leave police custody on May 8, 2006. (Compl. ¶ 380.) Miller and Heard then escorted Eilman out of the Second District Station at approximately 6:30 p.m. (Compl. ¶¶ 381, 408.) Heard then observed Eilman standing in the

Second District Station's parking lot with a puzzled look on her face, so Heard pointed her towards 51st Street. (Compl. ¶ 408.) After the officers escorted Eilman out of the Second District Station, Eilman gestured towards a detective as if to bless him by making the Sign of the Cross. (Compl. ¶¶ 382, 409.) Eilman then proceeded through the parking lot of the Second District Station. (*Id.*) Prior to her release, and despite their requests, no police personnel attempted to contact Eilman's parents regarding her release. (Compl. ¶ 37.) Despite Eilman's behavior that day, Miller and Heard did not provide Eilman with access to a medical or mental health facility. (Compl ¶¶ 383, 411.) Although they had witnessed Eilman's erratic behavior that day, Miller and Heard released Eilman into an area of Chicago approximately two blocks away from the Robert Taylor Homes housing project located at 5135 South Federal Street in Chicago. (Compl. ¶¶ 38-40.) Soon after her discharge from police custody, someone abducted her, sexually assaulted her within the Robert Taylor Homes, and propelled her out of a seventh floor apartment window, causing her to sustain serious bodily injuries, including cervical and lumbar spine fractures, pelvic and right tibia and fibula fractures, blunt head trauma, severe brain hemorrhaging and brain injury, cognitive damage, collapsed lungs, and partial paralysis to the lower torso. (Compl. ¶ 41, 60.)

Although Defendant City of Chicago has a protocol that requires its police officers to transport persons demonstrating symptoms of mental illness to designated mental health care facilities for evaluation and care, no one from the Chicago Police Department provided Eilman with such care on May 7-8, 2006. (Compl. ¶¶ 26, 30-34.) Paine alleges that at the time of Eilman's detention, the Chicago Police Department had explicit and *de facto* policies, practices, procedures and customs that caused the officers and detention aides to respond to Eilman's condition in the way that they did. (Compl. ¶ 469.) Among these policies, practices and customs, Paine alleges that the

City of Chicago failed to properly train police officers to identify and respond to detainees who exhibit signs of mental illness. (Compl. ¶ 470.)

## STANDARD

When considering a motion to dismiss under Rule 12(b)(6), a court must accept as true all facts alleged in the complaint and construe all reasonable inferences in favor of the plaintiff. *See Murphy v. Walker*, 51 F.3d 714, 717 (7th Cir. 1995). To state a claim upon which relief can be granted, a complaint must contain a "short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2). A plaintiff need not allege all facts involved in the claim. *See Sanjuan v. Am. Bd. of Psychiatry & Neurology, Inc.*, 40 F.3d 247, 251 (7th Cir. 1994). However, in order to survive a motion to dismiss for failure to state a claim, the claim must be supported by facts that, if taken as true, at least plausibly suggest that the plaintiff is entitled to relief. *See Bell Atlantic Corp. v. Twombly*, 127 S. Ct. 1955, 1974 (2007). Such a set of facts must "raise a reasonable expectation that discovery will reveal evidence" of illegality. *Id.* at 1965.

## DISCUSSION

### I. Claims Against Police Officers for Violations of Eilman's Constitutional Rights

A plaintiff may bring an action under 42 U.S.C. § 1983 for redress of constitutional violations committed under color of state law. *See* 42 U.S.C. § 1983. "[T]o state a claim for relief under § 1983, plaintiffs must allege: 1) they were deprived of a right secured by the Constitution or laws of the United States, and 2) the deprivation was visited upon them by a person or persons acting under color of state law." *McKinney v. Duplain*, 463 F.3d 679, 683 (7th Cir. 2006). Even if a plaintiff states a claim under § 1983, an individual acting under color of state law may assert qualified immunity. "The doctrine of qualified immunity shields government officials against suits

arising out of their exercise of discretionary functions as long as their actions could reasonably have been thought consistent with the rights they are alleged to have violated." *Id.* at 683-84. Therefore, a two-part test for § 1983 claims and qualified immunity exists:

> First, a court must decide whether the facts, when viewed in the light most favorable to the plaintiff, indicate that the officer's conduct violated some constitutional right of the plaintiff. If so, the court must determine whether the constitutional right violated was "clearly established" at the time of the alleged violation. Unless the answer to both questions is "yes," a government official is entitled to qualified immunity.

*Id.* at 684 (citations omitted). The parties do not dispute that the individual Defendants acted under color of state law. Therefore, this Court begins its analysis by determining if Paine has properly alleged that the Defendants violated Eilman's constitutional rights.

### a. False Arrest and False Imprisonment

In Counts IV, VIII, XII and XXXVII, the Complaint states claims under § 1983 for false arrest and false imprisonment in violation of the Fourth Amendment against Cason, Moreno, Earnest and the City of Chicago, respectively. After those Defendants filed their motions to dismiss, Paine voluntarily dismissed those counts. Accordingly, Counts IV, VIII, XII and XXXVII have been dismissed with prejudice.

### b. Failure to Provide Eilman with Medical or Mental Treatment

In Counts II, VI, X, XV, XVIII, XX, XXII, XXIV, XXVI, XXVIII, XXX and XXXIII, the Complaint states claims under § 1983 for violation of the Fourteenth Amendment against Cason, Moreno, Earnest, Berglind, Stokes, Williams, Hudson, Quinn, Mabery, Smith, Miller and Heard, respectively. In their briefs, the parties all analyzed these claims under the Fourteenth Amendment's "deliberate indifference" standard. To state a claim for deliberate indifference to medical needs, a plaintiff must allege "that 1) the harm to the plaintiff was objectively serious; and 2) that the official

was deliberately indifferent to his health or safety." *Williams v. Rodriguez*, 509 F.3d 392, 401 (7th Cir. 2007). The Court notes that the parties applied the incorrect standard, because the Complaint does not allege that Eilman ever received a judicial determination of probable cause during her detention on May 7-8, 2006. "Claims regarding conditions of confinement for pretrial detainees such as [Eilman] who have not yet had a judicial determination of probable cause (a *Gerstein* hearing), are instead governed by the Fourth Amendment and its objectively unreasonable standard." *Id.* at 403; *see also Lopez v. City of Chicago*, 464 F.3d 711, 719 (7th Cir. 2006). "The Fourth Amendment, which so far as pertinent here forbids unreasonable seizures of persons . . . has been held applicable to the states by virtue of the due process clause of the Fourteenth Amendment." *McKinney v. George*, 726 F.2d 1183, 1186 (7th Cir. 1984). Therefore, the Court construes Paine's Fourteenth Amendment due process claims against individual officers for failure to provide medical or mental treatment to Eilman as claims for unreasonable seizure in violation of the Fourth Amendment, as incorporated against the states under the Fourteenth Amendment.

Once a state takes a person into its custody, it assumes an obligation to provide for his basic needs, including "food, clothing, shelter, medical care, and reasonable safety." *DeShaney v. Winnebago County Dept. of Social Servs.*, 489 U.S. 189, 1005 (1989). Courts apply a four-factor test to evaluate the objective reasonableness of an officer's conduct in the medical needs context. *See Sides v. City of Champaign*, 496 F.3d 820, 823 (7th Cir. 2007). The first factor measures whether the officer has received notice of the detainee's medical need whether by word or through observation of the detainee's physical symptoms. *Id.* at 823, 828. The second factor considers the seriousness of the medical need. *Id.* at 828. "The severity of the medical condition under this standard need not, on its own, rise to the level of objective seriousness required under the Eighth and

Fourteenth Amendment. Instead, the Fourth Amendment's reasonableness analysis operates on a sliding scale, balancing the seriousness of the medical need with the third factor- the scope of the requested treatment." *Williams*, 509 F.3d at 403. In the final factor, police interests factor into the reasonableness determination. *Sides*, 496 F.3d at 828. This final factor "is wide-ranging in scope and can include administrative, penological, or investigatory concerns." *Williams*, 509 F.3d at 403.

### i. *Cason and Moreno*

The Complaint alleges that once Cason and Moreno took Eilman into custody at the Eighth District Station, they each personally observed Eilman's erratic behavior and vast mood swings. Upon viewing her behavior, each officer suspected that she suffered from some form of mental illness. Cason even received direct notice from Delia that Eilman had bipolar disorder. Despite their observations and Cason's knowledge of Eilman's mental disorder, those officers did not provide Eilman with access to treatment. Taking the allegations in the Complaint as true, based on their actual knowledge Eilman's bipolar disorder and their personal observations of Eilman's physical symptoms, Counts II and VI state constitutional violations against Cason and Moreno for unreasonably failing to provide her with access to medical or mental treatment.

### ii. *Earnest*

With respect to Earnest, the Complaint alleges that as the watch commander at the Eighth District Station, he received multiple reports of Eilman's erratic behavior. Additionally, Earnest received direct notice from Delia that Eilman had bipolar disorder. Delia also told Earnest that she had concerns about Eilman's mental health. In response, Earnest ordered Berglind to assess her behavior and mental condition, even though Berglind had no training in assessing mental health. Despite his knowledge actual knowledge of Eilman's bipolar disorder and reports of her mental

condition during her detention at the Eighth District Station, Earnest did not provide Eilman with access to treatment. Taking the allegations in the Complaint as true, based on his actual knowledge of Eilman's bipolar disorder and his personal observations of Eilman's physical symptoms, Count X states a constitutional violation against Earnest for unreasonably failing to provide her with access to medical or mental treatment.

### iii. Stokes, Williams, Hudson, Quinn and Mabery

The Complaint alleges that after Eilman arrived at the Second District Station, Stokes, Williams, Hudson, Quinn and Mabery all observed Eilman's erratic behavior. Stokes offered Eilman a sanitary napkin because she noticed that Eilman had blood stains on her clothes. Another detainee informed Williams that Eilman suffered from bipolar condition after Williams noted that she thought Eilman was under the influence of alcohol or drugs. Williams also heard Eilman yell requests to go to the hospital for heart murmurs. In response to Eilman's requests to go to a hospital, Williams stated that she would not take Eilman to a hospital, and that if Eilman kept screaming, Williams would send her to the "crazy hospital." Williams did not provide Eilman with access to treatment.

Hudson observed Eilman experiencing mood swings and abrupt changes in behavior. She also observed Eilman kicking the bars of her cell while screaming that dead rap musicians were coming to rescue her. When Eilman's cell mate informed Hudson that Eilman had painted the walls of her cell with blood, Hudson saw the blood, called Eilman a "crazy bitch," and ordered Eilman to clean the blood off the walls. Eilman then requested to go to the emergency room, but Hudson did not arrange for her to receive treatment. Quinn observed much of the same erratic behavior that Hudson saw. Quinn also removed Eilman's cell mate from Eilman's cell because of Eilman's

behavior. When Quinn became aware that Eilman requested medical treatment, she did not arrange for treatment.

Mabery observed Eilman behave erratically while screaming and yelling for approximate thirty five minutes. During that time, she saw Eilman kick the bars of her cell while screaming that she had a heart murmur, that she had difficulty breathing, and that she needed an ambulance to take her to a hospital's emergency room. In response, Mabery told Eilman to "shut the fuck up," but she did not arrange for Eilman to receive treatment.

Taking the allegations in the Complaint as true, based on their actual knowledge Eilman's bipolar disorder and their personal observations of Eilman's physical symptoms, Counts XVIII, XX, XXII, XXIV and XXVI state constitutional violations against Stokes, Williams, Hudson, Quinn and Mabery for unreasonably failing to provide her with access to medical or mental treatment.

### iv. Smith

The Complaint alleges that Smith received actual notice of Eilman's bipolar disorder when Paine called the front desk of the Second District Station and spoke with Smith. During that phone call, Paine informed Smith of Eilman's disorder, and stated that she did not want the Chicago Police to release Eilman if she was experiencing a psychiatric episode. Despite receiving this information, Smith did not investigate Eilman's behavior in the Second District Station's lock-up. Smith then prepared the paperwork for Eilman's release from custody and issued Eilman a personal recognizance bond instead of providing Eilman with access to medical or mental treatment. Taking the allegations in the Complaint as true, based on her actual knowledge of Eilman's bipolar disorder, Count XXVIII states a constitutional violation against Smith for unreasonably failing to provide Eilman with access to treatment.

*v. Miller and Heard*

The Complaint alleges that Heard listened to Eilman yelling for an extended period of time to no one in particular that she wanted to eat, that she wanted to make a phone call, that her heart hurt, and that she could not breathe. Heard also observed Eilman pounding on her cell's bars. Despite her observations, Heard did not provide Eilman with access to medical or mental treatment. Taking the allegations in the Complaint as true, based on her observations of Eilman's behavior and Eilman's health complaints, Count XXXIII states a constitutional violation against Heard for unreasonably failing to provide Eilman with access to treatment.

Miller had responsibility for overseeing bond procedures, personally inspecting prisoners, and ensuring the cleanliness of lock-up cells at the Second District Station, and Miller signed Eilman's personal recognizance bond. The Complaint does not allege that Miller had actual knowledge of Eilman's bipolar disorder, or that she had personally observed Eilman's erratic behavior. Furthermore, the Complaint does not allege that Eilman complained about her health to Miller or that she asked Miller to take her to a hospital for treatment. Even taking the allegations in the Complaint as true, Count XXX fails to state a constitutional violation against Miller for unreasonably failing to provide Eilman with access to treatment while Eilman remained in custody. Accordingly, Count XXX is dismissed with prejudice.

*c. Unreasonable Seizure*

In Counts III, VII and XI, the Complaint states claims under § 1983 for unreasonable seizure in violation of the Fourth Amendment against Cason, Moreno and Earnest, respectively, for failure to obtain medical or mental treatment for Eilman. However, because Counts II, VI and X stated § 1983 claims for unreasonable seizure against those same Defendants for unreasonably failing to

obtain medical or mental treatment for Eilman, Counts III, VII and XI are entirely duplicative of Counts II, VI and X. Because Counts III, VII and XI do not state an alternative basis for liability or name different defendants, they do not state separate claims for recovery. Therefore, the Court dismisses Counts III, VII and XI as entirely duplicative of Counts II, VI and X. *See Zurich Ins. Co. v. T.T.C., Inc.*, No. 92 C 6051, 1994 WL 66086, at *4 (N.D. Ill. Mar. 3, 1994) (Marovich, J.) (dismissing one claim as entirely duplicative of another claim in the same case).

d. *"DeShaney"* Actions

In Counts XIII, XXXI, XXXIV and XXXVI, the Complaint states "*DeShaney*" claims under § 1983 against Earnest, Miller, Heard and the City of Chicago, respectively. As a preliminary matter, the Court notes that *DeShaney* did not create a cause of action; rather, it defined the duties that a State owes it citizens under the Due Process Clause of the Fourteenth Amendment. *See DeShaney*, 489 U.S. at 197. *DeShaney* determined that "a state's failure to protect an individual against private violence simply does not constitute a violation of the Due Process Clause." *Id.* As an exception to that general rule, the state assumes a duty to protect in two situations that create a special relationship: 1) custodial settings in which the state has limited the individual's ability to care for himself; and 2) when the state affirmatively places the individual in a position of danger the individual would not have otherwise faced. *See Stevens v. City of Green Bay*, 105 F.3d 1169, 1174 (7th Cir. 1997) ["*Stevens I*"]. Because *DeShaney* did not create a separate cause of action, the Court analyzes Counts XIII, XXXI, XXXIV and XXXVI as § 1983 actions alleging violations of substantive due process rights. The Court has already determined that based on the conditions of Eilman's confinement, Paine has stated a claim against several officers for violation of her Fourth Amendment right of freedom from unreasonable seizure, as incorporated against the states in the

Fourteenth Amendment's Due Process Clause. Therefore, to the extent that Counts XIII, XXXI and XXXIV state claims under *DeShaney's* first exception against Earnest, Heard and Miller, those Counts are dismissed as entirely duplicative of Counts XI, XXVIII and XXX. *See Zurich*, 1994 WL 66086, at *4.

The second special relationship that imposes an affirmative duty on a state to protect an individual arises "where the state creates a dangerous situation or renders citizens more vulnerable to danger." *Stevens I*, 105 F.3d at 1176. The first *DeShaney* exception, the duty to provide services to those in state custody, arises only when the state exercises its power in a way that restrains an individual's personal liberty through incarceration or institutionalization, because the state has effectively cut off alternative avenues of aid. *See DeShaney*, 489 U.S. at 200; *Monfils v. Taylor*, 165 F.3d 511, 516 (7th Cir. 1998) ("The basis of a special relationship [under the first *DeShaney* exception] is that the state has some sort of control or custody over the individual, as in the case of prisoners . . . . The state's duty to protect those persons or to provide services for them arises from that custody or control."). In contrast, the second *DeShaney* exception arises independently of the duties that a state assumes when it restrains a person's liberty; it arises from the assumption of a duty to protect an individual "when the state affirmatively places a particular individual in a position of danger the individual would not otherwise have faced." *Monfils*, 165 F.3d at 516-17. To state a claim under this "state-created danger" theory, "a plaintiff must plead facts showing some *affirmative act* on the part of the state that either created a danger to the plaintiff or rendered him more vulnerable to an existing danger." *Stevens v. Umsted*, 131 F.3d 697, 705 (7th Cir. 1997) (emphasis in original) ["*Stevens II*"]. "[T]he key question in determining whether state behavior violated the victim's constitutional rights is: 'What actions did the state actor affirmatively take, and

what dangers would the victim otherwise have faced?'" *Windle v. City of Marion, Ind.*, 321 F.3d 658, 661 (7th Cir. 2003) (citations omitted).

### i. Earnest

In Count XIII, the Complaint alleges that when Earnest transferred Eilman from the Eighth District Station to the Second District Station, he placed her in a position of heightened risk. Transferring a pretrial detainee from one police station to another in a different district does not place the detainee in a position of heightened risk. *See Collignon v. Milwaukee County*, 163 F.3d 982, 987 (7th Cir. 1998) (noting that a police officer could place a pretrial detainee in a position of heightened risk if he "released a pretrial detainee by, for example, dumping him in the wilderness"). When Earnest transferred Eilman to the Second District Station, he did not "dump her in the wilderness" or subject her to similar risks. Transferring a Eilman from one police station to another did not amount to abandoning her, because she remained in police custody after the transfer. The only affirmative act alleged against Earnest as a basis for liability under the second *DeShaney* exception, transferring her from one police station to another one, did not create danger for Eilman. Even taking the allegations in the Complaint as true, Count XIII fails to state a constitutional violation against Earnest for failing to protect Eilman after placing her in a position of heightened risk. Accordingly, Count XIII is dismissed with prejudice.

### ii. Miller and Heard

Counts XXXI and XXXIV allege that Miller and Heard violated Eilman's due process rights by placing her in a position of heightened risk when they released her from the Second District Station. Plaintiffs "may state claims for civil rights violations if they allege state action that creates, or substantially contributes to the creation of, a danger or renders citizens more vulnerable to a

danger than they otherwise could have been." *Monfils*, 165 F.3d at 518 (*quoting Reed v. Gardner*, 986 F.2d 1122, 1126 (7th Cir. 1993)); *see also McLin v. City of Chicago*, 742 F.Supp. 994 (N.D. Ill. 1990) (Rovner, J.). "[T]he constitutional right involved was not a right to protection, per se, but rather a right not to be placed at harm by state officials." *Monfils*, 165 F.3d at 518.

In *Monfils*, a police informant notified the police that his co-worker had stolen property from their employer. *Id.* at 513. The police had recorded the informant's phone call. *Id.* After making the phone call, the informant specifically informed the police department on numerous occasions that he wanted to remain anonymous because his co-worker "was known to be violent." *Id.* Despite their actual knowledge of the situation, the police subsequently disclosed a copy of the tape to the co-worker caught stealing. *Id.* at 515. When the co-worker played the tape, he recognized the informant's voice, and along with five other co-workers, killed the informant. *Id.* By releasing the tape of the informant, the police knowingly took an affirmative action that created a danger that the informant would not have otherwise faced. *Id.* at 518. Similarly, in *Reed*, the police knowingly created danger for the public when it took one driver into custody, leaving an obviously drunk passenger alone with the car and its keys. *Reed*, 986 F.2d at 1125. Such police action created a danger for others on the road at that time, because the police knowingly introduced a risk that did not exist before they took action. *Id.*

In *Wood v. Ostrander*, 879 F.2d 583, 599 (9th Cir. 1989), a police officer stopped a car for driving with its high beam lights turned on. *Id.* at 586. After the officer determined that the driver was intoxicated, he arrested the driver and called for a tow truck to have the car impounded. *Id.* When the officer impounded the car, he left the passenger stranded in a high-crime area. *Id.* The passenger walked towards her home until she accepted a ride from an unknown man. *Id.* After the

passenger got into the car, the driver took her to a secluded area and raped her. *Id.* In that case, the Ninth Circuit found that the officer assumed a duty to afford the passenger some measure of safety because the officer arrested the driver, impounded his car, and stranded the passenger on the side of a road in a high crime area at 2:30 a.m. *Id.* at 590. This Court notes that the Ninth Circuit did not analyze that case under *DeShaney*. Rather, the *Wood* Court stated "[t]he relevant inquiry is whether the deprivation is sufficiently serious that the constitutional line has been crossed so as to constitute a deprivation of substantive due process." *Id.* at 589. Applying *DeShaney*, because the officer did not take the passenger into custody, he did not assume a duty to protect the passenger by restraining her freedom to act on her own behalf; rather, he assumed a duty to protect her once he knowingly stranded her in the middle of a high crime area at 2:30 a.m.

In this case, the Complaint alleges that Miller and Heard placed Eilman in a position of heightened risk when they released her from the Second District Station into an area known for violent crime. As in *Monfils*, Heard had actual knowledge of Eilman's situation based on observations of her behavior while in custody. She listened to Eilman yelling for an extended period of time to no one in particular that she wanted to eat, that she wanted to make a phone call, that her heart hurt and that she could not breathe. When she saw Eilman acting confused in the parking lot of the Second District Station and exhibiting bizarre behavior by making the Sign of the Cross towards a detective, Heard pointed Eilman towards 51st Street. Despite her knowledge of Eilman's situation, Heard directed Eilman towards a high-crime area. As in *Wood*, that action created a danger to Eilman and a corresponding duty for Heard to protect Eilman. Based on those allegations, Paine has stated a claim under *DeShaney*'s second exception against Heard in Count XXXIV. In contrast, the Complaint does not allege that Miler had actual knowledge of Eilman's bipolar disorder

or that she had personally observed Eilman's erratic behavior. While Miller signed the paperwork for Eilman's personal recognizance bond and escorted Eilman out of the Second District Station, Miller did not have knowledge of Eilman's situation, and she did not direct Eilman towards 51st Street when Eilman acted confused in the parking lot. Therefore, Miller did not assume a duty to protect Eilman. Because Count XXXI fails to state a claim under *DeShaney*'s second exception against Miller, Count XXXI is dismissed with prejudice.

### iii. City of Chicago

Count XXXVI of the Complaint purports to assert a "*DeShaney*" action against the City of Chicago. As previously mentioned, *DeShaney* did not create a cause of action for constitutional violations; rather, *DeShaney* defined when a state has an affirmative constitutional obligation to act under the Due Process Clause of the Fourteenth Amendment. *See DeShaney*, 489 U.S. at 199-201. Therefore, the Court construes a "*DeShaney*" action as a § 1983 action that seeks redress for due process violations under one or both of the *DeShaney* exceptions to the general rule that "a state's failure to protect an individual against private violence simply does not constitute a violation of the Due Process Clause." *Id.* at 197; *see also Collignon*, 163 F.3d at 986 (bringing § 1983 action seeking redress for state due process violations under both *DeShaney* exceptions). Therefore, the Court construes Count XXXVI as a § 1983 action against the City of Chicago for redress of due process violations against Eilman for failing to provide her with medical care and for releasing her from custody in a dangerous neighborhood.

"Municipalities and other local government units cannot be liable under § 1983 on a respondeat superior theory, but can be liable if action pursuant to an official policy or custom of the municipality or government unit causes a constitutional tort." *Gossmeyer v. McDonald*, 128 F.3d

481, 494 (7th Cir. 1997). Count XXXVI does not allege that an official policy or custom of the City of Chicago caused a constitutional tort against Eilman. The actions of various Chicago police officers provide the only stated basis for liability in that claim. Accordingly, Count XXXVI merely seeks to impose vicarious liability on the City of Chicago for the actions of its police officers, who failed to provide Eilman with medical treatment and released her from custody outside of the Second District Station. Because § 1983 does not impose respondeat superior liability on municipalities, Paine has failed to state a claim against the City of Chicago in Count XXXVI. The Court dismisses Count XXXVI of the Complaint with prejudice.

### e. Qualified Immunity

#### i. Fourteenth Amendment Violations for Failure to Provide Treatment

Having determined that Counts II, VI, X, XV, XVIII, XX, XXII, XXIV, XXVI, XXVIII, and XXXIII state constitutional violations against Cason, Moreno, Earnest, Berglind, Stokes, Williams, Hudson, Quinn, Mabery, Smith and Heard, respectively, the Court now turns to the issue of qualified immunity for those individuals. "The defense of qualified immunity shields government officials performing discretionary functions 'from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights.'" *Eversole v. Steele*, 59 F.3d 710, 717 (7th Cir. 1995) (*quoting Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)). "Once a defendant has pleaded qualified immunity, the plaintiff has the burden to demonstrate the existence of the clearly established constitutional right." *Abel v. Miller*, 824 F.2d 1522, 1534 (7th Cir. 1987). "The contours of the right must be sufficiently clear that a reasonable official would understand what he is doing violates that right." *Anderson v. Creighton*, 483 U.S. 635, 640 (1987). Because the Counts at issue state claims against the officers for unreasonably failing to provide Eilman with medical or

mental treatment under the Fourth Amendment, as incorporated against the states through the Fourteenth Amendment's Due Process Clause, this Court must determine whether access to medical care was a clearly established right for pre-trial detainees in May 2006.

When the Supreme Court decided *DeShaney* in 1989, it reasoned, "when the state by the affirmative exercise of its power so restrains an individual's liberty that it renders him unable to care for himself, and at the same time fails to provide for his basic human needs–*e.g.*, food, clothing, shelter, *medical care*, and reasonable safety–it transgresses the substantive limits on state action set by . . . the Due Process Clause." *DeShaney*, 489 U.S. at 1005 (emphasis added). The Seventh Circuit also noted in 1998 that substantive due process requires the state to provide for the basic medical needs of pretrial detainees. *Collingnon*, 163 F.3d at 991. Furthermore, "[i]n the context of a chronically mentally ill person like [Eilman], that duty is principally one of maintenance rather than cure . . . ." *Id.*

In response, the individual officers argue that Eilman did not have a right to be involuntarily committed to a mental health facility. *See Wilson v. Formigoni*, 42 F.3d 1060, 1066 (7th Cir. 1994) ("[T]here is no constitutional right to be deprived of liberty . . . ."); *Archie v. City of Racine*, 847 F.2d 1211, 1221 (7th Cir. 1988) (*en banc*) ("[T]he Due Process Clause does not require the state to imprison [insane persons] or protect its citizens from them."). While that is a correct statement of the law, it ignores that the police had already taken Eilman into custody. *See Collingnon*, 163 F.3d at 987 ("When a state actor . . . deprives a person of his ability to care for himself by . . . detaining him . . ., it assumes an obligation to provide some minimum level of well-being and safety."). Therefore, in *Collingnon*, while the state detained Jonathan Collingnon, a person with mental illness, it had an obligation to provide the detainee with constitutionally adequate mental treatment. *Id.* at

25

991. However, once the detention ended, Collingnon no longer had a right to receive treatment from the state or a right to receive an involuntary commitment to a mental health facility. *Id.* at 991-92. Therefore, Eilman had a clearly established due process right to receive basic medical treatment while in custody, including mental health treatment. *Id.* at 991. The Complaint alleges that she received no such treatment despite exhibiting the symptoms of a serious psychiatric episode. Furthermore, she complained of difficulty breathing, chest pain and heart murmurs, but received no treatment. Taking the allegations in the Complaint as true, the individual officers are not entitled to dismissal of Counts II, VI, X, XV, XVIII, XX, XXII, XXIV, XXVI, XXVIII, and XXXIII on the basis of qualified immunity.

### ii. Fourteenth Amendment Violation for Failure to Act After Creating Risk

Having determined that Count XXXIV states a constitutional violation against Heard, the Court must determine whether the defense of qualified immunity shields Heard from the claim. When the state affirmatively places an individual in a position of danger the individual would not have otherwise faced, the state assumes a duty to protect the individual. *See Stevens I*, 105 F.3d at 1174; *see also Monfils*, 165 F.3d at 518; *Reed*, 986 F.2d at 1125. Even before the Supreme Court decided *DeShaney*, the Seventh Circuit recognized that the police violate constitutional rights when they create a dangerous situation for an individual and subsequently fail to protect the individual from harm. *See White v. Rochford*, 592 F.2d 381 (7th Cir. 1979) (finding allegations stated a claim for constitutional violations when police arrested a man for drag racing and left his passengers, young children, stranded on the side of the Chicago Skyway on a cold evening). Additionally, when the police release an individual from custody, then cannot do so in a manner that creates an increased danger for the detainee. *See McLin*, 742 F.Supp at 994-97 (finding potential for

constitutional violation when police officers ordered two Black adolescents into their squad car and subsequently released them into an area where the officers knew that white youths would attack Blacks who entered the neighborhood). Therefore, clearly established law indicated that Heard could not release Eilman from custody in a manner that increased her risk of harm. The Complaint alleges that Heard released Eilman in a manner that increased her risk of harm. Taking the allegations in the Complaint as true, Heard is not entitled to qualified immunity on Count XXXI.

### f. Causation

Finally, the individual officers argue that their actions could not have been the proximate cause of Eilman's injuries. "[M]any factors or things or the conduct of two or more persons may operate at the same time, either independently or together, to cause injury or damage. In such a case each may be a proximate cause." *Beard v. Mitchell*, 604 F.2d 485, 497 (1979). Substantive due process protects detainees not only from a state's failure to treat a current health problem, but also from a state's failure to treat conditions that could create a risk of serious damage to the detainee's future health. *See Henderson v. Sheahan*, 196 F.3d 839, 846-47 (*citing Helling v. McKinney*, 509 U.S. 25, 33-35 (1993)). Taking the allegations in the Complaint as true, Paine has sufficiently pled that any constitutional deprivations that she experienced as a pretrial detainee proximately caused her injuries because the Complaint alleges that the lack of medical or mental treatment provided caused Eilman's injuries. Accordingly, the motions to dismiss Counts II, VI, X, XV, XVIII, XX, XXII, XXIV, XXVI, XXVIII, and XXXIII are denied.

## II. Monell Claim Against the City of Chicago for Violation of Eilman's Constitutional Rights

In Count XXXVIII, the Complaint alleges a *Monell* claim against the City of Chicago under § 1983. As previously mentioned, respondeat superior does not provide a basis for municipal liability under § 1983. *See Gossmeyer*, 128 F.3d at 494. "[M]unicipal liability exists only 'when execution of a government's policy or custom, whether made by its lawmakers or by those whose edicts or acts may fairly be said to represent official policy, inflicts the injury." *Calhoun v. Ramsey*, 408 F.3d 375, 379 (7th Cir. 2005) (*quoting Monell v. N.Y. City Dep't of Social Servs.*, 436 U.S. 658, 694 (1978)). Municipalities may violate § 1983 in three different ways: 1) through an express policy that, when enforced, causes a constitutional deprivation; 2) through a "wide-spread practice" that although not authorized by written law and express policy, is so permanent and well-settled as to constitute a "custom or usage" with the force of law; or 3) through an allegation that the constitutional injury was caused by a person with "final decision policymaking authority." *McTigue v. City of Chicago*, 60 F.3d 381, 382 (7th Cir. 1995).

The Complaint attributes any constitutional deprivation that Eilman received to the policies, practices and customs of the City of Chicago and its police department. Specifically, Paine alleges that the City of Chicago has a policy that results in police officers inadequately trained in identifying and responding to pretrial detainees exhibiting signs of mental illness. "[A] municipality may be directly liable for constitutional violations by its officers when the municipality evinces a deliberate indifference to the rights of the plaintiff by failing to train adequately its offers to prevent the violation . . . ." *Jenkins v. Bartlett*, 487 F.3d 482, 492 (7th Cir. 2007). Furthermore, the Complaint has alleged that a custom exists within the Chicago Police Department to ignore its own department policy in assessing and handling mentally ill persons. Because Count XXXVIII seeks to impose liability on the City of Chicago for its policies and customs that resulted in violation of Eilman's

constitutional rights, Count XXXVIII states a valid claim for relief under § 1983 and *Monell*. Accordingly, with respect to Count XXXVII, the City of Chicago's motion to dismiss is denied.

### III. Americans with Disabilities Act Claim Against the City of Chicago for Discrimination

In Count XXXIX, the Complaint alleges unlawful discrimination against the City of Chicago under Title II of the Americans with Disabilities Act ("ADA"), 42 U.S.C. § 12131 *et seq.* Title II of the ADA provides that "no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs or activities of a public entity, or be subjected to discrimination by any such entity." 42 U.S.C. § 12132. The term "public entity" includes local governments, such as the City of Chicago, and its departments, such as the Chicago Police Department. *See* 42 U.S.C. § 12131(1)(A)-(B).

To state a claim under the ADA, a plaintiff must first allege a disability. *See Duncan v. State of Wisc. Dept. of Health and Family Servs.*, 166 F.3d 930, 935 (7th Cir. 1999) (noting that "[t]he first hurdle a plaintiff must pass . . . is the requirement that the plaintiff must be 'disabled.'"). In relevant part, the ADA defines a disability as either "a physical or mental impairment that substantially limits one or more of the major life activities" of the individual or "a record of such impairment." 42 U.S.C. § 12102(2)(A)-(B). "Not every medical affliction amounts to, or gives rise to, a substantial limitation on a major life activity." *Cassimy v. Bd. of Educ. of Rockford Public Schs., Dist. No. 205*, 461 F.3d 932, 936 (7th Cir. 2006). A impairment substantially limits a major life activity when a person "is either unable to perform a major life activity or is significantly restricted as to the condition, manner or duration under which the individual can perform the major life activity as compared to the average person in the general population." *Furnish v. SVI Sys., Inc.*, 270 F.3d 445, 450 (7th Cir. 2001) (citations omitted). In assessing whether an impairment is

substantially limiting, courts consider the nature and severity of the impairment, its duration or expected duration, and its permanent or long term impact or its expected impact. *See* 29 C.F.R. § 1630.2(j)(2).

In her Complaint, Paine alleges that Eilman suffers from a mental impairment, bipolar disorder. (Compl. ¶ 8.) The ADA recognizes bipolar disorder as a mental disability. *See Bultemeyer v. Fort Wayne Cmty. Schs.*, 100 F.3d 1281, 1284 (7th Cir. 1996). The Complaint also alleges that Eilman has a record of impairment, due to her previous institutionalization for bipolar disorder. (Compl. ¶ 8.) However, the Complaint does not allege that Eilman's bipolar disorder substantially limits one or more of her major life activities; rather, it alleges that her mental condition "has at times impacted [Eilman's] major life activities." (*Id.*) That statement does not allege the nature and severity of her condition, its duration or expected duration, or its permanent or long term impact or its expected impact on her ability to conduct her major life activities. While the Complaint does allege the problems that Eilman encountered over the course of three days in May 2006 on account of her bipolar disorder, the Complaint makes no further allegation of whether her bipolar disorder prevents her from performing a major life activity or restricts the condition, manner, or duration under which she can perform a major life activity as compared to the average person in the general population.

In her brief, Paine notes that the Seventh Circuit permitted a plaintiff with bipolar disorder to survive a motion to dismiss in *Duda v. Bd. of Educ. of Franklin Park Public Sch. Dist. No. 84*, 133 F.3d 1054 (7th Cir. 1998). However, in *Duda*, the plaintiff properly alleged a "disability" in his Complaint when he plead that he had a medically diagnosed mental condition that caused his employer to regard him as substantially limited in major life activities. *Id.* at 1059. In that case, the

plaintiff properly alleged both parts of a "disability" under the ADA: an impairment that substantially limits one or more major life activities. Here, Paine has only alleged that Eilman's mental condition has "impacted" her major life activities. That assertion alone does not "at least plausibly suggest that the plaintiff is entitled to relief." *Twombly*, 127 S. Ct. at 1974. Without alleging that her bipolar disorder substantially limits one or more of her major life activities, or that she has a record of bipolar disorder that substantially limited one or more of her major life activities in the past, Paine has failed to properly allege that Eilman has a "disability" under the ADA. Accordingly, she has failed to state a claim under the ADA. As a result, this Court dismisses Count XXXIX without prejudice and Paine may replead an ADA claim within fourteen days.

## IV. State Law Claims for Willful and Wanton Conduct

In Counts I, V, IX, XIV, XVII, XIX, XXI, XXIII, XXV, XXVII, XXIX, XXXII, XXXV and XL, the Complaint alleges Illinois state law claims for willful and wanton conduct against Johnson, Cason, Moreno, Earnest, Berglind, Stokes, Williams, Hudson, Quinn, Mabery, Smith, Miller, Heard and the City of Chicago, respectively.

Under Illinois law, to state a cause of action for willful and wanton conduct, "the plaintiff must allege the existence of a duty owed by the defendant to the plaintiff, a breach of that duty, and an injury proximately caused by the breach." *Kirwan v. Lincolnshire-Riverwoods Fire Protection Dist.*, 811 N.E.2d 1259, 1263 (Ill. App. 2004). Additionally, the plaintiff must allege "either a deliberate intention to harm or an utter indifference to or conscious disregard for the welfare of the plaintiff." *Id.* (*quoting Adkins v. Sarah Bush Lincoln Health Center*, 544 N.E.2d 733, 733 (Ill. 1989)). However, through the Local Governmental and Governmental Employees Tort Immunity Act ("Tort Immunity Act"), the Illinois Legislature has immunized municipalities and municipal

employees against liability arising from willful and wanton conduct in various situations. *See* 745 ILCS 10/1-101 *et seq.* Governmental entities bear the burden of establishing immunity under the Tort Immunity Act. *Van Meter v. Darien Park Dist.*, 799 N.E.2d 273, 280 (Ill. 2003). In relevant part, the Tort Immunity Act states:

> Neither a local public entity nor a public employee acting within the scope of his employment is liable for injury caused by the failure to make a physical or mental examination, or to make an adequate physical or mental examination of any person for the purpose of determining whether such person has a disease or physical or mental condition that would constitute a hazard to the health or safety of himself or others.

745 ILCS 10/6-105. Furthermore, the Tort Immunity Act provides:

> Neither a local public entity nor a public employee acting within the scope of his employment is liable for injury resulting from diagnosing or failing to diagnose that a person is afflicted with mental or physical illness or addiction or from failing to prescribe for mental or physical illness or addiction.

745 ILCS 10/6-106(a). Additionally, under the Tort Immunity Act, "[n]either a local public entity nor a public employee is liable for an injury caused by the failure to make an arrest or by releasing a person in custody." 745 ILCS 10/4-107. Those provisions offer local governments and governmental employees immunity from tort claims that arise from willful and wanton conduct. *See Moore v. Green*, 848 N.E.2d 1015, 1020 (Ill. 2006) (noting that § 4-107 of the Tort Immunity Act "offer[s] absolute immunity"); *Grandalski ex rel. Grandalski v. Lyons Twp. High Sch. Dist. 204*, 711 N.E.2d 372, 381 (Ill. 1999) (noting that "the immunity provided by [§ 6-105 of the Tort Immunity Act] contains no exception for willful and wanton misconduct").

Under Illinois law, the Tort Immunity Act provides immunity from a claim for willful and wanton conduct to governmental employees that did not evaluate, assess or transport an individual requiring immediate medical treatment. *See Abruzzo v. City of Park Ridge*, — N.E. 2d —, No.

104935, 2008 WL 4427089, at *4 (Ill. Oct. 2, 2008).  In *Abruzzo*, the plaintiff alleged that when she

called 911 to report that her non-responsive fifteen year old son required CPR, Park Ridge EMTs,

paramedics and firefighters responded to the call.  *Abruzzo*, 2008 WL 4427089, at *1.  However, she

alleged that once emergency responders arrived on the scene, they left without evaluating or giving

necessary treatment to her unresponsive son, who died that night.  *Id.*  In her Complaint, the plaintiff

alleged that the emergency responders acted with willful and wanton disregard for her son's health

and safety by responding to her call and subsequently failing to evaluate him, assess his condition,

or transport him to a hospital.  *Id.*  The Illinois Supreme Court found that the plaintiff's allegations

fell within the "plain language" of §§ 6-105 and 6-106(a) of the Tort Immunity Act.  *Id.* at *4 ("On

its face, the plain language of these statutory provisions applies to plaintiff's complaint . . . .

Plaintiff alleges that the City failed to evaluate or assess [her son] or otherwise provide any

assistance.  Plaintiff's allegations, therefore, fall within the City's immunity for failing to examine

[him].").[3]  Therefore, the Tort Immunity Act immunizes municipal employees against claims for

willful and wanton conduct that derive from the employee's failure to evaluate, assess or transport

an individual requiring immediate medical treatment.  In this case, the Complaint alleges that

individual police officers acted with willful and wanton disregard of Eilman's mental health when

they failed to properly assess Eilman's mental state, failed to transport her to a mental health facility,

failed to recommend transporting her to a mental health facility, and released her from custody while

---

[3] While the *Abruzzo* Court found the plain language of the Tort Immunity Act applied to the plaintiff's allegations, it found that the narrower immunity provision of the EMS Act also applied to the allegations in that case.  *Abruzzo*, 2008 WL 4427089, at *11.  Ultimately, the Court concluded that when the EMS Act and the Tort Immunity Act both apply to the facts of a case, the immunity provision in the EMS act controls.  *Id.* at *13.  The parties in this case have made no argument that the EMS Act applies.

she experienced a psychiatric episode.[4]  Paine's allegations mirror the allegations in *Abruzzo* because she claims that the police officers failed to properly evaluate or assess Eilman's mental condition, and that officers otherwise failed to provide any assistance to her when they did not transfer her to a mental health facility.  As in *Abruzzo*, all of those allegations fall within the plain language of §§ 6-105 and 6-106(a) of the Tort Immunity Act.  Moreover, the Tort Immunity Act precludes Paine's claim against the City of Chicago for willful and wanton conduct because that claim derives from the failures of the individual officers to evaluate or assess Eilman's mental condition, or otherwise provide her with assistance.  Accordingly, with respect to her Illinois claims for willful and wanton conduct, Paine has failed to state a claim upon which this Court can grant relief.  Therefore, this Court dismisses Counts I, V, IX, XIV, XVII, XIX, XXI, XXIII, XXV, XXVII, XXIX, XXXII, XXXV and XL with prejudice.

## CONCLUSION AND ORDER

For the reasons stated, with respect to Counts II, VI, X, XV, XVIII, XX, XXII, XXIV, XXVI, XXVIII, XXXIII (claims against individual officers for failure to provide medical care), XXXIV (claim against individual officer for placing Eilman in position of danger) and XXXVIII (*Monell* claim against the City of Chicago), the motions to dismiss are denied.  With respect to all other Counts, the motions to dismiss are granted.  However, Paine may replead Count XXXIX, the ADA claim, within fourteen days.

So ordered.

_____

---

[4]  Paine concedes that § 4-107 of the Tort Immunity Act provides Smith, Miller and Heard with absolute immunity for releasing Eilman from police custody.  Accordingly, Paine has voluntarily withdrawn Counts XXIX, XXXII and XXXV to the extent that they allege willful and wanton misconduct claims against those officers for releasing Eilman from custody.

Virginia M. Kendall,  United States District Judge
Northern District of Illinois

Date:  11/7/2008