UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

KATHLEEN PAINE, as Guardian of the )
Estate of CHRISTINA ROSE EILMAN, )
a Disabled Person, )
 )
      Plaintiff, )  06 C 3173
   v. )
 )  Judge Kendall
CITY OF CHICAGO, a municipal corporation, )
et al., )  Magistrate Judge Valdez
 )
      Defendants. )

**DEFENDANT CITY OF CHICAGO'S MEMORANDUM OF LAW IN SUPPORT
OF ITS MOTION FOR SUMMARY JUDGMENT AS TO COUNT XXXIX**

## TABLE OF CONTENTS

TABLE OF AUTHORITIES . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . ii

STATEMENT OF FACTS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

STANDARD FOR SUMMARY JUDGMENT . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

ARGUMENT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

I.     The City is entitled to summary judgment because prior to May 7, 2006, Eilman
       through her own fault failed to take steps to control her bipolar disorder, and
       her failure to do so is a bar to recovery under the ADA. . . . . . . . . . . . . . 3

II.    The City is entitled to summary judgment because there is no genuine issue as to
       any fact material to the elements that plaintiff must prove to prevail on her Title
       II ADA claim against the City. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

       A.     Eilman is not a qualified individual with a disability. . . . . . . . . . . . . 6

              (1)    Eilman's impairment did not substantially limit her ability to
                     care for her own health, safety, and well-being. . . . . . . . . . . 8

              (2)    Eilman's impairment did not substantially limit her ability to
                     communicate and interact with others, or safely travel freely and
                     independently. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

              (3)    Eilman's impairment did not substantially limit her ability to
                     attend college classes. . . . . . . . . . . . . . . . . . . . . . . . . . . 11

       B.     Eilman was not subjected to discrimination by the City or the CPD. . 15

       C.     Eilman was not subject to discrimination by the City and therefore her
              allegation that any discrimination she suffered was by reason of her
              disability is moot. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

CONCLUSION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

## TABLE OF AUTHORITIES

SUPREME COURT CASES

*Albertson's Inc. v. Kirkingburg*, 527 U.S. 563 (1999) . . . . . . . . . . . . . . . . . . . . . . . . 8

*Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242 (1986) . . . . . . . . . . . . . . . . . . . . . . 2, 3

*Celotex Corp. v. Catrett*, 477 U.S. 317 (1986) . . . . . . . . . . . . . . . . . . . . . . 2

*Toyota Motor Manufacturing, Kentucky, Inc. v. Williams*, 534 U.S. 184 (2002) . . . . . . 6-9

OTHER CASES

*Branham v. Snow*, 392 F.3d 896 (7th Cir. 2004) . . . . . . . . . . . . . . . . . . . . . . 14

*Bryant v. Madigan*, 84 F.3d 246 (7th Cir. 1996) . . . . . . . . . . . . . . . . . . . . . . 16, 17

*Cassimy v. Bd. of Educ. of Rockford Public Schs., Dist. No. 205*, 461 F.3d 932 (7th Cir. 2006) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

*Champlain v. Wonewoc-Center Sch. Dist.*, 72 Fed. Appx. 445 (7th Cir. 2003) . . . . . . . . . 9

*Davidson v. Midelfort Clinic, Ltd.*, 133 F.3d 499 (7th Cir. 1998) . . . . . . . . . . . . . . . . . . . 7

*Duda v. Bd. of Educ.*, 133 F.3d 1054 (7th Cir. 1998) . . . . . . . . . . . . . . . . . . . . . . 7

*Gorman v. Bartch*, 152 F.3d 907 (8th Cir. 1998) . . . . . . . . . . . . . . . . . . . . . . 15

*Grzan v. Charter Hospital of Northwest Indiana*, 104 F.3d 116 (7th Cir. 1997) . . . . . . 17, 18

*Harris v. Proviso Area for Exceptional Children*, 581 F.Supp.2d 942 (N.D.Ill. 2008) . . . . 9

*Homeyer v. Stanley Tulchin Assocs., Inc.*, 91 F.3d 959 (7th Cir. 1996) . . . . . . . . . . . . . . 8

*Krocka v. City of Chicago*, 203 F.3d 507 (7th Cir. 2000) . . . . . . . . . . . . . . . . . . . . . . 7, 14

*Love v. Westville Correctional Center*, 103 F.3d 558 (7th Cir. 1996) . . . . . . . . . . . 1, 6, 19

*Martin v. Discount Smoke Shop, Inc.*, 443 F.Supp.2d 981 (C.D.Ill. 2006) . . . . . . . . . . 12

*Moore v. J.B. Hunt Transport, Inc.*, 221 F.3d 944 (7th Cir. 2000) . . . . . . . . . . . 8, 13, 14

ii

*Nunn v. Illinois State Board of Education*, 448 F.Supp.2d 997 (C.D.Ill. 2006) . . . . . . . . . 4

*Radaszewski ex rel Radaszewski v. Maram*, 383 F.3d 599 (7th Cir. 2004) . . . . . . . . . . . . 6

*Robinson v. Morgan Stanley & Co. Inc.*, 269 Fed.Appx. 603 (7th Cir. 2008) . . . . . . . . . 13

*Roth v. Lutheran General Hospital*, 57 F.3d 1446 (7th Cir. 1995) . . . . . . . . . . . . . . . . 7

*Samuels v. Wilder*, 871 F.2d 1346 (7th Cir. 1989) . . . . . . . . . . . . . . . . . . . . . . . . 2

*Siefken v. Village of Arlington Heights*, 65 F.3d 664 (7th Cir. 1995) . . . . . . . . . . . . 2-4, 17

*Sinkler v. Midwest Prop. Mgmt. Ltd. Pshp.*, 209 F.3d 678 (7th Cir. 2000) . . . . . . . . . . . 9

*Spencer v. Dawson*, 2006 WL 3253574 (N.D.Ill. Nov. 7, 2006) . . . . . . . . . . . . . . . . . 15

*Winsley v. Cook County*, 563 F.3d 598 (7th Cir. 2009) . . . . . . . . . . . . . . . . . . . . . 7

*Wisc. Cmty. Servs., Inc. v. City of Milwaukee*, 465 F.3d 737 (7th Cir. 2006) . . . . . . . . . 15

## STATUTES, RULES, AND REGULATIONS

20 C.F.R. § 1630.2(j) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7, 8

28 C.F.R. § 35.130(b)(7) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

29 C.F.R. § 630.2(i) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

42 U.S.C. § 12102 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

42 U.S.C. § 12102(1)(A) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

42 U.S.C. § 12112(b)(5)(A) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

42 U.S.C. § 12131(1)(A)-(B) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

42 U.S.C. § 12131(2) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

42 U.S.C. § 12132 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6, 15

Fed. R. Civ. P. 56(c) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2, 19

iii

UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| KATHLEEN PAINE, as Guardian of the Estate of CHRISTINA ROSE EILMAN, a Disabled Person, | ) ) ) ) | |
| Plaintiff, | ) | 06 C 3173 |
| v. | ) ) | Judge Kendall |
| CITY OF CHICAGO, a municipal corporation, et al., | ) ) ) | Magistrate Judge Valdez |
| Defendants. | ) ) | |

**DEFENDANT CITY OF CHICAGO'S MEMORANDUM OF LAW IN SUPPORT OF ITS MOTION FOR SUMMARY JUDGMENT AS TO COUNT XXXIX**

On May 7, 2006, Christina Eilman ("Eilman") was arrested by the Chicago police and taken into police custody. Plaintiff Kathleen Paine ("plaintiff" or "Paine") – Eilman's mother – alleges that Eilman had a preexisting bipolar disorder at the time. Eilman was released from police custody the next day. After her release, Eilman was abducted and physically attacked, causing her to suffer serious bodily injuries.

Plaintiff has sued the City of Chicago (the "City") and various employees of the Chicago Police Department ("CPD") for damages allegedly arising from this attack. Among other legal theories, Plaintiff seeks to hold the City liable pursuant to Title II of the Americans with Disabilities Act ("ADA") by alleging unlawful discrimination against Eilman for failure to accommodate her bipolar disorder.

To prevail against the City, plaintiff must establish the following: Eilman (1) is a qualified individual with a disability; (2) she was denied the benefits of the services, programs, or activities of a public entity or otherwise subjected to discrimination by such an entity; and (3) the denial or discrimination was by reason of Eilman's disability.[1] As these elements are stated in the conjunctive, plaintiff must satisfy all three requirements to prevail on her Title II ADA claim.

---

[1] *See Love v. Westville Correctional Center*, 103 F.3d 558, 560 (7th Cir. 1996).

1

Moreover, as a threshold matter, an ADA plaintiff is barred from recovering under this statute if through her own fault she failed to control an otherwise controllable illness.[2]

For reasons explained below, there is no genuine issue as to any fact material to the above-stated requirements necessary for plaintiff to succeed on her Title II ADA claim against the City. Accordingly, pursuant to Fed. R. Civ. P. 56(c), the City is entitled to entry of summary judgment as to Count XXXIX of plaintiff's Third Amended Complaint against it.

### STATEMENT OF FACTS

The statement of facts is set forth in the City's L.R. 56.1(a)(3) Statement of Undisputed Material Facts ("56.1(a)(3) Statement") filed separately.

### STANDARD FOR SUMMARY JUDGMENT

A court should grant summary judgment if "there is no genuine issue of material fact and . . . the moving party is entitled to judgment as a matter of law."[3] The burden is on the moving party to identify portions of the pleadings, depositions, and other discovery-related materials that demonstrate an absence of a genuine issue of material fact.[4] The burden then shifts to the non-moving party to "set forth specific facts showing that there is a genuine issue for trial."[5] The simple assertion that a factual dispute exists is not enough to defeat a Rule 56(c) motion. "Merely alleging a factual dispute cannot defeat the summary judgment motion."[6] To defeat a motion for summary judgment, the non-moving party must set forth specific facts, through affidavits or other materials, that demonstrate disputed material facts.[7] A fact is genuinely in dispute when "the evidence is such that a reasonable jury could return a verdict for the

---

[2]*See Siefken v. Village of Arlington Heights*, 65 F.3d 664, 667 (7th Cir. 1995)

[3]Fed. R. Civ. P. 56(c).

[4]*See id.; Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).

[5]Fed. R. Civ. P. 56(c).

[6]*Samuels v. Wilder*, 871 F.2d 1346, 1349 (7th Cir. 1989).

[7]*See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 256 (1986).

nonmoving party."[8]  In deciding a motion for summary judgment, the court must read the facts in a light most favorable to the non-moving party.[9]

## ARGUMENT

I.  *The City is entitled to summary judgment because prior to May 7, 2006, Eilman through her own fault failed to take steps to control her bipolar disorder, and her failure to do so is a bar to recovery under the ADA.*

The City is entitled to summary judgment on Count XXXIX of plaintiff's Third Amended Complaint because recovery under the ADA is barred by Eilman's failure through her own fault to control her bipolar disorder.  This legal proposition is enunciated in *Siefken v. Village of Arlington Heights*, in which a probationary police officer was discharged by the Village after he experienced a severe diabetic reaction while on duty.  The Village stated that it terminated Siefken because of his failure to monitor his disease; Siefken claimed that he was fired because of his medical condition, in violation of the ADA.  The Seventh Circuit affirmed the district court's dismissal, holding that "when an employee knows that he is afflicted with a disability, needs no accommodation from his employer, and fails to meet 'the employer's legitimate job expectations,' *due to his failure to control a controllable disability,* he cannot state a cause of action under the ADA."[10]

Following *Siefken*, the district court in *Nunn v. Illinois State Board of Education* held that a discharged employee with bipolar disorder had been fired, not because she had bipolar disorder, but because she failed to take steps to control it.  There, the plaintiff, who had filed an ADA lawsuit, had been diagnosed as suffering from bipolar affective disorder after exhibiting symptoms of this illness in the workplace.  The psychiatrist who evaluated her recommended, among other things, that she be allowed to return to work only after receiving treatment and medical clearance.  The plaintiff refused to take time off or get treatment, and subsequently was discharged.  The district court dismissed the plaintiff's ADA discrimination claim, holding that

---

[8]*Id.* at 248.

[9]*Id.* at 255.

[10]*Siefken*, 65 F.3d at 667 (citation omitted) (emphasis added).

she "cannot prevail on her ADA claim because she did nothing to control her bipolar disorder."[11] According to the district court,

> The Seventh Circuit has stated that a *plaintiff cannot recover under the ADA if through plaintiff's own fault plaintiff fails to control an otherwise controllable illness.* The medical evidence shows that Nunn's bipolar disorder was a treatable condition. The ISBE gave Nunn the opportunity to get treatment and to return to work once she was medically able to do so. Nunn refused and the ISBE terminated her. Her decision bars recovery under the ADA.[12]

As with the plaintiffs in *Siefken* and *Nunn*, plaintiff's ADA claim here must fail because Eilman did nothing to control her bipolar disorder. Eilman first was diagnosed with bipolar disorder in February 2005, when she was evaluated and treated by Dr. Fayez Romman at Sierra Vista, a psychiatric hospital, through March 22, 2005.[13] Eilman was given medication, which she tolerated well and from which she experienced no side effects.[14] Her condition significantly improved after taking the medication for one month.[15] Eilman reported doing much better, she denied any suicidal or homicidal ideation, she had no delusions or hallucinations, and she had fair insight and judgment.[16]

On March 22, 2005, Eilman was discharged from Sierra Vista Hospital.[17] As part of her discharge plan, Eilman was instructed to follow up at a partial hospitalization program at Heritage Oaks, where she was urged to have her lithium level checked within three days of her discharge.[18] However, there is no record that Eilman followed up at Heritage Oaks Hospital, or

---

[11]*Nunn v. Illinois State Board of Education*, 448 F.Supp.2d 997, 1001 (C.D.Ill. 2006).

[12]*Id.* at 1001-02 (citing *Siefken v. Village of Arlington Heights*) (emphasis added).

[13]*See* 56.1(a)(3) Statement at ¶¶ 9-11.

[14]*See id.* at ¶ 10.

[15]*See id.*

[16]*See id.*

[17]*See id.* at ¶ 11.

[18]*See id.*

that she had had her lithium level checked.[19] And within four or five days of her discharge from Sierra Vista, Eilman stopped taking her medication,[20] and never took the medication again until after the incident at the Robert Taylor Homes in Chicago on May 8, 2006.[21] In addition, there is no record that Eilman purchased, possessed, or consumed any prescription medication for her mental health from January 1, 2006, to May 7, 2006, or that Eilman received treatment or prescriptions for mental health care from November 18, 2005, to May 7, 2006.[22]

As explained above, failure to treat or control an otherwise treatable or controllable condition through one's own fault bars recovery under the ADA. The purpose of treating Eilman with medication for bipolar disorder is to control her symptoms and to prevent new episodes.[23] One of plaintiff's experts, Dr. Craig Nelson, would recommend that Eilman continue medication to prevent new episodes.[24] It is undisputed that for more than one year prior to her arrest by the Chicago police, Eilman failed to treat or control her bipolar disorder. Thus, Eilman's inaction creates an insuperable threshold bar to plaintiff's recovery on her ADA claim against the City, and the City thereby is entitled to summary judgment on this claim.

II.    *The City is entitled to summary judgment because there is no genuine issue as to any fact material to the elements that plaintiff must prove to prevail on her Title II ADA claim against the City.*

Title II of the ADA provides that "no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs or activities of a public entity, or be subjected to discrimination by any such

---

[19]*See id.* at ¶ 12.

[20]*See id.* at ¶ 13.

[21]*See id.* at ¶ 14.

[22]*See id.*

[23]*See id.* at ¶¶ 15-16.

[24]*See id.* at ¶ 17.

entity."[25] Hence, in order to show a violation of the ADA, plaintiff must establish the following: Eilman (1) is a qualified individual with a disability; (2) she was denied the benefits of the services, programs, or activities of a public entity or otherwise subjected to discrimination by such an entity, and (3) the denial or discrimination was by reason of Eilman's disability.[26] The elements of an ADA Title II claim are linked by the conjunction "and"; therefore, plaintiff must satisfy all three requirements to prevail against the City. However, as explained below, the applicable law and the relevant undisputed facts show that there is no genuine issue of material fact as to any of these requirements. Therefore, the City is entitled to summary judgment.

A.    Eilman is not a qualified individual with a disability.

"The ADA only prohibits discrimination against 'qualified individuals with disabilities,'"[27] and Eilman is not such an individual. "The term 'qualified individual with a disability' means an individual with a disability who . . . meets the essential eligibility requirements for the receipt of services or the participation in programs or activities provided by a public entity."[28] The ADA defines a disability as "(A) a physical or mental impairment that substantially limits one or more major life activities of [an] individual; (B) a record of such an impairment; or C) being regarded as having such an impairment . . . ."[29] *This standard was designed to be demanding.*[30]

---

[25]42 U.S.C. § 12132. The City and the CPD are encompassed by the term "public entity." *See* 42 U.S.C. § 12131(1)(A)-(B).

[26]*See Love,* 103 F.3d at 560 (quotation marks omitted).

[27]*Radaszewski ex rel Radaszewski v. Maram*, 383 F.3d 599, 612 (7th Cir. 2004); *see also* 42 U.S.C. § 12132.

[28]42 U.S.C. § 12131(2).

[29]42 U.S.C. § 12102.

[30]*Toyota Motor Manufacturing, Kentucky, Inc. v. Williams*, 534 U.S. 184, 197 (2002) (emphasis added).

Plaintiff alleges an actual impairment, based on Eilman's bipolar disorder, or, in the alternative, that Eilman has "a record of such impairment."[31] However, "not all impairments are disabilities for purposes of the ADA."[32] Plaintiff must show that Eilman's impairment "*substantially* limits one or more major life activities" of Eilman.[33] "Merely having an impairment does not make one disabled for purposes of the ADA. Claimants also need to demonstrate that the impairment limits a major life activity."[34] An impairment is "substantially limiting" only where the individual, "as compared to the general population, is 'unable to perform a major life activity' or is 'significantly restricted as to the condition, manner or duration under which' he can perform that major life activity."[35] Major life activities include basic functions such as "caring for oneself, performing manual tasks, walking, seeing, hearing, speaking, breathing, learning, and working."[36] These activities are so important to everyday life that almost anyone would consider himself limited in a material way if he could not perform them.[37]

Impairments must be evaluated on an individual basis in order to determine if the limitations they cause are substantial.[38] "Some impairments may be disabling for particular individuals but not for others, depending upon the stage of the disease or disorder, the presence

---

[31]*See* 56.1(a)(3) Statement at ¶ 5.

[32]*Cassimy v. Bd. of Educ. of Rockford Public Schs., Dist. No. 205*, 461 F.3d 932, 936 (7th Cir. 2006).

[33]42 U.S.C. § 12102(1)(A) (emphasis added); *see also Krocka v. City of Chicago*, 203 F.3d 507, 512-13 (7th Cir. 2000) (citation omitted).

[34]*Toyota,* 534 U.S. at 195.

[35]20 C.F.R. § 1630.2(j); *Davidson v. Midelfort Clinic, Ltd.*, 133 F.3d 499, 506 (7th Cir. 1998).

[36]29 C.F.R. § 630.2(i); *Duda v. Bd. of Educ.*, 133 F.3d 1054, 1058 (7th Cir. 1998).

[37]*See Winsley v. Cook County*, 563 F.3d 598, 603 (7th Cir. 2009).

[38]*Id.*; *see also Roth v. Lutheran General Hospital*, 57 F.3d 1446, 1454 (7th Cir. 1995) ("inquiry is an individualized one, and must be determined on a case-by-case basis").

of other impairments that combine to make the impairment disabling or any number of other factors."[39] In *Moore v. J.B. Hunt Transport, Inc.*, the Seventh Circuit rejected the plaintiff's hypothetical arguments and focused instead on his actual experiences, noting that "[g]eneral statements concerning rheumatoid arthritis, and the possibility that Mr. Moore might experience various debilitating aspects of the condition, do not establish that Mr. Moore's arthritis rises to the level of a disability."[40] "It is insufficient for individuals attempting to prove disability status under this test to merely submit evidence of a medical diagnosis of an impairment. Instead, the ADA requires those 'claiming the Act's protection . . . to prove a disability by offering evidence that the extent of the limitation [caused by their impairment] in terms of their own experience . . . is substantial.'"[41]

Plaintiff alleges that Eilman's bipolar disorder, prior to her encounter with the Chicago police, "impacted and substantially limited her ability to care for her own health, safety and well-being, her ability to communicate and interact with others, her ability to safely travel freely and independently and her ability to attend college classes as compared to the average person in the general population."[42] However, there is no evidence in the record to support this allegation. Therefore, there is no triable issue of fact as to whether Eilman is "a qualified individual with a disability," which she must prove to establish her ADA claim.

> (1)     Eilman's impairment did not substantially limit her ability to care for her own health, safety, and well-being.

Nothing in the record relating to Eilman's own individual experience suggests that her impairment substantially limited her ability to care for her own health, safety, and well-being. In

---

[39]*Homeyer v. Stanley Tulchin Assocs., Inc.*, 91 F.3d 959, 962 (7th Cir. 1996) (citing 20 C.F.R.App. § 1630.2(j)).

[40]*See Moore v. J.B. Hunt Transport, Inc.*, 221 F.3d 944, 952 (7th Cir. 2000).

[41]*Toyota*, 534 U.S. at 198. *See also Albertson's Inc. v. Kirkingburg*, 527 U.S. 563, 567 (1999) (holding that monocular vision is not invariably a disability, but must be analyzed on an individual basis, taking into account the individual's ability to compensate for the impairment).

[42]*See* 56.1(a)(3) Statement at ¶ 5.

October or November 2004, Eilman stopped living with her parents, and she was not living with them from March 24, 2005 through May 7, 2006.[43] During this time, Eilman was able to care for herself; perform manual tasks; see, hear, speak, and breathe; sit, stand, lift, and reach; interact with others; and think, learn, and read.[44] – tasks and activities that are "among the types of manual tasks of central importance to people's daily lives."[45] Indeed, plaintiff's own expert witness, Dr. Craig Nelson, testified that the symptoms Eilman displayed would not stand in the way of her ability to work and be productive. According to Dr. Nelson, "a little bit of hypomania, energy, not sleeping at night, we'd all like to have a little bit of that . . . some of these features actually might stand her in very good stead. But there's nothing that would really interfere with her functioning."[46]

> (2)  Eilman's impairment did not substantially limit her ability to communicate and interact with others, or safely travel freely and independently.

Nothing in the record relating to Eilman's own individual experience suggests that her impairment substantially limited her ability to communicate and interact with others, or to safely travel freely and independently.[47] In August 2005, Eilman moved to Los Angeles, where she

---

[43]*Id.* at ¶ 7.

[44]*Id.* at ¶ 20.

[45]*Toyota*, 534 U.S. at 202. *See also Harris v. Proviso Area for Exceptional Children*, 581 F.Supp.2d 942, 954 (N.D.Ill. 2008) (plaintiff's impairments not severe where she could prepare her own meals and "perform most activities central to her daily existence, albeit with occasional assistance when taking a bath").

[46]*See* 56.1(a)(3) Statement at ¶ 32.

[47]Specifically as to "interacting with others," it is an open question whether it is a "major life activity" within the meaning of the ADA. Traveling (or commuting) is not a major life activity. *See Sinkler v. Midwest Prop. Mgmt. Ltd. Pshp.*, 209 F.3d 678, 685 (7th Cir. 2000) (commuting "is either a sub-species of the activity of 'working' or of 'driving'"); *Champlain v. Wonewoc-Center Sch. Dist.*, 72 Fed. Appx. 445, 448 (7th Cir. 2003) ("the inability to drive is relevant only if it limits an independent major life activity").

rented a room from Nigel John.[48] Nigel John testified that Eilman had an outgoing personality and good social skills, which made it easy for her find a roommate.[49] John never noticed any signs of any mental illness in Eilman; he observed that she would go to school in the morning, go home, study, go to work, work out, come home, and sleep.[50]

In Los Angeles, Eilman continued working for 24 Hour Fitness.[51] In December 2005 Eilman began work as a promoter for nightclubs, in addition to her job at 24 Hour Fitness and her enrollment as a full-time student.[52] Eilman went to night clubs and interacted with clubgoers, texted individuals, and handed out flyers and advertised on the internet.[53] In January or February 2006, Eilman started working as an exotic/go-go dancer, in addition to her responsibilities in her other jobs and in school.[54] She worked on her dancing every night, practicing her routines over and over and learning new moves.[55] She worked at strip clubs in Los Angeles and Las Vegas.[56] On March 6, 2006, Eilman began working at Abercrombie and Fitch.[57]

Simply stated, Eilman was very sociable, outgoing, and, indeed, uninhibited in her communications and interactions with others. She met many people, made new friends, went to many social events and parties, and even had Thanksgiving dinner with Gene Simmons, a music

---

[48]*See* 56.1(a)(3) Statement at ¶ 8, 22.

[49]*Id.* at ¶ 23.

[50]*Id.* at ¶ 24.

[51]*Id.* at ¶ 18.

[52]*Id.* at ¶ 27.

[53]*Id.*

[54]*Id.* at ¶ 28.

[55]*Id.* at 34.

[56]*Id.* at ¶ 35-36.

[57]*Id.* at ¶ 29.

and television celebrity.[58]  As Dr. Nelson testified, Eilman's "capacity to relocate and live
independently in Los Angeles, change jobs, . . . have a relationship with a young man, have other
girlfriends that she hung out with, [demonstrates] that she could have a full and productive social
and employment life."[59]

As to her ability to safely travel freely and independently, Eilman experienced no
substantial limitations.  Once having chosen to pursue a career as an exotic dancer, she traveled
to Las Vegas ten to twelve times to work there in strip clubs, renting a car to do so, and would
stay there from one to three nights at a time.[60]  Eilman made a lot more money in Las Vegas
($300 to $500 nightly) than in Los Angeles, so that it was worthwhile for her to travel from Los
Angeles to Las Vegas; for purposes of travel, she could afford gas, rental car fees, and the price
of an airline ticket.[61]  She drove to and from work and school, and could use public
transportation.[62]  Eilman also flew to Chicago after withdrawing from UCLA, where she planned
to dance.[63]  In Chicago, she negotiated transportation to Midway Airport.[64]  In sum, the record
suggests that Eilman was able to travel independently, drive a car, use public transportation, and
fly more than halfway across the country.  She was able to – and did – travel anywhere she
wanted to go.

        (3)     Eilman's impairment did not substantially limit her ability to attend
                college classes.

Eilman's impairment did not substantially limit her ability to attend college classes.
Certainly Eilman's impairment did not affect her basic learning skills.  No evidence suggests that

---

[58]*Id.* at ¶ 30-31.

[59]*Id.* at ¶ 33.

[60]*Id.* at ¶¶ 38-39.

[61]*Id.* at ¶ 40.

[62]*Id.* at ¶ 25.

[63]*Id.* at ¶ 43.

[64]*Id.* at ¶ 44.

her mental processes were slow, or that she was unable to communicate or express herself with others, follow complex directions, reason or problem solve, comprehend language, or learn a wide variety of skills[65] – basic cognitive skills or abilities that constitute severe restrictions in learning.[66] To the contrary, Eilman attended, and succeeded academically at junior college,[67] and she applied to and was accepted at three prestigious colleges and universities.[68] Eilman matriculated at UCLA, where she enrolled in three classes.[69] She finished her first semester at UCLA getting two C- grades, which she explained as the result of working long hours and her own poor time management skills.[70] Eilman voluntarily withdrew from the winter term at UCLA because she "was financially unable to focus on her studies"; at the time, she was working numerous jobs.[71] Eilman also repeatedly learned new dance skills and other skills associated with new jobs.[72] Thus, it is uncontested that Eilman was not substantially limited in the activity of learning, including higher learning.

In sum, there is no evidence of record that Eilman's bipolar disorder, prior to her arrest by the Chicago police on May 7, 2006, substantially limited her ability to care for her own health, safety and well-being, her ability to communicate and interact with others, her ability to safely travel freely and independently, her ability to attend college classes, or in any other way, as she has alleged. Absent any such substantial limitations, Eilman is not a "qualified individual with a disability," as she must be for plaintiff to establish that the City violated the ADA. Accordingly, the City is entitled to summary judgment on plaintiff's Title II ADA claim against it.

---

[65]See, e.g., id. at ¶¶ 18, 22-23, 27-31, 33-37, 39-40.

[66]See Martin v. Discount Smoke Shop, Inc., 443 F.Supp.2d 981, 992 (C.D.Ill. 2006).

[67]See 56.1(a)(3) Statement at ¶ 6.

[68]Id. at ¶ 21.

[69]Id. at ¶ 26.

[70]Id.

[71]Id. at ¶ 42.

[72]See, e.g., id. at ¶¶ 27, 34.

\* \* \* \* \*

In addition, courts have looked to other variables to determine if an impairment is a disability within the meaning of the ADA. For example, intermittent "flare-ups" of a condition do not render that impairment a qualifying disability. In *Moore,* the plaintiff argued that his "flare-ups" caused him "to be completely debilitated while they last and that, therefore, the flare-ups render his condition a disability."[73] The Seventh Circuit rejected this argument, finding that "we do not believe that Mr. Moore's infrequent flare-ups [or rheumatoid arthritis], one or two per year, render his condition a disability."[74] Elaborating further, the Seventh Circuit in *Robinson v. Morgan Stanley & Co., Inc.* held that "[a] permanent condition is not disabling simply because infrequent flare-ups may produce severe symptoms; the question is whether the condition, not the occasional flare-up, is disabling."[75]

As with Moore, Eilman's flare-ups of her bipolar disorder were infrequent. Dr. Craig Nelson, one of plaintiff's experts, opined that her first known manic episode occurred in February of 2005, when she was hospitalized at Sierra Vista Hospital in California.[76] Dr. Nelson also opined that after being discharged from Sierra Vista Hospital in March of 2005, Eilman did not suffer another manic episode until May of 2006, with changes in her behavior beginning in March or April of 2006.[77] Dr. Joel Dvoskin opined that before, during, and after the time Eilman was in police custody, she was in "florid psychosis," experiencing a severe manic episode.[78] Thus, even if her bipolar disorder constituted a permanent disorder, Eilman experienced only two flare-ups of that condition in approximately fifteen months. Accordingly, following *Moore,* the

---

[73]*See Moore v. J.B. Hunt Transport, Inc.*, 221 F.3d at 952.

[74]*Id.*

[75]*Robinson v. Morgan Stanley & Co. Inc.*, 269 Fed.Appx. 603, 607 (7th Cir. 2008) (citing *Moore*, 221 F.3d at 952).

[76]*See* 56.1(a)(3) Statement at ¶ 45.

[77]*Id.* at ¶¶ 46-47, 51.

[78]*Id.* at ¶¶ 52, 54.

infrequency of these flare-ups, regardless of their severity, does not "render [her] condition a disability."

In addition, "if an impaired individual employs measures to mitigate that impairment, such as taking medication or using a prosthetic device, the individual must be evaluated taking into account the ameliorating, or aggravating, effects of the measures on his ability to perform a major life activity."[79] "We are less likely to find an individual disabled if she can easily take medicine to ameliorate the condition."[80] As noted above, Eilman took medication for one month during her hospitalization in February 2005 for bipolar disorder, and for four to five days after she was discharged.[81] The effects for Eilman of taking medication were ameliorating, and no aggravating effects were noted.[82] Her condition significantly improved after taking the medication for one month.[83] Eilman reported doing much better, she denied any suicidal or homicidal ideation, she had no delusions or hallucinations, and she had fair insight and judgment.[84] However, Eilman never followed up with her voluntary discharge plan after she left Sierra Vista Hospital,[85] and within four or five days of her discharge, she stopped taking her medication, and never took the medication again until after the incident at the Robert Taylor Homes in Chicago on May 8, 2006.[86] Therefore, as the *Moore* court advises, this court should be

---

[79]*Krocka*, 203 F.3d at 513.

[80]*Moore*, 221 F.3d at 952. *Compare Branham v. Snow*, 392 F.3d 896, 903-04 (7th Cir. 2004) (finding that plaintiff's diabetes and the treatment regimen he must follow "substantially limit him in the major life activity of eating," due to the many "negative side effects" he suffers "from the use of mitigating measures).

[81]*See* 56.1(a)(3) Statement at ¶¶ 10, 13.

[82]*Id.* at ¶ 10.

[83]*Id.*

[84]*Id.*

[85]*Id.* at ¶¶ 11-12.

[86]*Id.* at ¶¶ 13-14.

disinclined to find Eilman disabled because "she can easily take medicine to ameliorate the condition."

B.  Eilman was not subjected to discrimination by the City or the CPD.

To prevail on her Title II ADA claim against the City, Eilman must prove that she was subjected to discrimination by the City or the CPD.[87] This she cannot do.

For purposes of the ADA, "discrimination" includes "not making reasonable accommodations to the services, programs or activities of a public entity . . . ."[88] Courts generally have recognized that a disability discrimination claim may arise from an arrest due to the failure to reasonably accommodate the person's disability after arresting a person for a crime unrelated to the disability.[89] That is, once an arrestee with a disability is in custody, the police have a duty to reasonably accommodate the arrestee's disability.[90] A plaintiff may establish a violation of Title II of the ADA by showing that the defendant refused to provide a reasonable modification.[91] Here, plaintiff alleges that the City failed to provide Eilman with medical or mental health treatment despite the fact that police officers knew (or should have known) that she was experiencing a psychiatric episode while in police custody.[92]

Plaintiff's claim that Eilman was subject to discrimination, however, fails under *Bryant v. Madigan*.[93] There, a paraplegic inmate sued prison employees under the ADA for allegedly

---

[87]*See* 42 U.S.C. § 12132.

[88]42 U.S.C. § 12112(b)(5)(A); *see also Wisc. Cmty. Servs., Inc. v. City of Milwaukee*, 465 F.3d 737, 753-54 (7th Cir. 2006) (en banc); 28 C.F.R. § 35.130(b)(7) ("A public entity shall make reasonable modifications in policies, practices, or procedures when the modifications are necessary to avoid discrimination on the basis of disability . . . .").

[89]*See Spencer v. Dawson*, 2006 WL 3253574, at *11 (N.D.Ill. Nov. 7, 2006).

[90]*See Gorman v. Bartch*, 152 F.3d 907, 913 (8th Cir. 1998) (noting that the ADA requires local police to treat an arrestee with a disability in "a safe and appropriate manner consistent with his disability").

[91]*See Wisc. Cmty. Servs.*, 465 F.3d at 753.

[92]*See* 56.1(a)(3) Statement at ¶¶ 5.

[93]84 F.3d 246 (7th Cir. 1996).

denying him pain medication. The Seventh Circuit affirmed the district court's granting of summary judgment for the defendants, which held that the ADA was inapplicable to the plaintiff's claim. In so doing, the Court of Appeals held that the ADA "would not be violated by a prison's simply failing to attend to the medical needs of its disabled prisoners."[94] The court reasoned that the plaintiff's ADA claim alleges no discrimination; instead, it constitutes a claim of inadequate medical treatment, for which the ADA provides no redress. According to the Court of Appeals,

> No discrimination is alleged; Bryant was not treated worse because he was disabled. His complaint is that he was not given special accommodation. Unlike the prisoner plaintiffs [in other cases], he is not complaining of being excluded from some prison service, program, or activity, for example an exercise program that his paraplegia would prevent him from taking part in without some modification of the program. He is complaining about incompetent treatment of his paraplegia. *The ADA does not create a remedy for medical malpractice.*[95]

In essence, the court found that the plaintiff's claim in *Bryant*, if recognized by the courts, would foster discrimination against non-disabled individuals, rather than provide a remedy for discrimination against persons with disabilities. The 7th Circuit continued:

> Even apart from the prison setting it would be extremely odd to suppose that disabled persons whose disability is treated negligently have a federal malpractice claim by virtue of the Americans With Disabilities Act, whereas a sick or injured but not disabled person – a person suffering from an acute viral infection, perhaps, or who has broken his leg, or who has a hernia or an inflamed gall bladder – must be content with the remedy that the state law of medical malpractice provides.[96]

As did Bryant, plaintiff here wants to convert the ADA into "a medical malpractice statute for prisoners."[97] Both Bryant and Eilman allege they suffered from disabilities at the time they were in state custody. Each has alleged the denial of medical treatment while in custody. And each has claimed that the defendants' conduct violated the ADA. Thus, *Bryant* is squarely

---

[94]*Bryant v. Madigan*, 84 F.3d 246, 249 (7th Cir. 1996).

[95]*Id.* (emphasis added).

[96]*Id.*

[97]*Id.*

on point with the instant case. Consequently, this court should apply the holding and analysis of
*Bryant* to this case: it should find that the City's failure to provide Eilman with medical or mental
health treatment while she was in the custody of the Chicago police is not discrimination, and
thus plaintiff fails to state a claim under the ADA. "Congress enacted the ADA to 'level the
playing field' for disabled people."[98] *Bryant* teaches that the "playing field" must remain level
for disabled and non-disabled people alike.

Other cases following *Bryant* have addressed its holding that the ADA is not violated by a
failure to provide medical care. For example, in *Grzan v. Charter Hospital of Northwest
Indiana*, the Seventh Circuit applied *Bryant* in holding that dismissal of the plaintiff's claim
under the Rehabilitation Act for failure to state a cause of action was appropriate. There, a
former psychiatric inmate at a hospital sued the hospital and a counselor under the Rehabilitation
Act of 1973 based on the counselor's alleged sexual relationship with her.[99] Grzan alleged that
the hospital discriminated against her based on her disability, claiming that the sexual
relationship was discriminatory because it interfered with the treatment for her disability.

> Grzan does not allege she was barred access or denied treatment by Charter
> Hospital. Instead she alleges she received poor treatment, defective treatment, and
> thereby different and unequal treatment from the hospital by the actions of a
> counselor who, because she suffered from diagnosed depression, personality
> disorder, and posttraumatic stress disorder, was able to entice her into entering
> into a sexual relationship to the detriment of her psychiatric recovery.[100]

Grzan alleged only mistreatment by her counselor, not an institutional treatment decision.
"Grzan complains that she received treatment different from that received by other handicapped
persons accepted into Charter's treatment program not because of any institutional policy but
because of the aberrant conduct of one of Charter's counselors. In essence, Grzan alleges
malpractice."[101] The court held that Grzan's complaint fails because section 504 "does not

---

[98]*Siefken*, 63 F.3d at 666.

[99]The Rehabilitation Act is materially identical to the ADA. [CITE]

[100]*Grzan v. Charter Hospital of Northwest Indiana*, 104 F.3d 116, 120 (7th Cir. 1997).

[101]*Id.* at 123.

provide a federal malpractice tort remedy."[102]  It reasoned that section 504 is materially identical to the ADA, and the 7th Circuit in *Bryant* held that the ADA did not provide a remedy for medical malpractice.[103]  The Court of Appeals stated that "as we noted in *Bryant*, we do not believe that [the ADA] created a federal medical malpractice action . . . that is totally lacking for non-disabled psychiatric patients."[104]

In sum, *Bryant* and its progeny are dispositive of plaintiff's ADA claim against the City. To prevail on her Title II ADA claim, Eilman must prove that she was subjected to discrimination by the City or the CPD.  Plaintiff has alleged that Eilman suffered discrimination in the form of the failure of the City to provide Eilman with medical or mental health treatment because of her disability.  *Bryant* holds that the failure to provide medical care to disabled persons that is not available to non-disabled persons – precisely the situation in this case –does not constitute discrimination, and hence is not actionable under the ADA.  Accordingly, under *Bryant*, the City is entitled to summary judgment on this claim against it, and Count XXXIX should be dismissed.

---

[102]*Id.*

[103]*Id.*

[104]*Id.* at 123 n.7.

C.    Eilman was not subject to discrimination by the City and therefore her allegation that any discrimination she suffered was by reason of her disability is moot.

In order for plaintiff to prevail against the City, she must establish that any discrimination Eilman suffered was by reason of Eilman's disability.[105] As explained above, however, Eilman was not subject to discrimination by the City. Thus, this court need not reach the third requirement that plaintiff must satisfy in order to prove her ADA claim. This requirement is moot. Accordingly, the City is entitled to summary judgment on Count XXXIX against it.

## CONCLUSION

For the reasons explained above, there is no genuine issue as to any fact material to the requirements necessary for plaintiff to succeed on her Title II ADA claim against the City. Accordingly, pursuant to Fed. R. Civ. P. 56(c), this court should enter summary judgment on the City's behalf as to Count XXXIX of plaintiff's Third Amended Complaint against it.

Respectfully submitted,

MARA S. GEORGES
Corporation Counsel of the City of Chicago

BY:    /s/ JORDAN MARSH
Special Litigation Counsel
Attorney for Defendant City of Chicago

30 North LaSalle Street - Suite 1720
Chicago, Illinois 60602
(312) 744-8362
Atty. No. 6216489

---

[105]*See Love,* 103 F.3d at 560.

19