**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

GMR

**FILED**

**OCTOBER 23, 2009**
MICHAEL W. DOBBINS
CLERK, U.S. DISTRICT COURT

|  |  |  |
|---|---|---|
| KATHLEEN PAINE, as Guardian of the Estate of CHRISTINA ROSE EILMAN, a Disabled Person, | ) ) ) ) | |
| Plaintiff, | ) ) | |
| v. | ) ) | No. 06 C 3173 |
| OFFICER JEFFREY JOHNSON, OFFICER, RICHARD CASON, OFFICER ROSENDO MORENO, LIEUTENANT CARSON EARNEST, SERGEANT DAVID BERGLIND, DETENTION AIDE SHARON STOKES, OFFICER TERESA WILLIAMS, DETENTION AIDE CYNTHIA HUDSON, DETENTION AIDE CATONIA QUINN, OFFICER DEBORAH MABERY, OFFICER PAMELA SMITH, OFFICER BENITA MILLER, OFFICER PAULINE HEARD, and CITY OF CHICAGO, a municipal corporation, | ) ) ) ) ) ) ) ) ) ) ) ) ) ) | Judge Virginia Kendall<br><br>Magistrate Judge Maria Valdez |
| Defendants. | ) | |

**AMENDED MEMORANDUM IN SUPPORT OF**
**DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**

Defendants Richard Cason, Rosendo Moreno, Carson Earnest, David Berglind, Sharon Stokes, Teresa Williams, Cynthia Hudson, Catonia Quinn, Deborah Mabery, Pamela Smith, Pauline Heard and the City of Chicago respectfully submit this Amended Memorandum in Support of Defendants' Motion for Summary Judgment.



DEFENDANT'S EXHIBIT A

i

## TABLE OF CONTENTS

TABLE OF CONTENTS....................................................................................................ii
TABLE OF AUTHORITIES ...........................................................................................iv
SUMMARY OF FACTS ...................................................................................................2
STANDARD OF REVIEW ................................................................................................3
ARGUMENT.......................................................................................................................4

I.  Defendants' denial of medical care to Eilman was objectively reasonable,
    so that Eilman's lack of medical treatment was not a constitutional violation..........................4

    A.  Eilman did not present with a serious medical need while in custody. ............................5
        1.  Eilman did not have a serious  psychiatric condition while in custody. ......................5
        2.  Eilman did not have a serious physical condition while in custody. ...........................9

    B.  The Scope of the Desired Treatment for Eilman Was Burdensome and Unnecessary......11

    C.  Defendants did not receive notice of a serious medical need. ...........................................14
        1.  Defendants Stokes, Williams, Hudson, Quinn, Mabery and Heard did not receive
            notice of a serious physical condition requiring medical attention.............................15
            a.  There is no competent evidence that Eilman requested medical attention. ...........15
            b.  There is no evidence that the purported requests for help were heard by Stokes,
                Williams, Hudson, Quinn, Mabery, or Heard, or that Eilman was in custody when
                the requests were made. ......................................................................................16
            c.  Eilman's alleged complaints were insufficient to put defendants on notice of a
                serious medical need. ..........................................................................................17
        2.  Smith was not on notice of a serious medical need. .................................................18
            a.  The alleged telephone conversation between plaintiff and Smith is inadmissible.18
            b.  Plaintiff's statements to Smith did not indicate a serious medical need...............20
        3.  Defendants were not on notice of a serious mental health need. ...............................20
            a.  Defendants were not on notice of a need to provide medical treatment during
                Eilman's short confinement. ...............................................................................20
            b.  Defendants reasonably relied on Eilman's denial of a need for  mental health
                treatment. ...........................................................................................................21
            c.  Eilman's behavior in custody did not signify a serious medical need...................22
                i.   Individuals at the Eighth District were not on notice of a serious
                     medical need based on Eilman's behavior....................................................24
                ii.  Williams and Stokes were not on notice of a serious medical need based on
                     Eilman' s behavior on May 7, 2008.............................................................26
                iii. Hudson and Quinn were not on notice of a serious medical need based on
                     Eilman' s behavior. ....................................................................................27
                iv.  Mabery, Williams and Heard were not on notice of a serious medical need
                     based on Eilman's behavior on May 8, 2008................................................31

D. Defendants acted reasonably in light of police interests in expediting Eilman's release, avoiding a potentially unconstitutional restriction of liberty, and maintaining an effective police department....................................................................................................................31

1. Respecting Eilman's Fourth Amendment right not to be unreasonably detained is a legitimate police interest. ....................................................................................................31

2. Respecting Eilman's Fourth Amendment right not to be involuntarily committed or receive unwanted mental health treatment was a legitimate police interest..............32

3. Police interests were served by Cason, Moreno and Berglind obeying the order of their commanding officer....................................................................................................34

II. The failure to provide medical treatment while Eilman was in custody was not a proximate cause of her injuries. ..................................................................................................................36

A. The failure to provide treatment while Eilman was in custody was not the actual cause of any harm to Eilman. ................................................................................36

B. Defendants' conduct was not the legal cause of plaintiff's injuries sustained in the fall...............................................................................................................42

III. Officer Heard did not create or increase any danger to Eilman by pointing north toward 51st Street.............................................................................................46

A. Pointing toward 51st Street, did not create or increase a danger to Eilman. ....................47

B. Pointing Eilman north out of the parking lot was not the proximate cause of Eilman's attack and fall from a seventh-story window several hours later........................................50

C. Heard did not have the culpable state of mind required to establish a due process violation. ..........................................................................................................................53

IV. Defendants are entitled to qualified immunity for the alleged constitutional violations.........54

A. The law did not clearly establish that failing to provide involuntary mental health care to a non-suicidal arrestee would violate the Fourth Amendment. .........................................56

B. The law did not clearly establish that failing to provide requested medical care for a non-existent medical condition violated Eilman's Fourth Amendment rights. ........................60

C. The law did not clearly establish that giving directions to Eilman would violate her Fourteenth Amendment rights. .............................................................................................61

CONCLUSION.....................................................................................................................63

## TABLE OF AUTHORITIES

**Constitutional Provisions**

U.S. Const. Amend. IV ................................................................................................. *passim*


**Cases**


**U.S Supreme Court**

Anderson v. Creighton, 483 U.S. 635 (1987) ..........................................................54, 55, 57, 61

Beard v. Banks, 548 U.S. 521 (2006) ..................................................................................30

Brinegar v. United States, 338 U.S. 160 (1949) ..................................................................15

Celotex Corp. v. Catrett, 477 U.S. 317 (1986) ......................................................................4

City of Los Angeles v. Heller, 475 U.S. 796 (1986) ...............................................................2

County of Riverside v. McLaughlin, 500 U.S. 44 (1991)........................................................32

County of Sacramento v. Lewis, 523 U.S. 833 (1998) ...........................................................53

DeShaney v. Winnebago County Dep't of Soc. Servs.,
        489 U.S. 189 (1989).................................................9, 46, 47, 49, 50, 53, 62

Estelle v. Gamble, 429 U.S. 97 (1976) ...............................................................................13

Farmer v. Brennan, 511 U.S. 825 (1994)............................................................................57

Graham v. Connor, 490 U.S. 386 (1989)..........................................................................4, 14

Harlow v. Fitzgerald, 457 U.S. 800 (1982)..........................................................................54

Hill v. California, 401 U.S. 797 (1971) ...............................................................................15

Hope v. Pelzer, 536 U.S. 730 (2002) ....................................................................................6

Martinez v. California, 444 U.S. 277 (1980) .........................................................42, 51, 52, 62

O'Connor v. Donaldson, 422 U.S. 563 (1975) ....................................................20, 26, 29, 33

Pearson v. Callahan, 129 S. Ct. 808 (2009) ........................................................................54

Saucier v. Katz, 533 U.S. 194 (2001) .............................................................................54, 59

Town of Castle Rock v. Gonzales, 545 U.S. 748 (2005)...................................................49 n. 12

Vitek v. Jones, 445 U.S. 480 (1980)....................................................................................33

Washington v. Harper, 494 U.S. 210 (1990) ........................................................................33

Wilson v. Layne, 526 U.S. 603 (1999) ................................................................................55


**Courts of Appeals**

Alejo v. Heller, 328 F.3d 930 (7th Cir. 2003)..........................................................................4

Alvarado v. Picur, 859 F.2d 448 (7th Cir. 1988) ...................................................................54

Archie v. City of Racine, 847 F.2d 1211 (7th Cir. 1988) ....................................................48, 49

Azeez v. Fairman, 795 F.2d 1296 (7th Cir. 1986) ..................................................................55

Beard v. O'Neal, 728 F.2d 894 (7th Cir. 1984) ...................................................50, 62

Benson v. Allphin, 786 F.2d 268 (7th Cir. 1986) ..............................................59

Bowers v. DeVito, 686 F.2d 616 (7th Cir. 1982) ...........................................50, 62

Bradich v. City of Chicago, 413 F.3d 688 (7th Cir. 2005) ..............................14

Brownell v. Figel, 950 F.2d 1285 (7th Cir. 1991) .....................................24, 30, 37

Bryant v. Madigan, 84 F.3d 246 (7th Cir. 1996) ..........................................13

Buchanan-Moore v. County of Milwaukee, 570 F.3d 824 (7th Cir. 2009) .................51, 52, 62

Cabaniss v. City of Riverside, 231 F. App'x 407 (6th Cir. 2007) ......................43, 44

Catlin v. City of Wheaton, 574 F.3d 361 (7th Cir. 2009) ...............................56, 62

Cavalieri v. Shepard, 321 F.3d 616 (7th Cir. 2003)......................................14

Chan v. Wodnicki, 123 F.3d 1005 (7th Cir. 1997) .......................................56

Chapman v. Keltner, 241 F.3d 842 (7th Cir. 2001) .....................................57, 60

Chathas v. Smith, 884 F.2d 980 (7th Cir. 1989) .........................................32

Chortek v. City of Milwaukee, 356 F.3d 740 (7th Cir. 2004) ............................32

Ciomber v. Cooperative Plus, Inc., 527 F.3d 635 (7th Cir. 2008) ......................36, 50

Collignon v. Milwaukee County,
    163 F.3d 982 (7th Cir. 1998) .........................8, 9, 14, 20, 36, 40, 41, 50, 57, 58

Collins v. Seeman, 462 F.3d 757 (7th Cir. 2006) .......................................14

Crowley v. Hedgepeth, 109 F.3d 500 (8th Cir. 1997) ...................................37

Davis v. Jones, 936 F.2d 971 (7th Cir. 1991) ......................................6, 10, 17

Donovan v. City of Milwaukee, 17 F.3d 944 (7th Cir. 1994)............................54, 61

Delgado v. Stegall, 367 F.3d 668 (7th Cir. 2004) ......................................53, 54

Driebel v. City of Milwaukee, 298 F.3d 622 (7th Cir. 2002) ............................34

Dykema v. Skoumal, 261 F.3d 701 (7th Cir. 2001)......................................49

Estate of Allen v. City of Rockford, 349 F.3d 1015 (7th Cir. 2003) ...................34, 47

Estate of Boncher v. Brown County, 272 F.3d 484 (7th Cir. 2001) ......................8, 21

Estate of Novack v. County of Wood,
    226 F.3d 525 (7th Cir. 2000) .....................8, 20, 21, 22, 26, 28, 31, 58

Estate of Stevens v. City of Green Bay, 105 F.3d 1169 (7th Cir. 1997) ..............46, 47, 51

Freeman v. Berge, 441 F.3d 543 (7th Cir. 2006) .......................................29, 30

Gaudreault v. Municipality of Salem, 923 F.2d 203 (1st Cir. 1990) ...................9, 17

Gibson v. City of Chicago, 910 F.2d 1510 (7th Cir. 1990) .............................47, 49

Gibson v. County of Washoe, 290 F.3d 1175 (9th Cir. 2002)...........................22, 24

Gooden v. Howard County, 954 F.2d 960 (4th Cir. 1992)...............................34, 59

Green v. Carlson, 826 F.2d 647 (7th Cir. 1987) .......................................56, 57

Gutierrez v. May, 4 F.3d 996, 1993 WL 322664 (7th Cir. 1993) (Exh. 8)...............33, 34

Henderson v. Sheahan, 196 F.3d 839 (7th Cir. 1999)..................................43

Hernandez v. City of Goshen, 324 F.3d 535 (7th Cir. 2003)............................49, 62

Hibma v. Odegaard, 769 F.2d 1147 (7th Cir. 1985)...............................36, 42, 44, 45

Higgins v. Corr. Med. Servs. of Ill., Inc., 178 F.3d 508 (7th Cir. 1999) ...............................13

Hill v. Dekalb Reg'l Youth Det. Ctr., 40 F.3d 1176 (11th Cir. 1994)........................5, 6, 9, 30

Holland v. Hanks, 139 F. 3d 901 (7th Cir. 1998) ..............................................................43

Hughes v. Meyer, 880 F.2d 967 (7th Cir. 1989).................................................................54

Jackson v. City of Joliet, 715 F.2d 1200 (7th Cir. 1983)........................................48, 51, 61

Jackson v. Kotter, 541 F.3d 688 (7th Cir. 2008)..................................................................13

Johnson v. Greer, 477 F.2d 101 (5th Cir. 1973)..................................................................45

Joseph v. Brierton, 739 F.2d 1244 (7th Cir. 1984) ......................................................29, 58

King v. County of Gloucester, 302 F. App'x 92 (3rd Cir. 2008)................................20, 21, 60

King v. E. St. Louis Sch. Dist. 189, 496 F.3d 812 (7th Cir. 2007)......................46, 49, 53, 62

Langston v. Peters, 100 F.3d 1235 (7th Cir. 1996).................................................................7

Lojuk v. Johnson, 770 F.2d 619 (7th Cir. 1985)..................................................................57

Losinski v. County of Trempealeau, 946 F.2d 544 (7th Cir. 1991)........................................48

Martin v. Shawano-Gresham Sch. Dist., 295 F.3d 701 (7th Cir. 2002) ...............................53

Martin v. Tyson, 845 F.2d 1451 (7th Cir. 1988)..............................................................7, 8

Mayan v. Weed, 310 F. App'x 38 (7th Cir. 2009).........................................................13, 14

Meriwether v. Faulkner, 821 F.2d 408 (7th Cir. 1987)........................................................58

Monfils v. Taylor, 165 F.3d 511 (7th Cir. 1998) .................................................................49

O'Neill v. Krzeminski, 839 F.2d 9 (2d Cir. 1988)................................................................40

Rakovich v. Wade, 850 F.2d 1180 (7th Cir. 1988)..............................................................59

Reed v. Gardner, 986 F.2d 1122 (7th Cir. 1993) ......................................46, 47, 51, 52

Ross v. United States, 910 F.2d 1422 (7th Cir. 1990); ........................................................47

Salazar v. City of Chicago, 940 F.2d 233 (7th Cir. 1991) .................................................24

Sandage v. Bd. of Comm'rs, 548 F.3d 595 (7th Cir. 2008)..............................47, 49, 50, 62

Sherman v. Four County Counseling Ctr, 987 F.2d 397 (7th Cir. 1993)................................59

Sides v. City of Champaign, 496 F.3d 820 (7th Cir. 2007) .........4, 5, 10, 11, 15, 17, 31, 57, 61

Spiegla v. Hull, 371 F.3d 928 (7th Cir. 2004) ...................................................................59

State Bank of St. Charles v. Camic, 712 F.2d 1140 (7th Cir. 1983)................................22, 27

Stevens v. Umsted, 131 F.3d 697 (7th Cir. 1997)................................................................62

Tibbs v. City of Chicago, 469 F.3d 661 (7th Cir. 2006)....................................................8, 10

United States v. Briscoe, 896 F.2d 1476 (7th Cir. 1990)..................................................16, 18

United States v. Roberts, 22 F.3d 744 (7th Cir. 1994).........................................................19

United States v. Wiggins, 94 F. App'x 959 (3rd Cir. 2004),
    vacated, Wiggins v. United States, 543 U.S. 1102 (2005) (Exh. 7) ...............................29

Wallace v. Adkins, 115 F.3d 427 (7th Cir. 1997)...................................................47, 49, 50

Waubanascum v. Shawano County, 416 F.3d 658 (7th Cir. 2005) ........................................51

White v. Rochford, 592 F.2d 381 (7th Cir. 1979)................................................................47

Williams v. Kelso, 201 F.3d 1060 (8th Cir. 2000) ....................................6, 12, 23, 24, 25, 35

Williams v. Rodriguez, 509 F.3d 392 (7th Cir. 2007) ..........................5, 10, 15, 18, 25, 30, 31

Willis v. City of Chicago, 999 F.2d 284 (7th Cir. 1993) .........................................32

Wilson v. Formigoni, 42 F.3d 1060 (7th Cir. 1994).........................................41, 58

Windle v. City of Marion, 321 F.3d 658 (7th Cir. 2003)..................................47, 50

Wood v. Ostrander, 879 F.2d 583 (9th Cir. 1989)..................................47, 49, 61, 62

Woods v. City of Chicago, 234 F.3d 979 (7th Cir. 2000)........................................16

Wynn v. Southward, 251 F.3d 588 (7th Cir. 2001) ...................................................5

Zentmyer v. Kendall County, 220 F.3d 805 (7th Cir. 2000) ...............................4, 15

## U.S. District Courts

Avalos v. Pulte Home Corp., 474 F. Supp. 2d 961 (N.D. Ill. 2007)........................37

B, N, & G v. Duff, 2009 WL 2147936 (N.D. Ill. July 17, 2009) (Exh. 12) ............53

Coleman v. Lane, 1995 WL 170025 (N.D. Ill. Apr. 7, 1995) (Exh. 13)..................59

Ellis v. Washington County, 80 F. Supp. 2d 791 (E.D. Tenn. 1998) ............39 n. 10

Gaby v. Dulin, 2008 WL 1925074 (N.D. Ind. May 1, 2008) (Exh. 6) ...................11

Legg v. Agee, 2009 WL 56876 (C.D. Ill. Jan. 6, 2009) (Exh. 3) ........................6, 11

Ortiz v. City of Chicago, 2008 WL 4681156 (N.D. Ill. May 13, 2008) (Exh. 9) ............38, 39

Petrovic v. City of Chicago, 2008 WL 4286954 (N.D. Ill. Sept. 16, 2008) (Exh. 5) .............11

Smith v. Village of Norridge, 2009 WL 210458 (N.D. Ill. Jan. 22, 2009) (Exh. 4)..................7

Stanford v. Garcia, 2009 WL 901131 (N.D. Ill. Mar. 31, 2009) (Exh. 11) ............46

Wasko v. Herman, 2008 WL 150604 (N.D. Ind. Jan. 14, 2008) (Exh. 2) .......................6, 7, 12

## Illinois State Courts

In Re Elizabeth McN., 855 N.E.2d 588 (Ill. App. Ct. 2006) ...................................23

In the Matter of O.C., 788 N.E.2d 1163 (Ill. App. Ct. 2003).................................23

Launius v. Board of Fire and Police Comm'rs, 151 Ill. 2d 419 (1992)...................35

## Statutes and Rules

42 U.S.C. § 1983 (2000) ............................................................................... *passim*

Fed. R. Civ. P. 56(c) ...........................................................................................3, 4

Fed. R. Evid. 801(c) ...............................................................................................16

Fed. R. Evid. 901 ......................................................................................15, 16, 18

Illinois Mental Health and Developmental Disabilities Code,

405 Ill. Comp. Stat. 5/3-601 (2004)......................................................................33

**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

KATHLEEN PAINE, as Guardian of the Estate of ) 
CHRISTINA ROSE EILMAN, a Disabled Person, ) 
           Plaintiff, ) 
                ) 
v.                )    No. 06 C 3173
                ) 
OFFICER JEFFREY JOHNSON, OFFICER, )    Judge Virginia Kendall
RICHARD CASON, OFFICER ROSENDO ) 
MORENO, LIEUTENANT CARSON EARNEST, )    Magistrate Judge Maria Valdez
SERGEANT DAVID BERGLIND, DETENTION ) 
AIDE SHARON STOKES, OFFICER TERESA ) 
WILLIAMS, DETENTION AIDE CYNTHIA ) 
HUDSON, DETENTION AIDE CATONIA QUINN, ) 
OFFICER DEBORAH MABERY, OFFICER ) 
PAMELA SMITH, OFFICER BENITA MILLER, ) 
OFFICER PAULINE HEARD, and CITY OF ) 
CHICAGO, a municipal corporation, ) 
          Defendants. ) 

**AMENDED MEMORANDUM IN SUPPORT OF
DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**

   Plaintiff Kathleen Paine ("plaintiff" or "Paine") has sued the City of Chicago (the "City")

and various Chicago police personnel for damages her daughter – Christina Eilman ("Eilman") –

allegedly suffered when she was physically attacked by a non-party civilian. Prior to this attack,

Eilman had been arrested by the Chicago police and was in police custody. The gravamen of

plaintiff's complaint is that while Eilman was in custody, defendants did not provide her with

appropriate medical (especially psychiatric) care, and that upon her release, defendant Heard's

directions to Eilman created a danger that Eilman would be assaulted.

   For reasons explained below, plaintiff's allegations find no support in the undisputed

material facts or the applicable law. Accordingly, defendants City of Chicago, Richard Cason,

Rosendo Moreno, Carson Earnest, David Berglind, Sharon Stokes, Teresa Williams, Cynthia

Hudson, Catonia Quinn, Deborah Mabery, Pamela Smith, and Pauline Heard[1] are entitled to

summary judgment on all of the claims remaining in plaintiff's Third Amended Complaint.

Specifically, this court should dismiss Counts II, VI, X, XV, XVIII, XX, XXII, XXIV, XXVI,

XXVIII, and XXXIII – each of which, in turn, brings a claim of "deliberate indifference to

---

[1] Claims against Jeffrey Johnson (Count I) and Benita Miller (Counts XXX, XXXI and XXXII) have been dismissed. See Mem. Op. and Order, Dkt. 419, attached as Exhibit 1, at pp. 17, 23, 34.

medical needs" under section 1983 against each of the individual defendants, respectively. This court also should dismiss Count XXXIV, styled as a "DeShaney" action against defendant Heard. Finally, insofar as this court dismisses any of these claims, defendant City of Chicago is entitled to summary judgment as to that particular claim, because the City's liability under Count XXXVIII (plaintiff's Monell claim) is derivative of the liability of the individual defendants.[2] See City of Los Angeles v. Heller, 475 U.S. 796, 799 (1986).

## SUMMARY OF FACTS

The statement of uncontested facts is set forth in Individual Defendants' L.R. 56.1(a)(3) Statement of Uncontested Facts. ("Defs. 56.1"). The court is familiar with the facts pleaded by plaintiff in her Third Amended Complaint, which at the outset of this litigation, were accepted as true by the court and the parties for purposes of the motion to dismiss. During discovery, additional, undisputed facts have emerged based on the evidence, of which three are of particular significance.

First, Eilman denied a need for medical care while in police custody and would not have agreed to mental health treatment. After her arrest, Eilman was interviewed at the Eighth District Station by Sgt. David Berglind. (Defs. 56.1 at ¶¶ 61-84) During this interview, Eilman was calm and aware of her surroundings. (Defs. 56.1 at ¶¶ 69, 70, 71, 84 ) Eilman stated that she was feeling fine, and was not under a doctor's care. (Defs. 56.1 at ¶ 73) Eilman further stated that she was upset about being stranded, and expressed a desire to be released as soon as possible. (Defs. 56.1 at ¶¶ 73, 74, 78) After Eilman arrived at the Second District female lockup, Officer Theresa Williams asked Eilman whether she was "sick, pregnant, injured, or in need of medical attention;" Eilman replied, "No, I just need a Pepsi." (Defs. 56.1 at ¶ 131) Plaintiff's police practices expert, James Kennedy, has opined that Eilman would not have consented to mental health treatment. (Defs. 56.1 at ¶ 387)

Second, discovery has illuminated Eilman's mental health condition while she was in custody. Dr. Joel Dvoskin, plaintiff's retained psychologist, has opined that Eilman showed no signs that she was suicidal at any time while she was in Chicago. (Defs. 56.1 at ¶¶ 367, 369)[3] In addition, the collective testimony of plaintiff's mental health experts is that while in custody

---

[2] Regarding the plaintiff's ADA claim against the City brought in Count XXXIX, the City has filed a motion for summary judgment under separate cover.

[3] Defendants reserve the right to challenge the admissibility of the opinions of each of plaintiff's experts, including Dr. Joel Dvoskin, Dr. Craig Nelson, and James Kennedy.

Eilman suffered no change in her mental condition from a lack of treatment, and would not have improved by receiving treatment. According to Dr. Dvoskin, Eilman's mental condition "was not getting better and was not getting worse" while in custody. (Defs. 56.1 at ¶ 371) In addition, Dr. Craig Nelson, plaintiff's retained psychiatrist, indicated that it would take from seven to twenty days of medication for Eilman's condition to improve. (Defs. 56.1 at ¶¶ 367, 382) Thus, even with treatment, Eilman's mental condition would not have improved during her detention.

Finally, much has been revealed about what happened after Eilman was released from custody. When Eilman left the station, Officer Pauline Heard saw her in the parking lot and directed her north toward 51st Street. (Defs. 56.1 at ¶ 330) The building at 5135 S. Federal, where Eilman was later injured, is directly east of the station, approximately one and one-half blocks away. (Defs. 56.1 at ¶¶ 334, 336) If Eilman had continued north -- the direction in which Heard had pointed -- across 51st Street, she would have entered a beat with the second lowest reported index crime in Chicago from January through May 2006. (Defs. 56.1 at ¶ 331) Exactly where Eilman went after exiting the station parking lot is unknown. However, approximately one half hour after leaving the station, Eilman arrived at a restaurant, King JJ Chicken and Fish, located at 51st Street and Wabash, three blocks east of the police station. (Defs. 56.1 at ¶ 337) Eilman left the restaurant approximately an hour later, encountered Robert Kimble and Floyd Fulton, and accompanied them west and south to 5135 South Federal. (Defs. 56.1 at ¶¶ 338, 340, 343) Approximately five hours after she was released from custody, while "hanging out" in a vacant apartment at 5135 South Federal, Eilman encountered Marvin Powell. (Defs. 56.1 at ¶¶ 347, 349, 357, 361) Prior to Powell's arrival, nobody in the apartment had harmed Eilman. (Defs. 56.1 at ¶¶ 352, 362) Powell demanded that everyone leave, but as Eilman attempted to exit, Powell pulled her into the apartment and locked the door. (Defs. 56.1 at ¶ 353) Powell then forced Eilman to perform a sex act on him. (Defs. 56.1 at ¶ 356) A short time later, at 11:30 p.m., Eilman fell from a seventh floor window, causing her injuries. (Defs. 56.1 at ¶ 357) Eilman's mental condition did not induce Marvin Powell to attack her; rather, at the moment Eilman was pulled into the apartment, it did not matter if Eilman was sane or not. (Defs. 56.1 at ¶¶ 358, 359)

## STANDARD OF REVIEW

Fed. R. Civ. P. 56(c) provides that a district court should grant summary judgment "if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of

3

law." Fed. R. Civ. P. 56(c). Once a motion for summary judgment has been made and properly supported, the nonmovant has the burden of setting forth specific facts showing the existence of a genuine issue of material fact for trial. Celotex Corp. v. Catrett, 477 U.S. 317, 322–24 (1986).

## ARGUMENT

As a threshold matter, all of plaintiff's claims arise out of 42 U.S.C § 1983, and require proof of personal responsibility for liability to attach. See Alejo v. Heller, 328 F.3d 930, 936 (7th Cir. 2003). As a result, plaintiff cannot base liability on the collective acts of the defendants. In Zentmyer v. Kendall County, a prisoner filed a Section 1983 action against nine deputies who failed to administer his medication over several days. 220 F.3d at 809-811 (7th Cir. 2000). Although the collective actions of the deputies arguably caused Zentmyer serious injury, plaintiff could not demonstrate that "any individual defendant failed to administer so many doses that the defendant's actions by themselves instantiate deliberate indifference." Id. at 811. As a result, the court granted summary judgment in favor of the individual defendants. Id. at 812. Likewise, it is not sufficient to show that the collective actions of the defendants injured Eilman. Rather, plaintiff must set forth specific conduct as to each defendant which, standing alone, is actionable under Section 1983. Because plaintiff cannot meet this burden, each defendant is entitled to summary judgment in his or her favor.

## I. Defendants' denial of medical care to Eilman was objectively reasonable, so that Eilman's lack of medical treatment was not a constitutional violation.

This court has already determined that plaintiff's claims regarding the failure to provide needed medical treatment invoke the Fourth Amendment. See Mem. Op. and Order ("Order"), Dkt. 419, attached as Exhibit 1, at pp. 12–14. Thus, the issue as to each individual defendant is whether his or her conduct was objectively reasonable. "[T]he question is whether the [defendants'] actions are 'objectively reasonable' in light of the facts and circumstances confronting them, without regard to their underlying intent or motivation." Graham v. Connor, 490 U.S. 386, 397 (1989) (citations omitted).

In the only Seventh Circuit case to determine the reasonableness of denying medical care to an arrestee, the court found that defendants did not violate the Fourth Amendment. In Sides v. City of Champaign, 496 F.3d 820 (7th Cir. 2007), the court considered whether officers acted reasonably in requiring an arrestee to stand for about an hour in the hot sun, against a hot car with its motor running. See id. at 823. "The police officers took turns going into their cars to cool

4

off, but, although Sides complained that he was dizzy and dehydrated, and that his buttocks were sore from standing against the hot, vibrating car, the officers did not give him permission to move." Id. at 823. While conceding that the detention was a "physically . . . unpleasant experience" for Sides, the Court of Appeals nonetheless found that the officers' conduct was objectively reasonable. Id. at 823, 828.

> The Fourth Amendment's standard is objective, and no jury could conclude that the information known to the police at the time would have led reasonable officers to move Sides elsewhere while the investigation continued. [Sides] has not offered proof that his appearance portended heat stroke or implied a need for medical attention, nor does he contend that the officers delayed unduly once their on-the-scene investigation had been concluded.

Id. at 828. In addition, the court found that because the arrestee refused to cooperate, thereby extending his detention, he was "poorly situated to complain" about the lack of treatment. Id.

Sides has been interpreted as establishing a four-factor test to evaluate the objective reasonableness of a defendant's conduct: 1) whether the officer had notice of the arrestee's medical needs, by word or through observation of the arrestee's physical symptoms; 2) the seriousness of the medical need; 3) the scope of the requested treatment and difficulty of providing it; and 4) police interests that might inhibit providing treatment. See Williams v. Rodriguez, 509 F.3d 392, 403 (7th Cir. 2007). An analysis of each of these four factors establishes that the officers involved in detaining Eilman acted reasonably in not providing medical care.

### A. Eilman did not present with a serious medical need while in custody.

Plaintiff claims that Eilman was denied treatment for both her psychiatric illness and alleged physical ailments. (Defs. 56.1 at ¶¶ 6, 7) However, the uncontested facts establish that while in custody Eilman did not have a serious medical need of any kind.

### 1. Eilman did not have a serious psychiatric condition while in custody.

A serious medical need has been defined as "one that has been diagnosed by a physician as mandating treatment or one that is so obvious that even a lay person would easily recognize the necessity for a doctor's attention." Wynn v. Southward, 251 F.3d 588, 593 (7th Cir 2001) (citation omitted). When the issue is a delay in treatment, medical needs are serious if they are "so obvious even to a lay person because they involve life-threatening conditions or situations where it is apparent that delay would detrimentally exacerbate the medical problem." Hill v.

Dekalb Reg'l Youth Det. Ctr., 40 F.3d 1176, 1187 (11th Cir. 1994), abrogated on other grounds by Hope v. Pelzer, 536 U.S. 730, 739 (2002); see also Davis v. Jones, 936 F.2d 971, 972–73 (7th Cir. 1991) (noting that medical treatment is constitutionally required for conditions which "may be life-threatening or pose a risk of needless pain or lingering disability if not treated at once").

District courts applying the Fourth Amendment reasonableness standard have adopted this approach, requiring a medical need to be emergent for delay in care to be actionable. In Wasko v. Herman (Exh. 2), the court phrased the inquiry as whether "expedited care was necessary to relieve significant pain or ensure optimal healing" and found that the arrestee's later refusal of pain medication negated any claim that the lack of treatment had enhanced his pain. 2008 WL 150604, at *6 (N.D. Ind. Jan. 14, 2008). Similarly, in Legg v. Agee 2009 WL 56876, at *8 (C.D. Ill. Jan. 6, 2009) (Exh. 3), the court found the arresting officers' failure to call for an ambulance reasonable because the lack of emergency care did not threaten the arrestee's "life or long-term health." 2009 WL 56876, at *8 (C.D. Ill. Jan. 6, 2009).

A mental health need is emergent if a person's mental health puts them at risk of physical danger. In such cases, courts look for objective signs of a threat to self to determine whether a medical need was serious. In Williams v. Kelso, 201 F.3d 1060 (8th Cir. 2000), the court considered whether an arrestee "going through some type of psychosis" was in need of immediate medical attention. Because there was no overt indication that the arrestee was a suicide risk, the court found that the arrestee did not present with a serious medical need. Id. at 1066-70. According to the court, "[w]e find no case which support's plaintiff's position of a §1983 requirement of immediate medical attention to a disoriented, confused, belligerent detainee . . . in the absence of any indication of harm to himself." Id. at 1065–66.

Here, Eilman's mental health was not a "life-threatening condition[ ]" or a "situation[ ] where it [was] apparent that delay would detrimentally exacerbate" her mental state. Hill v. Dekalb, 40 F.3d at 1187–88. Although her behavior may have been odd, it was not a life-threatening situation, in which the infliction of harm to herself or others was impending. Indeed, plaintiff's mental health expert agrees that Eilman was not a suicide risk. (Defs. 56.1 at ¶ 369) There also is no evidence that Eilman required immediate care in order to prevent an exacerbation of her mental condition. Eilman did not ask for mental health care or complain about any mental health conditions. (Defs. 56.1 at ¶¶ 73, 85, 131, 159, 388) Hence, there was no reason for any lay observer to believe that delaying treatment until Eilman's release from

custody would exacerbate her mental health condition.

The Seventh Circuit has also looked to the effect of a lack of treatment to determine the seriousness of an injury. In Langston v. Peters, 100 F.3d 1235 (7th Cir. 1996), an inmate rape victim's request for medical care was denied by the assistant warden, and it was not until later, when the inmate passed a note to a medical technician, that the inmate received treatment. Although the court found the assistant warden's conduct "wholly inappropriate," there was no constitutional violation for the delay in treatment, absent evidence that the delay itself had a detrimental effect. Id. at 1240-41. Similarly, in Martin v. Tyson, 845 F.2d 1451 (7th Cir. 1988), a pretrial detainee was denied dental care for a cracked tooth while in the county jail. The court found that because the plaintiff did not produce any evidence that he suffered permanent damage as a result of the lack of treatment, he had not stated a constitutional claim. See id. at 1457–58.

The district court applied this same standard when it evaluated whether a denial of medical care violated the Fourth Amendment. In Wasko, an arrestee suffered a wrist fracture and several individuals denied him treatment for seventeen hours. 2008 WL 150604, at *6-8 (Exh. 2). In considering the seriousness of the injury, the court noted that there was no evidence that the healing of the arrestee's injury was impacted by the failure of the individuals to provide treatment during this time period. Id. at *8. Accordingly, the court found the injury was not serious enough to violate the Fourth Amendment. Id. at *8–9; see also Smith v. Village of Norridge, 2009 WL 210458(Exh. 4), at *9–10 (N.D. Ill. Jan. 22, 2009) (finding that arrestee did not have an objectively serious medical condition where no harm was alleged from delay in treatment).

The uncontested evidence in this case is that the lack of treatment during detention did not affect Eilman's mental condition. Both of plaintiff's mental health experts have opined that Eilman's bipolar disorder, generally, and her alleged psychiatric episode, pre-existed her detention. Dr. Nelson opined that Eilman was in the midst of a manic episode on May 7 and 8, 2006. (Defs. 56.1 at ¶ 380) Dr. Dvoskin opined that Eilman was suffering from a severe manic episode before, during and after her detention. (Defs. 56.1 at ¶ 373) Neither expert opined that there was any change in Eilman's psychological condition while she was in custody. Rather, Dr. Dvoskin asserted that the psychiatric episode which Eilman experienced "was not getting better and was not getting worse" during her detention. (Defs. 56.1 at ¶ 371) Because Eilman's condition was not affected in any way by the lack of treatment while in custody, plaintiff cannot

7

establish that Eilman had an objectively serious need for mental health care.

Another factor in evaluating the seriousness of an injury is whether any complaint was made about the injury. In Martin v. Tyson, the court found it "noteworthy" that the detainee had not mentioned a problem with his tooth when he was examined by a physician, presumably because a person suffering from a serious condition would be expected to take advantage of an opportunity to seek relief. 845 F.2d at 1457. Similarly, in Tibbs v. City of Chicago, 469 F.3d 661 (7th Cir. 2006), the court found that an arrestee did not have a serious injury where he only once mentioned the handcuffs were tight and "gave the officers no indication of the degree of his pain, experienced minimal (if any) injury, and sought no medical care." 469 F.3d at 666. As a result, the court found that although the arrestee likely suffered some discomfort from the handcuffs, the officer's failure to alleviate such minor complaints was objectively reasonable. Id.

When mental health is at issue, the arrestee's complaints, or lack thereof, regarding his mental state are relevant to whether he has a serious need for mental health care. In Estate of Novack v. County of Wood, 226 F.3d 525 (7th Cir. 2000), a detainee was questioned regarding his mental health and responded that he was not contemplating suicide and had never attempted suicide. The court found that given these responses, he did not present a serious suicide risk. See id. at 530–32; see also Estate of Boncher v. Brown County, 272 F.3d 484, 485–86, 488 (7th Cir. 2001) (arrestee's statements to intake officers that his prior suicide attempt was a joke and that he was "fine" indicated that he was not a genuine suicide risk).

In this case, Eilman did not complain about mental health symptoms or ask for mental health care, even when given an opportunity to do so. To the contrary, during an interview at the Eighth district, Eilman told Berglind that she was feeling fine, was not under a doctor's care, and was just upset about being stranded. (Defs. 56.1 at ¶ 73) Later, Williams, the lockup keeper, asked Eilman if she was "sick, pregnant, injured, or in need of medical attention," to which she replied, "No, I just need a Pepsi." (Defs. 56.1 at ¶ 131) That Eilman did not take advantage of these opportunities is additional evidence that her mental health condition was not serious.

The criteria courts have identified to determine the seriousness of a medical condition are consistent with the Seventh Circuit's enunciation of the duty owed to arrestees with chronic mental illness. In Collignon v. Milwaukee County, 163 F.3d 982 (7th Cir. 1998), the Court of Appeals defined that duty as "principally one of *maintenance* rather than cure." 163 F.3d at 991

(emphasis added). The duty of "maintenance rather than cure" applies here. See Exhibit 1, Order, at p. 25 (quoting Collignon, 163 F.3d at 991). During her time in custody – the only period of time relevant to plaintiff's claim, see id. at 25-26 – Eilman did not present to defendants as a person with a serious medical condition. Her mental condition was not life-threatening, was not affected by lack of treatment during detention, and did not require immediate care in order to prevent its exacerbation. Eilman also did not complain about her mental health, or request mental health care. Defendants' duty to Eilman as to her mental condition during her period of detention was to preserve the status quo, and it is undisputed that they did so. Defendants "[did] not become the permanent guarantor of [Eilman's] safety by having once offered [her] shelter." DeShaney v. Winnebago County Dep't of Soc. Servs., 489 U.S. 189, 201 (1989). Rather, once Eilman was released, as was the case with Jonathan Collignon, defendants' duty was "cut off," Collignon, 163 F.3d at 991, and she was free to seek medical care on her own.

In sum, for the reasons explained above, Eilman did not have a serious mental health need while she was in custody. In the absence of any such serious medical need, defendants' conduct was objectively reasonable, and did not violate Eilman's constitutional rights.

### 2. Eilman did not have a serious physical condition while in custody.

Plaintiff alleges that Defendants Stokes, Williams, Hudson, Quinn, Mabery, and Heard failed to respond to Eilman's physical complaints of a heart murmur, chest pain, difficulty breathing, and general sickness, and/or ignored Eilman's requests to be taken to a hospital. (Defs. 56.1 at ¶ 7) These allegations are based solely on the testimony of arrestees Tamalika Harris, Corliss Holland, Gloria Rainge and Kimberly Warren, and are inadmissible for several reasons, addressed in Section (I)(C)(1). In addition, even if one assumes that Eilman in fact made the alleged complaints, there is no evidence that Eilman experienced heart murmur, chest pain, difficulty breathing, or any illness serious enough to be life-threatening or require immediate medical care. Hill v. Dekalb, 40 F.3d at 1187.

As an initial matter, the mere fact that a complaint was made does not necessarily indicate that a medical need is serious. See, e.g., Gaudreault v. Municipality of Salem, 923 F.2d 203, 208-209 (arrestee who "asked for, but was refused medical attention for a period of some ten hours after his arrest" did not have serious medical need). Eilman presented with no outward symptoms of a serious medical condition, such as clutching her chest, or struggling to breathe.

9

The mere fact that Eilman was screaming would indicate to a reasonable observer that she was breathing without difficulty, and raise doubt as to the seriousness of any of her complaints. As plaintiff's police practices expert, James Kennedy, testified, it is not unusual for people in the lockup to feign medical problems. (Defs. 56.1 at ¶ 390) Moreover, no expert has testified that Eilman even had these physical conditions while in custody, much less that they were life-threatening or made worse by the lack of treatment in custody. (Defs. 56.1 at ¶¶ 307, 308, 309)

In addition to the detrimental effect of the lack of treatment, courts have considered two other factors in determining whether a medical need is serious: whether the condition required post-custodial treatment and whether the complaint was accompanied by observable physical symptoms. An arrestee's rights are not violated where the injury does not require post-custodial treatment. In <u>Davis v. Jones</u>, 936 F.2d 971 (7th Cir. 2001), an arrestee claimed he was denied treatment for a scraped elbow and superficial cut on his temple. 936 F.2d at 972–73. Upon his release, he was examined by a physician who determined that neither injury required medical attention. <u>Id.</u> at 972. As a result, the court found that the injury was not objectively serious, thus the officers did not violate due process in failing to take the arrestee to the hospital. <u>Id.</u> at 972-73. Accordingly, the court reversed the jury verdict against the officers. <u>Id.</u> at 973. Similarly, the fact that treatment is not actually sought upon release also indicates that a condition is not serious. See <u>Tibbs v. City of Chicago</u>, 469 F.3d 661, 665–66 (7th Cir. 2006) (finding that any injury from tight handcuffs was not sufficiently serious to violate the Fourth Amendment and noting that the arrestee did not seek out medical treatment upon his release)

In determining the seriousness of the medical need, courts also consider whether the complaint was accompanied by observable physical symptoms. In <u>Sides,</u> the court noted that although the arrestee claimed to be suffering symptoms of sore buttocks, dizziness and dehydration, he did not show symptoms of a serious illness, such as heat stroke, thus the officers' failure to provide medical attention was reasonable. 496 F.3d at 827-28. Similarly, in <u>Williams v. Rodriguez</u>, an arrestee's asthma was not serious enough to warrant medical attention due to a lack of physical symptoms. 509 F.3d at 401–03. The arresting officer failed to give the arrestee his asthma medication for a period of four hours, despite the fact that the arrestee's wife had provided the medication to the officer. <u>Id.</u> at 396–97. In determining whether the asthma attack was sufficiently serious to warrant medication, the court considered the arrestee's outward symptoms. <u>Id.</u> at 396–97, 402. The arrestee did not exhibit any signs of an asthma attack, other

than his silence as he attempted to control his breathing. Id. at 401–04. The court therefore found that the arrestee's ability to control his breathing indicated that his condition was not serious enough to require immediate medical attention. Id. Other courts have found the existence of a serious medical condition when the arrestee "had visible blood and lacerations on her face and back as well as visible bruising on her body," Petrovic v. City of Chicago, 2008 WL 4286954, at *7 (N.D. Ill. Sept. 16, 2008)(Exh. 5), and when the arrestee "suffered extensive bruising, contusions and a large golf ball size lump on her head," Gaby v. Dulin, 2008 WL 1925074, at *2 (N.D. Ind. May 1, 2008) (Exh. 6).

In this case, there is no evidence that, while in custody, Eilman actually experienced any serious physical illness, including a heart murmur, chest pain, or shortness of breath. Moreover, Eilman has not sought treatment for a heart murmur, chest pain, or shortness of breath unrelated to her fall since being released from custody. (Defs. 56.1 at ¶¶ 307, 308, 309) She presented with no outward symptoms of a serious medical condition while in custody. In sum, for the reasons explained above, it was reasonable for defendants Stokes, Williams, Hudson, Quinn, Mabery, and Heard to conclude that Eilman did not have a serious need for medical care for any physical condition while in custody.

## B. The scope of the desired treatment for Eilman was burdensome and unnecessary.

Courts have viewed the objective reasonableness test as balancing the seriousness of the medical need against the difficulty in obtaining requested treatment. As explained above, Eilman did not have a serious medical need. Where the need is not serious, it is reasonable to deny even the most minimal request. Sides, 496 F.3d at 828. In Sides, an arrestee asked only that he be moved out of the sun as he was suffering from dehydration and weakness. Id. at 823–24. Despite the minimal effort that would have been involved in simply moving the arrestee somewhere cooler, the Seventh Circuit found that the failure to provide such treatment was reasonable, noting that "the constitution does not require arrests to be conducted in comfort." Id. at 828.

At least one district court has considered, in light of Sides, whether it was reasonable for officers not to call an ambulance for an arrestee. In Legg v. Agee, an intoxicated arrestee was removed from his home and transported to the police station. 2009 WL 56876 at *1–3. When the arrestee was subsequently diagnosed with a spinal cord injury, it was alleged that police officers should have called an ambulance rather than remove him from his home by force. See

id. at *1, 8–11. Because there was no evidence of a serious medical need at the time of the arrest, it was reasonable for officers not to call an ambulance. See id. at *9. The court opined that "[i]t may have been one reasonable course of action for the officers to have called an ambulance to transport [the arrestee] from [his] residence. It may have even been the better option. However, under the circumstances, no reasonable jury could find that [defendants] violated minimum constitutional standards by failing to call for an ambulance or by failing to otherwise administer medical aid to [the arrestee]." Id.

In this case, there is no evidence that Eilman suffered even minor discomfort due to her mental health or physical condition at any time while in police custody. (Defs. 56.1 at ¶¶ 73, 85, 131, 139, 388) As a result, it was reasonable for defendants, like the defendants in Sides, to deny her any medical care at all, even a trip to the hospital. While a trip to the hospital also might have been a reasonable option, the constitution does not require defendants to choose the best option, but only a reasonable one. See Williams v. Kelso, 201 F.3d 1060, 1068 (8th Cir. 2000).

Moreover, in evaluating the scope of the desired treatment, it is not simply a trip to the hospital that is at issue, but the actual treatment that the arrestee would have received upon arrival. See Wasko v. Herman, 2008 WL 150604 at *5–9 (N.D. Ind. Jan. 14, 2008) (holding that scope of requested treatment included x-rays and treatment of fractured wrist at hospital). Indeed, a trip to the hospital would have been of no help to Eilman if she was not provided any treatment. (Defs. 56.1 at ¶¶ 364, 365, 377, 400)

As to Eilman's purported physical ailments, nothing in the record indicates what treatment might have been provided had Eilman been transported to the hospital. In fact, as there is no evidence that Eilman actually suffered chest pain, a heart condition, or breathing difficulty, it is unlikely that she would have received any treatment at all. Thus, committing police resources to transport Eilman to a hospital would have been excessively burdensome, as no treatment was medically necessary for her physical complaints.

The treatment requested for Eilman's mental condition also would have been excessively burdensome on the police department. Initially, it bears noting that Eilman was not guaranteed psychiatric treatment at a hospital. Whether to admit a patient for mental health treatment is a judgment call made by hospital staff. (Defs. 56.1 at ¶¶ 395, 398, 399) Dr. Dvoskin admits it was possible that a hospital would not have admitted Eilman. (Defs. 56.1 at ¶ 377) Thus, the police could have expended unnecessary resources transporting Eilman to the hospital, only to return

with her to the lockup. (Defs. 56.1 at ¶ 400) On the other hand, if the hospital had determined that Eilman qualified for psychiatric admission, the burden on the police would have been even greater. The process for admitting a person in police custody for mental health treatment is not as simple as dropping the person at the hospital door. Rather, when an arrestee is transported to the hospital for psychiatric treatment, a police officer is assigned to the hospital to guard the arrestee. (Defs. 56.1 at ¶ 396) Thereafter, the police engage in the complicated and tedious process of transferring the arrestee for treatment at Cermak Hospital. (Defs. 56.1 at ¶ 397) This involves the police appearing in court to obtain an order transferring custody to the Cook County Sheriff, and can take up to two days. (Defs. 56.1 at ¶ 397) The burden on the police department in committing police resources to the task of hospitalizing Eilman (which was not even necessary) as opposed to simply monitoring her while in custody, was extensive.

The excessive effort that the defendants would have to put forth must be balanced against the fact that the constitution did not require the defendants to do any more than to keep Eilman safe while she was in custody.

Section 1983 is not a means to recovery for what amounts to a medical malpractice claim. See Estelle v. Gamble, 429 U.S. 97, 107 (1976) (holding that a medical decision does not violate the Eighth Amendment; rather "it is medical malpractice, and as such the proper forum of the state court . . . "); Bryant v. Madigan, 84 F.3d 246, 249 (7th Cir. 1996) (noting that "the courts have labored mightily to prevent the transformation of the Eighth Amendment's cruel and unusual punishment clause into a medical malpractice statute for prisoners."). In Higgins v. Corr. Med. Servs. of Ill., Inc., 178 F.3d 508, 510 (7th Cir. 1999), a pretrial detainee alleged that his jailers were deliberately indifferent in treating his dislocated shoulder. The court found that the decision not to send the detainee to the hospital for an x-ray was at most "an error in judgment" and not a deliberate act that would justify a federal tort action. Id. at 513. As a result, summary judgment was affirmed in favor of prison officials. See id. at 514.

To challenge the decisions of the defendants herein with regard to Eilman's care, plaintiff must set forth facts that no reasonable person "would have so responded under those circumstances." Mayan v. Weed, 310 F. App'x 38, 41 (7th Cir. 2009) (quoting Jackson v. Kotter, 541 F.3d 688, 697-98 (7th Cir. 2008)). Plaintiff's expert, Dr. Dvoskin, opines that Eilman should have been transported to a hospital where she would have been kept safe. (Defs. 56.1 at ¶ 368) However, it was not unreasonable for defendants to conclude that a hospital visit

was not necessary to accomplish this goal. The opinions of plaintiff's experts thus express "mere dissatisfaction or disagreement with a course of treatment [which] is generally insufficient" to establish a civil rights violation. Mayan, 310 F. App'x at 41.

It is commonly recognized that a mentally ill arrestee who presents as a threat to self is entitled to protection from harm while in custody. See, e.g Collins v. Seeman, 462 F.3d 757, 760-62 (7th Cir. 2006) (discussing whether officer knew of known risk of suicide); Cavalieri v. Shepard, 321 F.3d 616, 621 (7th Cir. 2003) (issue of fact existed as to whether officer knew that detainee was on verge of suicide); Bradich v. City of Chicago, 413 F.3d 688, 690-91 (7th Cir. 2005) (jail staff did not display deliberate indifference to risk or suicide). Where measures are taken which successfully protect the arrestee from harm while in custody, the mental health needs of the arrestee are met. In Collignon, 163 F.3d, at 984, a schizophrenic detainee committed suicide after being released from jail, and his family sought to hold the jail psychologist, as well as the municipality and police officers, liable for his death. The court recognized that, in hindsight, Collignon's mental illness was serious in that there was a substantial risk that he would take his own life. Id. at 989. However, the court found that Collignon's jailers "prudently eliminated [the] risk" by placing him on a high level of suicide watch. Id. at 990. Thus, Collignon's serious medical needs were met while in jail. Id. at 990-91.

It is undisputed that Eilman was protected from harm while in custody. Eilman was provided a "safe place to stay" while in the Eighth District and while in the Second District lockup. Prior to her entering a cell, items with strings were confiscated to prevent Eilman from doing harm to herself. (Defs. 56.1 at ¶ 134) The very fact that Eilman was confined in a jail cell provided her with a safe environment. In addition, Eilman's well-being was checked every fifteen minutes. (Defs. 56.1 at ¶ 184, 185) Given that defendants kept Eilman safe while she was in custody, they were not further required to transport her to a hospital for medical treatment.

**C. Defendants did not receive notice of a serious medical need.**

Whether each defendant acted reasonably depends on the particular facts and circumstances known to that defendant, and the reasonable conclusions drawn from those facts. See Graham, 490 U.S. at 397. The objective reasonableness standard allows for mistakes in judgment.

> Because many situations which confront officers in the course of executing their duties are more or less ambiguous, room must be allowed for some mistakes on their part. But the mistakes must be those of reasonable men acting on facts

leading sensibly to their conclusions of probability.

Brinegar v. United States, 338 U.S. 160, 176 (1949); accord Hill v. California, 401 U.S. 797, 804 (1971) (arresting innocent man on assumption that he had provided a false identity was objectively reasonable).

Notice of a medical need can be provided through word or observations of the detainee's physical symptoms. Williams v. Rodriguez, 509 F.3d 392, 403 (7th Cir. 2007) (citing Sides, 496 F.3d at 823, 828). Plaintiff claims that Defendants Stokes, Williams, Hudson, Quinn, Mabery and Heard were notified of Eilman's physical needs for medical care directly through Eilman's requests. As to the need for mental health care, there is no competent evidence that Eilman or anybody on her behalf requested treatment. Defendant Smith allegedly was aware of a need for medical care based on a conversation with Eilman's mother. (Defs. 56.1 at ¶ 6) Plaintiff alleges that the observations of Eilman's behavior by the remaining defendants put them on notice of a need for medical care. (Defs. 56.1 at ¶ 6) When the particular circumstances facing each defendant are analyzed independently, however, it becomes clear that no defendant was put on notice of an emergent need for medical care. Such an analysis is required because plaintiff must specify the conduct of each individual defendants for liability to attach to him or her, rather than rely on the conduct of "defendants" generally. See Zentmyer, 220 F.3d at 811–13.

### 1. Defendants Stokes, Williams, Hudson, Quinn, Mabery and Heard did not receive notice of a serious physical condition requiring medical attention.

Plaintiff claims that Stokes, Williams, Hudson, Quinn, Mabery, and Heard had notice that Eilman complained of physical conditions while in the lockup. (Defs. 56.1 at ¶ 6) The only evidence in support of these allegations is the testimony of four arrestees, who claim to have heard a woman in the lockup screaming about medical ailments. However, plaintiff cannot establish that Eilman was the woman complaining, that the screams were capable of being heard by any defendant, or that Eilman's complaints were genuine. As a result, there is no evidence that these defendants had notice that Eilman suffered from any serious physical or mental illness.

### a. There is no competent evidence that Eilman requested medical attention.

Plaintiff cannot establish, through admissible evidence, that Eilman requested medical attention. Fed. R. Evid. 901 requires authentication or identification of evidence as a condition precedent to admissibility, which is "sufficient to support a finding that the matter in question is what its proponent claims." Fed. R. Evid. 901(a). Voice identification may be made by "opinion

based upon hearing the voice at any time under circumstances connecting it with the alleged speaker." Fed. R. Evid. 901(b)(5) . The Seventh Circuit has adopted this standard, holding that "[a]s long as the basic requirement of familiarity [with the voice] is met, lay opinion testimony is an acceptable means for establishing the speaker's identity." U.S. v. Briscoe, 896 F.2d 1476, 1490 (7th Cir. 1990). However, none of the witnesses in the lockup who heard a woman yelling was familiar with Eilman's voice, and they could not see that person because of the layout of the cells.[4] Thus, despite the content of what they heard (e.g., "Help me," "I have a heart murmur," "somebody call an ambulance," "I need to go to the hospital,"), their lack of familiarity with Eilman's voice precludes them from identifying Eilman as the woman complaining about medical problems, which in turn is fatal to the admissibility of their testimony. This prevents plaintiff from relying on the testimony of these witnesses as evidence to defeat summary judgment. See Woods v. City of Chicago, 234 F.3d 979, 988 (7th Cir. 2000) (holding that in ruling on a motion for summary judgment, only evidence that would be admissible at trial is considered).

> **b. There is no evidence that the purported requests for help were heard by Stokes, Williams, Hudson, Quinn, Mabery, or Heard, or that Eilman was in custody when the requests were made.**

Even if plaintiff could establish that Eilman was the woman requesting medical attention, this testimony would be inadmissible hearsay unless it was being introduced not for its truth, but to establish that the request likely was heard by a defendant. See Fed. R. Evid. 801(c). However, for any defendant to be aware of a request, he or she must be within hearing range of the lockup when the request was made.

No witness testified to hearing complaints of illness or requests to be taken to the hospital during the third watch on May 7, 2006, the only shift in which Stokes was on duty during Eilman's stay in custody. (Defs. 56.1 at ¶ 130) As a result, there is no evidence that Stokes heard and failed to respond to any complaints for medical treatment.

Gloria Rainge testified that she heard somebody yelling that she wanted to go to the hospital while Rainge was being fingerprinted during the first watch on May 8, 2006. (Defs.

---

[4] Each of these witnesses testified at deposition under the assumption that the voice they heard was Eilman, and were often asked by plaintiff's counsel what "Christina" said. However neither the leading nature of the questioning, nor the apparent belief of some of the witnesses that Eilman is the woman they heard, negates the fact that their testimony as to these conversations is inadmissible. The parties agreed early in this litigation that all objections to the admissibility of testimony were reserved.

56.1 at ¶¶ 164, 165, 254) However, Rainge could not identify either Hudson or Quinn, who staffed that watch, as being present when the screaming occurred, or at any other time. (Defs. 56.1 at ¶ 256) Rainge is the only witness to testify to complaints during this time period; therefore, there is no evidence that Hudson and Quinn heard but failed to respond to the alleged request.

As to Mabery, Williams, and Heard, the record does not indicate whether they were on duty when the witnesses heard medical complaints. Only Rainge and Harris testified as to when they heard complaints. Harris heard screaming at approximately 7:00 or 8:00 p.m. on May 8, 2006, after Eilman had been released, so her testimony is irrelevant. (Defs. 56.1 at ¶¶ 299, 305, 306) So is the testimony of both Warren and Holland, who also were in the lockup at this time. (Defs. 56.1 at ¶¶ 294, 313) But even if Warren and Holland heard different screaming than Harris, plaintiff still cannot establish that any particular defendant was on notice of a complaint by Eilman. Neither Warren nor Holland identified precisely when in her detention she heard complaints. Therefore, their testimony does not establish that Mabery, Williams or Heard were on notice, because it is not possible to correlate the events to which they testified with the time that Eilman was in custody or when these defendants were on duty.

### c. Eilman's alleged complaints were insufficient to put defendants on notice of a serious medical need.

Even if complaints were made by Eilman and heard by these defendants, the complaint alone does not place any defendant on notice of a serious medical need. Asking to go to a hospital, screaming about a heart murmur, heart pain, and difficulty breathing, and making the general complaint "I'm sick," without more, would not put any defendant on notice of a serious need for medical attention. (Defs. 56.1 at ¶¶ 296, 300, 305) Even where Eilman allegedly made more specific complaints, the statements alone do not indicate a serious need. See Gaudreault v. Municipality of Salem, 923 F.2d 203, 208–09 (1st Cir. 1990) (arrestee who "asked for, but was refused medical attention for a period of some ten hours after his arrest" did not have serious medical need). As addressed above, medical needs are not serious if they are not accompanied by objective symptoms, or do not require treatment. Sides, 496 F.3d at 828; accord Davis v. Jones, 936 F.2d 971, 972 (7th Cir. 1991). Thus, the mere fact that these statements were made is not enough to put defendants on notice that a serious medical need existed.

A detainee may have motivation to request medical treatment, other than a real need for

treatment. In <u>Williams v. Rodriguez</u>, an arrestee with asthma first complained of an inability to breathe when asked to take a breathalyzer test to determine whether he was legally impaired. 509 F.3d at 402. The court found that it was reasonable for officers to take into account the context of the arrestee's request, and to disregard it as an effort to avoid a test which could incriminate him. <u>Id.</u> at 402. As a result, the arresting officer was not on notice of a serious medical need. <u>Id.</u> at 402–03.

In this case, the environment of the lockup is a reasonable consideration when determining whether Eilman had a legitimate need for medical treatment. Generally speaking, arrestees are not happy about being in the lockup and do not want to be there. (Defs. 56.1 at ¶ 389) It is not unusual for people in the lockup to feign medical problems, or ask to see a doctor in order to get out of the lockup. (Defs. 56.1 at ¶ 390) Thus, in the absence of physical symptoms verifying a need for treatment, these defendants were not on notice of a serious medical need.

### 2. Smith was not on notice of a serious medical need.

Plaintiff alleges that she had a conversation with Smith which gave notice of a need to provide medical care to Eilman. However, sufficient foundation for any such conversation to be admitted into evidence is lacking. Moreover, nothing that plaintiff allegedly said would have placed Smith on notice that Eilman needed immediate mental health treatment.

### a. The alleged telephone conversation between plaintiff and Smith is inadmissible.

Any telephone conversation which plaintiff alleges took place between herself and Smith is inadmissible because neither party can identify the other as the person to whom she was speaking. To be admissible, this conversation must be authenticated. <u>See</u> Fed. R. Evid. 901(a). As indicated previously, voice identification may be made by "opinion based upon hearing the voice at any time under circumstances connecting it with the alleged speaker." Fed. R. Evid. 901(b)(5); <u>see also</u> <u>U.S. v. Briscoe</u>, 896 F.3d 1476, 1490 (7th Cir. 1990 (holding that a lay witness can establish a speaker's identity only if the witness is familiar with the voice). Plaintiff has not established that she is familiar with Smith's voice, therefore, absent such voice identification, the conversation is inadmissible.

Plaintiff allegedly placed three telephone calls to the Second District on May 7 and 8, 2006 when Smith was on duty. (Defs. 56.1 at ¶¶ 114-121) Plaintiff cannot identify Smith as the

person to whom she spoke in any of these conversations. Plaintiff testified that she called the Second District at 6:49 p.m. on May 7, 2006 and told a female who answered the phone that she was "concerned because we believe [Eilman] has bipolar and she could be having an episode." (Defs. 56.1 at ¶ 114) Smith did not answer any phone calls from anybody identifying themselves as a family member of Eilman on May 7, 2006. (Defs. 56.1 at 113) In fact, plaintiff does not know to whom she spoke, but it could have been one of many officers who routinely answer the phone. Thus, plaintiff cannot establish that she spoke with Smith on May 7, 2006.

The following day, plaintiff placed two phone calls to the Second District desk at 2:47 p.m. and 3:15 p.m., respectively. (Defs. 56.1 at ¶¶ 116-118) In the first phone call, she spoke to a female and mentioned nothing about Eilman's mental condition. (Defs. 56.1 at ¶ 117) In the second phone call, she allegedly advised the female answering the phone, whose identity was unknown to her, that she was concerned because she believed Eilman was "bipolar, and she could be having an episode, and I don't want her just released to the streets of Chicago with nothing and nowhere to go." (Defs. 56.1 at ¶ 118) During that time, the desk was staffed by four female officers, including Smith. (Defs. 56.1 at ¶¶ 109-112) Any of the desk staff could have answered the telephone, as could any other police officers near the desk. (Defs. 56.1 at ¶¶ 107, 112) Again, plaintiff cannot establish that she spoke with Smith on May 8, 2006 at 3:15 p.m.

Smith's testimony does not aid plaintiff in establishing that Smith was a party to the 3:15 p.m. conversation, rather than the 2:47 p.m. conversation. Smith testified that at some point she answered the telephone and spoke to a woman who identified herself as Eilman's mother. (Defs. 56.1 at ¶ 119) As an initial matter, this testimony is not sufficient to establish that Smith actually spoke to plaintiff because "self-identification by the speaker alone is insufficient to authenticate the source of a telephone call." U.S. v. Roberts, 22 F.3d 744, 754 (7th Cir. 1994). Moreover, there is no evidence that this conversation occurred at 3:15 p.m., when plaintiff claims she spoke about Eilman's mental health, rather than at 2:47 p.m. when plaintiff admits she said nothing about mental health. Indeed, the circumstantial evidence indicates that Smith answered the first phone call, as Smith testified that she was not advised of Eilman's mental health condition in the phone call. (Defs. 56.1 at ¶ 121) As a result, plaintiff cannot establish that Smith was told anything about Eilman's mental condition.

19

### b. Plaintiff's statements to Smith did not indicate a serious medical need.

Even if plaintiff could establish that she spoke to Smith, plaintiff's statements were not sufficient to put Smith on notice of a serious medical need. Plaintiff admits that she did not advise Smith, or anyone at the Second District, that Eilman was "reasonably expected to inflict harm on herself or was unable to provide for her basic needs so as to guard herself from harm without the assistance of family or outside help." (Defs. 56.1 at ¶ 125) Plaintiff also did not ask Smith, or anyone at the Second District, to bring Eilman to a hospital for a mental health evaluation, nor did she authorize such treatment. (Defs. 56.1 at ¶ 125) Rather, plaintiff testified that she merely advised Smith that Eilman was bipolar and could be having an episode, and expressed concern that Eilman would be released with nowhere to go. This was not sufficient indication of Eilman's need for mental health treatment.

The fact that an arrestee has a mental illness does not mean that immediate medical intervention is necessary to prevent harm. See O'Connor v. Donaldson, 422 U.S. 563, 574-76 (1975) (holding that all mentally ill are not subject to involuntary confinement). See also Estate of Novack v. County of Wood, 226 F.3d 525, 529-31 (7th Cir. 2000 (holding that jailers were not on notice of suicide risk to schizophrenic detainee). Thus, Smith did not act unreasonably in failing to obtain medical care for Eilman based on mental illness alone. Plaintiff also did not provide any other information which would indicate a need for immediate medical attention. Plaintiff's concern for Eilman was limited to what would happen upon Eilman's release; she did not indicate that Eilman was at risk of harm while in custody. These statements could reasonably be interpreted as a request that Eilman not be released, which is outside the scope of a constitutional duty to care for an arrestee. See Collignon v. Milwaukee County, 163 F.3d 982, 990-91 (7th Cir. 1998) (arrestee does not have a right to be detained for purposes of receiving mental health care.) Moreover, Smith had no other knowledge of Eilman's condition, as she did not observe Eilman either before or after the conversation in question. (Defs. 56.1 at ¶ 123) Given Smith's limited knowledge, she was not on notice of a need for medical care for Eilman.

### 3. Defendants were not on notice of a serious mental health need.

#### a. Defendants were not on notice of a need to provide medical treatment during Eilman's short confinement.

The length of confinement is relevant to whether a non-suicidal detainee's mental illness presents a substantial risk. In King v. County of Gloucester, 302 F. App'x 92, 93-94 (3rd Cir.

2008), the police brought a man with bipolar disorder to the county jail to be held overnight awaiting a hearing. While in jail, the detainee exhibited bizarre behavior and he was shackled to a bedpost facedown, causing asphyxiation. Id. The police officers were sued for transporting the man to jail, rather than the hospital. Id. at 97-98. The court found that although the detainee's mother had warned officers that the detainee should be brought to the hospital, there was no indication to the officers that a night in jail posed a significant risk of harm. Id. at 98.

In this case as well, the anticipated length of Eilman's detention is a factor in determining whether defendants had notice of a need for medical attention. A reasonable person would conclude that Eilman would be in custody for a short time, typically less than two days. Thus, following King v. County of Gloucester, Eilman would need medical treatment only if she was reasonably likely to be harmed in this short time. Given Eilman's denial of a need for medical treatment, and the fact that her behavior was being monitored, there was no reason to believe that a few days in jail posed a significant risk to Eilman. In fact, with the benefit of hindsight, Eilman clearly was not at risk, as she was unharmed while in custody.[5]

### b. Defendants reasonably relied on Eilman's denial of a need for mental health treatment.

When mental health is at issue, officials can reasonably rely on what the detainee tells them about his present mental health in evaluating whether a serious need for mental health care exists. In Estate of Novack v. County of Wood, 226 F.3d 525, 528 (7th Cir. 2000), a detainee was questioned regarding his mental health and responded that he was not contemplating suicide and had never attempted suicide. Despite the fact that jail officials were aware of a previous visit to a mental health facility and were informed that the detainee was a suicide risk, the court found that jail officials were not aware of a serious risk of suicide. Id. at 530. Similarly, in Estate of Boncher v. Brown County, 272 F.3d 484 (7th Cir. 2001), the court found that there was no reason for jail officials to doubt an arrestee's statements to intake officers that his prior suicide attempt was a joke and that he was "fine." 272 F.3d 486-87.

In this case, Eilman repeatedly indicated that she did not need mental health care. Eilman told Berglind, in the presence of Cason, that she was feeling fine, and was not under a doctor's care. (Defs. 56.1 at ¶¶ 72, 73) And prior to being received into the lockup at the Second District, Williams asked Eilman whether she was "sick, pregnant, injured, or in need of medical

---

[5] That Eilman suffered no harm in custody is further addressed in Section II regarding proximate cause.

21

attention," to which Eilman replied, "No, I just need a Pepsi." (Defs. 56.1 at ¶ 131) Plaintiff's police practices expert, James Kennedy, admitted that Cason, Moreno and Berglind asked Eilman whether she was in need of mental treatment, and she said that she wasn't, and denied having anything mentally wrong with her. (Defs. 56.1 at ¶ 374) Eilman made no statements at any time which contradicted her denials of a need or desire for mental health assistance. As a result, it was reasonable for defendants to believe that Eilman did not have a serious need for mental health care while in custody.

### c. Eilman's behavior in custody did not signify a serious medical need.

Plaintiff alleges that Eilman's behavior while in custody constituted notice to defendants that Eilman had a serious medical need. However, the uncontested facts do not provide evidence to support this claim.

Strange, abusive, or uncooperative behavior does not indicate a serious need for mental health care while in custody. In State Bank of St. Charles v. Camic, 712 F.2d 1140 (7th Cir. 1983), an arrestee refused to answer several questions on the booking form, and demanded to make a phone call. 712 F.2d at 1143. Because he was not cooperating, he was denied a phone call. Id. A notation was made on the booking form that he was behaving in a "freaky" manner. Id. The arrestee became abusive and violent, and resisted the officers as they removed his belt and shoelaces and brought him to his cell. Id. Shortly thereafter, the arrestee committed suicide. Id. The court found that defendants had no reason to suspect a suicide risk, holding that "[k]nowing that he was behaving violently, or was acting in a 'freaky' manner is not synonymous with having reason to know that the violence might become self-directed." Id. at 1146. Similarly, in Estate of Novack, 226 F.3d, at 528, 530, the court found that the behavior of a schizophrenic detainee, who pounded on the walls of his cell and giggled uncontrollably, did not put his jailers on notice that he was a suicide risk. Moreover, in Gibson v. County of Washoe, 290 F.3d 1175 (9th Cir. 2002) an arrestee was abusive toward arresting officers, "shouting obscenities and yelling that the police were going to plant something in his truck" and exhibited "peculiar mood swings and dramatic shifts from combativeness to compliance." 290 F.3d at 1181. Yet the court found that defendants were not on notice of a need for mental health care, as such symptoms did not necessarily connote mental illness. Id. at 1197.

Loud and boisterous behavior not only does not indicate a suicide risk, but it also does not support the theory of "risk of harm" alleged in this case. Dr. Dvoskin acknowledges that

Eilman was not a suicide risk, but hypothesizes that Eilman faced some ambiguous risk of harm because she could make bad choices. (Defs. 56.1 at ¶¶ 369, 370) This does not support the allegation that Eilman had a serious medical need. In <u>In the Matter of O.C.</u>, 788 N.E.2d 1163 (Ill. App. Ct. 2003), the state attempted to justify an involuntary commitment of O.C., an individual with bipolar disorder, on the premise that his behavior indicted he was at risk of future harm to himself or others. 788 N.E.2d at 1165.   The future harm alleged was not a risk of suicide, but a risk that O.C. "may unknowingly act out by likely misperceiving other peoples' motives as a result of his mental illness." <u>Id</u>. at 1167.   However, the evidence did not show that O.C. was reasonably expected to "act out" by inflicting serious physical harm upon himself or another. <u>Id</u>. at 1168.  O.C. had no history of violence. <u>Id</u>. at 1167. The only support for committing O.C. was that he had been engaging in loud and boisterous behavior in public. <u>Id</u>. He was observed dancing in the street, calling out to persons "I'm going to kill you," screaming and cussing. <u>Id</u>. The court found that this behavior was not sufficient to establish a risk of future harm.  <u>Id</u>. at 1168.

Also, the possibility that an individual might be victimized for her odd behavior does not mean that there was a reasonable risk that she would be harmed in the near future.  In <u>In Re Elizabeth McN.</u>, 855 N.E.2d 588 (Ill. App. Ct. 2006), the Appellate Court of Illinois considered a petition for civil commitment of a woman with chronic bipolar illness. 855 N.E.2d at 589.  In the opinion of her psychiatrist, Elizabeth exhibited behaviors which might induce someone to harm her. <u>Id.</u> However, there was no evidence that she previously had been victimized. <u>Id</u>. at 591. The court found that despite her "weakness as a member of society," and the potential that Elizabeth might be preyed upon by criminals, Elizabeth was not at risk of future harm due to her mental illness. <u>Id.</u>

Even undeniable symptoms of mental illness are insufficient to give notice of a risk of harm.  In <u>Williams v. Kelso</u>, 201 F.3d 1060, 1068 (8th Cir. 2000), a detainee presented as disoriented, confused and separated from reality, with short periods of coherency.   While in custody his conduct was erratic and unusual, and he was involved in an altercation with a cellmate after hallucinating and hearing voices during the night. <u>Id</u>. at 1063. The arrestee was evaluated by a psychologist who diagnosed him with intermittent psychosis and returned him to jail, where he later committed suicide. <u>Id</u>. Despite the arrestee's symptoms and diagnosis of a mental health disorder, the court found that the arrestee "gave no overt indication that he was a

suicide risk." Id. at 1065. The court noted that while jailed for three days, the arrestee did not have a serious episode of harm to himself or others. Id. at 1066. Nor was there any indication of any known history of mental disorder. Id. As a result, defendants were not on notice of a serious need for mental health treatment. Id.

Behavior which could, in hindsight, have been consistent with a serious risk of harm, does not establish notice if it was open to another reasonable interpretation. In Brownell v. Figel, 950 F.2d 1285 (7th Cir. 1991) an intoxicated detainee behaved in an unusual manner by stating that his arms and legs would not move, not responding to pain stimulus, and generally being inactive. 950 F.2d at 1288 When it was subsequently discovered that the arrestee had suffered from a fractured vertebra and was paralyzed, it was alleged that his behavior had put his jailers on notice that he had a serious medical condition. Id. However, the court found that his behavior was also consistent with intoxication, holding that "[a]n officer, within the pale of reason, could certainly believe that a person in a drunken stupor claiming an inability to move does so in hopes of being left alone to sleep." Id. at 1291. Thus, given that there was a reasonable alternative explanation for the detainee's behavior, that behavior did not put his jailers on notice of a serious need for medical attention. Id.; accord Salazar v. City of Chicago, 940 F.2d 233, 241 (7th Cir. 1991) (detainee's unusual behavior of sleeping on the floor and undressing could be reasonably attributed to intoxication, rather than heart condition).

In light of the above-stated law, none of the defendants were on notice that Eilman had an immediate need for mental health treatment.

### i. Individuals at the Eighth District were not on notice of a serious medical need based on Eilman's behavior.

The first Eighth District personnel to encounter Eilman were Cason and Moreno, who observed Eilman exhibiting mood swings, swearing, cursing and being vulgar. (Defs. 56.1 at ¶¶ 23-27, 38, 39) Eilman's abusive and obscene behavior and mood swings, like that exhibited by the arrestee in Gibson v. County of Washoe, 290 F.3d at 1181, do not necessarily connote mental illness and did not put Cason and Moreno on notice of a need for immediate mental health care. It is not the exclusive province of the mentally ill to be loud, profane and vulgar. Rather, Eilman's behavior was consistent with being a member of the stripper culture, who often use profanity and vulgarity. (Defs. 56.1 at ¶¶ 41-46) Thus, there was a reasonable explanation for Eilman's behavior other than mental illness. Even plaintiff's psychology expert, Dr. Dvoskin,

admits that yelling and swearing is not a sufficient reason to take someone in for a mental health evaluation. (Defs. 56.1 at ¶ 289) Indeed, Eilman's behavior was far less erratic than that demonstrated by the detainee in Williams v. Kelso, 201 F.3d 1060, who was known to be disoriented, confused and separated from reality, yet not a threat to himself. Because Eilman's behavior did not necessarily indicate that she was at risk of harm, the behavior did not put Cason and Moreno on notice of a serious risk that Eilman would harm herself. Cason and Moreno also had no reason to believe that Eilman was a threat to others. Although Sharon Lewis, an employee of the Chicago Transit Authority, reported that Eilman told Cason that she would take his gun and shoot him with it, this did not make any impression on Cason. (Defs. 56.1 at ¶¶ 28-30) Cason did not remember the statement, likely because it was barely distinguishable from the other profanities Eilman was angrily spewing. (Defs. 56.1 at ¶¶ 28, 36, 37, 39) Moreover, this statement, having been made to a police officer, is a far less serious threat, than the general threats to kill members of the public made by O.C., which the Illinois court found did not indicate O.C. was a threat to others.

Moreover, although Cason and Moreno observed loud, profane and vulgar behavior, they also observed Eilman being calm and compliant. Throughout the interview with Berglind and Cason, Eilman remained calm. (Defs. 56.1 at ¶¶ 69-71, 84) Eilman also demonstrated that she was not disoriented; rather, she was aware of her surroundings and why she had been arrested. (Defs. 56.1 at ¶¶ 72-74) The only unusual behavior Eilman demonstrated during the interview was to begin discussing rap music and mentioning the United States' overdependence on oil. (Defs. 56.1 at ¶ 75) Raising these topics in the context of an arrest perhaps shows a lack of social decorum, but certainly does not demonstrate that she was a threat to herself. Indeed, as Dr. Dvoskin recognized, there were periods when Eilman did not show any signs of mental illness (Defs. 56.1 at ¶ 372), and this interview would appear to be one of them. It appeared that Eilman had pulled herself together for the interview, and was able to control her behavior. (Defs. 56.1 at ¶ 71) To the reasonable person, this indicated that whatever the cause of Eilman's behavioral problem, it had resolved. Indeed, the ability to control one's behavior is one of the ways medical professionals measure the extent of psychiatric illness. (Defs. 56.1 at ¶ 394). Indeed, Eilman's ability to control her behavior could indicate that no medical treatment was necessary. See Williams v. Rodriguez, 509 F.3d at 402-04 (arrestee's ability to control his asthma symptoms indicated that treatment was not necessary). As a result, following the interview, neither Cason

nor his partner, Moreno, had reason to believe there was a risk of harm if Eilman were to remain in police custody for a short period of time.

Berglind's only interaction with Eilman was within the interview, which gave him no indication that Eilman was a harm to herself. Berglind reported to Earnest that Eilman was aware of who she was, where she was, and why she was there, and just wanted to be released as soon as possible. (Defs. 56.1 at ¶¶ 74, 85) This report did not put Earnest on notice that Eilman was in need of immediate medical attention. Officer Delia's report of her telephone conversation with Eilman's father, in which she advised Cason and Earnest that Eilman may have bipolar disorder, also did not notify these officers that Eilman was in need of immediate mental health treatment. (Defs. 56.1 at ¶ 89-93) The mere fact that Eilman may have had bipolar disorder does not lead to the reasonable conclusion that Eilman was a threat to herself or needed immediate medical treatment. See O'Connor v. Donaldson, 422 U.S. 563 (1975) (holding that all mentally ill are not subject to involuntary confinement); See also Estate of Novack v. County of Wood, 226 F.3d 525, 529-31 (7th Cir. 2000) (holding that jailers were not on notice of risk to schizophrenic detainee). Indeed, the reasonable person would expect that if Eilman's father had a significant concern over Eilman's mental health he would have requested a mental health examination on her behalf, yet he did not. (Defs. 56.1 at ¶¶ 125, 327) Because individuals at the Eighth District did not have any reason to believe Eilman had a serious medical need based on her behavior (or anything else), they acted reasonably in transferring Eilman to the Second District station for processing.

### ii. Williams and Stokes were not on notice of a serious medical need based on Eilman's behavior on May 7, 2008.

At the Second District, defendant Williams received Eilman at the lock up during the third watch on May 7, 2006. (Defs. 56.1 at ¶¶ 127, 129) Before Eilman entered the lockup, Williams asked Eilman whether she was sick, pregnant, injured, or in need of medical attention, to which Eilman replied, "No, I just need a Pepsi." (Defs. 56.1 at ¶ 131) Inside the lockup, Eilman advised Williams that she had been drinking. (Defs. 56.1 at ¶ 132) Eilman was talkative and, according to arrestee Beatrice Martinez, was yelling. (Defs. 56.1 at ¶ 133, 147, 221) Martinez also claims that she called out that something was wrong with Eilman and that Eilman was not understanding what they were saying. (Defs. 56.1 at ¶ 222) After being searched and not permitted to have a tampon, Eilman became uncooperative, refusing to answer questions or be

fingerprinted (Defs. 56.1 at ¶¶ 137, 139) In fact, according to Martinez, Eilman was told to "shut up" and stopped talking altogether. (Defs. 56.1 at ¶ 221)

Eilman's behavior during intake is remarkably similar to that of the arrestee in State Bank of St. Charles v. Camic, 712 F.2d at 1143, although Eilman was quietly uncooperative rather than violent and abusive. Williams and Sharon Stokes, who worked with Williams in the lockup, had no more reason to believe that Eilman was at risk of harm than did the defendants in State Bank. Nothing in the record indicates that Williams or Stokes ( or for that matter Johnnie Smith, who is not a defendant but was also on duty at the time) heard Martinez calling out to them, nor would another arrestee's comments that something was "wrong" necessarily put a reasonable person on notice of a need for medical attention. (Defs. 56.1 at ¶ 222) Also, Eilman's loud and talkative behavior was not an indication of a need for mental health treatment; indeed, it could be explained by Eilman's statement that she had been drinking. Eilman expressly denied a need for medical attention, which Williams and Stokes were justified in relying upon. It was not until she was refused the accommodation of a tampon that Eilman became uncooperative. As a result, her behavior could easily be explained by the fact that she was not getting her way; it certainly was not an unambiguous indication of mental illness, or a risk of harm. Other than her refusal, in part, to cooperate with the booking process, Eilman's behavior throughout the remainder of the third watch, approximately three and one half hours, was unremarkable, and gave no indication of medical need. (Defs. 56.1 at ¶ 153) Eilman was brought to her cell, where at various times throughout the third watch she was observed singing quietly, sitting on the bench, holding hands with an arrestee in the neighboring cell and sleeping. (Defs. 56.1 at ¶ 154, 155) Overall, nothing in Eilman's behavior, indicated a serious medical need to Williams or Stokes.

### iii. Hudson and Quinn were not on notice of a serious medical need based on Eilman's behavior.

Hudson and Quinn were on duty for the first watch on May 8, 2006. (Defs. 56.1 at ¶¶ 163-164) When Hudson arrived, she conducted a cell check during which Eilman would not speak to her. (Defs. 56.1 at ¶167) Among the arrestees in lockup during this time were Senora Baker, Tanya Hall, Euraina Hawkins, and Natasha Washington. (Defs. 56.1 at ¶¶ 245, 237, 259, 282) Washington was in the cell adjacent to Eilman, and testified that she heard Eilman screaming that she wanted to go home, and kicking the bars of her cell. (Defs. 56.1 at ¶¶ 261, 264) Baker also testified that she heard somebody yelling that she wanted to go home. (Defs.

56.1 at ¶ 246) Although Baker was in less of a position to attribute this behavior to Eilman, we will presume for the sake of this argument that it was Eilman that she heard. Eilman also had two cellmates during this time. The first cellmate, Tanya Hall, testified that she asked Hudson for a sanitary napkin for Eilman, and informed Hudson that Eilman was "taking blood and wiping it on the bench," and Hudson "looked at her crazy and walked away." (Defs. 56.1 at ¶ 236) Eilman's next cellmate was Euraina Hawkins, who testified that upon arriving at the cell she noticed smeared fingerprints of blood on the walls, and started screaming she did not want to go in there with all that blood. (Defs. 56.1 at ¶¶ 282, 284) Either Hudson or Quinn escorted Hawkins to her cell.[6] Washington testified that she overheard Hudson ask a detainee in cell 8 "why she did that" and indicate that she was going to get her a tissue to "clean it up." (Defs. 56.1 at ¶270) Hawkins testified that Quinn told her "you're going in that cell, she is no crazier than you." (Defs. 56.1 at ¶284) Hawkins made noise the entire time she was in the cell with Eilman, banging on the bars and hollering that she wanted to get out. (Defs. 56.1 at ¶285) Eilman was banging on the bars with Hawkins and laughing. (Defs. 56.1 at ¶287) Hawkins claims to have told Quinn and Hudson that "something was wrong with" Eilman. (Defs. 56.1 at ¶286)

The fact that Eilman was banging on the bars and laughing is not an indication that she was at risk of harm. In Estate of Novack, the court found that nearly identical behavior— pounding on the walls and giggling uncontrollably—did not give notice of a risk of harm. 226 F.3d at 529-31. According to plaintiff's expert, it is not unusual for somebody in a lockup to bang on the bars or yell. (Defs. 56.1 at ¶288) Indeed, Eilman was not the only arrestee behaving this way, as Hawkins admits to constantly banging on the bars and screaming that she wanted to get out. (Defs. 56.1 at ¶285) Hawkins also testified that others in the lockup were yelling. (Defs. 56.1 at ¶290, 292) Nothing about Eilman's conduct in banging on the bars and laughing was even unusual under the circumstances. (Defs. 56.1 at ¶288, 290) Rather, Eilman was behaving exactly like the other inmates. Hudson responded reasonably to this behavior by telling Eilman to calm down and be quiet. (Defs. 56.1 at ¶274)

There is also no evidence that Eilman's alleged behavior of smearing menstrual blood in the cell was an indication of harm to herself or of a serious medical need. Neither mental health

---

[6] The record is unclear on this point. Hawkins identifies Quinn as her escort, while Washington recalls seeing Hudson. However, for purposes of argument only, each defendant will presume that it was she that escorted Hawkins.

expert retained by plaintiff indicated that this behavior evinces a threat to self, or drew any inference from this particular behavior. One can hardly expect Hudson or Quinn to know how to interpret the behavior, if professionals with the benefit of experience and hindsight could not do so. Case law likewise does not provide an answer. Defendants are aware of one case in which an inmate who had defiled his cell sued for indifference to his mental health needs. In Joseph v. Brierton, 739 F.2d 1244 (7th Cir. 1984), an inmate in a prison hospital unit tore off his clothes, raced about uncontrollably, and "spread his own feces all over his cell and on his body, hair, and mouth, shouting all the while that he was Moses and Christ, and the son of Abraham Lincoln" for an entire week. 739 F.2d at 1246-47. Joseph is distinguishable from this case for several reasons. First, Joseph was in prison; thus, officials had a responsibility for his long-term mental health care. Eilman, as an arrestee, was not entitled to long-term care. Second, Joseph was in a hospital unit due to a mental breakdown, and his action was directed against persons trained in mental health issues. Here, nothing in the record indicates that Hudson and Quinn were aware of Eilman's mental health history, or were trained to recognize and treat a mental health condition. Third, Joseph's behavior with his feces presented a sanitation and health risk not alleged in the present case, as the fecal matter was all over his body and in his mouth. Id. Eilman allegedly smeared menstrual blood on the wall and bench, not on her body or in her mouth. Finally, running around naked and screaming that he was "Moses and Christ, and the son of Abraham Lincoln" were further indicators of Joseph's patent need for mental health care. In this case, other than wiping menstrual blood on the wall, Eilman's behavior was not unusual for an arrestee.

While a reasonable person might find Eilman's behavior disgusting, it does not follow that touching one's menstrual blood and wiping it on a wall is an indication of a serious risk of harm or a serious medical need. See e.g. United States v. Wiggins, 94 F. App'x 959 (3rd Cir. 2004), vacated, Wiggins v. U.S., 543 U.S. 1102 (2005) (Exh. 7) (arrestee reached into his own feces to retrieve drug filled balloon). "Mere public intolerance or animosity cannot constitutionally justify the deprivation of a person's physical liberty." O'Connor v. Donaldson, 422 U.S. 563, 575 (1975).

Defiling a jail cell is also not necessarily an indicator of mental illness. In Freeman v. Berge, 441 F.3d 543 (7th Cir. 2006), the court considered a civil rights claim by an inmate who refused to take a sock off of his head and had smeared his cell walls with blood and feces. 441

F.3d at 544-45. The court found that the prison was justified in refusing to provide meals to the inmate when he failed to comply with required conditions for food service. Id. at 547. And, despite his disgusting behavior the opinion in Freeman did not presume that the inmate was mentally ill.

It is not uncommon for detainees to act out in anger in far more repulsive fashion. See Beard v. Banks, 548 U.S. 521, 531 (2006) (recognizing legitimate state interest in withholding paper products which can be used to hurl feces at prison personnel). Anger and defiance are reasonable explanations for Eilman's behavior. Hudson and Quinn were aware that Eilman was defiant, as she refused to be fingerprinted. (Defs. 56.1 at ¶ 166) Moreover, the simplest explanation for Eilman's conduct is the fact that Eilman did not have a sanitary napkin and was removing the menstrual blood to avoid staining her clothes. (Defs. 56.1 at ¶¶ 135, 231) This might not be a choice all women would make, but it is not an act which is harmful to oneself. Regardless, there were reasonable interpretations for Eilman's behavior other than mental illness. Just as the officers in Brownell were reasonable in attributing a detainee's immobility to drunkenness, so Hudson and Quinn were reasonable in attributing Eilman's blood-smearing to anger, defiance, or an attempt to keep her clothes clean. See Brownell, 950 F.2d at 1291-92.

Eilman's strange behavior must also be viewed in light of the circumstances. Eilman was a temporary detainee; thus, Hudson and Quinn were on alert for "life-threatening conditions or situations where it is apparent that delay would detrimentally exacerbate the medical problem." Hill v. Dekalb, 40 F.3d at 1187. This was not such a situation. It was a situation that could be, (and was, by some accounts), rectified with a tissue and a sanitary napkin. (Defs. 56.1 at ¶¶ 135, 136, 260) Moreover, just as she was in the Eighth District and at other times in the lockup, Eilman on occasion was calm, speaking in a normal tone of voice. (Defs. 56.1 at ¶ 272) This would indicate that Eilman was able to control her behavior, just as the arrestee in Williams v. Rodriguez, was able to control his asthma symptoms, making medical treatment unnecessary. 509 F.3d at 402. By accepting a sandwich, and sleeping in her cell Eilman further indicated to Hudson and Quinn that she was not a danger to herself, or in need of medical treatment; rather, she was looking out for her basic needs. (Defs. 56.1 at ¶¶ 155, 170, 173) As a result, considering all circumstances, Eilman's behavior would not put a reasonable person on notice of a need for mental health treatment for a "life-threatening condition[ ] or situation[ ] where it is apparent that delay would detrimentally exacerbate the medical problem." Hill v. Dekalb, 40 F.3d, at 1187.

### iv. Mabery, Williams and Heard were not on notice of a serious medical need based on Eilman's behavior on May 8, 2008.

During the two watches following Hudson and Quinn, the second watch staffed by Mabery and Jacqueline Roberson (who is not a defendant) and the third watch staffed by Heard, Williams and Johnnie Smith (also not a defendant), Eilman's behavior did not demonstrate a serious medical need. (Defs. 56.1 at ¶¶ 176, 182, 203) The only new behavior during this time was Eilman's statement to Heard, "Bitch, feed me." (Defs. 56.1 at ¶ 217) As plaintiff's expert acknowledged, nothing about this statement is unusual, or warranted a mental health evaluation, as people in the lockup frequently use profanity. (Defs. 56.1 at ¶ 218) The remaining evidence at most indicates that Eilman was kicking the bars and screaming that she wanted to go home, and wanted medical treatment.[7] (Defs. 56.1 at ¶¶ 264, 296, 317) Yelling and kicking on the bars, even for medical care one does not need, are neither unusual behaviors nor indications of a risk of harm. See Estate of Novack, 226 F.3d at 529-31; (Defs. 56.1 at ¶¶ 289, 390) In addition, the evidence indicates that Eilman was calm during the second and third watch on May 8, 2006. Washington testified that she spoke calmly with Eilman that morning, and that Roberson also spoke to Eilman and "kept her calm." (Defs. 56.1 at ¶ 275) Accordingly, Mabery, Williams, and Heard were not on notice of a serious medical need based on Eilman's behavior.

### D. Defendants acted reasonably in light of police interests in expediting Eilman's release, avoiding a potentially unconstitutional restriction of liberty, and maintaining an effective police department.

The police interest factor "is wide-ranging in scope and can include administrative, penological, or investigatory concerns." Williams v. Rodriguez, 509 F.3d at 403. In this case, the overriding police interest was respect for Eilman's constitutional rights, and the concomitant interest in avoiding liability for violating those rights. In addition, with regard to the conduct of Cason, Moreno, and Berglind, there is a significant police interest in upholding the organizational hierarchy of the police department.

#### 1. Respecting Eilman's Fourth Amendment right not to be unreasonably detained is a legitimate police interest.

In Sides v. City of Champaign, 496 F.3d at 828, the Seventh Circuit recognized expeditious processing of an arrest as a reasonable police consideration in determining whether

---

[7] The lack of credibility in these complaints is addressed above in Section I(C)(1).

to obtain medical treatment for an arrestee. Finding that the arresting officers acted reasonably in not obtaining treatment, the court noted that the officers did not unduly delay the plaintiff's detention after their on-site investigation concluded. See id. This, along with other factors, led the court to conclude that the officers acted reasonably. See id.

The police have an interest in expeditiously processing arrestees, based on the constitutional requirement that police "make every attempt to minimize the time a presumptively innocent individual spends in jail." County of Riverside v. McLaughlin, 500 U.S. 44, 58 (1991). When an arrest is delayed for non-administrative purposes, the legality of the arrest can be called into question under the Fourth Amendment. See Willis v. City of Chicago, 999 F.2d 284, 288-89 (7th Cir. 1993). Indeed, the Seventh Circuit recognized that a detention period as short as four hours could be unreasonable. See Chortek v. City of Milwaukee, 356 F.3d 740, 747 (7th Cir. 2004).

In this case, defendants had a legitimate police interest in avoiding a potentially unreasonable extension of detention. It was reasonable to conclude that bringing Eilman to the hospital would have increased her detention time, even if only for a short time. Because the processing of Eilman's arrest would be completed at the Second District, transporting Eilman to the hospital rather than to the Second District would have delayed her processing and release. Moreover, the booking process was on hold from Eilman's arrival at the Second District at approximately 8:00 pm on May 7, 2006 through approximately 11:30 am on May 8, 2006 when she agreed to be fingerprinted. During this time, a trip to the hospital would have taken away the opportunity to be fingerprinted and complete the processing necessary for her release, extending her detention. Even if Eilman had been transported to the hospital after she was fingerprinted, her detention would have been delayed by allocating personnel to travel to the hospital, execute the paperwork and facilitate her release from custody.

Given that some delay was inevitable, it was reasonable for defendants to consider whether there was a defensible justification for the delay in consideration of police interests.

### 2. Respecting Eilman's Fourth Amendment right not to be involuntarily committed or receive unwanted mental health treatment was a legitimate police interest.

Because Eilman did not consent to treatment, it was reasonable for defendants to consider any mental health treatment to be against Eilman's will. See Chathas v. Smith, 884 F.2d 980, 989 (7th Cir. 1989) (use of force reasonable absent testimony that plaintiff was willing to leave

voluntarily). The defendants had an interest in not providing treatment which could lead to civil rights violations. The Fourth Amendment protects Eilman from arbitrarily being committed to a mental health institution or subjected to unwanted mental health treatment. See O'Connor v. Donaldson, 422 U.S. 563, 576 (1975); Washington v. Harper, 494 U.S. 210, 221-222 (1990). While probable cause to arrest authorized the temporary restriction of Eilman's natural liberty, it did not totally deprive her of all liberty interests. See, e.g., Gutierrez v. May, 4 F.3d 996, 1993 WL 322664, **2 (7th Cir. 1993) (Exh. 8) (requiring independent probable cause determinations for arrest and involuntary commitment). Rather, Eilman retained the right to refuse both hospitalization and medication for her mental illness.

The Supreme Court has recognized that commitment to a mental hospital is a "massive curtailment of liberty" which entitles convicted prisoners to due process of law. See Vitek v. Jones, 445 U.S. 480, 491-492 (1980). In Vitek v. Jones, the court considered whether a prison inmate retained "a residuum of liberty that would be infringed by a transfer to a medical hospital without due process." Id. at 491. The court concluded that such a transfer impacted his liberty interest even though he was already confined, and stated:

> The loss of liberty produced by an involuntary commitment is more than a loss of freedom from confinement. It is indisputable that commitment to a mental hospital "can engender adverse social consequences to the individual" and that "[w]hether we label this phenomena 'stigma' or choose to call it something else . . . we recognize that it can occur and that it can have a very significant impact on the individual."

Vitek, 445 U.S. at 492. In this case, defendants did not have a right to subject Eilman to involuntary mental health treatment simply because she was in their custody. Rather, Eilman retained a liberty interest in not being subjected to involuntary commitment unless "immediate hospitalization [was] necessary for the protection of such person or others from physical harm." Illinois Mental Health and Developmental Disabilities Code, 405 ILCS 5/3-601 (2004).

In addition to freedom from involuntary commitment, Eilman also had a right to refuse any treatment for her mental illness. The Supreme Court has recognized "a significant liberty interest in avoiding the unwanted administration of antipsychotic drugs under the Due Process Clause of the Fourteenth Amendment." Washington, 494 U.S. at 221-222. Unwanted mental health care is a significant intrusion on individual liberty, thus the state cannot override an inmate's refusal of treatment unless "the inmate is dangerous to himself or others." Id. at 227.

33

The police have an additional interest in respecting an arrestee's right to refuse mental health treatment, because failing to do so could lead to a lawsuit for constitutional violations and common law tort actions. See, e.g., Gutierrez v. May, 4 F.3d 996, 1993 WL 322664 at **1 (7th Cir. 1993) (Exh. 8) (challenging involuntary commitment as violation of Fourth Amendment); Estate of Allen v. City of Rockford, 349 F.3d 1015, 1018 (7th Cir. 2003) (challenging involuntary medical care as violation of due process, battery, and intentional infliction of emotional distress). Avoiding the costs attendant to defending a law suit, as well as the potential for an adverse judgment, are legitimate police interests.

Whether, in hindsight, Eilman actually met the criteria for involuntary admission or forced administration of medical treatment is not at issue. Rather, because the defendants acted to avoid potential civil rights violations, their conduct was reasonable. See Gooden v. Howard County, 954 F.2d 960, 967 (4th Cir. 1992). In Gooden v. Howard County, plaintiff alleged that she was involuntarily seized for a mental health evaluation in violation of her civil rights. See id. at 964. The police had seized the plaintiff in response to a disturbance call, believing that she was attempting to harm herself. See id. Although, in retrospect, the police were mistaken and had seized the wrong person, their conduct was not unreasonable. See id. at 964, 967. The court recognized that the officers faced the possibility of a lawsuit if they had failed to protect the woman, given the prevailing law at the time.[8] See id. at 967. In refusing to rest on the "shifting sands" of the law, and instead choosing to avoid a potential due process violation, the officers acted reasonably. See id.

This case represents the flipside of the dilemma faced by officers in Gooden, in that defendants are being sued for their inaction. Defendants herein were faced with a potential violation of Eilman's civil rights if they had forced upon her involuntary mental health treatment. Like the defendants in Gooden, they chose an option which avoided a potential constitutional violation, and did not act unreasonably.

### 3. Police interests were served by Cason, Moreno and Berglind obeying the order of their commanding officer.

The Chicago Police Department, like any police department, depends on its members to follow certain rules. Driebel v. City of Milwaukee, 298 F.3d 622, 639 (7th Cir. 2002). "A police department is a paramilitary organization that must maintain the highest degree of discipline,

---

[8] The conduct at issue took place prior to DeShaney v. Winnebago County Dep't of Soc. Servs., 489 U.S. 189, 201 (1989), in which the court found no such duty because the state did not create the danger.

confidentiality, efficiency, and espirit de corps among its officers, who are the first line of defense against lawlessness." Id. at 638-639. It is fundamental to the efficiency of police service that its members obey the orders of their superiors. See Launius v. Board of Fire and Police Comm'rs, 151 Ill. 2d 419, 436 (1992) (upholding discharge of police officer for disobedience to order to remain at his post). "A police officer does not have the prerogative of actively disobeying an order from a superior while seeking a determination as to the validity of that order. Such a practice would thwart the authority and respect which is the foundation of the effective and efficient operation of a police force." Id.

In this case, Cason, Moreno and Berglind acted reasonably in respecting the chain of command of the police department. Cason brought Eilman's arrest to the attention of Earnest, seeking the advice of a superior officer as to how to proceed. (Defs. 56.1 at ¶ 55) This conduct was commendable, according to James Kennedy, plaintiff's expert in police procedures. (Defs. 56.1 at ¶ 60) Earnest ordered Berglind to interview Eilman. This was the appropriate response by Earnest, according to Mr. Kennedy. (Defs. 56.1 at ¶ 62) Berglind complied with Earnest's order by interviewing Eilman and reporting back to Earnest that Eilman was aware of her surroundings, understood what was going on, and was not a danger to herself or others. (Defs. 56.1 at ¶ 85, 86) As commanding officer, it was Earnest's decision whether to proceed with processing Eilman. As a subordinate, Berglind could not disrupt the chain of command by deciding on his own to bring Eilman for mental health treatment. (Defs. 56.1 at ¶ 93) Earnest also ordered Cason to continue processing Eilman's arrest, which order was conveyed to Moreno. (Defs. 56.1 at ¶ 94) Cason and Moreno "[did] not have the prerogative of actively disobeying an order from a superior while seeking a determination as to the validity of that order." See Launius, 151 Ill. 2d at 436. Rather, Cason, Moreno, and Berglind were required to obey orders, a practice at the very foundation of an "effective and efficient operation of a police force." See id. As a result, Cason, Moreno and Berglind acted reasonably in light of police interests in compliance with orders.

In sum, the uncontested facts show that (1) while in custody Eilman had no serious need for any medical treatment; (2) no defendant had notice that Eilman had a serious medical need; (3) providing Eilman with involuntary medical care would be burdensome and unnecessary; and (4) doing so would be against police interests. "The question is not whether [defendants] did all that they could have, but whether they did what the constitution requires." Williams v. Kelso,

201 F.3d 1060, 1068 (8th Cir. 2000) (citation omitted). Each of the individual defendants in their encounter with Eilman acted reasonably, thereby abiding with the Fourth Amendment. Accordingly, the defendants are entitled to summary judgment as to counts II, VI, X, XV, XVIII, XX, XXII, XXIV, XXVI, XXVIII, and XXXIII.

## II. The failure to provide medical treatment while Eilman was in custody was not a proximate cause of her injuries.

Plaintiff claims, pursuant to Section 1983, that her constitutional rights were violated when she was denied medical care during her arrest and detention. (Defs. 56.1 at ¶ 6) Because "general principles of tort law govern the liability imposed under 42 U.S.C. 1983," causation is a necessary element of this claim. Hibma v. Odegaard, 769 F.2d 1147, 1155 (7th Cir. 1985). To prove causation, plaintiff must establish that the conduct at issue was both the actual and legal cause of the harm alleged. Ciomber v. Cooperative Plus, Inc., 527 F.3d 635, 640 n.1 (7th Cir. 2008). In this case, the conduct at issue is limited to any "actions or inactions taken while [Eilman] was in custody." See Collignon v. Milwaukee County, 163 F.3d 982, 987 (7th Cir. 1999). Because the duty to provide medical care to an arrestee stems from a restriction of liberty, the duty terminates when detention ends. See Exhibit 1, Order, at pp. 25-26 (citing Collignon, 163 F.3d at 991-992)

Plaintiff alleges that Eilman was harmed in that she sustained "serious and life-threatening injuries," as a result of the failure to receive treatment while in police custody. Presumably, the injuries to which plaintiff refers were sustained when she was "propelled from a seventh floor window" five hours after her release from custody. (Defs. 56.1 at ¶6 ) To establish actual cause, plaintiff must establish that the injury would not have happened absent the defendants' conduct. Ciomber, 527 F.3d, at 640 n.1. To establish legal cause, plaintiff must show that the injury at the hands of another was the "natural and probable or direct consequence" of the failure to provide medical care. See Hibma, 769 F.2d at 1155. Plaintiff can establish neither element of causation, thus summary judgment on plaintiff's claims of failure to provide medical treatment is warranted.

### A. The failure to provide treatment while Eilman was in custody was not the actual cause of any harm to Eilman.

As this court has recognized, Eilman's right was limited to "basic medical treatment while in custody." Exhibit 1, Order, at p. 26. Thus, the issue is whether the lack of treatment during the period that Eilman was in each defendant's custody caused her harm, not whether

Eilman was entitled to psychiatric treatment after she was no longer in custody. Plaintiff cannot establish that the failure to receive medical treatment caused Eilman to have an acute psychiatric episode, or aggravated her psychiatric condition. Thus, to the extent that plaintiff claims that Eilman's psychiatric condition at the time of her release caused her later injuries, that condition was not caused by defendants' conduct. In addition, there is no evidence that Eilman suffered any physical harm as a result of not obtaining treatment, and no indication that her physical condition contributed to her injuries. As a result, plaintiff cannot establish that "but for" the lack of medical care Eilman would not have been injured. See Avalos v. Pulte Home Corp., 474 F. Supp. 2d 961, 968 (N.D. Ill. 2007).

To recover for failure to provide medical treatment over a defined time period plaintiff must provide evidence establishing actual harm. "An inmate who complains that delay in medical treatment rose to a constitutional violation must place verifying medical evidence on the record to establish the detrimental effect of delay in medical treatment to succeed." Crowley v. Hedgepeth, 109 F.3d 500, 502 (8th Cir. 1997). In Crowley, an inmate had eye surgery and was prescribed prescription sunglasses. See id. at 501. The inmate sued for inattention to medical needs based on a delay in supplying the sunglasses. See id. at 502. Because the medical evidence established that the lack of sunglasses did not cause any damage to his eye, an essential element of his claim was lacking and summary judgment against plaintiff was appropriate. See id.

In Brownell v. Figel, 950 F.3d 1285 (7th Cir. 1991), an arrestee developed paralysis following an automobile accident and an arrest for drunk driving. The arrestee alleged that, because the paralysis manifested while he was in custody of defendant officers, after he had been treated at the hospital, the police officers must have used excessive force and aggravated his injury, causing the paralysis. See id. The court found that although there was medical evidence of a spinal fracture which caused the paralysis, there was no evidence that the spinal fracture was caused by the unreasonable conduct of state actors, rather than the automobile accident. Id. at 1293. Because this necessary link was missing, causation was lacking and summary judgment was proper. Id. at 1293, 1295.

As to the lack of psychiatric care, plaintiff's two mental health experts have opined that Eilman's bipolar disorder, and her alleged episode, pre-existed her detention. Dr. Nelson opined that she was in the midst of a manic episode on May 7 and May 8. (Defs. 56.1 at ¶380) Dr. Dvoskin opined that Eilman was suffering from a severe manic episode before, during and after

her detention (Defs. 56.1 at ¶373)  Here, as in <u>Crowley</u> and <u>Brownell</u>, there is no evidence that links defendants' conduct to the cause or aggravation of Eilman's psychiatric episode or physical ailments. Neither experts has opined that there was any change to Eilman's psychological condition while in custody, much less an aggravation of her condition. In fact, Dr. Dvoskin opined that Eilman's psychiatric condition "was not getting better and was not getting worse" while in custody. (Defs. 56.1 at ¶ 371) Based on the testimony of plaintiff's experts, Eilman's condition was not aggravated by her failure to receive treatment while in custody. Thus, no defendant can be held responsible for Eilman's psychiatric condition at the time of her release.

There also is no evidence that defendants' conduct caused or aggravated Eilman's physical condition. Plaintiff claims that Eilman made various complaints about difficulty breathing, chest pain, and a heart murmur while in custody. (Defs. 56.1 at ¶ 67) However, there is no evidence that Eilman actually had such conditions,[9] or that the failure to provide medical treatment caused or exacerbated these conditions.

Evidence is required not only to establish harm, but also to establish how the lack of treatment caused the harm. In <u>Ortiz v. City of Chicago</u>, 2008 WL 4681156, at *1-2 (N.D. Ill. May 13, 2008) (Exh. 9), an arrestee died in lockup, allegedly due to a failure of lockup personnel to provide her with necessary medication. The plaintiff provided expert medical testimony as to what could happen to a patient with the arrestee's medical condition without certain medication, but failed to establish that it did happen. <u>Id.</u> at 8-9. The expert left crucial questions of causation unanswered: What medication should she have received? How would it have affected her condition? What was the result of not taking the medication while in custody? Would taking the medication have prevented the injury? <u>Id</u>. Absent answers to these questions, the court found the plaintiff's medical expert's hypothesis that the failure to provide medication "could have" resulted in her injury to be insufficient to withstand summary judgment. <u>Id</u>.

In this case, plaintiff's experts offer no opinions as to the treatment Eilman needed while in custody, the therapeutic effect of such treatment during the period of her detention, or the effect of a lack of treatment on her condition. Nothing in the record even suggests the need for treatment for Eilman's alleged physical conditions. Rather, plaintiff's experts focus exclusively on Eilman's mental health condition, and their opinions fail to establish any contested facts as to how the lack of treatment caused any harm. Dr. Dvoskin merely hypothesized regarding what

---

[9]  In addition, there is no evidence to connect these complaints to Eilman, as further addressed in Section (I)(c)(1).

might have been if Eilman had been brought to a hospital, much as plaintiff's expert did in <u>Ortiz</u>. Dr. Dvoskin opined that Eilman should have been brought to the hospital, which he believed could have resulted in three scenarios. First, Eilman might have agreed to inpatient treatment. (Defs. 56.1 at ¶376) Second, Eilman fit the criteria for involuntary committal, and could have been committed, although Dr. Dvoskin acknowledged that a hospital could choose not to involuntarily commit Eilman. (Defs. 56.1 at ¶¶375-377) Third, the hospital would have talked to Eilman and made sure she has a safe place to stay. (Defs. 56.1 at ¶378) Dr. Dvoskin did not opine which of these three scenarios was most likely. Rather, as did the expert in <u>Ortiz</u>, he merely speculated on what might have been. Such guesswork is insufficient to establish proximate cause.[10] In addition, all three scenarios offered by Dr. Dvoskin suggest the same "treatment" for Eilman: a safe place to stay. However, Eilman was provided a safe place to stay while in police custody. Thus, to the extent that Dr. Dvoskin has identified a "treatment" necessary to Eilman's well-being while she was in custody, it was provided.

Dr. Nelson also does not identify a treatment which, if administered while Eilman was in custody, would have affected Eilman's psychiatric condition upon her release from the Second District the next day. In fact, Dr. Nelson's testimony about the usual treatment for a manic episode makes clear that it would not have been effective prior to Eilman's release. Dr. Nelson testified that treatment for a manic episode typically takes seven to twenty days of administering various medications. (Defs. 56.1 at ¶382) Eilman's one and only prior episode required ten to thirteen days of treatment, and she remained delusional until the final days of her treatment. (Defs. 56.1 at ¶383) Thus, had Eilman immediately began the usual course of pharmaceutical treatment upon her arrest, it would not have taken effect prior to her release the next day.[11] Because there was nothing which could have been done while Eilman was in custody to change her manic condition, defendants' failure to provide treatment did not cause Eilman any injury.

---

[10] The district court for the Eastern District of Tennessee rejected a similar argument for proximate cause. In <u>Ellis v. Washington County</u>, 80 F. Supp. 2d 791 (E.D. Tenn. 1998), a detainee's representative argued that if he had been transported to the hospital and examined he "would have received 'treatment necessary for his well-being,' and he would not have been transported to [county jail]," where he later committed suicide. The court found such speculation to be insufficient to establish proximate cause, emphasizing the "obvious fact is [detainee] did not die or suffer life threatening injuries in [defendant's custody]."

[11] This argument assumes, without accepting, that Eilman would have been amenable to such treatment. However, this too is pure speculation.

See O'Neill v. Krzeminski, 839 F.2d 9, 11-12 (2d Cir. 1988) (conduct is not a proximate cause of an injury if the defendant had no realistic opportunity to prevent the injury). Thus, to the extent Eilman's psychiatric condition may have been a contributing cause to her having been assaulted after she was released from custody, it was unaffected by her detention. As a result, defendants' failure to provide treatment was not an actual cause of Eilman's injuries.

The testimony of plaintiff's experts highlights an additional difficulty with causation, as it offers nothing but speculation as to "but-for" causation. Based on the testimony of plaintiff's experts, the only medical treatment which could have prevented the attack by Marvin Powell was hospitalization. However, whether Eilman would have been admitted to a hospital is pure speculation, especially absent any evidence that she would have consented to treatment. See Collignon v. Milwaukee County, 163 F.3d 982, 990 (7th Cir. 1988) (finding expert's opinion speculative absent evidence that arrestee would have "voluntarily submitted to such a treatment or would have tolerated the side effects.") Although Dr. Dvoskin testified that Eilman met the criteria for involuntary admission, he conceded it was possible that any hospital would not admit her, and it is inconclusive as to what the hospital's position would have been on this issue. (Defs. 56.1 at ¶¶ 368, 376-378) What the record does indicate is that at St. Bernard Hospital, a triage center for mental health patients on Chicago's south side, the decision whether to admit a patient for mental health treatment is a judgment call made by the emergency room physician in conjunction with a group of psychologists on staff. (Defs. 56.1 at ¶¶ 395, 398) The emergency room physician's decision is then subject to review by a psychiatrist. (Defs. 56.1 at ¶ 399) There is no reason to believe that all of these individuals would have agreed with Dr. Dvoskin. Moreover, a hospital's decision depends on the information they receive regarding Eilman's condition. Dr. Dvoskin relied on Eilman's behavior over the previous few days, including events prior to Eilman's arrest and unknown to any defendant herein, to opine that Eilman was a candidate for admission. (Defs. 56.1 at ¶ 375) However, the hospital could have received a less complete, or different, picture of Eilman's behavior, making it even more speculative to ascertain if it would have admitted Eilman. Because it is pure speculation that Eilman would have been hospitalized, plaintiff cannot establish "but-for" causation. If Eilman had not been admitted, she would have been returned to police custody and released in the ordinary course. (Defs. 56.1 at ¶¶ 364, 400) Under these circumstances, Eilman would not have avoided the attack by Powell.

Nor is there any guarantee that Eilman would have escaped harm if she had been released from a hospital rather than the Second District station. Dr. Dvoskin assumes that a hospital would have made sure she had a safe place to stay. (Defs. 56.1 at ¶¶ 368, 378) However, nothing in the record indicates that any hospital would have met Dvoskin's expectations in this regard, or that Eilman would have cooperated. Had Eilman been released from a hospital in a different neighborhood, she may not have fared better. Indeed, she could have encountered a predator like Marvin Powell anywhere. (Defs. 56.1 at ¶ 366)

Finally, Dr. Dvoskin offers nothing more than speculation as to a connection between Eilman's illness and her injury. Dr. Dvoskin alone opines that Eilman's manic state "may have' lead her to make bad choices. Nothing in the record indicates that Eilman's untreated mental illness caused her to walk east on 51st Street upon leaving the Second District Station, or take any of the actions which eventually led to her injury. In fact, when confronted by Marvin Powell, Eilman made the wise choice to leave. (Defs. 56.1 at ¶ 353) It was Marvin Powell, not Eilman's disorder, that limited her choices. Marvin Powell grabbed Eilman, pulled her into the apartment, and forced her to engage in a sex act. (Defs. 56.1 at ¶ 356) The only bad choice Dr. Dvoskin identifies is that Eilman may have opted to jump from a window rather than succumb to rape. (Defs. 56.1 at ¶ 370) There is no reason to conclude that such a choice, which plaintiff cannot even establish was made, was the irrational result of Eilman's illness. In fact, plaintiff's experts concede that at the moment Marvin Powell grabbed Eilman and pulled her into the apartment, it did not matter whether Eilman was mentally ill. (Defs. 56.1 at ¶¶ 358, 359) Thus, plaintiff cannot link Eilman's untreated mental illness to her injury, and the evidence does not support "but-for" causation.

Dr. Dvoskin's testimony, or lack thereof, on causation illustrates that the true basis upon which plaintiff seeks to recover is not a failure to obtain medical care while Eilman was in custody. Hospitalizing Eilman would have been simply a means toward an end—to prevent Eilman from having her freedom. However, the notion that the mentally ill are entitled to be restrained for purposes of obtaining treatment has been foreclosed by the Seventh Circuit. See Collignon, 163 F.3d at 993; Wilson v. Formigoni, 42 F.3d 1060, 1066 (7th Cir. 1994) (noting that there is no right or entitlement to be involuntarily committed to a mental health facility). Plaintiff cannot circumvent well-established precedent merely by casting her claim as a failure to obtain medical care. Eilman entered police custody suffering from a long-term, pre-existing

mental illness. Eilman's failure to receive medical treatment in custody had no effect on her psychiatric condition at the time of her release, and did not cause her to be victimized by Powell. As a result, there is no causal link between defendants' conduct and any injury to Eilman following her release from custody.

### B. Defendants' conduct was not the legal cause of plaintiff's injuries sustained in the fall.

Plaintiff asserts that if Eilman had been taken for evaluation and treatment, she would not have been assaulted by Marvin Powell, for the simple reason that she would have been somewhere else at the time of the assault. Dr. Dvoskin predicted that her injuries would not have occurred if she had received treatment "because she would have been taken to a hospital and evaluated and probably kept there, either voluntarily or involuntarily; she would have been released with a discharge plan that would have accounted for her personal safety; and the most likely, by far most likely resolution is that someone would have come and gotten her that could have assisted her in remaining safe, rather than wandering around the streets." (Defs. 56.1 at ¶ 368) Setting aside the fact that this theory is based on pure speculation as to the treatment, if any, that would have been provided to Eilman, plaintiff cannot establish that the failure to bring Eilman to the hospital was the legal cause of her injuries.

Legal cause requires more than the mere assertion that the defendant's conduct started a chain of events which lead to an injury. In Martinez v. California, 444 U.S. 277 (1980), a fifteen-year-old girl was tortured and killed by a sex offender who had been paroled five months earlier. The victim's estate sought to hold the parole board liable for her death, as they were alleged to have had actual knowledge of the danger that the parolee would commit such a crime. Id. at 556-57. The court found that the parole board could not be liable "just because it may set in motion a chain of events that ultimately leads to the random death of an innocent bystander." Id. at 557. Rather, the court found that the death at the hands of another five months later was "too remote a consequence" of the parole officers' action to hold them responsible. Id. at 559. In this case, defendants cannot be liable "just because [they] may [have] set in motion a chain of events that ultimately [led] to the random [assault] of [Eilman]." Rather, the causal connection between Eilman's custody and injury is too remote to hold any defendant responsible.

A defendant cannot be held liable where the harm results from an outside force, the "risk of which is not increased by the defendant's act." Hibma, 769 F.2d at 1155. In the case of a

post-detention injury, plaintiff must establish that conduct during detention increased the risk of a future injury. In <u>Henderson v. Sheahan</u>, an inmate alleged that he suffered an increased risk of developing a smoke-related disease in the future, due to inhaling excessive amounts of second-hand smoke while at the Cook County jail. 169 F.3d 839, 842 (7th Cir. 1999). The Seventh Circuit acknowledged a cause of action for "an official's deliberate indifference to [jail] conditions posing an unreasonable risk of serious damage to a prisoner's future health." <u>Id.</u> at 846-847. Nonetheless, the court upheld summary judgment in favor of the defendants because plaintiff's expert could not link the jail conditions to an increased risk to plaintiff's future health. <u>Id.</u> at 853. <u>See also Holland v. Hanks</u>, 139 F. 3d 901 (7th Cir. 1998) (Exh. 10) (summary judgment proper where inmates failed to present evidence of increased risk of future injury due to exposure to environmental tobacco smoke).

In this case, as in <u>Henderson</u>, there is no causal link between events which occurred while Eilman was in custody and the injuries she sustained several hours after she was released. Just as the experts in <u>Henderson</u> were unable to opine that Henderson suffered an increased risk of disease from second-hand smoke in jail, so plaintiff's experts in this case cannot opine that Eilman's failure to receive treatment while in police custody put her at an increased risk of future harm. Even assuming, *arguendo*, that Eilman's psychotic state put her at greater risk of victimization than a sane person would have faced, that risk cannot be causally related to the time she spent in police custody. As demonstrated above, there is no evidence that Eilman's psychiatric episode was caused or aggravated by a failure to obtain treatment. As Eilman's condition was pre-existing and unchanged during the time she was being processed, any conduct by defendants did not put Eilman at an increased risk for future harm. According to plaintiff's experts it did not matter, at the moment Eilman was being pulled into the room by Powell, whether she was sane. (Defs. 56.1 at ¶¶ 358, 359, 392)

The failure to treat an arrestee's medical condition is not the legal cause of an injury where an intervening act was the direct cause of the injury. In <u>Cabaniss v. City of Riverside</u>, 231 F. App'x 407 (6th Cir. 2007), an intoxicated arrestee was injured in a fall while in police custody. The arrestee attempted to stand on his own and fell, suffering a head injury which ultimately resulted in his death. <u>Id.</u> at 410. The arrestee's estate sued the officers, alleging their failure to properly treat the arrestee's intoxication caused his fall and resulting injuries. The court found that "a showing of proximate cause is imperative in a case like this, where the

medical needs of the detainee are not obvious . . . " Id. at 415. The court noted that had the arrestee died as a result of his intoxication, for example by alcohol poisoning, there might have been a causal link between the failure to treat his intoxication and his death. Id. However, the arrestee died as a result of fall, which at most "may have been facilitated by his intoxication." Id. The court found the evidence was insufficient to establish that the failure to treat his intoxication was a legal cause of the accidental fall. Id. Rather, it was the arrestee's attempt to stand unassisted that was the direct cause of his injury, superceding his intoxicated state as a legal cause of the fall. See id.

In this case, plaintiff alleges that Eilman had a condition, a severe manic episode, which was untreated during Eilman's detention. Like the arrestee in Cabaniss, Eilman's injury did not directly result from her psychiatric condition. Her mental state was no more the cause of her fall than the Cabaniss arrestee's drunkenness was the cause of his fall. In fact, the connection is much more tenuous. At most, Eilman's mental state "may have facilitated" her being in the same place as Powell, which in turn led to her being assaulted. However, just as the officers in Cabaniss were not to blame for the arrestee's drunkenness, so defendants in this case were not to blame for Eilman's mental condition. It was the criminal act of Powell, who grabbed Eilman, pulled her into the apartment and forced her to engage in a sex act, that directly caused Eilman's injuries, superceding Eilman's mental health condition as a legal cause of her fall.

The Seventh Circuit has recognized that multiple factors can intervene to break the chain of causation between a custodial relationship and a future harm. In Hibma, deputy sheriffs committed a series of burglaries and framed Hibma for the crimes. 769 F.2d at 1149-50. Hibma was arrested, held for a period of time in the custody of defendants, then sent to prison, where he was later raped by another inmate. Id. at 1149-50. The court found that the acts of the deputy sheriffs were not the legal cause of the rape, stating "[t]hough the deputies' actions set in motion the events which led to Hibma's confinement at the [prison] the duty of protection assumed by the [prison system] and the criminal acts of the other inmates formed superceding causes which prevent the deputies' actions from being a legal cause in bringing about the sexual assault." Id. at 1156. Thus, the court recognized two intervening acts which broke the causal connection between the conduct of the deputies and the eventual injury: the prison system's taking custody of the arrestee and the criminal acts of the fellow inmates. Id. at 1156-57. The court further recognized that even "a willful or intentional tort feasor (sic) does not become an insurer of the

safety of those who he has wronged;" rather, "even he remains insulated from injuries caused by wholly unforeseen accidents occurring without his agency." Id. at 1155 (citing Johnson v. Greer, 477 F.2d 101, 106-07 (5th Cir. 1973) (internal citations omitted)).

In the case at bar, the same intervening acts addressed in Hibma, as well as several others, supercede any causal relationship between the acts of defendants and the later injury to plaintiff. As in Hibma, Eilman was not in the custody of any defendant when the injury occurred. (Defs. 56.1 at ¶ 361) Berglind's custody of Eilman ended after the interview, when he returned to his regular duties. (Defs. 56.1 at ¶ 88) Upon Earnest's order, itself an intervening act, Cason and Moreno released Eilman to the custody of the Second District on May 7, 2009. (Defs. 56.1 at ¶¶ 92-94, 103) The duty of protection was thereby assumed by personnel at the Second District, breaking the chain of causation between the conduct of individuals at the Eighth District and any subsequent injury.

At the Second District lockup, the duty to care for Eilman was first assumed by Williams, Stokes, and Johnnie Smith. (Defs. 56.1 at ¶¶ 127, 129) Later, Hudson and Quinn assumed this duty of protection, breaking the causal connection between conduct of Williams and Stokes on the prior shift and any later injury. (Defs. 56.1 at ¶¶ 162-68) When Hudson and Quinn finished their shift, the duty of protection again shifted, this time to Mabery and Roberson, superceding the causal link between the conduct of Hudson and Quinn and Eilman's later injury. (Defs. 56.1 at ¶¶ 176, 177, 182-185) In turn, Mabery and Roberson released Eilman into the custody of Heard, Williams and Johnnie Smith, again severing any causal connection. (Defs. 56.1 at ¶ 203) Finally, Eilman was released from the custody of the Second District, and the duty for her protection again shifted, this time to Eilman herself. (Defs. 56.1 at ¶¶322, 329) Thus, the release of Eilman on her own recognizance broke the chain of causation between any conduct by defendants at the Second District and Eilman's later injury.

Following Eilman's release, several additional intervening events occurred. Eilman left the Second District Station and proceeded to a restaurant, King JJ Chicken and Fish, where she spent approximately one hour. (Defs. 56.1 at ¶¶ 337, 338) Upon leaving the restaurant, Eilman met Robert Kimble and Floyd Fulton, and decided to follow them to 5135 S. Federal. (Defs. 56.1 at ¶¶ 340, 342, 343) Eilman spent several hours at that location. She first went to Apartment 702 with approximately six young men, then proceeded to another apartment with Jerrell and Osman Sanford to purchase beer. (Defs. 56.1 at ¶¶ 343-45) After a visit to Jerrell Sanford's

grandmother's house, Eilman and Jerrell returned to apartment 702. (Defs. 56.1 at ¶¶ 345-49) While Eilman was "hanging out" with residents in Apartment 702, Marvin Powell arrived. (Defs. 56.1 at ¶¶ 348-49) Eilman attempted to leave the apartment, but Powell grabbed Eilman and dragged her into the apartment, locking the door. (Defs. 56.1 at ¶ 353) Robert Kimble and Jerell Sanford heard Eilman screaming for help; thereafter, Eilman fell out of the window. (Defs. 56.1 at ¶¶ 354, 357) By this time, nearly five hours had passed since Eilman had left the custody of the Chicago Police Department. (Defs. 56.1 at ¶ 361) Given the many intervening events, culminating in the criminal conduct of Marvin Powell, the injuries to Eilman were far too remote a consequence of defendants' conduct for liability to attach to defendants.

### III. Officer Heard did not create or increase any danger to Eilman by pointing north toward 51st Street.

The Seventh Circuit has interpreted DeShaney v. Winnebago County Dep't of Soc. Servs., 489 U.S. 189 (1989), as allowing exceptions to the general rule that the State has no duty to protect (1) when the State takes a person into custody; and (2) an affirmative act by the State places a person in a position of danger he would not have otherwise faced. See Estate of Stevens v. City of Green Bay, 105 F.3d 1169, 1174 (7th Cir. 1997) (stating that there is a "special relationship" imposing a due process duty to protect in custodial settings and when the state puts someone in danger). This Court has already dismissed as duplicative plaintiff's Fourteenth Amendment claims to the extent they allege the custodial exception to DeShaney. See Exhibit 1, Order, at p. 19. Further, this Court has determined that the Third Amended Complaint stated a claim as to Heard by alleging that the affirmative act of pointing toward 51st Street created a known danger to Eilman. See id. at p. 22. To survive summary judgment, plaintiff must now set forth facts which establish what she has plead: that directing Eilman from the parking lot toward 51st Street meets the criteria for the "state-created danger" exception. See Reed v. Gardner, 986 F.2d 1122, 1125 (7th Cir. 1993) (holding that although complaint stated claim under state created danger theory, plaintiffs would "face an insurmountable hurdle on summary judgment"). To prevail on a state-created danger claim, plaintiff must prove three elements: 1) that the State, by its affirmative acts, created or increased a danger to Eilman; 2) the state action was the proximate cause of Eilman's injury; and 3) the state's conduct "shock[s] the conscience." See King v. E. St. Louis Sch. Dist. 189, 496 F.3d 812, 817–18 (7th Cir. 2007) (listing elements of state-created danger doctrine); see also Stanford v. Garcia, 2009 WL 901131, at *2 (N.D. Ill. Mar. 31, 2009)

(Exh. 11) (same). Plaintiff cannot prove any of these required elements.

### A. Pointing toward 51st Street, did not create or increase a danger to Eilman.

To determine whether state action created a danger, the proper inquiry is whether the state's intervention placed the victim in a worse position than the victim otherwise would have been. Wallace v. Adkins, 115 F.3d 427, 429 (7th Cir. 1997) (quoting Estate of Stevens v. City of Green Bay, 105 F.3d 1169, 1174 (7th Cir. 1997)). In DeShaney, the Court found that when the state returned the boy to his abusive father, it did not place him in a worse position than had it not acted at all because the danger that the boy would be abused was present before and after the state intervened. 489 U.S. at 201. Following DeShaney, the Seventh Circuit established a two-part test for state-created danger: First, the court examines the actions that the defendant took, and second it asks what dangers the person would have otherwise faced. Wallace v. Adkins, 115 F.3d 427, 430 (7th Cir. 1997).

Considering the first prong of the test, courts have found a state created danger in "rare and often egregious" cases. Estate of Allen v. City of Rockford, 349 F.3d 1015, 1022 (7th Cir. 2003). Such "rare and egregious" conduct includes: failing to disarm a police officer on medical leave, Gibson v. City of Chicago, 910 F.2d 1510 (7th Cir. 1990); preventing the rescue of a drowning victim, Ross v. United States, 910 F.2d 1422 (7th Cir. 1990); arresting driver and abandoning passengers, White v. Rochford, 592 F.2d 381 (7th Cir. 1979), Wood v. Ostrander, 879 F.2d 583 (9th Cir. 1989), and Reed v. Gardner, 986 F.2d 1122 (7th Cir. 1993). No court has held that conduct as innocuous as pointing or giving directions increased danger.

As to the second prong of the test, the plaintiff must prove that the "danger would not have existed in the absence of the . . . affirmative action." Windle v. City of Marion, 321 F.3d 658, 662 (7th Cir. 2003). Put simply, plaintiff must demonstrate that Eilman was safe before Heard pointed and unsafe afterward. See Sandage v. Bd. of Comm'rs, 548 F.3d 595, 598 (7th Cir. 2008) (explaining the state can be held liable in cases where "the victim is safe before the state intervenes and unsafe afterward"); Reed, 986 F.2d 1125–26 (emphasizing that whether the state could be held liable turned on a finding that the passenger left behind was also drunk). "The question is not what dangers [Eilman] would have faced had [Heard] behaved as [plaintiff] wanted [her] to, but what dangers [Eilman] would have faced absent the affirmative acts actually taken." Wallace, 115 F.3d at 430.

The Seventh Circuit has held that the state does not create a danger when it gives bad

advice, or makes a poor attempt to provide assistance. Archie v. City of Racine, 847 F.2d 1211 (7th Cir. 1988) *(En Banc)*; Losinski v. County of Trempealeau, 946 F.2d 544 (7th Cir. 1991). In Archie, a dispatcher declined to send an ambulance for a woman in respiratory distress, and instead instructed that she breathe into a paper bag. 847 F.2d at 1213. The woman died later that night. Id. at 1214. According to plaintiff's expert, medical care would have saved the woman. Id. The Court held that the state's affirmative act did not "propel her into danger" as advising someone to breathe into a paper bag is not itself dangerous. Id. at 1223. Moreover, the court noted that the state "did not hinder her from seeking other sources of aid; she could have called a private ambulance or asked . . . one of her relatives" to take her to a hospital. Id. Accordingly, plaintiff's due process claim failed. Id.

Similarly, in Losinski, the court found inadequate state assistance did not create a danger. In Losinski, a woman asked a deputy sheriff to accompany her as she retrieved belongings from her home, because she was afraid of her estranged husband. Id. at 547. While inside the house, with the deputy nearby, an argument ensued and the husband shot and killed the woman. Id. at 547–48. The court held that the deputy did not create or increase the risk that the husband would harm the woman. Id. at 550–51. Moreover, the state "did not force her to proceed. It did not encourage her to continue. And once [she arrived] it did not require her to stay." Id. at 550. As a result, plaintiff's due process claim was dismissed. See id. at 551; accord Jackson v. City of Joliet, 715 F.2d 1200, 1206 (7th Cir. 1983) (holding that "an attempt by state officers to assist at an accident is not a deprivation of life without due process of law . . . when the attempt fails because of the negligence or even gross negligence of the officers").

In this case as in Archie and Losinski, plaintiff claims that the state's assistance was inadequate. Plaintiff alleges that by directing Eilman out of the parking lot toward 51st Street, Heard placed Eilman in danger. (Defs. 56.1 at ¶ 8) However, Eilman would have faced the same danger if she had simply proceeded north without direction from Heard. In addition, Eilman was not forced to proceed north, nor did Heard encourage Eilman to travel east on 51st Street, toward the Robert Taylor Homes. (Defs. 56.1 at ¶ 330) Moreover, the north exit of the parking lot was not a more dangerous means of egress than others. Plaintiff's expert, Dr. Robert Sampson, opined that all neighborhoods surrounding the Second District presented a high risk of crime. (Defs. 56.1 at ¶ 332) Dr. Sampson conceded that the police beat directly north of the Second District had the second lowest reported index crime in Chicago from January to May

2006. Consequently, it would appear that north was the safest direction that Heard could have pointed. Thus, any danger to Eilman presented by the area surrounding the station was unchanged by Heard's actions.

Plaintiff's claim also contradicts the long-standing principle that the state is not responsible for private acts of violence. DeShaney, 489 U.S. at 195 (recognizing that "nothing in the language of the Due Process Clause itself requires the State to protect the life, liberty, and property of its citizens against invasion by private actors."); Archie, 847 F.2d, at 1221 (7th Cir. 1988) (stating that "[t]he rule that the government need not protect its residents from private predators or their own misfortune is an implication of the language and structure of the Due Process Clause.") An exception to this rule has been found only where the conduct in question was particularly outrageous. Compare Wood v. Ostrander, 879 F.2d 583 (9th Cir. 1989) (allowing claim where police arrested driver and impounded car leaving passenger stranded), with King v. E. St. Louis Sch. Dist. 189, 496 F.3d 812 (7th Cir. 2007) (school did not create danger to student who was abducted and raped after being denied re-entry into school to call for a ride). The Seventh Circuit has only twice found a state-created danger based on private acts of violence, and in both cases the state essentially armed the criminal with the means to act. See Monfils v. Taylor, 165 F.3d 511 (7th Cir. 1998); Gibson v. City of Chicago, 910 F.2d 1510 (7th Cir. 1990). In Gibson, the police department allowed a former officer to retain his weapon, which increased the risk that he would shoot his neighbor. 910 F.2d at 1512–13, 1522 n.20 (7th Cir. 1990). In Monfils, the police disclosed the identity of an informant, after promising confidentiality, to the person on whom he had informed, which placed the informant at risk of violent retaliation.[12] 165 F.3d 511, 513–15 (7th Cir. 1998). The Seventh Circuit has distinguished such cases, noting that a danger of private violence is increased only when "the state did something that turned a potential danger into an actual one," and not when "it just stood by and did nothing to prevent private violence." Sandage v. Bd. of Comm'rs, 548 F.3d 595, 600 (7th Cir. 2008); see also Hernandez v. City of Goshen, 324 F.3d 535 (7th Cir. 2003) (failing to investigate threat did not increase danger that man would engage in shooting spree); Dykema v. Skoumal, 261 F.3d 701 (7th Cir. 2001) (hiring informant did not increase danger that he would be murdered during drug transaction); Wallace v. Adkins, 115 F.3d 427 (7th Cir. 1997) (prison

---

[12] Recently, the Seventh Circuit has questioned whether Monfils remains good law, given the Supreme Court's ruling in Town of Castle Rock v. Gonzales, 545 U.S. 748 (2005), that a failure to follow through on a promise to protect is not an actionable due process claim. Sandage v. Bd. of Comm'rs, 548 F.3d 595, 599 (7th Cir. 2008).

officials' denial of guard's request to leave post did not increase danger of attack by inmate); Beard v. O'Neal, 728 F.2d 894 (7th Cir. 1984) (presence of FBI informant did not increase danger to murder victim); Bowers v. DeVito, 686 F.2d 616 (7th Cir. 1982) (releasing mentally ill man did not create danger to murder victim).

An individual's knowledge of a risk of violence is not relevant to whether the state created the danger. DeShaney, 489 U.S. at 201 (1989) (noting that "[w]hile the State may have been aware of the dangers that [he] faced . . . it played no part in their creation, nor did it do anything to render him any more vulnerable to them"). Even if the state is aware that a person is going to be the victim of a crime, it can only be liable for acts which make the crime more likely. See Sandage , 548 F.3d at 596 (dismissing suit against county officials despite assumption that officials were reckless in letting inmate remain out on work-release); Windle, 321 F.3d at 662 (police officers' knowledge of inappropriate relationship between teacher and student did not increase danger of continued inappropriate conduct toward the student); Wallace, 115 F.3d at 430 (assuming prison officials had full knowledge of imminent attack by inmate, officials nonetheless did not increase the danger).

Nothing in the present case justifies a deviation from the principle that the state is not responsible for private acts of violence. Whatever Heard's knowledge of Eilman's particular circumstances, her conduct did not increase the risk that Eilman would become the victim of a crime. To the extent that Eilman was at risk of victimization when she exited the station, that risk was unchanged by the directions provided by Heard. Unlike in Monfils and Gibson, Heard did not arm Powell with the means to commit a crime by directing Eilman out of the parking lot. A rule that would impose liability for the benign act of giving directions "would be a strong incentive for the police to avoid any attempt to provide assistance to people like [Eilman] and so deny help to others who might benefit from the sort of [service] that the police performed here." Collignon v. Milwaukee County, 163 F.3d 982, 992 (7th Cir. 1998). This is not the type of public policy the court should seek to enforce.

### B. Pointing Eilman north out of the parking lot was not the proximate cause of Eilman's attack and fall from a seventh-story window several hours later.

Heard's action in directing Eilman was neither the actual nor legal cause of the harm alleged. To establish actual cause, plaintiff must prove that absent Heard's directions, Marvin Powell would not have assaulted Eilman. See Ciomber, 527 F.3d 635, 640 n. 1. This cannot be

established in the absence of evidence as to all that transpired from the time Eilman left the station until the assault. Estate of Stevens, 105 F.3d at 1170–71, 1177-78 (finding state action in dropping intoxicated man at gas station was not the "but for" cause of his death in a motor vehicle accident because "little is known about [his] exact whereabouts and actions during the 90 minutes between when the officers dropped him off and he was killed"). In this case, Eilman has no memory of events in Chicago, thus there is little evidence as to where she walked upon exiting the parking lot and no evidence as to why she eventually chose to proceed east. (Defs. 56.1 at ¶¶ 21, 22, 337) The idea that Eilman would not have left the parking lot through the north exit onto 51st Street had Heard not pointed in that direction is pure speculation, and cannot give rise to liability. Jackson v. City of Joliet, 715 F.2d at 1205 (noting that it was pure speculation as to whether a botched rescue attempt made accident victim worse off). Indeed, the parking lots north exit, located on 51st Street, is the most obvious means of egress. (Defs. 56.1 at ¶ 336) Upon exiting the parking lot, Eilman could have continued north or turned east or west. Nothing Heard did influenced this decision. In fact, if Eilman had strictly followed Heard's direction, she would have continued north, rather than traveling east. The facts simply do not establish that "but for" Heard's direction Eilman would not have eventually traveled east and been injured after her release from police custody.

Legal cause does not exist for an act which merely "set in motion a chain of events that ultimately [lead] to the random [assault] of [Eilman]." Martinez v. California, 444 U.S. 277, 281 (1980).[13] Rather, the affirmative act must lead to a risk which is "familiar and specific" such that "the immediate threat of harm has a limited range and duration." Reed , 986 F.2d at 1127 (finding that removal of a sober driver from a vehicle created a foreseeable risk that motorists on the same area of road two hours later would be hit by drunk driver). Whether a risk was specific involves "consideration of time, geography, range of potential victims, and the nature of harm that occurred." Buchanan-Moore v. County of Milwaukee, 570 F.3d 824, 829 (7th Cir. 2009).

A risk faced by the "public at large," is not specific enough to be a foreseeable result of state action. In Waubanascum v. Shawano County, 416 F.3d 658 (7th Cir. 2005), the Seventh Circuit overturned a jury verdict in favor of plaintiff based on its finding that by licensing a foster parent the state did not create a foreseeable danger that plaintiff would be abused by the

---

[13] The many events which intervened to break the causal connection between Heard's act and the assault are further explained in Section II, and incorporated herein.

foster parent. The court found that the danger was not specific to plaintiff, as any child who could have been placed in the home, would have faced the same danger. Id. at 669-71. As a result, the court found that the county's affirmative act of providing a license did not create an immediate risk of harm to the plaintiff, and entered judgment in defendant's favor. Id. at 670-71.

Recently, in Buchanan-Moore, the Seventh Circuit re-emphasized that a state action must create a particularized risk to be actionable. 570 F.3d at 828-29. In Buchanan-Moore, Moore was shot and killed by a mentally ill man named Gray, with a history of assault, shortly after his release from custody. Id. at 825–26. The plaintiffs argued that Moore was a foreseeable victim of the county's actions in part because he was a resident of Milwaukee's "north side," the area where Gray was let go. Id. at 828. The court found the circumstances distinguishable from Reed because Gray's conduct was not a risk that was familiar to the county. Id. at 828. First, unlike the risk posed by a drunk driver, Gray's assault on Moore was unpredictable, as there was no indication that the county knew that Gray had "access to a gun or propensity toward homicide." Id. Second, the court noted that the danger was not to a "definable population," and stated that dangers faced by "the public at large," are not specific enough for liability under the state-created danger exception. Id. (citing Martinez, 444 U.S. at 285). Moore's geographic locale was not sufficiently limited, as thousands of others lived in Moore's "north side" community, and Gray's potential victims could live in any community accessible to Gray by foot or public transit. Finally, the danger "existed without temporal boundaries," because, unlike drunkenness, Gray's criminal propensity would not resolve itself over time. Id. at 828-29.

The present case is closely analogous to Buchanan-Moore, and is likewise lacking in legal cause. First, nothing in the record indicates that Heard was aware of the risk posed by Powell. There is no indication that Heard knew Powell existed, that Powell was currently in the area, or that Powell had a propensity for violent crime. Thus, an assault by Powell was unpredictable. Second, Eilman, like Moore, faced the same risk as the "public at large" in being assaulted by Powell. In this case, forty-five thousand people live in the three neighborhoods surrounding the Second District, and virtually every neighborhood in the City was accessible to Powell by train or bus. (Defs. 56.1 at ¶ 332) Thus, the universe of potential victims was not a "definable population." Finally, the risk posed by Powell lacked temporal boundaries, as Powell's apparent propensity for criminal activity was indefinite. Moreover, the threat posed to Eilman was far from immediate, as Eilman was not assaulted until nearly five hours had passed

after she left the parking lot.  (Defs. 56.1 at ¶¶ 357, 361)  Because Eilman did not face a risk familiar to Heard such that "the immediate threat of harm [had] a limited range and duration," she cannot establish that Heard's conduct was a proximate cause of Eilman's injuries.

### C. Heard did not have the culpable state of mind required to establish a due process violation.

Conduct by executive officials that "shocks the conscience" is conduct which may be deemed "arbitrary in the constitutional sense." King v. East. St. Louis Sch. Dist., 496 F.3d at 818 (quoting County of Sacramento v. Lewis, 523 U.S. 833, 850 (1998)).  The standard for conduct that shocks the conscience is more than mere negligence, which is "categorically beneath the threshold of constitutional due process." Id. at 819 (quoting Lewis, 523 U.S. at 849). At a minimum, the official's conduct shocks the conscience when it evinces a deliberate indifference to the rights of the individual.  Id. at 819; Martin v. Shawano-Gresham Sch. Dist., 295 F.3d 701, 710 n.10 (7th Cir. 2002) (deliberate indifference is required for constitutional liability).  An official is not deliberately indifferent simply because he should have known of certain risks; rather he must know all the facts and know of such risks that his conduct may be culpable.  B, N, & G v. Duff, 2009 WL 2147936, *13 (N.D. Ill., July 17, 2009) (Exh. 12).  In other words, "[w]hen the cases speak of a 'known' or 'obvious' risk that makes a failure to take steps against it reckless they have in mind risks so great that they are almost certain to materialize." Delgado v. Stegall, 367 F.3d 668, 672 (7th Cir. 2004) (citations omitted).

In this case, Heard's pointing in the direction of the main street in response to Eilman's "puzzled look" does not shock the conscience.  There is no doubt that if Heard had simply stood by and allowed Eilman to find her own way out of the parking lot, she would not be liable as she had no duty to assist Eilman.  See DeShaney, 489 U.S. at 196 (1989).  Heard's attempt to assist Eilman did not demonstrate deliberate indifference. Heard did not know, based on Eilman's behavior, that Eilman was at particular risk of being the victim of a crime.[14]  There would be no reason for Heard to conclude from Eilman's behavior in the lockup that Eilman would be attacked if she exited the parking lot onto 51st Street.  Heard had no information on Eilman's plans upon exiting the parking lot, and there is no indication that she subjectively believed there was a high risk of crime in the neighborhood.  Thus, any danger to Eilman was neither known or obvious to Heard, such that Eilman was "almost certain to" be attacked  upon leaving the parking

---

[14] Heard's alleged observations of Eilman's behavior are addressed in Section (I) (C) (3) (d) (iii).

lot. <u>Delgado</u>, 367 F.3d at 672. As a result Heard's conduct did not shock the conscience.

Because plaintiff has failed to establish the requisite elements of a state-created danger claim, Heard is entitle to summary judgment in her favor.

## IV. Defendants are entitled to qualified immunity for the alleged constitutional violations.

Qualified immunity protects government officials "from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person should have known." <u>Harlow v. Fitzgerald</u>, 457 U.S. 800, 818 (1982) (citations omitted). To overcome a qualified immunity defense, plaintiff "must shoulder a rather heavy burden, and appropriately so because qualified immunity is designed to shield from civil liability 'all but the plainly incompetent or those who knowingly violate the law.'" <u>Donovan v. City of Milwaukee</u>, 17 F.3d 944, 952 (7th Cir. 1994), (quoting <u>Hughes v. Meyer</u>, 880 F.2d 967, 971 (7th Cir. 1989)). "The protection of qualified immunity applies regardless of whether the government official's error is 'a mistake of law, a mistake of fact, or a mistake based on mixed questions of law and fact.'" <u>Pearson v. Callahan</u>, 129 S. Ct. 808, 815 (2009). Indeed, qualified immunity is intended to "avoid excessive disruption of government and permit the resolution of many insubstantial claims on summary judgment." <u>Harlow</u>, 457 U.S. at 818.

Qualified immunity is a question of law for the court to decide. <u>Alvarado v. Picur</u>, 859 F.2d 448, 450 (7th Cir. 1988). The analysis is two-fold: 1) whether a constitutional right was violated and 2) whether that right was clearly established such that a reasonable person would have recognized the conduct as unlawful. <u>Saucier v. Katz</u>, 533 U.S. 194, 201-05 (2001) <u>modified by Pearson</u> , 129 U.S. at 818. In <u>Pearson</u>, the Court held the <u>Saucier</u> test is not mandatory and that lower courts are permitted to exercise their discretion in deciding which of the two prongs should be addressed first in light of the circumstances. <u>Id</u>. at 818.

As argued extensively above, no constitutional right was violated based on the record in this case. However, even if a constitutional violation could be made out, the rights defendants are alleged to have violated were not clearly established at the time of the violation. For a right to be clearly established "the contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right." <u>Anderson v. Creighton</u>, 483 U.S. 635, 640 (1987). In other words, the court evaluates whether the law was clear in relation to the specific facts confronting the officer at the time he acted. <u>Saucier</u>, 533 U.S. at 201.

The Supreme Court has recognized that if the constitutional issue is phrased in broad

terms, qualified immunity is obsolete, as "[p]laintiffs would be able to convert the rule of qualified immunity that our cases plainly establish into a rule of virtually unqualified liability simply by alleging violation of extremely abstract rights." Anderson 483 U.S., at 639. Thus, the right must be defined with reference to the particular circumstances facing the defendants. In Anderson, the Supreme Court found error with the lower court's phrasing of the legal right at issue as "the right of persons to be protected from warrantless searches of their home unless the searching officers have probable cause and there are exigent circumstances." Id. at 640-41. The Appellate Court's phrasing of the issue did not take into account the specific facts of the case, namely the information the defendants possessed. See id. As a result, the Supreme Court remanded the matter for further proceedings. See id. at 646.

In Wilson v. Layne, 526 U.S. 603, 615 (1999), the Supreme Court reaffirmed the holding in Anderson, ruling "the right allegedly violated must be defined at the appropriate level of specificity before a court can determine if it was clearly established." In Wilson v. Layne, the court held that police officers who permitted the media to videotape the execution of a search warrant were entitled to qualified immunity. See id. at 605-06. Although it was clearly established that searches must be reasonable, the court found a more fact-specific inquiry was required. See id. at 615. Therefore, the Court phrased the issue as whether it was clearly established "that media entry into homes during a police ride-along violates the Fourth Amendment." See id. at 616. Finding no judicial opinions holding that this conduct was unlawful, the court found that the defendants were entitled to qualified immunity and affirmed summary judgment in defendants' favor. See id. at 618.

In accord with Supreme Court precedent, the Seventh Circuit has refused to use generalities in defining the clearly established law:

> "The words "clearly established ... constitutional rights" may not be used to read the defense of immunity out of federal tort law by the facile expedient of stating constitutional rights in the most general possible terms, so that anyone who prevails on the merits of a claim . . . can defeat the defense of immunity. . . . The right must be sufficiently particularized to put potential defendants on notice that their conduct probably is unlawful.

Azeez v. Fairman, 795 F.2d 1296, 1301 (7th Cir. 1986).

Once the right is specifically defined, the burden is on the plaintiff to establish that the right was clearly established, by citing "cases of controlling authority in [her] jurisdiction at the

time of the incident which clearly established the rule on which [she seeks] to rely" or "a consensus of cases of persuasive authority such that a reasonable officer could not have believed that his actions were lawful." Wilson, 526 US at 617. "[T]he plaintiff must show either a reasonably analogous case that has both articulated the right at issue and applied it to a factual circumstance similar to the one at hand or that the violation was so obvious that a reasonable person necessarily would have recognized it as a violation of the law." Chan v. Wodnicki, 123 F.3d 1005, 1008 (7th Cir. 1997).

Catlin v. City of Wheaton, 574 F.3d 361 (2009), illustrates the degree of analogy which the Seventh Circuit requires to clearly establish the law. In Catlin, the court addressed whether it was clearly established that police officers must announce their office when arresting someone in a public place. See id. at 369. Although the case law indicated that such announcement was required in a private dwelling, no court of appeals had found that the requirement carried over to a public place. See id. The law was therefore not clearly established because "even if the defendants had consulted a casebook prior to formulating their plan, they still would not have had fair notice that they had a constitutional obligation to announce their identity prior to completing the arrest." See id. As a result, the defendants were entitled to qualified immunity. See id. at 369-370.

In this case, when the issues are framed with particularity, no sufficiently analogous case law exists which could have put defendants on notice that failing to provide medical care to Eilman or giving Eilman directions out of the parking lot were unlawful acts. As a result, all defendants are entitled to qualified immunity.

### A. The law did not clearly establish that failing to provide involuntary mental health care to a non-suicidal arrestee would violate the Fourth Amendment.

In the course of discovery, certain facts not apparent in the pleadings have been established which inform the qualified immunity analysis as to Eilman's right to mental health care. See Green v. Carlson, 826 F.2d 647, 650 (7th Cir. 1987) ("[w]hen considering the issue of qualified immunity on a motion for summary judgment, a district court should consider all of the undisputed evidence in the record.") With these facts, it is now possible to define the law at issue with the appropriate level of specificity, rather than in the broad terms of the complaint.

Although one could phrase the issue in this case as "whether it was clearly established that an arrestee was constitutionally entitled to medical care," this would not take into account

the "specific facts confronting the public official when [he or she] acted." Id. at 649. In Green, the Seventh Circuit reviewed a district court's denial of summary judgment on qualified immunity grounds. See id. at 649. The district court had inquired "whether the constitutional right at issue -- that the defendants were deliberately indifferent to the decedent's medical needs -- was clearly established." Id. The Seventh Circuit held that the district court erred in framing the issue in such broad terms, without considering the specific facts of the case. See id. (citing Anderson, 483 U.S. at 639). Accordingly, the Court remanded with instructions for the district court to incorporate the facts into the qualified immunity analysis. See id. at 650.

In this case, three facts frame the right at issue: (1) Eilman was not suicidal; (Defs. 56.1 at ¶ 369) (2) Eilman did not consent to mental health treatment (Defs. 56.1 at ¶¶ 73, 131, 388); and (3) Eilman was an arrestee. (Defs. 56.1 at ¶ 35) The Seventh Circuit has recognized that the applicable constitutional amendment and the status of the plaintiff are relevant contexts in defining the constitutional issue for qualified immunity purposes. See Lojuk v. Johnson, 770 F.2d 619, 629-631 (7th cir. 1985). Thus, the appropriate inquiry is whether it was clearly established, in May 2006, that the Fourth Amendment was violated by the failure to transport a non-suicidal arrestee for involuntary mental health treatment.

The constitutional amendment at issue and Eilman's status as an arrestee are relevant contexts for the consideration of whether the law was clearly established. In May 2006, at the time of the conduct alleged, it was not clearly established that a police officer's failure to attend to an arrestees medical needs would be evaluated under an objective reasonableness standard. The Seventh Circuit first applied the objective reasonableness standard to a claim of inattention to medical needs in Sides, 496 F.3d, at 828, which was decided September 11, 2007. Prior to Sides, precedent indicated that the Fourteenth Amendment deliberate indifference standard applied to arrestees. See, e.g., Collignon, 163 F.3d at 986-987, Chapman v. Keltner, 241 F.3d 842, 845 (7th Cir. 2001). Under this standard, a reasonable officer in May 2006 would not be on notice that his conduct violated the constitution. In addition to proof of a serious medical need,[15] due process requires public officials to obtain medical care only if they are "aware of facts from which the inference could be drawn that a substantial risk of serious harm exists" and "also draw the inference." Farmer v. Brennan, 511 U.S. 825, 837 (1994). The failure to act on a risk that one

---

[15] As indicated in Section I (A) (1), incorporated herein, under the clearly established law, Eilman did not have an objectively serious medical need.

"should have" perceived but did not, is not a due process violation. See id. at 838. Thus, errant behavior "is not sufficient to impute subjective knowledge" of a serious risk. See Novack, 226 F.3d at 530. Nothing in the record indicates that any defendant was subjectively aware of a risk of harm to Eilman, thus their conduct did not violate due process, which was the established standard in May 2006.

In addition, the Collignon decision would have advised defendants that their conduct was lawful. In Collignon, 163 F.3d at 984, the Seventh Circuit specifically addressed an arrestee's right to mental health treatment. The court held that the failure to provide an arrestee with "access to medical personnel capable of assessing his known serious [mental health] condition" was not a due process violation. Id. at 992. Further, the court noted that the jailers' conduct comported with due process in that they protected the arrestee from harm while in custody. See id. at 990. The court emphasized that "the plaintiffs cannot claim that the County defendants should have involuntarily committed Jonathan to a mental health facility: Due process protects people from being unlawfully restrained; it provides no right to be restrained, lawfully or otherwise." Id. at 987. As a result, the court found that Jonathan's jailers could not be held liable for his suicide, which occurred several hours after his release. See id. at 986, 993; accord Wilson v. Formigoni, 42 F.3d 1060 (7th Cir. 1994) (psychiatric facility was not responsible for injuries to a patient who left the facility and was found injured four hours later).

No reasonable person would have any reason to distinguish Collignon from the facts of the present case. Both Collignon and Eilman were arrestees with serious chronic mental health conditions. A reasonable person would believe that while he had a duty to protect Eilman from harm while in custody he was not obligated to provide care for her chronic mental illness, or ensure that she would not be harmed after leaving police custody.

Nor was it clearly established that mental health care was required for a non-suicidal arrestee. There is case law establishing the rights of non-suicidal detainees awaiting trial and convicted prisoners to long-term mental health care. See, e.g., Meriwether v. Faulkner, 821 F.2d 408, 413 (7th Cir. 1987) (prisoner entitled to mental health care for gender disphoria); Joseph, 739 F.2d at 1246 (pre-trial detainee entitled to mental health care for acute psychosis). However, these cases would not have put the reasonable person on notice of the rights of an arrestee in temporary custody, for whom the "duty is principally one of maintenance rather than cure." See Exhibit 1, Order, at p. 25. Defendants are aware of no case law case finding liability for

58

deliberate indifference to mental health needs of an arrestee who was not suicidal.

It was also not clearly established how defendants should resolve the conflict between Eilman's right to medical care and her other rights. [16] When an officer's decision to act depends on a balancing of interests, courts require a higher level of factual similarity for the law to be clearly established. Benson v. Allphin, 786 F.2d 268, 276 (7th Cir. 1986), superceded on other grounds by statute as recognized by Coleman v. Lane, 1995 WL 170025, at *2-4 (N.D. Ill. Apr. 7, 1995) (Exh. 13) ("It would appear that whenever a balancing of interests is required, the facts of the existing caselaw must closely correspond to the contested action before the defendant official is subject to liability under [Harlow ]."); accord Rakovich v. Wade, 850 F.2d 1180, 1213 (7th Cir. 1988), abrogated on other grounds by Spiegla v. Hull, 371 F.3d 928, 941-42 (7th Cir. 2004) (finding qualified immunity where officers were required to balance first amendment rights against law enforcement interests) (overruled on other grounds); Sherman v. Four County Counseling Ctr, 987 F.2d 397, 408-409 (7th Cir. 1993) (finding qualified immunity where officers were required to balance liberty interests and societal demands in determining whether to involuntarily commit individual).

The Supreme Court has recognized that competing interests are an important factor in the immunity analysis. In Saucier, the Supreme Court considered whether the force used against an audience member during a speech by the vice president violated clearly established law. See id. at 198-199. The lower court had rejected qualified immunity because the general principle that the use of force must be objectively reasonable was clearly established. 533 U.S. at 199. The Supreme Court found that phrasing the issue in such broad terms did not serve the purposes of qualified immunity. See id. at 202. Instead, the court considered whether it was clearly established that the particular level of force used was unreasonable, given the interest of officers in protecting the vice president. See id. at 208-209. Finding no case "prohibiting the officer from acting as he did" in light of the circumstances, the court found that the law was not clearly established and granted qualified immunity. See id. at 209.

In this case as well, defendants had to consider competing interests in determining whether to provide Eilman with medical care. Defendants were in a no-win situation, facing the possibility of suit whether they brought Eilman for mental health treatment or not. See Gooden v. Howard County, 954 F.2d 960 (4th Cir. 1992) (officers entitled to qualified immunity because

---

[16] The other rights at issue are fully addressed in Section I (E) (1) and I(E)(2) and incorporated herein.

they faced the possibility of a lawsuit whether or not they seized the plaintiff for mental health treatment). The competing interests of a detainee's right to refuse mental health care and the obligation to provide for his mental health needs make it impossible to determine the clearly established law. In King v. County of Gloucester, 302 F. App'x 92 (3d Cir. 2008), a detainee with a severe mental disorder died of positional asphyxia while lying face down, shackled to a bed post in a holding cell. See id. at 94. The detainee's estate sued the arresting officers for bringing him to jail rather than to the hospital for psychiatric evaluation due to his bipolar disorder and severe manic state. See id. The detainee had informed the arresting officer that he had not taken medication and was not supposed to be taking any medication. See id. at 95. Given these circumstances, "defendants found themselves between two competing obligations: the need to respect [the detainee's] constitutional right to decline medical treatment, and the obligation to be responsive to his medical needs." Id. at 98 (internal citations omitted). As a result of this conflict, the court found their failure to provide medical treatment could not be considered clearly unlawful. Id. at 99.

The defendants in this case were stuck between the same competing obligations which were addressed in King v. Gloucester, as well as others, [17] and are likewise entitled to qualified immunity. Eilman, like King, had denied a need for mental health care. As the King court recognized, due to the countervailing right, the defendants choice not to take Eilman to the hospital for mental health care was not clearly unlawful. 302 F. App'x at 98. As a result, defendants are entitled to qualified immunity.

**B. The law did not clearly establish that failing to provide requested medical care for a non-existent medical condition violated Eilman's Fourth Amendment rights.**

Defendants Stokes, Williams, Hudson, Quinn, and Mabery are also entitled to qualified immunity for failing to attend to Eilman's alleged physical ailments. As indicated in Section IV A, due process, not objective reasonableness was the prevailing standard in May 2006. Under this due process standard, defendants would only be liable if they "knew that the risk of injury was substantial but nevertheless failed to take reasonable measures to prevent it." Chapman , 241 F.3d at 845.

In this case, despite Eilman's alleged complaints, there is no evidence that any of these

---

[17] In fact, defendants had more conflicting constitutional concerns, as outlined in Section I (E) (1) and I(E)(2) and incorporated herein.

defendants knew of a risk of injury or failed to protect Eilman from injury. There is no evidence that Eilman actually had any of the conditions of which she allegedly complained. As a result, it was impossible for these defendants to have been subjectively aware of a risk or to have disregarded it. Moreover, the defendants did not fail to prevent any harm to Eilman, as she was not harmed as a result of her physical condition.[18] Nothing in the established law indicated that defendants were required to blindly honor Eilman's requests for treatment. On the contrary, treatment is indicated only for medical needs accompanied by objective symptoms, or which require treatment, which was not the case here.[19] See Sides, 496 F.3d, at 828. Thus, because no reasonable person could believe that failing to treat Eilman's non-existent conditions was unlawful, Stokes, Williams, Hudson, Quinn, and Mabery are entitled to qualified immunity.

### C. The law did not clearly establish that giving directions to Eilman would violate her Fourteenth Amendment rights.

As previously noted, the law is clearly established if "a reasonable official would understand that what he is doing violates [a constitutional] right." Anderson, 483 U.S., at 640. A defendant is not on notice that conduct is unlawful, unless similar conduct was found unlawful in the past. See Donovan, 17 F.3d at 952 (finding law regarding seizure by use of deadly force did not clearly establish seizure by vehicular roadblock was unlawful). In this case, the fact that some state acts may create a danger is too general a principle to have put Heard on notice that her conduct in this case was unlawful. Whether Heard could reasonably have believed her actions were lawful must be determined by looking at the particular circumstances, and the action taken. Heard observed that Eilman was confused, and pointed in the direction of an exit. (Defs. 56.1 at ¶ 330) No court has found that a danger may be created by pointing or giving directions. Indeed, the only case which involved giving any form of directions was Jackson v. City of Joliet, 715 F.2d, at 1206, in which the court found that directing traffic did not create a danger to the occupants of a burning vehicle. Nor did the case law indicate that by directing Eilman, Heard was assuming responsibility to keep Eilman free from crime in the future. Only one case, Wood v. Ostrander, 879 F.2d 583, (9th Cir. 1989), has found that a state act can increase the danger posed by a high-crime area. In Wood, the danger did not result from giving

---

[18] See Section II (A) for further discussion of the lack of harm to Eilman from the failure to provide medical treatment.

[19] The lack of a serious medical need is further addressed in Section I (A) (2).

direction, but from the far more culpable act of taking away all means of transportation. See Wood, 879 F.2d at 586-87, 591-96. No reasonable person would interpret Wood as making it unlawful to give directions.

Moreover, Wood is a singular exception to the general rule that there is no duty to protect an individual from the criminal acts of others. In DeShaney, the Supreme Court held that "a State's failure to protect an individual against private violence simply does not constitute a violation of the Due Process Clause." 489 U.S. at 197. In the vast majority of cases, courts have found allegations that state action contributed to a criminal act meritless. See e.g., Martinez, 444 U.S. at 284-285 (1979) (parole of sex offender did not violate due process rights of fifteen-year-old girl who he tortured and killed); Bowers v. DeVito, 686 F.2d 616, 618 (7th Cir. 1982) (releasing mentally ill man with history of violence did not crate danger to woman who he later killed); Beard v. O'Neal, 728 F.2d 894, 899 (7th Cir. 1984) (undercover FBI agent did not violate due process by accompanying murderer when crime committed); Stevens v. Umsted, 131 F.3d 697, 706 (7th Cir. 1997) (school did not create danger to student assaulted by fellow students); Hernandez v. City of Goshen, 324 F.3d 535. 539 (7th Cir. 2003) (rejecting claim that police increased danger by failing to investigate threat of co-worker, who engaged in shooting spree); Sandage v. Bd. of Comm'r of Vanderburgh County, 548 F.3d 595, 599-600 (7th Cir. 2008) (failure to revoke violent offenders work release did not violate due process of neighbor whom he shot and killed); King v. East St. Louis Sch. Dist. 189, 496 F.3d 812, 819 (7th Cir. 2007) (denying re-entry into school did not create danger to student who was abducted and raped); Buchanan-Moore v. County of Milwaukee, 570 F.3d 824, 829 (7th Cir. 2009) (releasing mentally ill arrestee without his medications did not create danger that arrestee would shoot plaintiff's decedent). A reasonable person could not be expected to even be aware of one case in another circuit, much less to reasonably believe that the exception, rather than the rule, would apply to her circumstances. Thus, even if Heard had "consulted a casebook prior to [giving Eilman directions], she "still would not have had fair notice that [she] had a constitutional obligation [not to point toward a high crime area]." Catlin v. City of Wheaton, 547 F.3d 361, 369 (7th Cir. 2009).

## <u>CONCLUSION</u>

For the reasons explained above, there is no genuine issue as to any fact material to the requirements necessary for plaintiff to succeed on her claims against the individual defendants and the City, and, under the undisputed facts, defendants are entitled to judgment as a matter of law. Consequently, this court should enter summary judgment in favor of all defendants and against plaintiff Kathleen Paine, and enter such other relief as it deems just.

Respectfully submitted,

Individual Defendants                                        City of Chicago

By:   /s/ Matthew A. Hurd                    By:   /s/ Jordan Marsh
       Matthew A. Hurd                                     Jordan Marsh
       Deputy Corporation Counsel              Special Litigation Counsel
       Attorney Number 6191532                  Attorney Number 6216489

30 North LaSalle, Suite 1720
Chicago, Illinois 60602
(312) 742-0234