IN THE UNITED STATES DISTRICT COURT FOR THE
NORTHERN DISTRICT OF ILLINOIS, EASTERN DIVISION

KATHLEEN PAINE, as Guardian of the )
Estate of CHRISTINA ROSE EILMAN, )
a Disabled Person, )
                                      )     Case No. 06 C 3173
           Plaintiff, )
                                      )     Judge Virginia M. Kendall
v. )
                                      )     Magistrate Judge Valdez
OFFICER RICHARD CASON, et al. )
                                      )
           Defendants. )

**PLAINTIFF'S MEMORANDUM OF LAW IN OPPOSITION TO
DEFENDANT CITY OF CHICAGO'S MOTION FOR SUMMARY
<u>JUDGMENT AS TO COUNT XXXIX (ADA CLAIM)</u>**

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ...................................................................................................iv

EXHIBIT INDEX ...................................................................................................................v

LEGAL STANDARD ............................................................................................................1

ARGUMENT..........................................................................................................................1

I.     THERE ARE GENUINE MATERIAL QUESTIONS OF FACT IN
DISPUTE AS TO WHETHER THE CITY OF CHICAGO VIOLATED
MS. EILMAN'S RIGHTS UNDER THE ADA ...........................................................1

     A.     Ms. Eilman is a qualified individual with a disability under 42 U.S.C.
§ 12131.  Her incapacity to control her bipolar disorder symptoms is
no bar to her right to recover.................................................................2

II.     PLAINTIFF HAS PRESENTED GENUINE ISSUES OF MATERIAL FACT
THAT SUPPORT ALL ELEMENTS REQUIRED TO PREVAIL ON HER ADA
CLAIM AGAINST THE CITY. ...................................................................................6

     A.     Ms. Eilman's bipolar condition renders her a qualified individual with a
disability under the ADA........................................................................6

          1.     Ms. Eilman has several major life activities that are substantially
impaired by the mania episodes caused by her bipolar disorder. ........7

               a.     Ability to care for her own safety, health and well-being……..8

               b.     Ability to communicate and interact with others……………..10

               c.     Ability to safely travel freely and independently……………..11

               d.     Ability to concentrate and think. ..……………………………11

               e.     Ability to work…………………………………………..……13

          2.     Ms. Eilman has a record of impairment substantially affecting her
major life activities.................................................................................14

          3.     Ms. Eilman's bipolar condition is more than just a "flare up." ............14

          4.     The City was on notice of Ms. Eilman's disability as well as the
substantial impairment it caused to her major life activities. .................15

          5.     Even if Ms. Eilman had been taking medication, she would still be a
qualified person with a disability under the ADA. ..................................16

**III.    MS. EILMAN WAS SUBJECTED TO DISCRIMINATION BY THE CITY'S FAILURE TO ACCOMMODATE HER DISABILITY.** ..................................................17

    **A.    Ms. Eilman has not asserted a medical malpractice claim.** ....................18

    **B.    The City is liable under the ADA for otherwise subjecting Ms. Eilman to discrimination based on her disability.** ..................................................20

# TABLE OF AUTHORITIES

## Cases

*Barber v. Guay*, 910 F. Supp. 790 (D.Me 1995)...................................................................................... 20

*Bennet v. Unisys Corp.*, 2000 WL 33126583, *5 (E.D. Pa. 2000)....................................................... 7, 10, 12

*Boring v. World Gym-Bishop, Inc.*, 2007 WL 142612, *2 (N.D. Ill. 2007)................................................. 6

*Branham v. Snow*, 392 F.2d 896 (7th Cir. 2005) ..................................................................................... 7

*Davidson v. Midelfort Clinic, Ltd.*, 133 F.3d 499 (7th Cir. 1998) ...................................................... 7, 14

*Duda v. Board of Education of Franklin Park School Dist*, 133 F.3d 1054 (7th Cir. 1998) .......... 10, 12, 20

*Gorman v. Bartch*, 152 F.3d 907 (8th Cir. 1998) ........................................................................... 16, 17

*Grieveson v. Anderson*, 538 F.3d 763 (7th Cir. 2008) ................................................................................ 1

*Head v. Glacier Northwest, Inc.*, 413 F.3d 1053 (9th Cir. 2005).............................................................. 6

*Krocka v. City of Chicago*, 203 F.3d 507 (7th Cir. 2000)............................................................................ 6

*Nunn v. Illinois State Board of Education*, 448 F.Supp. 2d 997 (C.D. Ill. 2006) ............................ 2, 3, 4, 5

*Paine v. Johnson*, 2008 WL 4890269 (N.D. Ill.2008) .................................................................... 2, 6, 17, 18

*Russello v. United States*, 464 U.S. 16, 104 S.Ct. 296, 78 L.Ed.2d 17 (1983) ............................................ 3

*Sides v. City of Chicago*, 496 F.3d 820 (7th Cir. 2007) ............................................................................... 1

*Siefken v. Village of Arlington Heights*, 65 F.3d 664 (7th Cir. 1995)................................................. 2, 3, 5

*Spencer v. Dawson*, 2006 WL 3253574 (N.D. Ill. 2006)........................................................................ 20

*Taylor v. Phoenixville Sch. Dist.*, 184 F.3d 296 (3rd Cir. 1999)................................................................ 5

*Toyota Motor Mfg. Ky., Inc. v. Williams*, 534 U.S. 184 122 S. Ct. 681, 151 L. Ed. 2d 615 (2002) ............. 5

*Verhoff v. Time Warner Cable, Inc.*, 299 Fed. Appx. 488, 2008 WL 4691794 (6th Cir. 2008) ................... 6

*Wasko v. Herman*, 2008 WL 150604 * 2 (N.D. Ind.) ............................................................................... 1

*Winsley v. Cook County*, 563 F.3d 598 (7th Cir. Ill. 2009)...................................................................... 6

*Wis. Cmt. Servs v. City of Milwaukee*, 465 F.3d 737 (7th Cir. 2006) .................................................... 19

## Statutes

§ 12112 ...................................................................................................................................... 2, 3, 4

§ 12132 ........................................................................................................................................ 3, 19

42 U.S.C. § 12102(2)(A)............................................................................................................................ 6

42 U.S.C. § 12102(2)(A)-(B)..................................................................................................................... 6

42 U.S.C. § 12111(8) ............................................................................................................................ 2, 3

42 U.S.C. § 12112(a) .................................................................................................................................. 2

42 U.S.C. § 12112(b)(5)(A) ....................................................................................................................... 2

42 U.S.C. § 12131................................................................................................................................ 1, 2, 3

42 U.S.C. § 12132............................................................................................................................ 3, 18, 19

42 U.S.C. §12112...................................................................................................................................... 3

## Rules

Fed.R.Civ.P. 56(c) ................................................................................................................................... 1

# EXHIBIT INDEX

Plaintiff's Exhibit Index in Support of Memorandum Of
Law In Opposition To Defendant City Of Chicago's
Motion For Summary Judgment As To Count XXXIX (ADA Claim)

| Exhibit | Description |
|---------|-------------|
| A | C. Eilman Dep. |
| B | R.Paine Dep. |
| C | K.Paine Dep. |
| D | Romann Dep. |
| E | Nelson Dep. |
| F | Brooker Dep. |
| G | McJunkin Dep. |
| H | Van Auken Dep. |
| I | Ignatowicz Dep. |
| J | O'Neill Dep. |
| K | Necessary Dep. |
| L | Elvick Dep. |
| M | Morris Dep. |
| N | Banuelos Dep. |
| O | Cason Dep. |
| P | Moreno Dep. |
| Q | S. Lewis Dep. |
| R | Gryll Dep. |
| S | A.Miller Dep. |
| T | N. John Dep. |
| U | Sanderson Dep. |
| V | Tessa Williams Dep. |
| W | J. Johnson Dep. |
| X | Hamilton Dep. |
| Y | Woodard Dep. |
| Z | Escobedo Dep. |
| AA | Dvoskin Dep. |
| BB | Obolsky Dep. |
| CC | Gilmore Dep. |
| DD | Zenik Dep. |
| EE | Hawkins Dep. |
| FF | Hall Dep. |
| GG | Harris Dep. |
| HH | Delia Dep. |
| II | Washington Dep. |
| JJ | Berglind Dep. |
| KK | T. Kimble Dep. |
| LL | T. Powell Dep. |
| MM | Martinez Dep. |
| NN | Hudson Dep. |

| OO | Porter Dep. |
|---|---|
| PP | J. Sanford Dep. |
| QQ | Teresa Williams Dep. |
| RR | Stokes Dep. |
| SS | Baker Dep. |
| TT | T.Kennedy Dep. |
| UU | Loggins Dep. |
| VV | Dengler Dep. |
| 20 | Rainge IAD Statement FILED UNDER SEAL |
| 28 | CPD General Order D.S.O. 04-06 |
| 29 | CPD Guidelines for Arrestee Screening |
| 29A | CPD Guidelines for Arrestee Screening |
| 30 | CPD General Order D.S.O. 04-06-01 |
| 58 | CPD General Order  02-03-01 |
| 61 | Washington IAD statement FILED UNDER SEAL |
| 114 | Rocklin Police Dept. report  (P0288-P02089) |
| 139 | Placer County Records (P004274-P004277) FILED UNDER SEAL |
| 140 | Placer County Records (P03654-P03655) FILED UNDER SEAL |
| 163 | UCLA Records (P005436) |
| 197 | Placer County Records (P03886) (P03898-P03899) FILED UNDER SEAL |
| 198 | Placer County Records (P04068-P04072) (P04112) (P04070) FILED UNDER SEAL |
| 199 | Sierra Vista Records (Sierra Vista 00001-00008; 00015-00016, 00024-00036) FILED UNDER SEAL |
| 206 | Mee Memorial Hospital Records (P02031) FILED UNDER SEAL |
| 244 | Nelson Report |
| 259 | Dvoskin Report |
| 331 | DSM-IV TR – Manic Episode, p.357 - 362 |
| 410 | Judge Kendall's Order on Motion to Dismiss dated May 21, 2009 |
| 411 | Tullock Arrest Report |
| 434 | Plaintiff's Third Amended Complaint |
| 437 | CA Highway Patrol Records (P013862-P01386) |
| 438 | Placer County Records (P004862-P004863) FILED UNDER SEAL |
| 450 | Placer County Records (P01489-01495, P01496) FILED UNDER SEAL |
| 451 | Sierra Vista Hospital Records (P006863-P006866) (P006873-P006876) FILED UNDER SEAL |
| 452 | DSM-IV TR – Bipolar Disorder, p. 382-397 |
| 459 | Group exhibit of all Westlaw cases without federal reporter numbers (ADA) |
| 460 | Plaintiff's Local Rule 56.1(b)(3)(c) Statement of Additional Facts |

**PLAINTIFF'S MEMORANDUM OF LAW IN OPPOSITION TO
DEFENDANT CITY OF CHICAGO'S MOTION FOR SUMMARY
JUDGMENT AS TO COUNT XXXIX (ADA CLAIM)**

**LEGAL STANDARD**

"Summary judgment is appropriate when the record '[s]hows that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law'". *Sides v. City of Chicago*, 496 F.3d 820, 826 (7th Cir. 2007); Fed.R.Civ.P. 56(c). Courts must construe all facts in the light most favorable to the nonmoving party as well as view all reasonable inferences in that party's favor. *See Grieveson v. Anderson*, 538 F.3d 763, 767 (7th Cir. 2008). "A court's role is not to evaluate the weight of the evidence, judge the credibility of witnesses or determine the truth of the matter…" *Wasko v. Herman*, 2008 WL 150604 * 2 (N.D. Ind.). Rather, the court must consider all the evidence that a jury might, "construing the record in the light most favorable to the nonmovant and avoiding the temptation to decide which party's version of the facts is more likely true." *Id.* at *2.

**ARGUMENT**

I.  **THERE ARE GENUINE MATERIAL QUESTIONS OF FACT IN DISPUTE AS TO WHETHER THE CITY OF CHICAGO VIOLATED MS. EILMAN'S RIGHTS UNDER THE ADA.**

Plaintiff claims that the Defendant City of Chicago violated Ms. Eilman's rights under Title II of the Americans with Disabilities Act, 42 U.S.C. § 12131, (hereinafter "ADA" or "the Act") (P. ADA 56.1, Ex. 434; Plaintiff's Third Amended Complaint). As this Court noted in its November 7, 2008 Memorandum Opinion and Order:

> Title II of the ADA provides that "no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits or the services, programs or activities of a public entity, or be subjected to discrimination by any such entity." 42 U.S.C. § 12132. The term "public entity" includes local governments, such as the City of Chicago, and its departments, such as the City of Chicago Police Department. See 42 U.S.C. § 12131(1)(A)-(B).

*Paine v. Johnson*, 2008 WL 4890269, *16 (N.D. Ill.2008)[1]. To prevail under Title II of the ADA, Plaintiff must show that Ms. Eilman (1) has a disability, (2) is otherwise qualified, and (3) was excluded from participation in, denied the benefits of, or was otherwise subjected to discrimination by the City of Chicago.[2]  As set forth below, when construing all facts and inferences in the light most favorable to Plaintiff, there is sufficient factual support for her ADA claim. At a minimum, there are genuine material issues that must be submitted to a jury.[3]  Thus, the City's summary judgment motion should be denied.[4]

**A.    Ms. Eilman is a qualified individual with a disability under 42 U.S.C. § 12131. Her incapacity to control her bipolar disorder symptoms is no bar to her right to recover.**

Relying on *Siefken v. Village of Arlington Heights*, 65 F.3d 664, 667 (7th Cir. 1995) and *Nunn v. Illinois State Board of Education*, 448 F.Supp. 2d 997, 1001 (C.D. Ill. 2006), the City broadly and inaccurately states that Ms. Eilman is barred from recovery under the ADA because she failed to control her bipolar disorder. (City's Memo, pp. 3-5.)  *Siefken* and *Nunn* are, however, factually and legally distinguishable, and thus neither binding or persuasive.

In both cases, the plaintiffs sued *their employers* pursuant to 42 U.S.C. § 12112 of the Act, claiming they were wrongfully discharged on the basis of their disabilities.  *Siefken* at 665; *Nunn* at 1000.  That particular section of the Act provides that no covered entity shall discriminate against a qualified individual on the basis of disability with regard to employment. 42 U.S.C. § 12112(a).  Discriminatory activities, for purposes of this section, include the failure to make reasonable accommodations to an otherwise qualified individual with a disability.  42 U.S.C. § 12112(b)(5)(A).  A "qualified individual" is one who "with or without reasonable accommodation, can perform the essential functions of the employment position that such individual holds or desires."  42 U.S.C. § 12111(8).  In both cases, the plaintiffs were fired because they failed to meet their employers' reasonable job expectations.

---

[1] Any case not published in an official reporter is attached hereto as Exhibit 459.

[2] Defendant does not contest its status, or that of its police department, as a public entity subject to the ADA's mandates.  (Defendant City of Chicago's Memorandum of Law in Support of Summary Judgment ("City's Memo."), n.25.

[3] To the extent that any case law cited herein addresses violations of the Rehabilitation Act, courts have held that cases interpreting the ADA or the Rehabilitation Act are applicable and interchangeable.  *See Gorman v. Bartch*, 152 F.3d 907, 912 (8th Cir. 1998)

[4] Throughout this Memorandum, Plaintiff will use the following citations to reference the evidence of record: Plaintiff's Response to the City's ADA Local Rule 56.1(a)(3) Statement ("P.Resp. ADA 56.1, ¶"); and Plaintiff's Local Rule 56.1 (b)(3)(c) Statement of Additional ADA Facts ("P.ADA 56.1, ¶ ")

In our case, Plaintiff's claim is based on 42 U.S.C. § 12132, not 42 U.S.C. § 12112. Section 42 U.S.C. § 12132 provides that no disabled individual, by reason of his or her disability, shall be excluded from (1) participation in or (2) denied the benefits of the services, programs, activities, or (3) be otherwise subjected to discrimination by a public entity. The definition of a "qualified individual with a disability" under this section is separate and distinct from that found in 42 U.S.C. § 12112 and as applied in *Siefken* and *Nunn*. For claims asserted pursuant to 42 U.S.C. § 12131, a qualified individual with a disability is "an individual with a disability who, with or without reasonable modifications to rules, policies, or practices, the removal of architectural, communication, or transportation barriers, or the provision of auxiliary aids and services, meets the essential eligibility requirements for the receipt of services or the participation in programs or activities provided by a public entity." Given the distinction, a "qualified individual" under one section would not necessarily be a "qualified individual" under the other. Congress obviously intended different meanings. Otherwise, it would not have provided separate definitions within the same Act. *See Russello v. United States*, 464 U.S. 16, 23, 104 S.Ct. 296, 78 L.Ed.2d 17 (1983) ("Where Congress includes particular language in one section of a statute but omits it in another section of the same Act, it is generally presumed that Congress acts intentionally and purposely in the disparate inclusion or exclusion.") (Citation and internal quotation marks omitted).

Since *Siefken* or *Nunn* applied the 42 U.S.C. §12112 definition, they do not and cannot, control the question whether Ms. Eilman is a qualified individual under § 12132. The thrust of 42 U.S.C. § 12111(8) is whether the person can meet the essential functions of her job. Under 42 U.S.C. § 12131, on the other hand, a person does not have to show that she can perform the essential functions of a job, service, program or activity in order to recover. Rather, she simply has to demonstrate that she meets the essential eligibility requirements for the receipt of services or participation in programs or activities. As discussed below, Ms. Eilman not only met the essential eligibility requirements for access to medical care while in police custody, but the City was constitutionally mandated to provide her with such access. Thus, in this regard, *Siefken* and *Nunn* are inapplicable.

Both cases, however, have additional distinguishable features. In *Siefken*, the plaintiff, a police officer, suffered from diabetes but failed to monitor his condition. *Siefken*, *supra*, at 666. After experiencing an episode of diabetes-related disorientation while on duty, he was

discharged. *Id.* at 665. The plaintiff claimed he was discriminated against not because his employer failed to accommodate his disability, but rather because it failed to give him an opportunity to change his monitoring techniques. *Id.* at 666-67. The court held that such "second chances" are not required under the ADA. *Id.* at 667. Under the circumstances, the court found that the plaintiff was not a "qualified individual" when he failed to meet his employer's legitimate job expectations due to his failure to control a controllable disease. *Id.* at 667 ("We only hold that when an employee knows that he is afflicted with a disability, needs no accommodation from his employer, and fails to meet 'the employer's legitimate job expectations,' (citation omitted) due to his failure to control a controllable disability, he cannot state a cause of action under the ADA.") The court's ruling was narrowly drawn, and certainly not intended as a sweeping proposition extending beyond the sphere of employment-related disability discrimination.

Similarly, in *Nunn*, plaintiff was fired for being unable to meet her job requirements. *Nunn*, 448 F. Supp. 2d at 999-1000. After exhibiting unusual behavior at her job, she was ordered to undergo a psychiatric evaluation. *Id.* at 1000. She was diagnosed with bipolar disorder. The physician recommended that she not be allowed to return to work until she received treatment. *Id.* at 999-1000. Plaintiff refused the treatment offered by her employer, and was subsequently discharged. *Id.* at 1000. She then brought suit under 42 U.S.C. § 12112. The court found that the plaintiff was barred from recovery under that section of the ADA because: (1) she was not a qualified individual with a disability, since the evidence established without material dispute that she could not behave in a professional manner; (2) the medical evidence showed that her bipolar condition was treatable, but she refused the treatment offered by the defendant; and (3) the defendant had a nondiscriminatory reason for her discharge – her disruptive behavior. *Id.* at 1001-1002. On appeal, the primary issue was whether the plaintiff was a "qualified individual with a disability." *Nunn v. Illinois State Board of Education*, 211 Fed.Appx. 502, 504, (7th Cir. 2006). The Seventh Circuit held she was not, since she could not perform the essential functions of her job, and her employer had no legal duty to create a new position for her. *Id.* at 504-505. Thus, Ms. Nunn was not entitled to recover under the ADA. *Id.* at 505. The Seventh Circuit did not address the issue of her ability to control her disease, and certainly did not hold that a person with bipolar disorder who fails to comply with recommended treatment that would enable her to function in an employment setting is barred from ever

recovering under the Act, under other circumstances or pursuant to other portions of the statute. The City's suggestion to the contrary must accordingly be disregarded.

In addition, there was no discussion in *Nunn* regarding plaintiff's *ability to control* her disease. Ms. Nunn apparently did not contend her condition itself prevented her from obtaining treatment. Thus, the court's finding rested upon undisputed medical testimony that her particular bipolar condition was treatable. *Nunn* does not, and cannot, stand for the sweeping proposition that every person with bipolar disorder has the ability to "control" their disease.[5] *See Taylor v. Phoenixville Sch. Dist.*, 184 F.3d 296, 306 (3rd Cir. 1999) (plaintiff's medication could not perfectly control her mental illness; thus, she was considered disabled under the ADA, since her condition substantially limited her ability to think).

The evidence of record in our case shows that a common characteristic of bipolar disorder is that patients refuse to accept their disease, recognize their condition or the need for treatment. (P.Resp. ADA 56.1, 13, 15)  Moreover, the evidence shows that even if Ms. Eilman was taking her medication religiously, she still could have suffered manic episodes. That has, in fact, occurred frequently since her return to California in the Fall of 2006.  Despite being on mood stabilizing medication and receiving treatment for her bipolar condition, Ms. Eilman has had three subsequent manic episodes (in 2007 and 2008) which led to involuntary commitments to mental health facilities.  (P.Resp. ADA 56.1,15; P. ADA 56.1, 15-17)  Thus, the City's contention that Ms. Eilman has always had a "controllable" disease is simply untrue, as well as factually unsupported.  Whether Ms. Eilman did (or did not) take her medication is wholly immaterial.  The primary issue is whether the City denied her access to medical services that a non-disabled detainee would have been provided.

Even if *Siefken* and *Nunn* were deemed to have some persuasive value, Plaintiff has, at a bare minimum, raised genuine issues of material fact whether Ms. Eilman failed to control an otherwise controllable disease.  The existence of a disability is to be determined on a case-by-case basis.  *Toyota Motor Mfg. Ky., Inc. v. Williams*, 534 U.S. 184, 199, 122 S. Ct. 681, 151 L. Ed. 2d 615 (2002). Thus, even if the City had produced some competent evidence that Ms. Eilman's bipolar disorder was "controllable," that would, at most, highlight the existence of a material dispute between the parties. Summary judgment is, therefore, inappropriate.

---

[5] In *Siefken* , the court of appeals was presented with information from the American Diabetes Association suggesting that with proper monitoring, *most* diabetics can dramatically reduce the chances of a severe reaction. 65 F.3d at 666.  The same cannot be said for persons with bipolar disorders. (P.Resp. ADA 56.1, 13,15)

## II. PLAINTIFF HAS PRESENTED GENUINE ISSUES OF MATERIAL FACT THAT SUPPORT ALL ELEMENTS REQUIRED TO PREVAIL ON HER ADA CLAIM AGAINST THE CITY.

### A. Ms. Eilman's bipolar condition renders her a qualified individual with a disability under the ADA.

To succeed on a claim under the ADA, Plaintiff must first show that she has a disability. *Paine v. Johnson*, 2008 WL 4890269, * 16 (N.D. Ill. 2008). A disability is defined as either a physical or mental impairment that substantially limits one or more major life activities of the individual or a record of such impairment. *Id.* at *16 *citing* 42 U.S.C. § 12102(2)(A)-(B).

Furthermore,

> An impairment substantially limits a major life activity when a person 'is either unable to perform a major life activity or is significantly restricted as to the condition, manner or duration under which the individual can perform the major life activity as compared to the average person in the general population. In assessing whether an impairment is substantially limiting, courts consider the nature and severity of the impairment, its duration or expected duration, and its permanent or long term impact or its expected impact. *Id.* at *16 (internal citations omitted).

"Medically diagnosed mental conditions are impairments under the ADA." *Krocka v. City of Chicago*, 203 F.3d 507, 513 (7th Cir. 2000) (because plaintiff's severe depression had been diagnosed by a health professional, it qualifies as an impairment under the ADA). Although the ADA previously did not define "major life activities," cases have concluded that major life activities for purposes of the ADA include the ability to communicate, concentrate, focus, remember, care for oneself, interact with others, sleep, speak, work and think, i.e., the basic functions of life that the average person could perform with little or no difficulty. *See Boring v. World Gym-Bishop, Inc.*, 2007 WL 142612, *2 (N.D. Ill. 2007); *Verhoff v. Time Warner Cable, Inc.*, 299 Fed. Appx. 488, 493, 2008 WL 4691794 (6th Cir. 2008)(sleep and caring for oneself are major life activities); *Head v. Glacier Northwest, Inc.*, 413 F.3d 1053 (9th Cir. 2005) (sleeping, interacting with others and the ability to think are major life activities).[6]

The determination of whether an impairment is substantially limiting requires an individualized examination. In other words, not all individuals with a given medical condition

---

[6] Congress amended the ADA last year to include a statutory definition: "[M]ajor life activities include, but are not limited to, caring for oneself, performing manual tasks, seeing, hearing, eating, sleeping, walking, standing, lifting, bending, speaking, breathing, learning, reading, concentrating, thinking, communicating, and working." *See Winsley v. Cook County*, 563 F.3d 598, 604 (7th Cir. Ill. 2009) *citing* 42 U.S.C. § 12102(2)(A) (effective Jan. 1, 2009).

are disabled for purposes of the ADA. *Branham v. Snow*, 392 F.2d 896, 903 (7th Cir. 2005). While true that not every mental health disorder may substantially limit major life activities (City's Memo, p. 7), in Ms. Eilman's case, her bipolar disorder, and in particular her manic episodes, have indeed had a severe limiting impact on her major life activities. Her condition certainly rises to the level of severity that renders her a disabled person entitled to ADA protection.

To determine whether an activity is "substantially limited" for purposes of deciding a summary judgment motion, the court should consider whether there exists sufficient evidence in the record from which the fact finder could conclude that a person "is either unable to perform, or significantly restricted as to the condition, manner or duration under which the individual can perform, a major life activity as compared to an average person in the general population." *Davidson v. Midelfort Clinic, Ltd.*, 133 F.3d 499, 506 (7th Cir. 1998).

> ### 1. Ms. Eilman has several major life activities that are substantially impaired by the mania episodes caused by her bipolar disorder.

The City argues that Ms. Eilman is not a qualified individual with a disability because her bipolar condition did not substantially impair her ability to care for her own health, safety and well being, her ability to communicate and interact with others, or travel safely and freely or attend college classes. (City's Memo, pp. 6-14) Plaintiff does not deny that, at different times in her life, Ms. Eilman's bipolar condition has not impaired her major life activities. However, the evidence shows that an inherent characteristic of bipolar disorder is that its symptoms, mania and depression, come and go. Ms. Eilman may have a stable mood for several months, but will then "cycle" into mania or depression for several months until her brain chemistry restores some sense of balance. (Plf. ADA 56.1 ¶ 1, 2) When Ms. Eilman is experiencing mania, as she was in May, 2006 while in Chicago, she is *substantially impaired* in her ability to care for her own health, safety and well being, her ability to communicate and interact with others, her ability to think and concentrate, her ability to safely travel freely and independently, and her ability to work. (P.Resp. ADA 56.1, 20) *Bennet v. Unisys Corp.,* 2000 WL 33126583, *5 (E.D. Pa. 2000)(plaintiff does not have to show that she is completely unable to interact with others or that she experiences problems every day, rather, "[c]hronic episodic conditions can easily limit how well a person performs an activity as compared to the rest of the population.") Each of these activities is central everyday life. It is hard to imagine any fact finder who would not consider a

person disabled if he or she could not perform them. Ms. Eilman's bipolar disorder is a permanent and chronic condition. (P. Resp. ADA 56.1,15,16,17, 32) When she is suffering from a manic episode, her ability to perform an array of major life activities is substantially and gravely impaired. (P.Resp. ADA 56.1, 15, 16, 17, 20, 25, 27, 29, 32; P. ADA 56.1, 14, 38) Evidence in support follows. Even if the City disputes this evidence, which it cannot, the record shows an issue of fact for the jury.

### a. Ability to care for her own safety, health and well-being.

The City claims that nothing in the record suggests Ms. Eilman was limited in her ability to care for her own health, safety, and well being compared to the average person. There is a vast amount of evidence to the contrary. A manic episode caused by bipolar disorder can be so severe and disabling as to necessitate a person's involuntary commitment because the person (1) requires 24 hour care and supervision, (2) is gravely disabled, (3) is a danger to himself or others, and/or (4) is unable to function by himself. (Plf. ADA 56.1 ¶ 10, 14, 15, 16, 17) In other words, the person is substantially impaired and cannot care for his or her own safety, health and well-being. Indeed, Ms. Eilman herself has been involuntarily hospitalized on four separate occasions (both before and after her tragedy in Chicago) because of her bipolar-induced manic episodes. In February and March of 2005, Ms. Eilman was institutionalized for thirty-seven days, fifteen months before the events giving rise to the present litigation. In December, 2007, she again experienced severe mania and was involuntarily institutionalized for eight days at a hospital in northern California. The following month, Ms. Eilman was again institutionalized for 28 days, and later spent an additional twelve days in an acute care residential program following a manic episode. (P. ADA 56.1, 9-17; P.Resp. ADA 56.1, 13, 15)

Ms. Eilman's manic episode in February, 2005 rendered her gravely disabled and unable to care for herself and led to the first of her involuntary commitments. (P. ADA 56.1, 10) The signs and symptoms of her mania included: disorganization, psychosis, inability to stay on track with conversations, lack of organization in her speech, hostility, irritability, confusion, inability to answer questions, engaging in pressured speech (talking forcefully and rapidly), throwing things at people, aggressive behavior, agitation, restlessness, and an impulsive and explosive mood. (P.ADA 56.1, 10 – 14) Although Ms. Eilman never expressed a desire to kill herself, medical professionals nonetheless deemed the hospitalization necessary because she was gravely disabled and could not care for herself. (P.ADA 56.1, 13)

8

In the two months before Ms. Eilman came to Chicago, her behavior signaled the onset of another bipolar-induced manic episode. Beginning in March, 2006, Ms. Eilman's friends became concerned about her behavior. Tamar Elvick thought Ms. Eilman was acting strange, saying strange things, babbling and talking incoherently, much as she had done just prior to her diagnosis and institutionalization in February, 2005. (P.ADA 56.1, 31 – 32) Sophia Morris observed that Ms. Eilman was acting differently - she was confrontational, aggressive and jealous; she was "just kind of not there, she was just talking about anything;" she appeared "very excited and stressed" all in one and could not hold a conversation. (P.ADA 56.1, 31 – 32)

While in Chicago on May 6, 7, and 8, 2006, including most of the time she was in police custody, Ms. Eilman exhibited many of these same behaviors. (P.ADA 56.1, 18 – 30, 36 – 38) For example:

- Ms. Eilman could not stay on track with her conversations. She was delusional. Either spontaneously or in response to questions, she would start talking nonsensically about the price of oil or yelling at people to stop smoking. She would start rapping. At one point, she claimed that dead rap stars were coming to rescue her from police custody. She talked about superheroes (P.ADA 56.1,22)

- She was hostile, aggressive and engaged in assaultive behavior. She threw her boots at a Midway airport airline ticket counter, tore up a $20.00 bill and threw it at airline personnel, and tore cigarettes out of the mouth of a complete stranger. (P.ADA 56.1, 20) Without provocation, she yelled at the caregiver of a blind man, claiming the blind man was fake. She yelled *at a baby* seated quietly in its stroller at a Midway Airport airline ticket counter to "Stop fucking crying!" (P.ADA 56.1, 20) When she was asked to leave the CTA train station on May 7, 2006, she responded with profanity. When placed under arrest, she hollered, struggled, screamed and kicked. She exhorted the officers, in vulgar terms, to perform sexual acts on her. (P.ADA 56.1, 18)

- Following her arrest on May 7, she was agitated, excitable, and restless. At the Eighth District police station, personnel witnessed her standing on a toilet, being loud, yelling profanities, getting up and sitting down, and jumping on a bench in her cell. Her eyes bizarrely roamed in different directions. (P.ADA 56.1, 19)

- Her mood was erratic, impulsive and explosive. On May 7, both at Midway Airport and afterwards, she approached complete strangers and, without provocation, started yelling at them. (P.ADA 56.1, 18 – 20)

- She exhibited severe mood swings. On May 6 and 7, airline personnel, CTA employers, lockup detainees and Chicago police officers observed her mood swings Within a short period of time, she would transform from being jovial and pleasant, to angry, verbally abusive and profane. She would also suddenly cry. (P.ADA 56.1, 21)

As with her other episodes of mania, these behaviors evidence that Ms. Eilman was disabled from the major life activity of being able to care for her own health, safety and well being on May 6, 7, and 8, 2006.

### b. Ability to communicate and interact with others

There is substantial evidence that Ms. Eilman's ability to communicate and interact with others was substantially impaired by her bipolar disorder compared to the average person. In addition to some of the examples described above, Ms. Eilman:

- engaged in pressured speech (loud and rapid) speech (P.ADA 56.1, 23);
- was irrational, uncooperative, and refused to answer questions (P.ADA 56.1, 24);
- talked nonsense and gibberish; people could not understand what she was saying: "you couldn't make no sense of her;" she said a lot of crazy things, and would start laughing for no reason; she would blank out in a conversation and start talking about a different topic (P.ADA 56.1, 25);
- acted like a mute and refused to talk for several hours (P.ADA 56.1, 26);
- was confused and presented with disorganized speech; she was difficult to understand and would start jabbering and singing songs; she was not communicating in sentences or making any sense; she could not understand what people were saying to her (P.ADA 56.1, 27);
- was unable to tend to her menstruation needs while in police custody; instead of accepting a sanitary pad, she put her fingers down her shorts and smeared her menstrual blood on her cell bench and walls (P.ADA 56.1, 28);
- was acting in a way that put her at risk of harm.

See *Bennet v. Unissy Corp.*, 2000 WL 33126583, *5-6 (E.D. Pa. 2000) (plaintiff produced sufficient evidence that her major life activity of interacting with others was substantially limited by her mental disability; evidence included her belligerent and unprofessional attitude, difficulty controlling her emotions, and incredible sensitivity to criticism); *Duda v. Board of Education of Franklin Park School Dist*, 133 F.3d 1054 (7th Cir. 1998) (evidence that plaintiff's bipolar condition caused him to be socially withdrawn and not communicate with others when necessary was sufficient to show impairment of plaintiff's ability to interact with others).

The City also argues that because Ms. Eilman was able to work at times in 2006, her ability to communicate and interact with others could not have been substantially impaired by her disability. This is incorrect. The mere fact that Ms. Eilman was capable of working in early 2006, before her manic symptoms began to surface, is not dispositive of the issue whether she had a disability that substantially impaired her major life activity of communicating or

interacting with others in Chicago as of May, 2006.  One of the features of bipolar disorder, which differentiates it from other mental illnesses, is that some patients will be gravely disabled while in the midst of a manic episode, but will fully recover between episodes. (P.ADA 56.1, 2) Thus, Ms. Eilman's ability to resume work between episodes does not mean she would be able to work while experiencing an incapacitating bout of mania.  (P.Resp. ADA 56.1, 27)  Indeed, the evidence demonstrates that when Ms. Eilman's mania escalated, she was unable to work.  *Id.*

### c.    Ability to safely travel freely and independently

There is also substantial evidence that Ms. Eilman's ability to travel freely and independently was substantially impaired by her bipolar condition compared to the average person. For example, on February 13, 2005, Ms. Eilman was involved in a severe car accident that occurred during her first diagnosed manic episode. (P.ADA 56.1, 4 – 10; P. Resp. ADA 56.1, 25)  Fifteen months later, on May 6, 2006, Ms. Eilman was stranded in Chicago and unable to negotiate transportation to get home. (P. Resp. ADA 56.1, 25)  On that evening, Ms. Eilman's stepfather, who was at the family's home in Rocklin, California, had to stay on the phone with Ms. Eilman and talk her through getting on a shuttle bus to an airport hotel.  (P. Resp. ADA 56.1, 25)  Earlier that day, Ms. Eilman was barred from flying with Frontier Airlines and was asked to leave Midway airport because airline personnel found her to be erratic, forceful, abusive and confrontational. They believed Ms. Eilman could not follow directions, and would be a nuisance on the plane and a danger to other passengers.  (P. Resp. ADA 56.1, 25) The following day, Ms. Eilman was again denied boarding because of her erratic behavior. She was escorted out of the airport by Chicago police officers and taken to the airport's CTA station. (P. Resp. ADA 56.1, 25) While there,  Ms. Eilman was so manic she could not follow the CTA agent's repeated directions for getting on a train to O'Hare Airport.  (P. Resp. ADA 56.1, 25) Thus, there is substantial evidence that Ms. Eilman's ability to safely, freely and independently travel was significantly impaired by her mania episodes.

### d.    Ability to concentrate and think

Several of the examples discussed above also demonstrate that Ms. Eilman's ability to concentrate and think are also substantially limited by her bipolar condition compared to the average person. These include:

1.    Her inability to stay on track with her conversations, and her delusional behavior. When asked questions, or just randomly, she would start talking nonsensically about the price of oil, or yelling at people to stop smoking. She would

spontaneously start rapping, or would claim that dead rap stars were coming to rescue her from police custody. She talked about superheroes. (P. ADA 56.1, 22)

2.   Ms. Eilman was irrational and uncooperative, and refused to answer questions. (P. ADA 56.1, 24)

3.   She was talking nonsense and gibberish that people could not understand. She would start laughing for no reason and would blank out in a conversation and start talking about a different topic.  (P. ADA 56.1, 25)

4.   She acted like a mute and refused to talk.  (P. ADA 56.1, 26)

5.   She was confused and presented with disorganized speech.   She could not answer the question why she was arrested, even though it had been explained to her four to six times.   She was not using sentences and not making sense.  She could not understand what people were saying to her.  (P. ADA 56.1, 27)

See *Bennet, supra* (plaintiff produced sufficient evidence to show that her major life activity of thinking and concentrating was substantially limited – she was unable to understand assignments, she created a document that did not make sense, her thoughts were distorted, she had difficulty concentrating, difficulty controlling her emotions, and was incredibly sensitive to criticism); *Duda v. Board of Education of Franklin Park School Dist*, 133 F.3d 1054 (7th Cir. 1998)(finding sufficient evidence that plaintiff's ability to think was sufficiently impaired by his bipolar condition).

Although this Court is being asked to make an individualized determination whether Ms. Eilman's particular condition substantially impacts a major life activity, it is significant that other courts have found that bipolar disorder can substantially impact a major life activity for purposes of establishing a claim under the ADA. In *Cambria*, plaintiff suffered from bipolar disorder. Plaintiff alleged that as a result of her condition, her major life activities of thinking, concentrating, interacting with others, and sleeping were substantially limited.  *Cambria v. Association of Flight Attendants*, 2005 WL 1563343, *5 (E.D. Pa. 2005).  In support, she offered testimony that she suffered suicidal thoughts, attempted suicide, would "lose it" while waiting in lines at a store, had trouble with the law, and made mistakes in her personal and romantic life. *Id.* at *11.  Based on the plaintiff's testimony alone, the court found a genuine issue of material fact as to whether the plaintiff was disabled.  *Id.* at *9, *11.[7]

---

[7]  *See also Duda , supra* (plaintiff's bipolar condition recognized as a disability under the ADA and citing other cases where mental illnesses have been similarly recognized); *EEOC v. Voss Electric Co*., 257 F. Supp. 2d 1354 (W.D. Ok. 2003)(genuine issue of fact existed to defeat summary judgment as to whether plaintiff's bipolar

####        e.        Ability to work

Ms. Eilman's ability to work was substantially impaired by mania. Although Plaintiff admits that Ms. Eilman has, at times, been able to work, her ability is substantially impaired when her mania sets in. For example, Ms. Eilman began her employment with a 24 Hour Fitness health club near her family's home in northern California in April, 2005. (P. Resp. ADA 56.1, 27) For the first year she was employed, she received just one disciplinary warning. There is no evidence that her ability to work was impaired by her bipolar disorder. (P. Resp. ADA 56.1, 27) This changed in March and April of 2006. While she was living in Los Angeles, her mania surfaced and escalated. (P.Resp. ADA 56.1, 27) During a two week time frame, Ms. Eilman's mania interfered with her ability to work. On April 13 through 16, Ms. Eilman either showed up late or did not show up at all. (P. Resp. ADA 56.1, 27) On April 17, 2006, she was disciplined for being out of uniform on the job, despite the fact she had been warned about this just four days earlier. (P. Resp. ADA 56.1, 27) She was cited and warned about her unprofessional conduct and for disobeying a direct order from her supervisor. (P. Resp. ADA 56.1, 27) Following this, she fell asleep twice at the sales area desk in the health club. (P. Resp. ADA 56.1, 27) Ms. Eilman was issued a final warning for this. (P. Resp. ADA 56.1, 27) After April 26, 2006, Ms. Eilman simply stopped showing up for work. (P. Resp. ADA 56.1, 27) Thus, there is sufficient evidence in the record demonstrating that Ms. Eilman was significantly restricted, if not wholly unable to perform, this major life activity as well. For this reason, the City's motion for summary judgment should be denied.

####        2.        Ms. Eilman has a record of impairment substantially affecting her major life activities.

Further, Ms. Eilman has "a record of such impairment" establishing that her bipolar condition severely impaired her major life activities. Section 12102(2)(B) extends coverage of the ADA to persons who have a "history" of having a mental impairment that substantially limits one or more major life activities. On at least three separate occasions, Ms. Eilman's bipolar condition caused her to be hospitalized and receive 24 hour care and supervision because she was unable to provide for her own health and safety. In 2005, Ms. Eilman's institutionalization

---

condition substantially limited his ability to think, interact with others, communicate with others, or take care of himself); *Aragon v. Life Quotes*, 2005 WL 1661737 (D.Colo. 2005)(plaintiff suffers from bipolar disorder which impacted his major life activities of concentrating, focusing, thinking and remembering); *Bultemeyer v. Fort Wayne Commty School*, 100 F.3d 1281 (7th Cir. 1996)(plaintiff's bipolar disorder considered a disability under the ADA).

lasted thirty seven days; in 2007 for eight days; in 2008 for twenty eight days (P. ADA 56.1, 9 – 17. P. Resp. ADA 56.1, 15)   Thus, based on the fact that Ms. Eilman has a history of bipolar-induced mania substantially impairing her major life activities, she meets the requirements of this particular definition of disability under the ADA.  *Davidson v. Midelfort Clinic, Ltd*., 133 F.3d 499, 509 (7th Cir. 1998).

### 3.        Ms. Eilman's bipolar condition is more than just a "flare up."

The City argues that Ms. Eilman's manic episodes are nothing more than "flare-ups" akin to the "flare-ups" of arthritis or sensitivity to perfume which do not give rise to a qualifying disability.  (City's Memo., p. 13 *citing Moore v. J.B. Hunt Transport*, 221 F.3d 944 (2000); *Robinson v. Morgan Stanley*, 269 Fed.Appx. 603, 2008 WL 695221 (7th Cir. 2009)).  In *Moore*, the evidence showed that plaintiff's arthritis flare-ups "probably" made it a little more difficult to perform manual tasks, that he "might" not be able to do certain physical tasks, and that he could still walk and move but just had to go a little slower.  *Id.* at 948, 951.  There is no meaningful comparison between Mr. Moore's arthritis flare-ups and Ms. Eilman's chronic, permanent, and severe mental illness. Her illness causes episodes of mania that can require 24 hour care and supervision for months at a time, rendering her truly disabled and utterly incapable of caring for her own safety, health, and well being.  (P. Resp. ADA 56.1, 15;  P. ADA 56.1, 9 - 17)

Notwithstanding the City's contention, it is, at minimum, a question of fact for the jury. The court in *Moore* also found that the plaintiff had failed to show that his intermittent flare-ups were an impairment to meet the definition of a disability.  *Id.* at 952.  However, the court still recognized that this was a *different* situation from conditions where one of the characteristics of the disability is intermittent impairment.  *Id.* at 952.

> [A]n intermittent impairment that is a characteristic manifestation of an admitted disability is, we believe, a part of the underlying disability and hence a condition that the employer must reasonably accommodate. [Here, the plaintiff] does not seek an accommodation for an intermittent impairment resulting from an 'admitted disability;' instead, he attempts to use his intermittent flare-ups to establish that his impairment is a disability.  *Id.*

Distinct from *Moore,* Ms. Eilman has an admitted disability, one of the characteristics of which is intermittent impairments caused by severe manic episodes.  Thus, *Moore* is not of much value here.

14

In *EEOC v. Voss Electric Co.,* the evidence of record established that although the plaintiff was able to function at certain times, he had also been hospitalized for his bipolar disorder after presenting with delusional, incoherent and "out of touch with reality" behavior. 257 F. Supp. 2d 1354, 1356 (W.D. Ok. 2003). Regardless of the fact he could function at certain times, there was no dispute that the plaintiff suffered from bipolar disorder and, as a result, he was considered disabled under the ADA. *Id.* at 1358; *see also Johnson v. Billington,* 404 F. Supp.2d 157 (D.C. 2005) (rejecting defendant's argument that plaintiff was not disabled because his bipolar episode was only temporary).

### 4. The City was on notice of Ms. Eilman's disability as well as the substantial impairment it caused to her major life activities.

The City was on notice of Ms. Eilman's disability and denied Ms. Eilman access to medical services which the non-disabled would have been provided. At least four of the City's police officers had information that Ms. Eilman suffered from bipolar disorder. This information, coupled with her obvious aberrant behavior in their and other police personnel's presence, establishes that the City had actual notice of Ms. Eilman's disability and severe psychiatric episode. (E.g. Plf. ADA 56.1 56.1, 33-38; Plft. Ex. 460, ¶ 76-95, 98-106, 113-114, 131, 196-199, 205, 228, 244, 286, 299) For the convenience of the court, Plaintiff incorporates her arguments and factual support set forth in section I.A. of her Memorandum in Opposition to Defendants' Motion for Summary Judgment (§1983 counts) showing that the Defendants had notice of Ms. Eilman's serious mental health need (i.e. her disability), as if fully set forth herein.

In addition, Plaintiff submits that psychiatric crises such as manic episodes are not constant behaviors. Even persons who are quite psychotic from bipolar disorder might, at any given moment, be more or less calm and in control. (Plf. ADA 56.1 ¶ 1, 2). So, even if Ms. Eilman appeared calm some of the time to some of the City's employees, as the Defendant contends, that would not mean that her bipolar disorder was anything but real, and should not cast doubt whether the numerous instances of bizarre, manic behavior that she exhibited, and that were observed by both City personnel and civilians, were anything but genuine manifestations of the manic side of her condition. *Id.* At a minimum, her outbursts and other strange conduct certainly gives rise to genuine material issues for a jury to decide.

### 5. Even if Ms. Eilman had been taking medication, she would still be a qualified person with a disability under the ADA.

The City makes the argument that because Ms. Eilman could "easily take medicine to ameliorate the condition," the Court should find that she is not disabled. This is disputed for three reasons. First, the City has presented no evidence that Ms. Eilman "could have easily" taken medication. Rather, the evidence demonstrates that Ms. Eilman's condition virtually assured she could *not* "easily take medicine." (P. Resp. ADA 56.1, 13 - 15) Second, there is absolutely no evidence to establish that if she was on medicine, she would not have had any manic episodes before she came to Chicago. Third, even if she was taking medicine, there is no guarantee that her bipolar condition would have been controlled, or that her manic behavior would have been prevented. (P. Resp. ADA 56.1, 13 - 15) *Johnson v. Billington*, 404 F. Supp.2d 157, 165 (D.C. 2005)(even if the condition is treated by medication, the individual may still qualify as disabled if he remains substantially impaired). As stated above, the evidence shows that even while on medication, Ms. Eilman's bipolar condition has substantially impaired her major life activities and warranted involuntary mental health hospitalizations due to recurring manic episodes, requiring 24 hour care and supervision due to an incapacity to care for her own health and safety. (P. Resp. ADA 56.1, 15) Thus, whether Ms. Eilman had or had not been taking any psychotropic medication, she is still a qualified disabled person under the statute and entitled to recover for the City's violations of the ADA.

Accordingly, there exists sufficient evidence in the record from which a fact finder could conclude that Ms. Eilman was disabled, that her bipolar condition imposed significant restrictions on a number of her major life activities, and that the City's employees were well aware of that before and during the time she was in police custody.

## III.   MS. EILMAN WAS SUBJECTED TO DISCRIMINATION BY THE CITY'S FAILURE TO ACCOMMODATE HER DISABILITY.

The City argues, for the third time ( See Documents 363, 441), that Plaintiff's claim that the City failed to provide her with a reasonable accommodation for her disability in the form of access to medical or mental health assistance fails to state a claim under the ADA. (City's Memo, pp. 15-16). This Court, and other courts, have already considered and rejected the City's position. On May 21, 2009, this Court declared:

> Once an arrestee with a disability is in custody, the police have a duty to reasonably accommodate the arrestee's disability. *See Gorman v. Bartch*, 152 F.3d 907, 913 (1998)(noting that the ADA requires local police to treat an individual with a disability in "a safe and appropriate manner

16

consistent with the disability."); *see also Pennsylvania Dept. of Corr. v. Yeskey*, 524 U.S. 206, 210 (1998)(noting that state prison facilities that provide medical services must comply with Title II of the ADA)[8].   A plaintiff may establish a violation of Title II of the ADA by showing that the defendant refused to provide a reasonable accommodation.  *See Wisc. Cmty Servs.,* 465 F.3d at 753.  Here, Paine alleges that the City failed to provide Eilman with medical or mental treatment despite the fact that the police officers knew or should have known that she was experiencing a psychiatric episode while in police custody . . . Accordingly, to the extent that Paine alleges that the City failed to provide Eilman with a reasonable accommodation in the form of access to medical or mental assistance, she states a cognizable claim under Title II of the ADA.  (Doc. 463, p. 3)

As stated in *Lee v. City of Los Angeles*, 250 F.3d 668 (9th Cir. 2001):

> [q]uite simply, the ADA's broad language brings within its scope anything a public entity does. This includes programs or services provided at jails, prisons, and any other custodial or correctional institution.   Although incarceration itself is hardly a program or activity to which a disabled person might wish access, mental health services and other activities or services undertaken by law enforcement and provided by correctional facilities to those incarcerated are services, programs, or activities of a public entity within the meaning of the ADA.  Certainly, if prisoners do not park [their rights against discrimination] at the prison gates, [then] pretrial detainees do not do so either.

*Id.* at 691(internal citations and quotations omitted); *see also Schorr v. Borough of Lemoyne*, 243 F. Supp. 2d 232, 235 (M.D. Pa. 2003).

Since it is well established that denial of access to medical care is actionable under the ADA, and the City is merely rehashing previously rejected arguments, the City's motion for summary judgment fails and should be denied on this ground as well.

The evidence of record (disputed and undisputed) shows that Ms. Eilman was deprived of access to medical and mental health care because of her bipolar condition, sufficient to warrant trial on her ADA claim.  Evidence exists of record that City employees knew and/or should have

---

[8] In *Pennsylvania Dept. of Corr. v. Yesky*, the Supreme Court expressly held that medical services were clearly "services, activities and programs" under the ADA which a disabled person could not be excluded from. Thus, the exclusion from those services could be actionable under the ADA.  *Id.* at 210; see also *Gorman v. Bartch, supra* at 913 (Congress' finding and purpose of the ADA notes discrimination against individuals with disabilities persist in areas such as public access to services and the ADA is a "clear and comprehensive national mandate for the elimination of discrimination against individuals with disabilities").  Further, to the extent that Defendant has argued in a separate brief the disputed fact that Ms. Eilman rejected offers for medical care, it should be noted that the *Pennsylvania Dept. of Corr.* court held that a person does not have to voluntarily seek the benefit to be eligible for the service.  *Id.* at 211; see also *Gorman v. Bartch, supra.*

known that Ms. Eilman was experiencing a psychiatric episode while in police custody. The record shows that dozens of lay witnesses at Midway Airport and the CTA station, the Second and Eighth District police personnel, the Second District detainees, and the residents in and around 5135 S. Federal recognized Eilman's behavior as aberrant and extraordinary. (P. ADA 56.1, Ex. 460, ¶ 37-62, 63-70, 71-75, 76-95, 98-105, 113-114, 197-198, 212-215, 228, 230, 233-237, 244, 258, 263-265, 286, 288-289, 305, 310, 357, 449-460) Despite this knowledge, the City's employees failed to provide Ms. Eilman with access to medical or mental health care. The care that Ms. Eilman required was a "service, program, or activity" that the City of Chicago's Police Department routinely provides to non-disabled persons. For example, Chicago Police Department general orders provide that persons in need of mental health evaluation or care shall be transferred to the nearest designated mental health facility. (P. ADA 56.1, Ex. 460, ¶163-168, 171-175, 177-181) The City cannot dispute that access to medical care is a service and right afforded to detainees under both the Fourth Amendment and the Chicago Police Department's own policies and procedures. *See Paine v. Johnson*, 2008 WL 4890269 *7 (N.D. Ill.) ("Once a state takes a person into custody, it assumes an obligation to provide for his basic needs, including 'food, clothing, shelter, medical care, and reasonable safety.'")

The City takes the extreme position that because Ms. Eilman had a "mental health" condition rather than a medical condition, she was appropriately deprived access to medical care because her type of disability requires her to make a higher showing of eligibility than would be required for others to gain access to medical services (i.e. that she must be at risk of harm to herself or others). *However, this is precisely the type of discriminatory behavior the ADA prohibits.* The Act forbids entities from denying access to services to a person because of their disability. 42 U.S.C. § 12132. Ms. Eilman was treated differently than other inmates that require medical care because of her disability. (P. ADA 56.1, 39) The City has failed to cite a single case to support its proposition that mentally disabled persons must make a higher showing of need for services than non-mentally disabled persons.

The City then claims that Ms. Eilman, with her disability, was treated like everyone else, no better and no worse. (City's Memo, p. 6). But the facts say otherwise. There was another detainee in the Second District lock up during the same time frame when Ms. Eilman was being held who required medical care. Based on that detainee's arrest processing report, it appears that on May 7, 2006, the same day Ms. Eilman was brought to the Second District, that other detainee

18

was taken to a nearby hospital "seeking medical treatment," and returned to the lock up approximately six hours later. (P. ADA 56.1, 39 – 40) This evidence shows that Ms. Eilman was not treated like other detainees when she was refused access to a service, program, or activity that was otherwise available to those without her particular disability.[9] Thus, there exists sufficient evidence that supports a finding that the City did in fact deny access to medical and mental health services to Ms. Eilman based on her disability.

### A.     Ms. Eilman has not asserted a medical malpractice claim.

The City relies on *Grazn v. Charter Hospital of Northwest Ind.*, 104 F.3d 116, 127 (7th Cir. 1997) for the proposition that the ADA does not provide a remedy for a medical malpractice claim. However, Plaintiff has not alleged a medical malpractice claim. In *Grazn*, the plaintiff claimed that a psychiatric hospital discriminated against her because a counselor had taken sexual advantage of her, and their sexual relationship interfered with her treatment for disability. *Id.* at 118, 120. ("Grazan does not allege that she was barred access or denied [mental health] treatment by Charter Hospital. Instead, she alleges she received poor [mental health] treatment, defective treatment …" In our case, on the other hand, the City's police department is not a medical provider, and Plaintiff is not claiming that the City negligently performed medical treatment. Thus, *Grazn* is readily distinguishable.

### B.     The City is liable under the ADA for otherwise subjecting Ms. Eilman to discrimination based on her disability.

ADA claims under 42 U.S.C. § 12132 are not limited to those involving the deprivation of a service, benefit, or program. *Bircoll v. Miami-Dade*, 480 F.3d 1072 (11th Cir. 2007). Liability can also arise by otherwise subjecting a disabled person to discrimination. *Id.* at 1084-1805 (Title II protects disabled persons from being subject to discrimination, and this is not tied to any service, program, or activity; rather, it is "a catch-all phrase that prohibits all discrimination by a public entity, regardless of the context.") (citations omitted); *see also* 42 U.S.C. § 12132.

---

[9] Further, although Ms. Eilman has shown disparate treatment, "[u]nder the law of the Seventh Circuit, a plaintiff need not allege either disparate treatment or disparate impact in order to state a claim under the reasonable accommodation claim under Title II of the ADA. In sum, a Title II claim under the ADA 'may be established by evidence that (1) the defendant intentionally acted on the basis of the disability, (2) the defendant refused to provide a reasonable accommodation, or (3) the defendant's rule disproportionally impacts disabled people." *Wis. Cmt. Servs v. City of Milwaukee*, 465 F.3d 737, 753 (7th Cir. 2006).

"Discrimination under the ADA is a broad concept. Simply failing to reasonably accommodate a person's disability in the course of an investigation or arrest, causing the person to suffer greater injury or indignity in that process than other arrestees would subject a municipality to liability." *Spencer v. Dawson*, 2006 WL 3253574 (N.D. Ill. 2006); *Duda v. Board of Education of Franklin Park School Dist*, 133 F.3d 1054 (7th Cir. 1998)("[A]n allowance of time for medical care or treatment may constitute a reasonable accommodation."); *Barber v. Guay*, 910 F. Supp. 790, 802 (D.Me 1995)(holding that defendant was not entitled to summary judgment on plaintiff's "claims [under the ADA] that he was denied proper police protection and fair treatment due to his psychological and alcohol problems").

Based on the totality of the evidence presented in the record, there is ample evidence that Ms. Eilman was caused to suffer greater injury or indignity during her time in police custody than other detainees, as described above. During her 28 hours in police custody, Ms. Eilman's behavior demonstrated she was in the throes of an obvious psychiatric episode. As discussed above, there is compelling evidence that her behavior indicated she needed immediate access to medical care. In addition to her glaringly obvious psychiatric episode, Ms. Eilman was also crying out that she was suffering from chest pain, was having difficulty breathing and needed to be taken to a hospital. (Plft. ADA 56.1, Ex. 460, ¶ 275-277, 285-286, 329, 331, 359-360) However, instead of responding to her needs, City employees ignored Ms. Eilman's pleas for care and instead mocked her and responded by telling her to "Shut the fuck up," "Shut the hell up white bitch," "Shut your ass up and go to sleep" and she was not going anywhere. (Plft. ADA 56.1, Ex. 460, ¶ 275-277, 285-286, 329, 331, 359-360) When Ms. Eilman was screaming that her chest hurt and she wanted to go to the hospital, Officer Hudson stated to Officer Williams "that white girl is acting crazy back there and now she wants to go to the emergency room." In response, Williams told Hudson "[a]in't nothing wrong with her and she ain't going nowhere and if she keeps on screaming we are going to send her crazy ass to the crazy hospital, that's where the fuck she is going." (Plft. ADA 56.1 Ex. 460, ¶ 285-286) Consequently, Ms. Eilman was caused to suffer great indignity and became even more disturbed, frightened, and out-of-control while in police custody, only to be released into a highly dangerous neighborhood where she was sexually assaulted and gravely injured. The City's summary judgment should thus be denied.

## CONCLUSION

For the reasons set forth above, and based on the authorities cited, the City's motion for summary judgment should be denied. There are many genuine issues of material fact to warrant submission of this claim to a jury.

Respectfully submitted,

*/s/ Jeffrey Singer*
Jeffrey Singer, Esq.
Misty R. Martin, Esq.
Mitchell P. Morinec, Esq.
Kimberly Kayiwa Esq.
Segal McCambridge Singer & Mahoney, Ltd.
233 S. Wacker Drive - Suite 5500
Chicago, Illinois 60606
(312) 645-7800

## CERTIFICATE OF SERVICE

I, the undersigned, being first duly sworn on oath, depose and state that a copy(ies) of **PLAINTIFF'S MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANT CITY OF CHICAGO'S MOTION FOR SUMMARY JUDGMENT AS TO COUNT XXXIX** was served on the party(ies) as above-addressed, by the Court's electronic filing system on this **16**[th] day of **November, 2009.**

*/s/ Misty R. Martin*_____
Attorney for Plaintiff