IN THE UNITED STATES DISTRICT COURT FOR THE
NORTHERN DISTRICT OF ILLINOIS, EASTERN DIVISION

KATHLEEN PAINE, as Guardian of the )
Estate of CHRISTINA ROSE EILMAN, )
a Disabled Person, )          Case No. 06 C 3173
             Plaintiff, )          Judge Virginia M. Kendall
v. )          Magistrate Judge Valdez
OFFICER RICHARD CASON, et al. )
             Defendants. )

**PLAINTIFF'S BRIEF IN OPPOSITION TO DEFENDANTS'
MOTION FOR SUMMARY JUDGMENT ON § 1983 CLAIMS**

# TABLE OF CONTENTS

LEGAL STANDARD ......................................................................................1

I.    THERE ARE GENUINE MATERIAL ISSUES OF FACT
      WHETHER EACH INDIVIDUAL DEFENDANT VIOLATED
      CHRISTINA EILMAN'S CONSTITUTIONAL RIGHTS BY
      UNREASONABLY FAILING TO PROVIDE HER WITH
      NECESSARY MEDICAL OR MENTAL HEALTH CARE WHILE
      SHE WAS IN CUSTODY ........................................................................1

      A.    The Defendants each had notice of Ms. Eilman's medical
            and/or mental health care need. ................................................1

            1.    Defendants Cason, Moreno, Berglind, and Earnest ....................3

            2.    DEFENDANTS WILLIAMS AND STOKES ...............................7

            3.    Defendants Hudson and Quinn .......................................11

            4.    Defendant Mabery ...............................................16

            5.    Defendant Smith.................................................17

                  a.    The May 8 telephone conversation is admissible ..............17

                  b.    Mrs. Paine's statements to Smith show a serious
                        medical need. ................................................21

            6.    Defendant Heard.................................................23

            7.    Eilman's "denial" of a serious condition or need for
                  care ........................................................26

      B.    MS. EILMAN PRESENTED WITH A SERIOUS MEDICAL
            NEED WHILE IN POLICE CUSTODY. ...................................28

      C.    THE DESIRED TREATMENT FOR MS. EILMAN WAS
            EASILY OBTAINABLE AND WOULD HAVE IMPOSED
            NO UNDUE BURDEN .........................................................35

      D.    DEFENDANTS' UNREASONABLE FAILURE TO
            PROVIDE MS. EILMAN WITH ACCESS TO CARE
            CANNOT BE JUSTIFIED UNDER THE RUBRIC OF
            "POLICE INTERESTS"........................................................38

      E.    PLAINTIFF IS NOT ASSERTING A "MEDICAL
            MALPRACTICE" CLAIM AGAINST DEFENDANTS .........................40

      F.    Even if deliberate indifference is the standard against which
            Defendants' conduct is to be measured, genuine material issues
            remain regarding Defendant's liability....................................41

II.   THE DEFENDANTS' FAILURE TO PROVIDE MS. EILMAN
      WITH ACCESS TO CARE PROXIMATELY CAUSED HER
      INJURIES .........................................................................42

      A.    The acts perpetrated by Marvin Powell do not sever the causal
            relationship between the Defendants' conduct and Ms. Eilman's
            injuries. ..................................................................43

      B.    Defendants' conduct is the actual cause of Eilman's injuries.................46

III.  DEFENDANT HEARD AFFIRMATIVELY PLACED MS. EILMAN INTO
      AN ENVIRONMENT OF INCREASED DANGER ...........................................48

    A.       Heard did not simply "give Ms. Eilman directions." ...............................50

    B.       Defendant Heard's affirmative acts proximately caused Eilman's injuries. ....................................................................................................54

    C.       Heard had the requisite state of mind.........................................................59

IV.    DEFENDANTS ARE NOT ENTITLED TO QUALIFIED IMMUNITY… ......59

    A.       Defendants are not entitled to qualified immunity for their failure to provide Christina Eilman with access to necessary medical and/or mental health care…. ................................................................................62

    B.       Defendant Heard had ample notice she could not affirmatively place Ms. Eilman into a position of danger and leave her to fend for herself..66

V.    CONCLUSION .......................................................................................................68

# TABLE OF AUTHORITIES

<u>Cases</u>

*Anderson v. Creighton*, 483 U.S. 635, 107 S.Ct. 3034, 97 L.Ed.2d 523 (1987) ............................60
*Antonelli v. Sheahan*, 81 F.3d 1422 (7th Cir. 1996) ............................31
*Beard v. Banks*, 548 U.S. 521 (2006) ............................15, 43, 67
*Benson v. Allphin*, 786 F.2d 268 (7th Cir. 1986) ............................66
*Board v. Farnham*, 394 F.3d 469 (7th Cir. 2005) ............................61
*Bowers v. DeVito*, 686 F.2d 616 (7th Cir. 1982) ............................44, 49, 67, 68
*Brinegar v. United States*, 388 U.S. 160 (1949) ............................15
*Brokaw v. Mercer County*, 235 F.3d 1000, 1018 n. 14 (7th Cir. 2000) ............................63
*Brownell v. Figel*, 950 F.2d 1285 (7th Cir. 1991) ............................15, 27, 28, 48
*Buchanan-Moore v. County of Milwaukee*, 570 F.3d 824 (7th Cir. 2009) ............................49, 67
*Castellano v. Chicago P.D.*, 129 F. Supp. 2d 1184 (N.D. of Ill. 2001) ............................42
*Chapman v. Keltner*, 241 F. 3d 842 (7th Cir. 2001) ............................63
*Clash v. Beatty*, 77 F.3d 1045 (7th Cir. 1996) ............................62
*Cleveland v. Rotman*, 297 F.3d 569 (7th Cir. 2002) ............................44
*Collignon v. Milwaukee County*, 163 F.3d 982 (7th Cir. 1998) ............................22, 34, 63, 64
*County of Riverside v. McLaughlin*, 500 U.S. 44 (1991) ............................39
*Crenshaw v. Rivera*, 2009 WL 377985 (N. D. Ind.) ............................34, 37
*Crowley v. Hedgepeth*, 109 F.3d 500 (8th Cir. 1997) ............................48
*Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 59, 113 S.Ct. 2786 (1993) ............................47
*Davis v. Jones*, 936 F.2d 971 (7th Cir. 1991) ............................33, 35, 39, 41
*DeShaney v. Winnebago County Department of Social Services*, 489 U.S. 189 (1989) ............................48, 49, 51, 53, 61
*Doe v. R.R. Donnelley & Sons Co.*, 42 F.3d 439 (7th Cir. 1994) ............................1
*Egebergh v. Nicholson*, 272 F.3d 925 (7th Cir. 2001) ............................62
*Enis v. Ba-Call Bldg. Corp.*, 639 F.2d 359 (7th Cir.1980) ............................44
*Estate of Boncher v. Brown County*, 272 F.3d 484 (7th Cir. 2001) ............................27
*Estate of Novak v. County of Wood*, 226 F.3d 525 (7th Cir. 2000) ............................14, 22, 27, 28
*Estelle v. Gamble*, 429 U.S. 97 (1976) ............................40, 41, 65
*Farmer v. Brennan*, 511 U.S. 825 (1994) ............................26, 27, 41
*Finsel v. Cruppenink*, 326 F.3d 903 (7th Cir. 2003) ............................61
*Freeman v. Burge*, 441 F.3d 543 (7th Cir. 2006) ............................15
*Gibson v. City of Chicago*, 910 F.2d 1510 (7th Cir. 1990) ............................51, 53, 54, 58
*Gil v. Reed*, 381 F. 3d 649 (7th Cir. 2004) ............................3, 36, 37
*Gonzalez v. City of Elgin*, 578 F.3d 526 (7th Cir. 2009) ............................61
*Graham v. Connor*, 490 U.S. 386 (1989) ............................2, 62, 63, 64, 65
*Grieveson v. Anderson*, 538 F.3d 763 (7th Cir. 2008) ............................1, 65
*Hall v. Ryan*, 957 F.2d 402 (7th Cir. 1992) ............................62, 65
*Harlow v. Fitzgerald*, 457 U.S. 800, 818, 102 S.Ct. 2727, 73 L.Ed.2d 396 (1982) ............................59
*Henderson v. Sheahan*, 169 F.3d 839 (7th Cir. 1999) ............................45
*Hibma v. Odegaard*, 769 F.2d 1147 (7th Cir. 1985) ............................43
*Higgins v. Correctional Medical Services of Ill., Inc.*, 178 F.3d 508 (7th Cir. 1999) ............................40
*Hill v. California*, 401 U.S 797 (1971) ............................15, 31
*Holmes v. Village of Hoffman Estates*, 511 F.3d 673, 687-88 (7th Cir. 2007) ............................62
*Hope v. Pelzer*, 536 U.S. 730, 122 S.Ct. 2508, 153 L.Ed.2d 666 (2002) ............................61
*Horwitz v. Board of Education*, 260 F.3d 602 ............................44
*In Re Elizabeth McN*, 855 N.E. 2d 588 (Ill. App. Ct. 2006) ............................33
*In the Matter of O.C.*, 788 N.E. 2d 1163 (Ill. App. Ct. 2003) ............................33
*Jackson v. City of Joliet*, 715 F.2d at 1204 (7th Cir. 1983) ............................53, 67, 68
*Jacobs v. City of Chicago*, 215 F. 3d 758 (7th Cir. 2000) ............................68
*Joseph v. Brierton*, 739 F.2d 1243 (7th Cir. 1984) ............................15, 65
*King v. County of Gloucester*, 302 Fed.App. 92 (3rd Cir. 2008) ............................27, 67

*Kneipp v. Tedder*, 95 F.3d 1199 (3rd Cir. 1996)................................................................49
*Langston v. Peters,* 100 F.3d 1235 (7th Cir. 1996)............................................................41
*Lewis v. Downey,* 581 F.3d 467 (7th Cir. 2009) ...............................................................62
*Lopez v. City of Chicago*, 464 F.3d 711 (7th Cir. 2006).............................................2, 37, 63
*Luck v. Rovenstine*, 168 F.3d 323 (7th Cir. 1999) .............................................................63
*Martin v. Tyson*, 845 F.2d 1451 (7th Cir. 1988) ...............................................................33
*Martinez v. California*, 444 U.S. 277 (1980).....................................................................44
*Matz v. Frank*, 2009 WL 2191885 (C.A. 7 (Wis.)), *4...................................................31, 37
*May v. Sheahan*, 226 F.3d 876 (7th Cir. 2000)..............................................................59, 60
*Mayan v. Weed* , 310 Fed. Appx. 38 (7th Cir. 2009)...........................................................41
*McLin v. City of Chicago*, 742 F. Supp. 994 (N.D. Ill. 1990)...............................................68
*Meriwether v. Faulkner*, 821 F. 2d 408 (7th Cir. 1987)..................................................29, 31
*Mombourquette v. Amundson*, 469 F.Supp.2d 624 (W.D. Wis. 2007) ....................26, 27, 28, 39, 42
*Monfils v. Taylor*, 165 F.3d 511, 516 (7th Cir. 1990).....................................................49, 58
*O'Connor v. Donaldson*, 422 U.S. 563 (1975)...................................................................22
*Ortiz v. City of Chicago*, 2008 WL 4681156 (N.D.Ill.) ........................................................47
*Paine v. Johnson*, 2008 WL 4890269 (N.D. Ill.), at *6...................................................1, 2
*Pearson v. Callahan*, 129 S.Ct. 808, 172 L.Ed.2d 565 (2009)..............................................60
*Peck v. Ford Motor Co.*, 603 F.2d 1240 (7th Cir. 1979) ....................................................43
*Petrovic v. City of Chicago*, 2008 WL 4286954 (N.D.Ill.) at *7 ...........................................63
*Quade v. Kaplan*, 2008 WL 905187 (N.D. Ill.) at *10 .......................................................68
*Rackovich v. Wade*, 850 F.2d 1180 (1987)...................................................................60, 66
*Reed v. Gardner*, 986 F.2d 1122 (7th Cir. 1993).........................................................53, 54, 63
*Riordan v. City of Joliet*, 3 F.Supp. 2d 889, 898 (N.D. Ill. 1998)......................................61, 68
*Ross v. United States*, 110 F.2d 1422 (7th Cir. 1990).................................................51, 53, 54, 61
*Salazar v. City of Chicago*, 940 F.2d 233 (7th Cir. 1991)..............................................27, 28
*Sallenger v. Oakes*, 473 F.3d 731 (7th Cir. 2007) ...........................................................62
*Saucier v. Katz*, 533 U.S. 194, 121 S.Ct. 2151, 150 l.Ed.2d 272 (2001) .............................60
*Sides v. City of Chicago*, 496 F.3d 820 (7th Cir. 2007) .................................1, 2, 35, 38, 62, 63, 64
*Sledd v. Lindsay*, 102 F.3d 282 (7th Cir. 1996) ...............................................................62
*Smith v. Village of Norridge*, 2009 WL 210458 (N.D. Ill.) at *9-10 ......................................63
*State Bank of St. Charles v. Camic*, 712 F.2d 1140 (7th Cir. 1983) .................................9, 27, 33
*Tibbs v. City of Chicago*, 469 F.3d 661 (7th Cir. 2006).......................................................35
*U.S. v. Wiggins*, No. 03-2527, 2004 WL 835979 at *1 (3rd Cir. April 20, 2004) .........................15
*United States v. Brisco*, 896 F.3d 1476 (7th Cir. 1990).......................................................21
*United States v. Roberts*, 22 F.3d 744 (7th Cir. 1994).......................................................21
*Villanova v. Abrams*, 972 F.2d 792 (7th Cir. 1992)...........................................................63
*Wade v. Castillo*, 2009 WL 2950246 (W.D. Wis.)....................................................28, 29, 42, 60, 66
*Wasko v. Herman*, 2008 WL 150604 (N.D. Ind.), at *5 ...................................................2, 29, 32
*White v. Rochford*, 592 F.2d 381 (7th Cir. 1979)........................................................53, 58, 68
*Williams v. Kelso*, 201 F.3d 1060 (8th Cir. 2000) .............................................................32
*Williams v. Rodriguez*, 509 F.3d 392 (7th Cir.2007) ....................................................2, 29, 38
*Wilson v. Layne*, 526 U.S. 603, 614, 119 S.Ct. 1692, 143 L.Ed.2d 818 (1999)..........................60
*Witkowski v. Milwaukee County*, 480 F.3d 511 (7th Cir. 2007) ............................................49
*Wood v. Ostrander*, 879 F.2d 583 (9th Cir. 1989).......................................................52, 53, 61, 67
*Wynn v. Southward*, 251 F.3d 588, 594 (7th Cir. 2001) .....................................................35

## Rules

Fed.R.Civ.P. 56(c) .........................................................................................................1

**PLAINTIFF'S BRIEF IN OPPOSITION TO DEFENDANTS'
MOTION FOR SUMMARY JUDGMENT ON § 1983 CLAIMS**

Plaintiff, Kathleen Paine, as Guardian of the Estate of Christina Rose Eilman ("Plaintiff"), by her attorneys, Segal McCambridge Singer & Mahoney, Ltd., submits the following arguments and authorities in opposition to the Defendants' motion for summary judgment, and accordingly requests this Honorable Court deny said motion.

**LEGAL STANDARD**

"Summary judgment is appropriate when the record '[s]hows that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law.'" *Sides v. City of Chicago*, 496 F.3d 820, 826 (7th Cir. 2007); Fed.R.Civ.P. 56(c). The court must construe all facts, and the reasonable inferences to be drawn from those facts, in the light most favorable to the nonmoving party. *Grieveson v. Anderson*, 538 F.3d 763, 767 (7th Cir. 2008). "[I]n ruling on a motion for summary judgment, the judge's role is not to evaluate the weight of the evidence or to determine the truth of the matter, but instead to determine whether there is a genuine issue of triable fact." *Doe v. R.R. Donnelley & Sons Co.,* 42 F.3d 439, 443 (7th Cir. 1994).

**ARGUMENT**

**I. THERE ARE GENUINE MATERIAL ISSUES OF FACT WHETHER EACH INDIVIDUAL DEFENDANT VIOLATED CHRISTINA EILMAN'S CONSTITUTIONAL RIGHTS BY UNREASONABLY FAILING TO PROVIDE HER WITH NECESSARY MEDICAL OR MENTAL HEALTH CARE WHILE SHE WAS IN CUSTODY.**

Pursuant to 42 U.S.C. §1983, Plaintiff has sued the Defendants, all of whom are officers or employees of the Chicago Police Department and the City of Chicago, for violating Christina Eilman's constitutional rights following her arrest on May 7, 2006. To succeed on a § 1983 claim, Plaintiff must establish: (1) the deprivation of a right secured by the Constitution or the laws of the United States, and (2) that the deprivation was committed by a person acting under the color of state law. Here, Defendants do not dispute that they were acting under color of state law. See *Paine v. Johnson*, 2008 WL 4890269 (N.D. Ill.), at *6. Instead, Defendants dispute whether their conduct deprived Ms. Eilman of her rights.

Christina Eilman was arrested without a warrant. The Defendants' challenged conduct

took place before Ms. Eilman was afforded a probable cause hearing in court.[1] Consequently, as this Court ruled on November 7, 2008, the Defendants' conduct must be scrutinized under the objective reasonableness standard of the Fourth Amendment as applied to the states through the Fourteenth Amendment. *Paine*, *supra*, at *7-8; see also *Sides*, *supra*, citing *Graham v. Connor*, 490 U.S. 386, 394-95 (1989).

The Fourth Amendment protects individuals against unreasonable seizures from the government. *Lopez v. City of Chicago*, 464 F.3d 711, 718 (7th Cir. 2006). Plaintiff claims that each of the Defendants subjected Christina Eilman to an unreasonable seizure by unreasonably failing to provide her with access to necessary medical and/or mental health care after she was arrested and taken into custody. "Once a state takes a person into custody, it assumes an obligation to provide for his basic needs, including 'food, clothing, shelter, medical care, and reasonable safety.'" *Paine*, *supra*, at *7-8.

An assessment of objectively unreasonable conduct requires careful attention to the facts and circumstances of each particular case. *See Graham, supra*, at 396. Furthermore, "[w]hen the fact finder's task is to decide whether an act or omission is objectively unreasonable, reliance upon common sense is particularly appropriate." *Lopez*, *supra*, at 720. "[C]ommon sense and ordinary human experience must govern over rigid criteria." *Id.* Thus, the salient question is whether a jury, using common sense and drawing upon its collective ordinary human experience, could conclude, based on the facts in this record, that the Defendants' acts and omissions were objectively unreasonable. *Id.*; *see also Sides*, *supra*, at 828. As shown below, when the evidence is viewed in the light most favorable to Plaintiff, as it must be at this stage, it becomes clear that a jury could, indeed, reach that conclusion.

Regarding the more particularized question whether a jury could find a defendant's failure to provide a detainee with access to medical (including mental health) care objectively unreasonable, the courts have outlined four factors to consider: (1) whether the official had notice of the arrestee's medical need; (2) the seriousness of the medical need; (3) the scope of the requested treatment; and (4) considerations of wide-ranging police interests, including administrative, penological, or investigatory considerations. *See Sides*, *supra*, at 828; *Williams v. Rodriguez*, 509 F.3d 392, 403 (7th Cir.2007); *Wasko v. Herman*, 2008 WL 150604 (N.D. Ind.), at *5. When the evidence in this case is examined against these four factors, it is also clear there

---

[1]    The Defendants do not contend, nor is there any evidence, that Ms. Eilman received such a hearing.

exists a multitude of material issues for a jury to decide regarding the objective unreasonableness of each Defendant's role in failing to provide Ms. Eilman with that care.

Before discussing the evidence in light of the foregoing factors, Plaintiff acknowledges that she must demonstrate that each Defendant was personally responsible for depriving Ms. Eilman of her rights. Contrary to Defendants' threshold contention (see Defendants' Memorandum, hereinafter "Defts' Memo" at p.4), Plaintiff's position does not rest upon a "collective liability" theory. Rather, the record demonstrates numerous genuine material factual issues concerning each Defendant's personal participation in violating Ms. Eilman's constitutional rights. See e.g. *Gil v. Reed*, 381 F. 3d 649, 661-62 (7th Cir. 2004) (single wrongful act can constitute violation under certain circumstances).

**A.     The Defendants each had notice of Ms. Eilman's medical and/or mental health care need.**

Contrary to Defendants' argument, there is ample evidence in the record upon which a reasonable jury could conclude that each Defendant had notice that Ms. Eilman had a serious medical or mental health care need.

**1.     Defendants Cason, Moreno, Berglind, and Earnest**

Defendant Cason arrested Ms. Eilman at the Midway Airport CTA station on May 7, 2006 and then processed her arrest at the Eighth District Station.[2] (P 56.1 ¶79). Officer Cason was told that Ms. Eilman was creating a disturbance at the CTA station, that she was approaching CTA patrons, and behaving and talking inappropriately. Further, he learned she had been earlier escorted from the airport to the CTA station by three Chicago police officers.  (P 56.1 ¶76-78, 85) Officer Cason knew the phone number for the Midway Airport officers, but he never called them to find out why she had been removed from the airport, nor did he inquire about her behavior. (P 56.1 ¶86)

Officer Cason personally observed Ms. Eilman engage in erratic behavior indicative of a serious mental health need. (P 56.1 ¶76-97) When Cason first approached Ms. Eilman, she was very aggressive without any provocation, which was unusual. She cursed at him, pointed in his face, and threatened to take his gun and shoot him. Ms. Eilman started talking inappropriately

---

[2]     References to Plaintiff's Local Rule 56.1(b)(3)(C) Statement of Additional Facts will be designated "P. 56.1¶___." References to Defendants' Local Rule 56.1(a)(3) Statement of Undisputed Material Facts will be designated "D 56.1 ¶ ___."

about the high price of oil and the oil companies. She was getting into his "body space" and being very aggressive. (P 56.1 ¶76, 78, 87) Ten minutes after Cason asked Ms. Eilman to leave the station, his partner, Officer Rosendo Moreno, told him there was a disturbance outside the train station with a young woman, who turned out to be Ms. Eilman. (P 56.1 ¶77) When Cason went outside, Ms. Eilman was having a confrontation with a man who appeared confused as to why she was even talking to him. She yelled at him about smoking a cigarette. She also started yelling about "running out of oil." (P 56.1 ¶78) Cason asked her to leave a second time, but she responded with more profanity. Officers Cason and Moreno then placed her under arrest. She immediately began struggling, screaming and kicking, making a big scene. She yelled at the officers that they "just wanted to fuck" her. She threw her legs in the air, spreading her legs open, humping the air, all the while telling Cason and Moreno to "fist fuck" her. She also told them they could tie her up and have sex with her. (P 56.1 ¶79) Cason was so concerned about the disturbance Eilman was making that he requested her immediate transfer to the Eighth District station house, rather than waiting the usual hour for a transport. (P 56.1 ¶81)

Cason admitted that of the 5,000 arrests he had made in his 35-year career, Ms. Eilman's mood swings were not like anything he had seen before. Instead, she really stood out. She was certainly not a "typical arrest." (P 56.1 ¶82) Ms. Eilman would be jovial one moment and then suddenly become profane and abusive. (P 56.1 ¶83). While in Cason's presence, she was easily distracted, made nonsensical comments, approached and yelled at complete strangers, and made extremely vulgar and inappropriate sexual comments. (P 56.1 ¶78-79, 90). Ms. Eilman did not appear to be a drug user. She did not look the part. She was clean cut, sounded fairly educated, but would then become very abusive, hurling obscenities at him. Then, all of a sudden, she would become very nice. (P 56.1 ¶84)

When Eilman was placed in the patrol wagon for transfer to the Eighth District, she continued to talk "real nasty." (P 56.1 ¶88) At the station house, Cason observed Ms. Eilman continuing to exhibit extreme mood swings – displaying a whole spectrum of behavior over the course of just an hour. Her eyes were roaming all over. She had crying spells. She behaved abusively. Then she would become jovial and happy. (P 56.1 ¶90, 95-96). She jabbered about oil companies ruining the country. She would quickly quiet down and start crying again. (P 56.1 ¶90).

When Cason asked Officer Yvonne Delia to search Eilman, Eilman was crying a lot, was

more hysterical than a usual arrestee, was difficult to understand, and started jabbering and singing songs. She could not answer why she was at the station, and kept talking about how oil companies were ruining the country. Then she would quiet down, cry, and ask why she was being locked up. (P 56.1 ¶90) After Officer Delia searched Ms. Eilman, Delia told Cason that Eilman was not acting right. She was, instead, acting weird. Delia suggested that Eilman might need to go to the hospital. (P 56.1 ¶91)

Officer Cason explained to Ms. Eilman four to six times why she had been arrested, but she could not understand and continued asking why she was being locked up. (P 56.1 ¶92). Cason admitted he thought Ms. Eilman had a mental illness. He was concerned that her behavior put her at risk of self harm or being hurt by someone else. (P 56.1 ¶93). Cason also later learned from Officer Delia that Ms. Eilman did have psychiatric problems, possibly bipolar disorder, and that Eilman's stepfather was concerned about her mood swings and behavior. (P 56.1 ¶94).

Cason visited the offices of the Watch Commander, Lieutenant Carson Earnest, and asked for a "second opinion" about Ms. Eilman's behavior. (P 56.1 ¶111, 127) Sergeant Berglind was asked to give that "second opinion". (P 56.1 ¶129)

Cason was present when Sergeant Berglind interviewed Ms. Eilman at the station, and heard her tell Berglind she did not know why she was arrested (even though Cason had told her several times). (P 56.1 ¶92) After the interview and after Watch Commander Earnest ordered Cason to continue processing Ms. Eilman's arrest forms, Cason continued to observe Eilman engaging in erratic behavior. She was excitable, would get up, sit down, and cry. Her eyes were roaming all over. (P 56.195, 134) Cason never went back to inform the watch commander about any of Eilman's post-interview behaviors, or recommend to anyone that she should go to a mental health facility for evaluation. (P 56.1 ¶96)

Cason's partner, Officer Moreno, was also involved in Ms. Eilman's arrest and processing. (P 56.1 ¶79) Officer Moreno also personally observed Ms. Eilman engage in strange, erratic, and potentially dangerous behavior. When he first saw her outside the CTA train station, Eilman was in a man's face yelling in a high pitched voice while the man was trying to walk away. Moreno learned that Eilman did not know the man. She just went up to him and started yelling at him. (P 56.1 ¶98-99) After Moreno told her she could not yell and swear, she stopped. A minute later, she started swearing and yelling again. (P 56.1 ¶100) Moreno observed Ms. Eilman having two to three mood swings in a short period of time – one moment, she would be

nice, the next she would become verbally aggressive and hostile. (P 56.1 ¶102) He heard Eilman utter nonsensical comments about the price of oil and wanting to become a school teacher. (P 56.1 ¶103) He knew she had been cursing at everyone walking through the CTA station. He also learned that Eilman was from California and was stranded in Chicago. (P 56.1 ¶101)

At the Eighth District station house, Moreno observed her continued extreme mood swings. She cried, stood on a stool, acted crazy, jumped on a bench, yelled and screamed. (P 56.1 ¶104-105) In the bullpen holding area, she stood on a toilet seat, was loud, and yelled obscenities. (P56.1 ¶105) Officer Moreno admitted he thought Ms. Eilman was crazy. (P 56.1 ¶107) His partner Cason told him that the watch commander said they should put Eilman in their car and take her to the hospital, but Cason told the commander they did not have a squad car. (P 56.1 ¶106) Officer Delia also told him that Eilman might need to go to the hospital. (P 56.1 ¶108) Officer Moreno never told anyone at the Eighth District, including the watch commander, that he thought Eilman was "acting crazy." He could not explain why he failed to report his assessment of Ms. Eilman to anyone else. (P 56.1 ¶107)

Sergeant Berglind was asked by Lieutenant Earnest to interview Ms. Eilman at the Eighth District station house. (P 56.1 ¶111, 129)  Berglind was aware of Officer Cason's concern about Ms. Eilman's mental state. (P 56.1 ¶111) Berglind is a not a medical professional and has no training in the assessment, evaluation, diagnosis or treatment of mental illnesses. (P 56.1 ¶109) He admits that in a close call, the safer route is to take a detainee to a designated mental health facility for evaluation. (P 56.1 ¶110) Based both on what he was told and what he personally observed, Berglind knew that Ms. Eilman had engaged in erratic and dangerous behavior. He was made aware, for example, that Ms. Eilman had been exposing her body to strangers at the CTA station. (P 56.1 ¶113-114)

Berglind asked Ms. Eilman simple, basic questions. (P 56.1 ¶115) He did not inquire whether she was taking any psychotropic drugs or if she had ever been institutionalized for a psychiatric condition. (P 56.1 ¶115) During the interview, Ms. Eilman engaged in bizarre and erratic behavior. (P 56.1 ¶114-115) She did not know why she was arrested, despite being informed by Officer Cason several times. (P 56.1 ¶92) She also could not provide answers to some of his questions. (P 56.1 ¶114) Instead, Ms. Eilman gave totally unrelated, disjointed responses, like inviting Sergeant Berglind to visit her in California or complaining about America's dependence on oil. She also started singing and rapping during the interview. (P 56.1

6

¶114)

Lieutenant Earnest was the Eighth District watch commander when Ms. Eilman was arrested and processed. (P 56.1 ¶120-121) Lieutenant Earnest received multiple reports that Ms. Eilman was an unusual arrest, that she was exhibiting erratic behavior and mood swings, and that more than one officer expressed concerns about her well being. (P 56.1 ¶127-128, 131) He also received direct notice from Officer Delia that a family member had reported that Ms. Eilman may have bipolar disorder.  (P 56.1 ¶131) Earnest knew that if a person was having dramatic mood swings, was not speaking intelligibly, had a history of psychiatric hospitalization, or was reportedly bipolar, he or she may be considered mentally unstable because they cannot take care of themselves.  (P 56.1 ¶125) Earnest assigned Sergeant Berglind to assess Ms. Eilman, though he knew Berglind did not have any specialized training.  (P 56.1 ¶129)  After Berglind reported Eilman had no plan to hurt herself, he told arresting Officer Cason to proceed with completing the arrest process. (P 56.1 ¶134)

### 2. Defendants Williams and Stokes[3]

Defendant Teresa Williams, the Women's lockup officer, "received" Ms. Eilman at the Second District lockup at 8:10 p.m., which was during the third watch (2 p.m. to 10 p.m.), on May 7. (P 56.1 ¶195; D. 56.1 ¶203) While being processed, Ms. Eilman talked non-stop about things other than responding to Williams' questions. (P 56.1 ¶196) Williams personally observed and specifically noted on the intake sheet that Ms. Eilman was "irrational" and was "carrying medication." (P 56.1 ¶197)  Further, Eilman refused to provide basic information sought by Williams, telling Williams (and Williams' colleague Stokes) that "I'm only going to be here an hour or two" and didn't need to answer Williams' questions. (P 56.1 ¶198)

Williams was aware that if an arrestee acted "irrational," she was to "send arrestee to the nearest approved hospital or mental health intake facility" *and* notify the desk sergeant or watch commander of the arrestee's transfer.  (P 56.1 ¶210) Williams failed to do this. Instead, Williams assigned Ms. Eilman to a cell used for uncooperative detainees ("Cell 8"). (P 56.1 ¶202-203)

Officer Williams claims that Ms. Eilman did not yell or scream, bang on the bars, request medical care, or complain of pain or discomfort during Williams' shift on May 7th. She claims

---

[3]     Attached for the Court's reference is Ex. 436, which is a timeline of the women's lock-up detainees and police personnel employed at the Second District on May 7 and 8, 2006, founded upon Chicago Police Department records, as well as Ex. 421, a detainee log detailing the times of reception and release of detainees from the Second District lockup on May 6th through 8th, 2006. The parties have jointly agreed to the submission of these exhibits for the convenience of the Court.

Eilman was merely uncooperative. (P 56.1 ¶197; D. 56.1 ¶157, 159, 142)  However, Williams'
account is directly contradicted by the sworn testimony of several eyewitnesses who were
present in the Second District lockup during her tour of duty on May 7 (and 8).

Detainee Beatrice Martinez first suspected that Ms. Eilman had mental problems before
the two were both behind bars at the Second District. (P 56.1 ¶64)  Ms. Martinez was taken into
police custody in the early afternoon on May 7 and transported by squadrol to the Midway
Airport CTA station. Upon arrival, she heard Eilman screaming and yelling as the two squadrol
officers forced her into the back of the vehicle. (P 56.1 ¶66) During the next half-hour, Ms.
Martinez witnessed Ms. Eilman talking to herself, answering her own questions, speaking
extremely fast, and generally speaking "nonsense" and "gibberish." (P 56.1 ¶68) Both Eilman
and Martinez were then taken to the Eighth District police station. (P 56.1 ¶71) Martinez
believed that anyone observing Ms. Eilman acting this way would know that there was
"something wrong" with her. (P 56.1 ¶75)

Ms. Eilman's unusual behavior continued when she and Ms. Martinez arrived at the
Eighth District Station.  There, Martinez observed Eilman speaking loudly, talking nonsense,
being uncooperative with the officers, and generally not making any sense. (P 56.1 ¶71)  At one
point, Ms. Eilman suddenly, and aggressively, turned to Ms. Martinez and with an angry facial
expression said "what's up yo?"   This frustrated Martinez because she and Ms. Eilman had been
"friendly" prior to Eilman's sudden change in mood.   This solidified Martinez's belief that
"something wasn't right" with Eilman. (P 56.1 ¶73)

At the Second District lockup, Ms. Martinez, who arrived at 5:00 p.m. a few hours before
Eilman, was placed in Cell 7. Ms. Eilman was placed in the adjacent cell, Cell 8. (P 56.1 ¶226;
D. 56.1 ¶223) Martinez noticed Ms. Eilman completely stopped talking and pretended to be
mute. (P 56.1 ¶230)  In the presence of the detention aides, Ms. Eilman squatted down and
pointed to her groin with her index finger indicating that she needed a tampon. (P 56.1 ¶229)
Later, Ms. Martinez was awakened from a nap by Ms. Eilman yelling and the guards yelling
back at her to shut up. (P 56.1 ¶227)  Martinez yelled out to the guards that Ms. Eilman was "not
all there" and "not understanding what you're saying" and specifically told Defendant Williams
and her colleagues that Ms. Eilman was "bipolar." (P 56.1 ¶228)  Martinez positively identified
Defendant Williams as one of the guards present during Eilman's yelling and to whom Martinez
called out for assistance for Eilman. (P 56.1 ¶232)  Despite Martinez's statements, the lockup

officers, including Williams, did nothing. (*Id.*)

Tanya Hall[4] was also detained in the Second District lockup from the time Ms. Eilman was initially brought there until 5:00 a.m. on May 8th. Hall shared Cell 8 with Ms. Eilman, but within a few hours requested a cell transfer because of Eilman's bizarre behavior. (P 56.1 ¶240; D. 56.1 ¶227) Shortly after being brought to the cell, Ms. Eilman became agitated, started shaking the bars of the cell, jumping from the bench to the floor, and "making a lot of noise." (P 56.1 ¶233) Then, Eilman refused to talk, placing her hand over her mouth. She put her index finger to her lips, indicating for Hall to be quiet, and pointed to the ceiling as though their conversations were being monitored. (P 56.1 ¶234) Defendant Williams came back to their cell and told Ms. Eilman, "Sit down because [you aren't] going nowhere. [You aren't] going nowhere. [You're] going to be [here] for a while." (P 56.1 ¶206) Though Williams had observed Ms. Eilman's bizarre behavior first-hand, the only thing she told her relief, Defendant Cynthia Hudson, at shift change was that Ms. Eilman was "just acting silly." (P 56.1 ¶244; D. 56.1 ¶167)

Defendant Williams witnessed more of Eilman's bizarre behavior the following day, May 8, while once again working the third watch. (D. 56.1 ¶203) Corliss Holeman-Holland, who was detained in the lockup from 4 p.m. on May 8 until 10:26 a.m. on May 9, testified that Williams approached Eilman's cell after hearing Eilman yell persistently and loudly, and then yell back, "What's wrong with you?" Ms. Eilman responded by screaming that she "couldn't breathe" and that she "had a heart murmur." (P 56.1 ¶350) Williams then told Eilman to "pick up her shoes and click them together," but Eilman told her she couldn't because her heart was hurting. (P 56.1 ¶347) Eilman was transferred to a new cell. There, she again began screaming and banging on the cell bars for approximately fifteen minutes. Williams remarked, "See, ain't nothing wrong with her heart. All she wants to do is use the phone." (P 56.1 ¶352)

Williams claims she had no more reason to believe that Eilman was at risk of harm than did the defendants in *State Bank of St. Charles v. Camic*, 712 F.2d 1140, 1143 (7th Cir. 1983). (Defts' Memo, p. 27) In *Camic*, however, the Seventh Circuit specifically noted that none of the defendant officers "had knowledge of, or even any particular reason to suspect, suicidal tendencies on the part of [the decedent]." *Id.* at 1146. In our case, on the other hand, there is substantial evidence, as just described, that Ms. Eilman exhibited obvious signs and symptoms of

---

[4]    Tanya Hall is also known as "Latanya Johnson".

a psychiatric crisis requiring immediate medical evaluation and/or intervention. Williams herself described Eilman as "irrational" on Eilman's arrest report intake form. She also characterized Eilman as "uncooperative," "very arrogant," "carrying medication," and refusing to answer if she had any "serious medical or mental problems." (P 56.1 ¶197)

Williams further contends that "[n]othing in the record indicates that Williams…heard Martinez calling out to them, nor would another arrestee's comments that something was 'wrong' necessarily put a reasonable person on notice of a need for medical attention." This argument, however, invites the Court to assess Martinez' credibility in Williams' favor as opposed to assessing whether an issue of fact exists. Martinez testified that she called out to seek assistance for Eilman, and that she used the word "bipolar" to describe Ms. Eilman to Defendant Williams and the other guards regarding Ms. Eilman's behavior. (P 56.1 ¶232) Consequently, at minimum, a question of fact exists. Williams' contention is also challenged by the fact that Martinez was not the only person to alert Williams that Ms. Eilman required attention. As Ms. Holland relates, Eilman herself informed Williams that she could not breathe, that she had a heart murmur, and that she needed assistance. (P 56.1 ¶341-343)

Despite all of this, Williams never informed the desk sergeant about Ms. Eilman's behaviors, her medical complaints, and her requests to go to the hospital. (P 56.1 ¶209) Williams knew that the Chicago Police Department Guidelines for Arrestee Screening required her to notify the desk sergeant and watch commander, which Williams conceded would require Eilman be transported to the nearest mental health intake facility.[5] This is especially compelling in light of Acting Desk Sergeant Miller's deposition testimony that, had she been informed of this, "by all means we'd take that person to the hospital." (P 56.1 ¶192) In sum, the testimonies of witnesses Holland, Martinez, and Hall demonstrate material questions of fact with respect to Defendant Williams' contention she was unaware of Ms. Eilman's serious medical need.

Defendant Stokes was a Second District detention aide who worked together with Williams during her May 7 shift. (D. 56.1 ¶129-130) Stokes initially searched Ms. Eilman upon her arrival at the station. (P 56.1 ¶211) During the search, Stokes observed Ms. Eilman being rude and uncooperative and refusing to answer questions. (P 56.1 ¶212) Both Stokes and Williams observed Eilman remove her bikini underpants, which were stained with menstrual

---

[5] Williams claimed at deposition that when she wrote "yes" for the line "appears to be irrational" on Eilman's arrest report (Ex. 53), she really meant "uncooperative." However, Ex. 29A's use of the term "irrational" mirrors questions on the intake form for the processing of detainees. (Ex. 53, Bates #00219)

blood, and throw them on the table in the processing area, which Stokes described as "nasty." (P 56.1 ¶212-216, 223) Stokes offered Ms. Eilman a sanitary napkin, which Eilman refused despite her menstrual bleeding. (P 56.1 ¶214)

Stokes concurred with Williams that Eilman was "irrational" because she refused to answer questions, was uncooperative, and refused to put on a sanitary pad. (P 56.1 ¶221) Despite the departmental guidelines for arrestee screening, Stokes, like Williams, failed to have Eilman sent to the nearest mental health intake facility and notify the desk sergeant or watch commander about Ms. Eilman's "irrational" behavior. Instead, Stokes escorted Eilman to Cell 8. (P 56.1 ¶197, 218)

Thereafter, Stokes, conducted inspections of the female lockup. Eilman simply stared quietly at her during one of the inspections. Stokes admitted she later observed Eilman standing on her cell bench and thereafter holding hands and singing with a detainee from the adjacent cell. (P 56.1 ¶219)

As aforementioned, Beatrice Martinez occupied the cell next to Ms. Eilman's. Her testimony, discussed above, applies with equal force as notice to Stokes regarding Eilman's genuine medical need. Stokes, like Williams, did not respond to Martinez's expressions of concern about Eilman's behavior. As a detention aide, Stokes was responsible not only for inspecting the arrestees in custody during her watch but also "providing for [their] well-being." (CPD General Order 02-03 IV.D.7.)  Since Stokes did nothing in the face of Ms. Eilman's irrational and bizarre behavior, she, like Williams, is not entitled to summary judgment.

### 3.    Defendants Hudson and Quinn

Cynthia Hudson and Catonia Quinn are Second District women's lock-up detention aides working the first watch on May 8. Their tour of duty started when Williams' and Stokes' ended (10:00 p.m. on May 7). They remained on duty through 6:00 a.m. on May 8. (D. 56.1 ¶162-164; Ex. 436)  When Hudson arrived, she conducted a cell check. In addition to Ms. Eilman, detainees Senora Baker, Tanya Hall, Euraina Hawkins, and Natasha Washington were in the lockup at that time.  (Defts' Memo, p. 27)  Hudson and Quinn claim they had no notice of Ms. Eilman's serious medical needs. (Defts' Memo p. 27) Like Co-Defendants Williams and Stokes, however, these Defendants also ignore crucial testimony creating issues of material fact whether they acted unreasonably in failing to provide Ms. Eilman with access to medical and/or mental health care.

Tanya Hall, whose testimony is described above, was still sharing the cell with Ms.

Eilman when Hudson and Quinn's watch began.   At one point while sleeping, Hall opened her eyes to find Eilman standing directly over her. (P 56.1 ¶235)  Hall also saw Ms. Eilman place her hand down her pants and begin to smear menstrual blood on the cell's bench and walls. (P 56.1 ¶236)  Hall demanded a cell change.  Defendant Quinn, in response to Hall's request, transferred her to a different cell because of Eilman's behavior.  Quinn recalls Hall asking to be moved from Eilman's cell "because of a sanitary pad." (P 56.1 ¶242)  Quinn's colleague Hudson later brought Ms. Eilman a sanitary napkin, looked at Eilman like she was "crazy," and walked away. (P 56.1 ¶239; Ex. 239, Hudson Mugshot)

Euraina Hawkins, who was detained from 11:30 p.m. on May 7 to 3:00 a.m. on May 8, positively identified Hudson and Quinn as aides in the Second District lockup during her detention. (P 56.1 ¶294; Ex. 421)  Quinn placed Hawkins in Cell 8 with Ms. Eilman on May 7 – after Hall had transferred out of Eilman's cell. (P 56.1 ¶295; Exs. 16, 421)  As Hawkins and Quinn approached Cell 8, Ms. Eilman was beating on the cell bars and making so much noise that other detainees were yelling they were going to "get her" and break her neck when they were released. (P 56.1 ¶296-297) Hawkins also saw blood covering the cell benches and walls. The bench looked as though it had been finger painted or "fingerprinted" with blood. (P 56.1 ¶298-299) Hawkins protested being placed in the cell with Eilman because she feared the risk of infection and disease due to the blood, but Defendant Quinn replied, "[Y]ou're going in that cell. She [Eilman] is no crazier than you is." (P 56.1 ¶300-301; Ex. 16)

Once Hawkins was locked in Cell 8, Ms. Eilman began dancing around, jumping, twirling in circles, and flapping her arms as though attempting to fly off the cell bench. (P 56.1 ¶302)  Eilman began reaching into her pants and vagina and revealing menstrual blood on her fingers.  She continued spinning around and then attempted to hug Ms. Hawkins with her bloody fingers. (P 56.1 ¶303-304) Hawkins testified she then "knew something was wrong with [Ms. Eilman]." (P 56.1 ¶305)  To add to this bizarre behavior, Ms. Eilman remained silent nearly the entire time Hawkins co-occupied Cell 8 with her. However, Eilman bobbed her head, mouthed words, and appeared to use sign language to communicate with Hawkins. (P 56.1 ¶306-307)

Hawkins screamed persistently to the guards to clean up the blood and to remove her from the cell. She also reported to guards Hudson and Quinn that something was "wrong" with Eilman, but they ignored her.  (P 56.1 ¶308)  When Hudson and Quinn eventually did return to Cell 8, they told her to "Shut up," and, in referring to Eilman, stated that "She is no crazier than

you." (P 56.1 ¶309-310)

Hudson and Quinn refused Hawkins' request to be transferred to a different cell. Hawkins was so upset by the blood and by Ms. Eilman's behavior that she remained standing on her feet the entire four hours she occupied the cell before her release. (P 56.1 ¶311) She later told Internal Affairs Division detectives that the lockup personnel had to have known that Eilman was "crazy" because her behavior was so glaringly bizarre. (P 56.1 ¶312-313)

Natasha Washington heard screaming, hollering, and objects being kicked while she was being fingerprinted at about 11 p.m. on May 7th. (P 56.1 ¶251; Ex. 78) Once she was placed into Cell 7, the cell adjacent to Eilman's and Hawkins' cell, she recognized the screaming as coming from the "white girl" in Cell 8, whom she identified as Ms. Eilman. (P 56.1 ¶252-253; Ex. 24) The kicking and screaming was sporadic. (P 56.1 ¶255, 265) Washington heard guards Hudson and Quinn yelling "Shut the fuck up!" on several occasions. (P 56.1 ¶266-270) She also heard Ms. Eilman's cellmate yelling to the guards about blood all over the cell. (P 56.1 ¶257) Washington identified Defendant Hudson as the guard who at one time came up to Cell 8 when Ms. Eilman's cellmate was yelling about the blood. (P 56.1 ¶258; Ex. 15) Hudson, with an angry voice, asked Eilman why she spread blood all over the cell, and told Eilman she would have to clean it up herself. (P 56.1 ¶258, 262) Later, Ms. Eilman spoke to Washington through their cells that dead rappers Tupac Shakur and Notorious B.I.G. were coming to rescue her. (P 56.1 ¶263) Washington could tell there was something wrong with Eilman and that it was obvious Eilman had a "mental problem." (P 56.1 ¶271)

Senora Baker was held in Cell 4 from 11:00 p.m. on May 7th until 3:00 a.m. on May 8th. (P 56.1 ¶274; P. 56.1 Resp. 245; Ex. 78) As she was being fingerprinted, she heard a white girl hollering that she wanted to go home and saying bad, violent words. (P 56.1 ¶272) In response, the guard at the fingerprint station yelled "Shut your ass up!" multiple times. (P 56.1 ¶273) She recalls hearing another guard respond by saying "Shut the hell up white bitch, you got blood all over the cell, shut your ass up and go to sleep!" (P 56.1 ¶275) As Baker was placed in her cell, she heard the white girl calling out for help because she was bleeding, and the guard telling her to "shut your white ass up, you got blood all over the cell with your nasty ass." (P 56.1 ¶276) The white girl called out for 2 to 3 hours. (P 56.1 ¶277) Baker said the white girl sounded scared. (P 56.1 ¶278) The guards repeatedly swore at her, saying "Shut the fuck up, white

bitch."[6] (P 56.1 ¶277)  Defendants Hudson and Quinn were the only detention aides on duty during Baker's custodial stay at the lockup that night. (D. 56.1 ¶162-163; Ex. 453)

Gloria Rainge, who was detained from 10:30 p.m. on May 7 until 5:15 a.m. on May 8 heard a young, blonde woman, whom she later identified as Ms. Eilman, in the lockup screaming, yelling, and asking to go to the hospital. (P 56.1 ¶279; Ex. 413)  Rainge also positively identified Defendants Hudson, Williams, and Quinn as working in the Second District lockup during her detention. (P 56.1 ¶284)

Rainge told Chicago Police Internal Affairs Division ("IAD") investigators, and confirmed in her signed statement, that Eilman was screaming that her chest was hurting bad and that she wanted to go to the hospital, at which time Defendant Hudson stated "That white girl is still acting crazy back there and now she wants to go to the emergency room."  (P 56.1 ¶285) Defendant Williams, whom it is undisputed was still in the lock-up when Hudson came on duty that evening, then told Hudson, "Ain't nothing wrong with her and she ain't going to no hospital and if she keeps on screaming we are going to send her crazy ass to the crazy hospital, that's where the fuck she is going." (P 56.1 ¶286) Rainge also told IAD that Ms. Eilman repeatedly asked for a sanitary pad, and eventually Hudson gave a pad to Rainge and ordered her to give it to Ms. Eilman.  Eilman snatched the pad from Rainge. (P 56.1 ¶287) Rainge told investigators that she heard Ms. Eilman's cellmate screaming that Eilman was acting crazy, wiping her bloody sanitary pad on the cell walls and bars and taping the pad to the wall.  (P 56.1 ¶288)  Hudson and Quinn then approached Eilman's cell, and Hudson said "You crazy bitch, you nasty bitch, get that nasty shit off my walls." (P 56.1 ¶289) Lastly, Rainge told the investigators that around 1:00 a.m. on May 8, she heard Eilman screaming constantly about having heart trouble. (P 56.1 ¶290)

Defendants compare this case to *Estate of Novack*, where the detainee was pounding on the walls and giggling uncontrollably, behavior that the court held did not indicate a risk of harm. *Estate of Novak v. County of Wood*, 226 F.3d 525, 529-531 (7th Cir. 2000).  But, as shown in the preceding pages, Ms. Eilman's abnormal, delusional, and irrational behavior extended well beyond giggling and pounding on walls. Nor was Eilman simply behaving, as the Defendants put it, "exactly like the other inmates." (Defts' Memo, p. 28)

---

[6] Christina Eilman was the only Caucasian detainee in the women's lockup during Quinn and Hudson's shift as a plain review of the mugshots depicted in the Arresting Reports of Washington, Hall (Johnson), Rainge, Hawkins and Baker reveal.  (P 56.1 ¶5; Exs. 413, 412, 417, 453-454) It was Eilman's voice whom Baker heard calling out for help.

Defendants attempt to distinguish *Joseph v. Brierton*, 739 F.2d 1243 (7th Cir. 1984), but the essential facts are strikingly similar. In *Joseph*, the plaintiff prisoner's behavior included spreading feces all over his cell and his body, and proclaiming he was Moses, Christ, and the Son of Abraham Lincoln. In reversing a defense verdict, the Seventh Circuit specifically noted the significant health risks posed by the prisoner's bizarre conduct. Here, by spreading her blood all over her cell, Ms. Eilman posed a health risk both to herself and to her cell mates, since she was openly menstruating. Additionally, though Ms. Eilman did not claim to be a prophet, a messiah, or a presidential daughter, she showed delusional behavior in declaring that dead rappers Tupac Shakur and Notorious B.I.G., were going to reincarnate, come to the Second District, and rescue her. (P 56.1 ¶263)

Citing *Brownell v. Figel*, 950 F.2d 1285 (7th Cir. 1991), Defendants also believe it could have been reasonable to interpret Ms. Eilman's blood-smearing as an expression of "anger, defiance, or an attempt to keep her clothes clean." (Defts' Memo p. 30) That argument essentially invites the Court to evaluate the blood-smearing as though it was an isolated instance, bereft of the other bizarre behavior she revealed, and to inappropriately draw inferences in Defendants' favor. Besides, *Brownell* does not buttress Defendants' position. There, the defendants had no way of knowing that the arrestee's immobility may have been caused by something other than his apparent intoxication. Here, on the other hand, Defendants Williams, Stokes, Hudson, and Quinn had plenty of additional factual context, including an array of bizarre, erratic, and irrational behavior by Ms. Eilman they observed, coupled with the complaints and pleas of other detainees, some of whom readily adduced that Ms. Eilman was suffering a psychiatric episode.[7]

Quinn and Hudson were each present and witnessed multiple instances of Ms. Eilman's irrational behavior indicative of a serious medical need. Neither of them notified the desk

---

[7]   The remaining cases on which Defendants rely are entirely inapposite. They include: *U.S. v. Wiggins*, No. 03-2527, 2004 WL 835979 at *1 (3rd Cir. April 20, 2004), a Third Circuit unpublished opinion dealing with criminal sentencing; *Freeman v. Burge*, 441 F.3d 543, 544-545 (7th Cir. 2006), which analyzes whether a refusal to feed a super-max inmate for not wearing pants was cruel and unusual punishment; *Beard v. Banks*, 548 U.S. 521, 531 (2006), a group of prisoners' First Amendment challenge to a state law disallowing them from receiving newspapers; *Brinegar v. United States*, 388 U.S. 160, 176 (1949), which addresses whether probable cause existed for the search and seizure of a suspected liquor smuggler; and *Hill v. California*, 401 U.S 797, 804 (1971), which examines the scope of a law enforcement officer's ability to conduct a search and seizure after making a wrongful arrest.

sergeant or watch commander, or took any other reasonable measures to have Eilman sent to the nearest approved mental health intake facility, St. Bernard's Hospital, *which was no more than a three minute drive from the lockup*. (P 56.1 ¶175) Instead of accommodating her glaringly apparent medical need, they chose to ignore it, telling Ms. Eilman to "Shut the fuck up!" At the very least, there are material fact issues regarding their awareness of Ms. Eilman's serious medical need and their affirmative decision to not assist her.

### 4. Defendant Mabery

Deborah Mabery was the Second District lockup officer during the second watch (6:00 a.m. to 2:00 p.m.) on May 8. (D. 56.1 ¶176; Ex. 436) She claims she could not have had notice of Ms. Eilman's serious medical needs because "the evidence indicates that Ms. Eilman was calm during the second watch" and that the testimony from detainees who testified under oath of Mabery's maltreatment of Ms. Eilman should not be considered due to their "lack of credibility."[8] (Def. Brief. P. 31, N. 7)

Tamalika Harris was detained in the Second District lockup beginning at noon on May 8th. (P 56.1 ¶4-5; Ex. 421) She heard Ms. Eilman calling for help for 30 to 45 minutes. She heard Eilman screaming: "Help me, help me, I have a heart murmur, I need to go to the hospital;" "I can't breathe;" and "Somebody call an ambulance, I need to go to the hospital." (P 56.1 ¶326-327; Ex. 1) None of the lockup personnel, including Defendant Mabery, responded to Ms. Eilman's cries for help. (P 56.1 ¶327; Ex. 2) Eilman also kicked her cell bars so hard that the bars on Harris' cell, located on the opposite side of the cell block, were shaking  (P 56.1 ¶325; Ex. 5).  Mabery only admitted at deposition that Ms. Eilman was verbal and loud, nothing more. (P 56.1 ¶317)  But Harris, who positively identified Mabery, testified that instead of offering Ms. Eilman assistance, Mabery opened her cell and yelled at her to "Shut the fuck up!  Ain't nothing wrong with you!" (P 56.1 ¶329; Ex. 2)

When Officer Williams relieved Mabery at the end of her shift on May 8 (D. 56.1 ¶203), Mabery did not notify Williams of any problems with Ms. Eilman. (P 56.1 ¶319-320)  Mabery never inquired about the medication Ms. Eilman was carrying when she was arrested, or why Ms. Eilman was deemed "irrational" by Williams and other intake lockup personnel when she was first processed the prior evening. (P 56.1 ¶321; Ex. 109)  Mabery admitted she never

---

[8]    Defendants' claim regarding "lack of credibility" does nothing but create material issues of fact for trial.

informed the desk sergeant or watch commander during her shift of any problems with Ms. Eilman during her shift. (P 56.1 ¶323; Ex. 109)  Like Williams, Stokes, Hudson, and Quinn, Mabery deliberately ignored Ms. Eilman's readily apparent medical needs.  Instead of asking her what was wrong when Ms. Eilman complained of heart problems, difficulty breathing, and needing an ambulance, Mabery instead replied, "There's nothing wrong with you," and "Shut the fuck up."  A jury could readily conclude that such conduct was not objectively reasonable.

Finally, Mabery testified she was unaware that Ms. Eilman was smearing her menstrual blood in her cell. (P 56.1 ¶324)  However, less than 10 days after Eilman's release, Mabery told a Chicago Police Internal Affairs Division ("IAD") investigator that one of the lockup personnel on the previous shift told her that Ms. Eilman had smeared blood in her cell and refused a sanitary pad. (Ex. 109)  This not only implicates Mabery as having knowledge of Ms. Eilman's irrational behavior, but also corroborates Co-Defendants Quinn and Hudson's awareness as well.

### 5.  Defendant Smith

Defendant Pamela Smith was assigned as the front desk officer from 2:00 p.m. to 10:00 p.m. on May 8. (P 56.1 ¶363; Ex. 436) Her job duties included fielding incoming telephone calls at the station's front desk, located in the police station lobby.  As the front desk officer, Smith was also required to prepare the paperwork for releasing persons in custody.  (P 56.1 ¶363)

Defendant Smith contends she had no notice of Ms. Eilman's serious medical need. To support this, she asserts that evidence relating to her phone conversation with Ms. Eilman's mother Kathy Paine on May 8 is not admissible because of an insufficient evidentiary foundation for that call. Even if the phone conversation is admissible, Smith claims that nothing Mrs. Paine said was sufficient to place her on notice that Ms. Eilman may have been in need of mental treatment. For the reasons that follow, Defendant Smith is wrong on both counts.

### a.  The May 8 telephone conversation is admissible.

Kathy Paine made eight telephone calls to the Second District. Four of those calls were made to the same phone number dedicated to the front desk of the station house[9] during Defendant Smith's shift on May 8, and in particular at 2:47, 3:15, 8:16, and 8:18 p.m. central time. (P 56.1 ¶392)[10]  Mrs. Paine testified that on each call she placed, she specified she was

---

[9]   (312) 747-8366.

[10]  Mrs. Paine recollection of the times she called the Second District's phone number is supported by her telephone records, which document the phone numbers she called and each call's duration.  These records, the authenticity of which is not in dispute, show Pacific time zone entries for each of Mrs.

calling about her daughter and seeking information regarding the prospective time her daughter would be released. (P 56.1 ¶393) During two of the eight calls, Mrs. Paine disclosed Ms. Eilman's history of bipolar disorder and expressed her concern that Christina may be suffering a psychiatric episode. (P 56.1 ¶394) Although Mrs. Paine did not document the name of the police officer she spoke with during each call, she clearly recalled the substance of each conversation. (P 56.1 ¶395) The police department did not tape record the phone conversations, according to disclosures made during the course of discovery in this case. Nonetheless, certain police officers assigned to the front desk, including Defendant Smith, recall Mrs. Paine's telephone calls and/or the substance of those calls. (P 56.1 ¶396; Ex. 80.)

Smith received a phone call at the front desk that afternoon from a woman identifying herself as "Christina's mom." Although Smith could not recall the exact time of that call, she remembers it occurred during the first half of her shift (i.e., between 2:00 p.m. and 6:00 p.m. Chicago time). (P 56.1 ¶364-365) She also stated that her colleagues were always within earshot of her and the front desk telephones. (P 56.1 ¶369)

Although "Christina's mom" did not say if she had called the station at any other time, she evidently was aware of Ms. Eilman's assigned court date, which she mentioned to Smith. (P 56.1 ¶366) The caller also wanted to know whether she could "bond" out Ms. Eilman over the phone with a credit card. (P 56.1 ¶368) Smith told her that was not an acceptable method to bond someone out from custody. She then placed the caller on hold and walked to a nearby computer terminal to retrieve information on Ms. Eilman's custodial status. (P 56.1 ¶369-370) She observed a "blue bar" on the computer screen, which indicated that Ms. Eilman's fingerprints had cleared. (P 56.1 370)[11] Smith returned to the telephone and informed "Christina's mom" that Christina would be eligible for a non-cash "I-Bond" – or personal recognizance bond – which merely required Christina's signature to permit her release from custody. (P 56.1 ¶371) Although "Christina's mom" did not say her daughter was from California, she did imply that she was not from the Chicago area, and that "Christina's mom" also was not in Chicago to get [Christina] upon her release from custody." (P 56.1 ¶367) Smith told the caller that once Christina signed her name, she could go freely on her way. (P 56.1 ¶382)

Paine's calls. Thus, the times of each phone call described above have been converted two hours forward to the central time zone, which includes Chicago. (Ex. 191)

[11] Chicago Police Department records show Ms. Eilman's fingerprints had cleared at 1:30 p.m. Chicago time but Ms. Eilman was not released until five hours later, at 6:37 p.m. (Ex. 53)

Smith testified she began to prepare Ms. Eilman's personal recognizance bond "immediately" after the telephone call. (P 56.1 ¶385)  She denied telling anyone at the station that evening about the substance of her telephone conversation with Mrs. Paine, and did not document or create a record of the call. (P 56.1 ¶386) In addition to preparing Ms. Eilman's bond, Smith called lockup personnel to let them know which detainees would be released on an I-Bond. (P 56.1 ¶387)  She did not inquire or investigate regarding Ms. Eilman's behavior in the lockup. (P 56.1 ¶388)  Smith completed Eilman's "package" for the acting desk sergeant, Benita Miller, including a copy of her arrest report (which referenced her "irrational" and uncooperative behavior as documented by the lockup personnel who initially processed her) and mug shot (which, in addition to depicting her appearance, also revealed her age and California address). The package also included 25 carbon copies of the I-Bond form. (P 56.1 ¶389)

Significantly, Smith did not specifically mention to Mrs. Paine that she had contemporaneously reviewed the computer records showing that Ms. Eilman's fingerprints had already cleared, or that Ms. Eilman's lack of an adult criminal history, coupled with the fact that her present arrest was for a misdemeanor offense, made her eligible for imminent release. (P 56.1 ¶390)  Moreover, Smith did not inform Mrs. Paine that Ms. Eilman's I-Bond would be prepared "immediately" after their call ended.  (P 56.1 ¶391)

Mrs. Paine's deposition testimony corroborates many of the particulars of Smith's testimony and provides sufficient foundation for the admissibility of the content of their phone conversation. For example, she corroborated Smith regarding the timing of the call. According to Mrs. Paine, she commenced the call at 3:15 p.m. Chicago time, which would coincide with Smith's time frame. (P 56.1 ¶376)  Paine inquired about Christina's status and prospective time of release. (P 56.1 ¶377) She also asked about posting a cash bond, and was told (by Smith) that $100.00 would be sufficient. (P 56.1 ¶378)  Mrs. Paine followed that up by asking whether she could pay the $100.00 with a debit card, since she was 2,000 miles away. (P 56.1 ¶379)  The police officer responded, "No, we don't do that." Paine then stated she was worried because Christina was bipolar and may be having a psychiatric episode. (P 56.1 ¶380).  Mrs. Paine also told the officer during that same phone call that she did not want Christina released to the streets of Chicago with nowhere to go. (P 56.1 ¶381)  The officer, a black female, replied that once Christina's fingerprints cleared, Christina could sign the I-Bond herself and "be free to go" because she was over 21 years of age. (P 56.1 ¶382).  Mrs. Paine became more upset by the

officer's statements and demeanor - she was "all business" and seemed to lack sympathy for her daughter's plight. (P 56.1 ¶383)[12]

Clearly, such evidence meets the low legal threshold required to authenticate the phone conversation. Rule 901(a) of the Federal Rules of Evidence provides:

> The requirement of authentication or identification as a condition precedent to admissibility is satisfied by evidence sufficient to support a finding that the matter in question is what its proponent claims.

In comparing Defendant Smith's sworn testimony to that of Mrs. Paine, Rule 901's admissibility standard is clearly satisfied. Significantly, Officer Smith does not deny speaking with "Christina's mom," gives a description of that conversation that is strikingly corroborative of Mrs. Paine's version, and thus "supports a finding that the [phone conversation] is what its proponent claims."

Subparagraph (b) of Rule 901, with its illustrations or examples of authentication or identification, lends further support to this conclusion. The pertinent language of the rule is as follows:

> **(b)  Illustrations**.  By way of illustration only, and not by way of limitation, the following are examples of authentication or identification conformed with requirements of this rule:
>
> * * *
>
> **(6)  Telephone conversations**.  Telephone conversations, by evidence that a call was made to the number assigned at the time by the telephone company to a particular person or business, if (A) in the case of a person, circumstances, including self identification, show the person answering to be the one called, or (B) in the case of a business, the call was made to a place of business and the conversation related to business reasonably transacted over the telephone.

Here, the evidence shows, without material dispute, that: (a) Mrs. Paine called (312) 747-8366; (b) that particular phone number was assigned to the front desk at the 51st and Wentworth police station; (c) the call was made while Defendant Smith was on duty; (d) Defendant Smith

---

[12]  Mrs. Paine expressed her concern regarding the officer's lack of empathy minutes later when she called her mother, Jane Eilman, and one of her friends, Stanella Penfield. Paine recalls, and her phone records confirm, that she also called her husband at 3:18 p.m. Chicago time to update him on Christina's situation, before calling her mother at 3:36 p.m. Chicago time to describe her efforts to obtain information from the police on Christina's eventual release. (K. Paine Dep. p.257; J. Eilman Dep. pp. 67-70, 78, 99-100) When Mrs. Paine telephoned Ms. Penfield at 3:55 p.m., she described the phone conversation she had with the police officer just forty minutes earlier. During her lengthy phone discussion with Ms. Penfield, Paine told Penfield that she had informed the policewoman that Christina was bipolar and how Paine was becoming more worried about her daughter's condition; that she was not getting information, and "everything that happened up until that point." (K. Paine Dep. pp. 258-260)

acknowledged speaking with Mrs. Paine ("Christina's mom"); and (e) as the rule states, other circumstantial evidence exists to show the person answering to be the one called. Moreover, the evidence also fits within Rule 901(b)(6)(B), since Defendant Smith was the bond officer that day, and one of the reasons Mrs. Paine called was to find out about posting bond to facilitate her daughter's release. Thus, the call was made to a place of business and the conversation related to business reasonably expected to be transacted over the telephone.

The Committee Comments to Rule 901 are also instructive. Example (4) within those Comments recites:

> The characteristics of the offered item itself, considered in the light of circumstances, afford authentication techniques in great variety. Thus, a document or telephone conversation may be shown to have emanated from a particular person by virtue of its disclosing knowledge of facts known peculiarly to him.

When Mrs. Paine telephoned the station and spoke with Officer Smith, *she already knew Ms. Eilman's court date*. Furthermore, she identified herself as *Christina's* mom. Both Officer Smith and Mrs. Paine remember conversation about posting bond by means of a credit or debit card. Both remember further conversation that a card could not be used for that purpose. Clearly, the phone conversation fits within the parameters outlined in the Committee Comments.

Defendant's reliance on *United States v. Brisco*, 896 F.3d 1476 (7th Cir. 1990) and *United States v. Roberts*, 22 F.3d 744 (7th Cir. 1994) is misplaced. Both cases support the proposition that identification *by the speaker alone* is insufficient to authenticate the source of a telephone call, and require that some corroboration or other circumstantial evidence must exist to establish the speaker's identity. Here, Plaintiff is not relying solely upon Mrs. Paine's self-identification. Instead, Plaintiff has provided the necessary corroboration, namely Mrs. Paine's phone records and Defendant Smith's testimony. Thus, neither *Brisco* or *Roberts* negates the admissibility of Mrs. Paine's 3:15 p.m. telephone conversation with Officer Smith.

Clearly, Defendant Smith's contention that there is insufficient foundation to support the admissibility of evidence relating to her phone conversation with Mrs. Paine is baseless. Mrs. Paine's telephone records (P 56.1 ¶392 fn8; Exs. 191, 192), plus the combination of Plaintiff's and Officer Smith's deposition testimony provide ample authentication for purposes of admissibility under Rule 901.

### b. Mrs. Paine's statements to Smith show a serious medical need.

Contrary to Defendant Smith's second contention, the evidence concerning Mrs. Paine's

21

conversation with her at 3:15 p.m. on May 8 is sufficient to show Smith was made aware that Ms. Eilman had a mental health history, specifically bipolar disorder, that she may have been suffering a psychiatric episode while in Chicago police custody, that she was not from Chicago or familiar with Chicago, and thus would be at risk if released to Chicago's streets. In other words, Smith was, either directly or inferentially, placed on notice of Ms. Eilman's serious medical need.

Smith relies on three cases to support her position – but none of them do. *O'Connor v. Donaldson*, 422 U.S. 563 (1975) merely stands for the proposition that not all mentally ill persons are subject to involuntary commitment. It does not address circumstances under the Fourth Amendment regarding a detained arrestee's right to medical or mental health care while in custody, nor the sufficiency of evidence to show a serious medical need. *Estate of Novack v. Wood*, *supra*, is an Eighth Amendment deliberate indifference case that is distinguishable for the reasons discussed earlier in this Memorandum. *Collignon v. Milwaukee County*, 163 F.3d 982 (7th Cir. 1998), considered whether jailers have a constitutional obligation to devise a psychiatric treatment discharge plan for an inmate upon his release. Here, Plaintiff is not making such a claim. Rather, Plaintiff claims the Fourth Amendment required Smith to provide Ms. Eilman with access to mental health care *before* her release, especially when Smith was given information distinctly indicating that Eilman had a history of mental illness and suggesting that if released into unfamiliar Chicago city streets, she would be particularly at risk of harm because of her psychiatric condition. Thus, *Collignon's* focus on constitutional obligations *after* a person's release from custody is immaterial.

Unlike Defendant's three cases, this Court's November 7, 2008 Memorandum Opinion and Order is instructive. In denying Smith's Rule 12(b)(6) motion to dismiss, this Court held that if Smith received notice of Eilman's bipolar disorder when Mrs. Paine called the Second District front desk and spoke with her, and then failed to take appropriate responsive action as alleged, Smith would be violating the Constitution by unreasonably failing to provide Eilman with access to treatment. (Ex. 433). The Court also specifically referred to Mrs. Paine's plea that the police not release her daughter if she was experiencing a psychiatric episode.

Smith did not, in fact, take appropriate actions after speaking with Mrs. Paine, such as investigating Eilman's behavior in the Second District lockup after speaking with Mrs. Paine, (P 56.1 ¶373-374) Instead, she immediately began preparing the personal recognizance bond

paperwork for Eilman's imminent release, notwithstanding Mrs. Paine's pleas. (P 56.1 ¶385) Further, the evidence shows Smith never notified the desk sergeant, the watch commander, or anyone else regarding the information about Ms. Eilman she had gained from "Christina's mom." (P 56.1 ¶386)  Significantly, at deposition, Smith admitted that if a family member of a detainee disclosed that the detainee suffered from a mental illness, that ". . . would be a cause for concern." (P 56.1 ¶386)  Such an admission further illustrates her own acknowledgement that as a desk officer who received such information, she was obligated to investigate the detainee's condition before facilitating her release.

In sum, there is evidence demonstrating that Defendant Smith was made aware of Ms. Eilman's bipolar disorder, that Eilman may have been suffering a psychiatric episode while in Chicago Police custody, that Eilman was not from Chicago, and that merely releasing Eilman into the community at large while suffering a psychiatric episode could be harmful to her. Instead of determining if Eilman needed mental health care, Smith "immediately" began processing the paperwork for Eilman's release.  Smith, who had worked in varying capacities (on the street, in the lockup, and behind a desk) in the Second District for nearly ten years, knew or certainly should have known the character of the surrounding neighborhood, where violent crime was prevalent. (P 56.1 ¶363) Thus, she also knew, or should have known, how dangerous it would be to release an individual who was from out of town, unfamiliar with the community, and in the throes of a psychiatric episode, out onto the streets.   Smith's request for summary judgment should, accordingly, be denied.

### 6.    Defendant Heard

Pauline Heard, a lockup police officer, was assigned to the Second District female lockup from 2:00 p.m. to 10 p.m. on May 8. (Ex. 436) Defendant Teresa Williams was the booking officer. (P 56.1 ¶410)  Heard inspected the cells at approximately 4:30, 4:45, and 7:45 p.m. (P 56.1 ¶415)  She noted that Ms. Eilman was in Cell 8, which is used for uncooperative detainees, and that she was dressed unusually since she wore shorts though it was early May. (P 56.1 ¶417; Ex. 5)

Heard recalls hearing Eilman speaking loudly while in the common area, and that her voice was echoing off the walls. This lasted from 30 to 45 minutes.  (P 56.1 ¶423)  She also recalls Ms. Eilman yelling, "Bitch, feed me!" more than once, which Heard ignored. (P 56.1 ¶421)  Heard claims that this was the only abnormal behavior which Ms. Eilman demonstrated

during the third watch on May 8th. (Defts' Memo. p. 31)

However, like several of her Co-Defendants, Heard ignores key testimony demonstrating that she, too, had notice of Ms. Eilman's serious medical need. As aforementioned, Corliss Holeman-Holland, who came into the lockup between 3:30 and 4:00 that same afternoon, heard Ms. Eilman yelling and hollering at least 5 or 6 times to use a phone, but the guards did not respond. (P 56.1 ¶339, 345) This occurred at about the time Heard was making her 4:30 and 4:45 inspection rounds. (P 56.1 ¶415)

Holland recalls during that same time period, Ms. Eilman screamed as many as six times that her heart hurt and that she could not breathe. (P 56.1 ¶341) Neither Heard nor Williams responded. (P 56.1 ¶345) Ms. Eilman also complained about her heart for as much as 15 minutes, and continued screaming and banging on the cell bars to get the guards' attention. (P 56.1 ¶344) Eventually, two guards visited Ms. Eilman's cell, but instead of allowing Eilman to use the telephone or questioning her regarding her complaints of chest pain, they moved her to a different cell, where she continued to make noise and bang on the cell bars. (P 56.1 ¶351) At one point one of the guards shouted to Ms. Eilman, "What's wrong with you?" and Ms. Eilman replied "I have a heart murmur." (P 56.1 ¶350) The guards did not respond to this. Instead, Holland heard the guards laughing about Eilman's heart hurting, dismissing her. (P 56.1 ¶346-347) Holland specifically identified Pauline Heard as one of the guards that interacted with Ms. Eilman at this time and was present when Ms. Eilman was screaming. (P 56.1 ¶343; Ex. 14)

Kimberly Warren, another detainee, occupied Cell 2 that May 8th afternoon during Heard's and William's shift. (P 56.1 ¶353) Warren heard a young Caucasian woman yelling, "I'm sick. Help me! Help me! Help me!" and "I have to go to the hospital!" The woman was also asking to call her mother. (P 56.1 ¶354) Warren could tell that this yelling, which continued for two hours, was coming from one of the cells behind her, which included Cell 8. (P 56.1 ¶355) A woman in the cell next to Warren yelled out for the detention aides to help the young Caucasian woman, saying "Someone help her! Why don't you help her? Ya'll ain't right!" (P 56.1 ¶357) Despite these cries for help, neither Heard or Williams did anything. Instead, Warren heard the lockup officers yell "Shut the fuck up!" and "Shut the hell up!" (P 56.1 ¶359) No one offered the woman any assistance as she continued to scream and kick her cell bars. (P 56.1 ¶362)

Despite hearing Ms. Eilman's yelling throughout her shift, Defendant Heard did not

investigate or attempt to respond to Eilman's complaints of illness and need to go to a hospital. She did not contact the desk sergeant or watch commander. Moreover, she did not inform the desk sergeant of Ms. Eilman's behavior over the preceding four hours Heard was on duty as Eilman's processing for release on bond by the desk sergeant was occurring in the lockup a few hours later. Heard recalls Eilman silently walking from her cell to the desk, where she was handed her property bag containing her sweatpants. (P 56.1 ¶427) After Eilman was given a bond receipt, Heard, in the company of the desk sergeant, escorted her from the lockup to the double doors leading to the Second District's parking lot. (P 56.1 ¶430) Eilman remained silent the entire time. (P 56.1 ¶432) Heard then observed Ms. Eilman walk about 15 feet into the parking lot, turn around, and look back at Heard with a "puzzled look on her face" for a few seconds. (P 56.1 ¶434) Heard thought it unusual that Ms. Eilman, who was wearing shorts, did not put on her sweatpants because of Chicago's weather in early May. Heard did not inquire as to where Ms. Eilman had been arrested, where she came from, where she lived, where she needed to go to get home, or if she needed directions to public transportation. (P 56.1 ¶435) Heard merely pointed towards 51st Street and watched Ms. Eilman walk away through the parking lot.

Moments after Ms. Eilman entered the parking lot, Detective John Zalatoris, who was sitting inside his unmarked squad car near the end of the lot, saw Ms. Eilman approach his vehicle. (P 56.1 ¶441) When approximately fifteen feet from the front of his squad car, Zalatoris watched as Eilman turned and looked at him, and then made the sign of the holy cross. (P 56.1 ¶441) Ms. Eilman then turned her head and continued walking north towards 51st Street. (P 56.1 ¶441)

Heard's observations of Ms. Eilman's bizarre behavior, and her awareness of Eilman's yelling and screaming for hours on end, as well as Eilman's requests to be taken to a hospital and pleas to phone a family member, all present, at a minimum, genuine material issues regarding Heard's notice of Ms. Eilman's serious medical needs. Heard was well aware that lockup personnel are to respond to complaints of difficulty breathing and chest pain by sending the arrestee to the nearest approved hospital and to notify the desk sergeant and watch commander. Heard did neither. (P 56.1 ¶413-414) She did not respond to a serious medical need. In sum, she did nothing, other than escort Eilman to the parking lot and point her in the direction of her eventual fate, notwithstanding all the indicators of Ms. Eilman's psychiatric state. Heard's conduct was not objectively reasonable, and thus violated Ms. Eilman's Fourth Amendment

rights.

### 7.    Eilman's "denial" of a serious condition or need for care.

Defendants argue that Ms. Eilman repeatedly indicated that she did not have a medical condition and did not need medical care, and that that they are entitled to reasonably rely on her denial as evidence of their lack of awareness regarding Ms. Eilman's need for care. (Defts' Memo pp. 8, 21)   The portions of the record Defendants cite do not support this contention. Defendants mention only two concrete examples, Sgt. Berglind's interview at the Eighth District and Officer Williams' intake questioning at the Second District, and neither of them are very "concrete." Berglind asked Ms. Eilman if she was "feeling okay" and whether she was under a doctor's care. He never asked her if she had any hospitalizations for psychiatric or psychological problems, or was taking any psychotropic medication. The balance of his interview did not include any significant probing into her condition. Nor did Officer Delia, who was present part of the time, remember any such questioning or provide any true reinforcement for Defendants' "repeated denial" theory. Similarly, Officer Williams' questions were cursory at best, and certainly insufficient as a basis for concluding that Ms. Eilman issued a definitive denial.

Even accepting as true that Ms. Eilman gave the responses she did to both Berglind and Williams, the Defendants would still be on notice through Ms. Eilman's behavior, actions, and words, through the information regarding Ms. Eilman's bipolar diagnostic history that was conveyed to the Eighth District by Ms. Eilman's stepfather, or through the words and actions of Ms. Eilman's Second District cell mates. Nor does Ms. Eilman's purported denial of any serious condition or need for care absolve the Defendants of the consequences of their failure to pay attention to and to take reasonable action in the face of the other indicators of her condition and need for care. See *Mombourquette v. Amundson*, 469 F.Supp.2d 624, 645 (W.D. Wis. 2007), citing *Farmer v. Brennan*, 511 U.S. 825, 843 (1994) ("[A] defendant may 'not escape liability if the evidence show[s] that he merely refused to verify underlying facts that he strongly suspected to be true, or declined to confirm inferences of risk that he strongly suspected to exist.' In other words, the Constitution does not reward those who play ostrich.")

*Mombourquette* also involved a plaintiff's "denial." The defendants there were relying heavily on records indicating that the plaintiff denied she was suicidal when she returned from the hospital to the county jail. In rejecting the defendants' summary judgment argument, the court concluded that the records were anything but conclusive on the issue of awareness of risk,

explaining:

> . . . I cannot conclude that this notation shows, as a matter of law, that [the defendant] did not believe the plaintiff to be in danger of harming herself again. The Supreme Court has held explicitly that knowledge of a risk of harm need not come from the plaintiff herself. In *Farmer*, 511 U.S. at 848, the Court held that it would be error to absolve officials of liability simply because statements from the plaintiff did not indicate that she was in danger. In this case, there was questionable value in plaintiff's self reporting of her mental state when she was under severe stress, on multiple psychotropic medications and recovering from a drug addiction, suffering multiple mental conditions and returning from an involuntary commitment to a hospital.

*Mombourquette*, 469 F. Supp. 2d at 643. Thus, even if it was undisputed that Ms. Eilman denied having a medical condition or needing medical care, the material issues of fact regarding the other sources of notice discussed above prevent the entry of summary judgment for the Defendants predicated on lack of notice.

Defendants' reliance upon the *Estate of Novack*, *Estate of Boncher*, *State Bank of St. Charles*, *Brownell*, *Salazar*, and *King* cases[13] in further support of their argument is misplaced. For one thing, all of those cases applied the deliberate indifference standard, not the Fourth Amendment objective reasonableness standard. The findings in those cases that the officers' conduct did not amount to deliberate indifference certainly would not preclude a finding in our case that the Defendants' conduct was objectively unreasonable under the circumstances.

*Estate of Novack*, *Estate of Boncher*, and *King* also differ because there was no notice given to the defendants in the form of plaintiff's (or plaintiff's decedent's) bizarre, unusual behavior. In *Estate of Novack*, the defendants specifically noted, while monitoring the decedent over a two-week period, that the decedent did not present any unusual behaviors. 226 F.3d at 530. Similarly, in *Estate of Boncher*, it was undisputed that the plaintiff did not exhibit any strange behavior. 272 F.3d at 487. In *King*, though plaintiff argued that the defendants should have taken him to a hospital, there was no dispute that the plaintiff appeared calm, compliant, and polite during his arrest, and that he was cooperative and aware of his circumstances during his interview. 302 Fed.App. at 97-98. In our case, on the other hand, Ms. Eilman did exhibit obvious, grossly unusual behavior that warranted further medical or mental health investigation

---

[13] *Estate of Novack v. County of Wood*, 226 F.3d 525 (7th Cir. 2000); *Estate of Boncher v. Brown County*, 272 F.3d 484 (7th Cir. 2001); *State Bank of St. Charles v. Camic*, 712 F.2d 1140 (7th Cir. 1983); *Brownell v. Figel*, 950 F.2d 1285 (7th Cir. 1991); *Salazar v. City of Chicago*, 940 F.2d 233 (7th Cir. 1991); and *King v. County of Gloucester*, 302 Fed.App. 92 (3rd Cir. 2008)

27

and evaluation. She was far from cooperative, calm, and compliant during her arrest. She engaged in bizarre behavior and demonstrated pronounced mood swings. At times, she appeared (and was noted to be) irrational, nonresponsive, and incoherent. (P 56.1 ¶¶76-95, 98-106, 113-114, 131, 196-199, 205, 228, 244, 286, 299) Though she may have appeared lucid and calm at other times, the sporadic nature of that conduct certainly provided no guaranty that she was no longer at risk. See *Mombourquette*, *supra*, at 645 (even though plaintiff had a four day lapse following suicide attempt, the court could not conclude that plaintiff was no longer at risk – a reasonable jury could still find that plaintiff was at risk of harm).

*Estate of Novack* is also distinguishable because the defendants there took steps to investigate the plaintiff's medical condition. They talked to his mother and to a representative of the mental health center where his mother sought to have him voluntarily committed. They also spoke with the medical provider who previously administered his psychiatric medication. 226 F.3d at 527-28. In our case, on the other hand, none of the Defendants reached out to Ms. Eilman's parents (despite her mother's numerous contacts to the station) or made any effort to contact her prior medical providers.

*Brownell* and *Salazar* also differ from our case because the defendant officers in those cases relied on the opinions of the medical professionals who evaluated each of the plaintiffs. In *Brownell*, the plaintiff was examined by two EMTs on the scene and by a physician at the hospital before being brought to jail. All three medical professionals opined that plaintiff did not appear seriously injured, only intoxicated. *Brownell*, 950 F.2d at 1288, 1290-91. Similarly, in *Salazar*, the plaintiff was examined at the scene by paramedics. The defendant officers had no reason to second-guess them. *Salazar*, 940 F.2d 235, 241. In our case, on the other hand, Ms. Eilman was never evaluated by any medical professional during the time she was in the Defendants' custody.

**B.      Ms. Eilman presented with a serious medical need while in police custody.**

The second factor courts examine when determining the objective reasonableness of a defendant's conduct is the seriousness of the arrestee's medical need. In *Wade v. Castillo*, 2009 WL 2950246 (W.D. Wis.), the court summarized the Seventh Circuit's view as follows:

> A "serious medical need" may be a condition that a doctor has recognized as needing treatment or one for which the necessity of treatment would be obvious to a lay person. (Citations omitted.) The condition does not have to be life threatening. (Citation omitted.) A medical need may be serious if

> it "significantly affects an individual's daily activities," (citation omitted), if withholding treatment of the condition results in needless pain and suffering, (citation omitted), or if it otherwise subjects the prisoner to a substantial risk of serious harm, (citation omitted). *A psychiatric or psychological condition may present a "serious medical need."* (Citation omitted)(Emphasis supplied).

*Wade*, at *6. Furthermore, a condition is objectively serious if it "*could* result in further significant injury or the unnecessary and wanton infliction of pain. *Gutierrez v. Peters*, 111 F.3d 1364, 1373 (7th Cir. 1997)(internal citations omitted)(emphasis supplied). There is no requirement that the condition be perilous or life threatening. *Meriwether v. Faulkner*, 821 F. 2d 408, 411-13 (7th Cir. 1987). Nor does the law require defendants to act only in emergent situations, as Defendants erroneously contend, citing *Wasko v. Herman*, *supra*. Lastly, while the foregoing cases discuss the concept of serious medical needs against the backdrop of the Eighth and Fourteenth Amendments, the Seventh Circuit has declared that for Fourth Amendment purposes, " [t]he severity of the medical condition under this standard need not, on its own, rise to the level of objective seriousness required under the Eighth and Fourteenth Amendment. Instead, the Fourth Amendment's reasonableness analysis operates on a sliding scale, balancing the seriousness of the medical need with the third factor – the scope of the requested treatment." *Williams v. Rodriguez*, 509 F.3d at 403.

Obviously, if a medical condition is questionably serious, an officer who simply ignores it or otherwise fails to take reasonable responsive measures is constitutionally accountable. Here, the evidence, taken in the light most favorable to the Plaintiff, establishes that Ms. Eilman had a serious medical need, and that the Defendants effectively ignored it.

As of May, 2006, Ms. Eilman was suffering from bipolar disorder, a severe mental condition characterized by episodic periods of mania and depression. (P 56.1 ¶10). Symptoms of manic episodes include mood swings, excessive talkativeness ("pressured speech"), flight of ideas, distractibility, engaging in activities with a high risk of painful consequences (such as sexual activity), and delusional and severely bizarre behavior. (P 56.1 ¶26) Bipolar/manic individuals may speak spontaneously and inappropriately, often in a loud, rapid, and virtually incomprehensible manner. They may curse excessively, hug strangers in public places, act in a more sexually aggressive fashion, and travel impulsively. (P 56.1 ¶28)

Ms. Eilman was first diagnosed with bipolar disorder in 2005. (P 56.1 ¶19) At the time, she was involuntarily committed and institutionalized for 37 days, during which she was noted to

be disorganized, confused, and psychotic. (P 56.1 ¶22)  She could not stay on track with conversations. (Plf's 56.1 ¶  ) She was hostile and irritable. She engaged in pressured speech. (P 56.1 ¶21) Her mood was impulsive and explosive. (P 56.1 ¶22) Although she never expressed a desire to kill herself, she was nevertheless involuntarily committed because she was gravely disabled and could not care for herself. (P 56.1 ¶22)

When she subsequently came to Chicago in 2006, Ms. Eilman exhibited many of these same symptoms and associated behaviors. This was true both before and during her arrest, throughout her detention, and immediately after her release. On May 6th and 7th, 2006, prior to her arrest, several people witnessed Ms. Eilman acting "crazy" at Midway Airport where she yelled profane language at airline employees and airport patrons, removed one of her boots and threw it over an airline ticket counter toward airline personnel, tore up a $20.00 bill and threw it at an airline ticket agent, and approached an infant in a stroller and yelled at the baby who was seated quietly in its stroller to "Stop fucking crying!"  (P 56.1 ¶37-39, 45)  Ms. Eilman also approached a blind man with his seeing-eye dog and screamed and yelled that she had "exposed" him as a "fake." (P 56.1 ¶52)  Later, Ms. Eilman was seen rapping, singing, dancing provocatively with two men, after lowering her pants outside the Midway Airport CTA train station.  (P 56.1 ¶56, 59)  At one point, Ms. Eilman approached a man outside the train station who was smoking, screamed at him, and twice ripped a cigarette out of his mouth. (P 56.1 ¶60)

Ms. Eilman's manic behavior continued after her arrest where she spoke nonsense and "gibberish," had mood swings ranging from friendly to aggressive and confrontational, accused the arresting police officers of wanting to "fuck her," and invited the officers to tie her up, have sex with her, and "fist fuck her." (P 56.1 ¶72-73, 79)

This erratic behavior continued while Ms. Eilman was in custody at the Second District police station, where she screamed and yelled and banged on the cell bars, acted as if she was mute for several hours, smeared her own menstrual blood on the bench and wall of her cell, and told fellow detainees that deceased hip-hop artists Tupac Shakur and Notorious B.I.G. were coming to Chicago to rescue her. (P 56.1 ¶223, 230, 236, 263)

 After her release from the Second District, Ms. Eilman continued to act "crazy," claiming to be Superman and Wonder Woman, laughing for no reason, making the sign of the cross to a detective, repeatedly referring to a complete stranger as her "boyfriend," and threatening to jump out a window if persistent efforts to have her engage in oral sex did not stop.

(P 56.1 ¶452-454, 458) These manifestations of her bipolar condition were hardly surprising. 90% of bipolar individuals have recurrent episodes that can require hospitalization. (P 56.1 ¶24)

Bipolar persons experiencing a manic episode can put themselves and others in danger through their delusional and bizarre behavior. (P 56.1 ¶32) For example, when an attractive woman yells out randomly for someone to "fuck [her]," or threatens to take a gun and shoot a police officer, she is engaging in dangerous behavior. (P 56.1 ¶80, 146) Ms. Eilman's psychiatric crisis in Chicago put her at risk of harm to herself and others. It also interfered with her ability to function normally and successfully. (P 56.1 ¶136) She was unable to fulfill her own basic needs and guard herself against physical harm. (P 56.1 ¶149)

A serious mental illness, like any serious medical condition, requires treatment appropriate to the situation. *Matz v. Frank*, 2009 WL 2191885 (C.A. 7 (Wis.)), *4. Responding unreasonably to a mental health need is just as actionable as responding unreasonably to a medical need. *Antonelli v. Sheahan*, 81 F.3d 1422, 1432 (7th Cir. 1996).

Here, Defendants' "response" is to deny that Ms. Eilman had any serious psychiatric condition while in custody. They suggest that her medical/mental health care need could not have been serious unless it was life-threatening or required emergent care. The Seventh Circuit has, however, ruled out the need to demonstrate a life-threatening situation. See *Meriwether, supra* at 411-13 (prisoner's transsexualism poses a serious medical need); *Gutierrez, supra* at 1370 ("Although the 'serious medical need' formulation is far from self-defining, it is clear that the Supreme Court contemplated that medical conditions far less critical than 'life-threatening' would be encompassed by the term.") Nonetheless, Defendants rely upon *Hill v. Dekalb Reg'l Youth Det. Ctr.*, 40 F. 3d 1176, 1187 (11th Cir. 1994) to support their view. But *Hill* did not lay down any hard and fast rule that the *only* serious medical needs are those involving life threatening conditions or situations where it is apparent that delay would detrimentally exacerbate the medical problem. Instead, based on its review of the facts before it, the court found that the particular condition involved in that case (dried blood found in the underwear of a detention center resident who had been treated for gastrointestinal problems the previous day, and then sexually assaulted by detention center guards) was not serious for purposes of gauging whether the defendant's response upon learning of it amounted to deliberate indifference. *Hill* has never been relied upon by the Seventh Circuit. To the extent it may conflict with the Seventh Circuit perspective on "serious medical needs" discussed above, it is the Seventh Circuit's

position that must prevail here.

Defendants' reliance on *Williams v. Kelso*, 201 F.3d 1060 (8th Cir. 2000) to support the supposed requirement for showing an emergent mental health need is also faulty. Their brief discussion of the case references the plaintiff's psychosis and suggests that the court determined there was no constitutional requirement to provide immediate medical care for a detainee who was "disoriented, confused, [and] belligerent" *presumably because of his psychosis*. The Defendants' cited excerpt, however, is misleading because of what it omits. The court's complete statement was: "We find no case which supports plaintiff's position of a §1983 requirement of immediate medical attention to a disoriented, confused, belligerent detainee *who has the odor of alcohol about him and has been arrested on an alcohol related misdemeanor charge* in the absence of any indication of harm to himself." (Emphasis added.) Our case poses no alcohol-related counterpart. Issues of alcohol involvement aside, Defendants' reliance on *Williams v. Kelso* is also undermined by the factual record of that case, which provides a virtual roadmap for what defendants *should do* following the arrest of a person exhibiting obvious mental health problems. In *Williams v. Kelso*, the prison officials "gave [the decedent] his medication (Dilantin); placed him in the misdemeanor section of the jail; regularly observed him; when he was injured, had him examined by a hospital, a psychologist, and a psychiatrist; and were in the process of transferring him to a treatment center when the suicide occurred." *Id.* at 1065. In our case, on the other hand, Defendants' "response" to Ms. Eilman's condition was to put her in a cell, ignore her bizarre behavior and pleas for help other than to tell her to shut up, ignore her cell mates' entreaties, disregard her need to be seen by a health care professional, and then dump her on the street.

For that reason, Defendants' additional reliance on *Wasko v. Herman* is also misplaced. Defendants argue that our case involves the issue of "delay in treatment," i.e. that the essence of Plaintiff's §1983 claims is that Ms. Eilman was injured through the Defendants' delay in affording her access to care. (Deft's Memo, pp. 5-6) That is a mischaracterization. As Judge Springmann recognized in *Wasko*, there is a difference between a claim that a plaintiff did not receive the appropriate care soon enough and a claim that he or she *was denied care altogether*. See *Wasko*, *supra* at *6. *Wasko* was a delay case. Ours involves a denial of access to care altogether.

Furthermore, since "delay" is not the issue, Defendants' companion argument that

Plaintiff must somehow demonstrate that Ms. Eilman's condition worsened during the course of her detention because of that delay must also be rejected. She was, as Dr. Dvoskin has opined and as the Defendants have observed, "suffering from a severe manic episode before, during and after her detention." The Defendants each witnessed or otherwise received ample notice of Ms. Eilman's manic behavior. Regardless whether Ms. Eilman's condition technically worsened or not, "[p]olice must respond to conditions they can observe. Just as the Constitution does not demand that police obtain medical care for prisoners whose injuries appear to be slight but turn out to be serious, so the officers must obtain medical care when the wound [or medical condition] reasonably appears to be serious even if the risk turns out to be small. Police can only act on appearances; anything else is gambling with a person's life, *a wager the Constitution does not permit arresting officers to undertake. Whether the injury is actually serious is a question best left to a physician.*" *Davis v. Jones*, 936 F.2d 971, 972 (7th Cir. 1991), citing *Martin v. Tyson*, 845 F.2d 1451, 1457-58 (7th Cir. 1988) (emphasis supplied).

Notwithstanding their own observations, Defendants maintain that Ms. Eilman's behavior in custody "did not signify a serious medical need." (Deft's Memo, p.22) Citing *State Bank of St. Charles v. Camic*, *supra*, they argue that "strange, abusive or uncooperative behavior does not indicate a serious need for mental health care while in custody." Defendants overstate the reach of *State Bank*. For one thing, the court's focus there was whether the defendants were deliberately indifferent to a specific risk – that of suicide. The court's conclusion that knowledge of an arrestee's violent, "freaky" behavior is not synonymous with knowledge *of suicidal intent* is much narrower than the suggestion that none of Ms. Eilman's behavior demonstrated that she had a serious medical need.

Further, the two Illinois cases Defendants cite, *In the Matter of O.C.,* 788 N.E. 2d 1163 (Ill. App. Ct. 2003) and *In Re Elizabeth McN*, 855 N.E. 2d 588 (Ill. App. Ct. 2006), neither control nor inform the issue whether Ms. Eilman had a serious medical need *for purposes of her Fourth/Fourteenth Amendment rights*. While states are certainly free to establish the standards upon which state tribunals are to base their decisions in involuntary commitment proceedings, federal courts deciding claims based on federal law are not beholden to any state statutory requirements or to the judicial interpretations given those statutes by state courts. In this case, whether Ms. Eilman had a "serious medical need" is a matter of federal law. The federal contours of that term are discussed earlier in this section. Defendants' attempt to dilute or

otherwise materially alter the federal parameters of a "serious medical need" based on *O.C.* and *Elizabeth McN* must, therefore, be rejected.

Defendants maintain that their only duty to Eilman under the circumstances was one of "maintenance rather than cure," again citing *Collignon v Milwaukee County*, and that once they released her, "as was the case with Jonathan Collignon," their duty was cut off. (Deft's Memo, p. 9) She would then be "free to seek medical care on her own." (*Id.*) The problem with this analogy, from an objective reasonableness standpoint, is that Jonathan Collignon was released directly into the care and custody of his parents. In Ms. Eilman's case, after "preserving the status quo" for 28 hours, the Defendants could not relinquish her to the care of her parents. They were two thousand miles away. So, as Defendants would have it, she was free to roam the streets of Chicago in search of "medical care on her own."

Finally, Defendants urge that Ms. Eilman's complaints of *physical* symptoms must be completely discounted, contending that the mere fact she complained does not necessarily indicate that her medical need was serious. Regardless whether her complaints were all valid, they are nonetheless relevant to the question whether the Second District Defendants' responsive conduct was objectively reasonable. When Ms. Eilman cried out that she had difficulty breathing, had chest pain, had a heart murmur, and needed to go to the hospital, the Defendants either ignored her or told her to "shut the fuck up." (P 56.1 ¶266, 277, 331, 333, 359-360) That is, simply put, a patently unreasonable response. Further, whether Ms. Eilman was (or was not) subsequently diagnosed with a heart murmur does not diminish the seriousness of that complaint. Moreover, with regard to her breathing difficulty, it is noteworthy that manic episodes can certainly trigger overwhelming anxiety and stress, which can, in turn, lead to chest pains and labored breathing. (P 56.1 ¶361) Thus, Ms. Eilman's breathing difficulty would be wholly consistent with, and further evidence of, a serious medical need.

Ms. Eilman's lack of any visible physical injury does not mean her condition was not glaringly obvious or serious. In *Crenshaw v. Rivera*, 2009 WL 377985 (N. D. Ind.), the court rejected the defendants' argument that their two hour delay in taking the plaintiff to the hospital following her complaints of leg pain was, as a matter of law, reasonable. *Id.* at *23. Though there was no indication that plaintiff was bleeding or that her leg appeared broken, the court determined that a jury could find, in light of plaintiff's complaints, that the two hour delay was unreasonable. *Id.* There was no requirement that plaintiff must first demonstrate a physical

manifestation of her injury before the officers were obligated to act. *Id.* Certainly, if complaints of leg pain could be sufficient to trigger an obligation for an officer to act, complaints of chest pain or a heart murmur and difficulty breathing would surely necessitate some reasonable action as well. Yelling at the complainant to "shut the fuck up" does not fit the bill. *See also Wynn v. Southward*, 251 F.3d 588, 594 (7th Cir. 2001) (plaintiff stated a claim for deliberate indifference when defendants ignored his complaints of heart fluttering and heavy chest pains, and his requests for medication).

Defendants also argue that when considering whether a medical need is serious, courts also consider whether the condition required post-custodial treatment. Their two examples, *Davis v. Jones*, *supra*, and *Tibbs v. City of Chicago*, 469 F.3d 661 (7th Cir. 2006) are anything but compelling when applied to Ms. Eilman's situation. *Davis* involved a superficial cut and scraped elbow. Small wonder that the court determined it was objectively reasonable for the officers not to take the plaintiff to the hospital. In *Tibbs*, the plaintiff voiced a single complaint about his handcuffs being too tight. He gave the arresting officers no indication of pain or injury and never sought medical care upon his release. Under those circumstances, the court deemed it reasonable for the defendants to not do anything to address his single complaint. *Id.*

### C. The desired treatment for Ms. Eilman was easily obtainable and would have imposed no undue burden.

Under the *Sides* formulation, the court next considers the scope of the desired medical treatment, and whether the evidence shows that the Defendants' actions were unreasonable in light of the means available to them to address Ms. Eilman's needs. The question is, could a jury find, based on the evidence presented, that it was unreasonable for the Defendants not to provide Ms. Eilman any access to medical care or evaluation under the circumstances?

The Defendants had, at a minimum, the following options available to them:

1. Officers Cason and Moreno could have chosen not to arrest Ms. Eilman and could have coordinated her transfer directly to a mental health facility for evaluation and treatment. (P 56.1 ¶167-169, 170, 172)

2. Lieutenant Earnest could have chosen not to have Ms. Eilman's arrest processed and ordered her transfer to a mental health facility for evaluation and treatment. (P 56.1 ¶124, 169)

3. The Eighth District Defendants could have reported their concerns and observations to their colleagues, and to the Second District personnel.

4. The Second District Defendants could have reported Ms. Eilman's unusual, erratic and uncooperative behavior to a supervisor or to their

colleagues.  (P 56.1 ¶163, 165, 186, 191)

5.    The Defendants could have attempted to contact individuals and officers at Midway Airport to obtain further information regarding the circumstances mandating her removal from the airport on two separate occasions.

6.    Officer Smith could have reported Mrs. Paines' calls to a supervisor and could have investigated Ms. Eilman's mental state.

7.    All of the Defendants could have attempted to contact Ms. Eilman's family members to further investigate her prior mental history.

8.    All of the Defendants could have coordinated Ms. Eilman's transfer to the nearest approved hospital or mental health intake facility for evaluation and treatment. (P 56.1 ¶163, 165-168, 170-192)    Each Defendant knew that a detainee charged with a misdemeanor in need of a mental health evaluation, treatment or hospitalization could be transported to a mental health facility.  *Id.*

9.    Both the Second and Eighth District stations had a designated mental health facility available to the Defendants for the purpose of providing mental health assessment and care for Ms. Eilman.  (P 56.1 ¶175, 180)

10.   Each Defendant was aware that detainees brought to approved mental health facilities would be accepted at any time on a no-decline basis.  (P 56.1 ¶167)

11.   The Defendants could have advised Ms. Eilman's family when she was going to be released so that arrangements could have been made for her safe release and access to medical care.

12.   The Defendants could have warned Ms. Eilman and her family that Ms. Eilman was being released into a dangerous high crime area.

Defendants' ability to address Ms. Eilman's mental health needs was not hindered by exigent or threatening circumstances, such as the necessity of securing an arrest scene.  Once Ms. Eilman was in custody, there was no threat to Officers Cason and Moreno, nor to anyone else, preventing the officers from providing her access to medical care.  Further, there would have been no undue cost or burden to the Defendants. *See Gil v.  Reed, supra* at 662 (defendant's angry and unexplained refusal to respond to plaintiff's medical needs created a genuine issue of fact for the jury, especially when there was no cost).  There is simply no legitimate excuse for Officers Cason and Moreno's, as well as the remaining Defendants', ongoing failure to investigate and address Ms. Eilman's obvious and serious medical need over the course of the 28 hours that she was in custody.

Defendants claim that keeping Ms. Eilman in a jail cell instead of providing her access to treatment was not unreasonable because there is no evidence she suffered even minor discomfort

due to her condition. Plaintiff disagrees. Common sense suggests that Ms. Eilman was indeed suffering the ill effects of her particular condition. *See Lopez*, *supra*, at 720 (reliance upon common sense is particularly appropriate). Ms. Eilman was screaming, displaying mood swings, banging on her cell, smearing her menstrual blood, and crying out for medical treatment. (P 56.1 ¶72-73, 233, 236, 280)

Defendants also claim that by keeping Ms. Eilman at the station rather than taking her elsewhere for an evaluation and possible treatment, they were prudently monitoring her needs. Whether their chosen course of action was "prudent" is for the jury to decide in light of the numerous disputed material issues over what each of the Defendants learned and/or observed about Ms. Eilman while she was in custody. Further, the "precise contours" of the required care depend on the circumstances of each case. A "response that may initially have been appropriate can over time in changing circumstances constitute unreasonable care." See *Matz v. Frank*, *supra* at *4, citing *Gil v. Reed* , *supra* at 664.

Defendants further argue there is no basis to conclude that if Ms. Eilman was taken to the hospital, she would have received treatment for her injuries. Instead, they contend it is likely she would not have received any treatment at all. For that reason, they also claim that transporting Ms. Eilman to a local hospital would have entailed an unnecessary expenditure of resources. Plaintiff disputes this view. No witness has offered an opinion supportive of Defendants' position. Plaintiff's experts have testified, on the other hand, that Ms. Eilman would have been committed if she was taken for a mental health evaluation. (P 56.1 ¶461-462, 464) As for the expenditure of resources, it is noteworthy that St. Bernard's Hospital, the designated mental health center for the Second District, is but a few minutes from the station house. (P 56.1 ¶175) Transporting Ms. Eilman to that location, and if necessary, posting an officer there, would hardly place any undue, unnecessary strain on the Second District's operations. After all, during the time Ms. Eilman was in custody, Second District personnel in fact transported another detained arrestee, Dorsie Tullock, to and from Michael Reese Hospital for examination. (Ex. 411) Thus, Defendants' "unnecessary expenditure of resources" argument rings hollow.

The fact that Ms. Eilman was kept in custody for less than forty eight hours does not, in and of itself, render the Defendants' actions reasonable. In *Crenshaw v. Rivera*, *supra*, the court considered whether the defendants acted unreasonably in the face of the plaintiff's need for medical care. During the course of plaintiff's arrest for disorderly conduct, the officers struck her

leg, thereby exacerbating her pre-existing knee injury. *Id.* at *23. Two hours elapsed before the defendants brought her to the hospital. *Id.* at *23. The court noted:

> [W]hile two hours is a relatively short period of time to receive medical care for a non-life threatening leg injury, the Court weighed several countervailing factors. The circumstances of [her] arrest were not such that the officers needed to delay attending to [her] medical needs. The officers were not transporting a dangerous suspect or bringing her in for proceeding in a case that required immediate involvement of other officers. Instead, the Officers arrested her for a misdemeanor and were bringing her in for booking. The Officers direct knowledge of [her] requests for medical attention and ignorance of those requests raises a genuine issue of material fact as to whether the City of East Chicago Defendants' treatment of [her] during those two hours between arrest and arrival at the hospital was objectively unreasonable under the Fourth Amendment.

*Id.* at *23. Thus, the court denied defendants' summary judgment motion. A similar ruling is warranted here.

### D. Defendants' unreasonable failure to provide Ms. Eilman with access to care cannot be justified under the rubric of "police interests."

The fourth factor under the *Sides/Williams v. Rodriguez* formula involves consideration of "police interests." Here, the Defendants raise three such purported interests, none of which, however, is compelling, let alone persuasive, when considered against the factual backdrop of this case.

First, Defendants argue that by not providing Ms. Eilman with access to medical or mental health care, they are simply respecting her Fourth Amendment right not to be unreasonably detained. They point out that the police have an interest in "expeditiously processing arrestees." But "expeditious processing," in some situations, has its limits. Here, for example, the officers were not able to process Ms. Eilman with the utmost of expedience. They may suggest it was, in whole or in part, Ms. Eilman's fault because she wouldn't cooperate with the booking process. But therein lies the rub. *Why* wasn't Ms. Eilman simply "going along with the program?" The evidence, discussed in the preceding sections, shows it was because of her severe psychiatric condition, which had made itself manifestly known to numerous individuals, including some of the police. To emphasize the need for "expeditious processing" under the circumstances is akin to saying that the Defendants' need for expedience takes precedence over the health and well being of an arrestee showing signs of a serious mental health problem. Accepting the Defendants' contention at face value, any arrestee's Fourth Amendment right of

access to medical care would always be superseded by a State actor's desire to insulate himself from the responsibility for providing access to medical care by using an "expeditious processing" trump card. This is the unconstitutional gamble that *Davis v. Jones*, *supra*, had warned against. It certainly would not have been unreasonable for the Defendants to refer Eilman for an evaluation in light of the severity of her symptoms and behavior. Again, as the Seventh Circuit admonished in *Davis*, let the physicians make the decisions as to whether the condition is really serious or not. *But get her to the physicians so that they can make that decision*.

Defendants' concern with violating the "forty-eight hour rule" following in the wake of *County of Riverside v. McLaughlin*, 500 U.S. 44 (1991) is misplaced. For one thing, Ms. Eilman was released twenty eight hours after her arrest. From a pure timing standpoint, Defendants still had twenty more hours of margin. Further, if a physician or other qualified health care provider certified that Ms. Eilman would need to remain hospitalized and/or under their immediate care beyond the proverbial forty-eight hour cutoff, the police would have their reasonableness cover.

Defendants are also concerned about violating Ms. Eilman's right not to receive *unwanted* mental health treatment. The problem with this argument is that Ms. Eilman never knowingly, intelligently, lucidly, understandingly, or unequivocally expressed a refusal or unwillingness to obtain mental health treatment. In fact, the Defendants never offered it to her. Sgt. Berglind never suggested it during his interview of Eilman at the Eighth District. Officer Williams never delved into it with Ms. Eilman when she posed her intake questions to Eilman at the Second District. Even if one or both of them had, Eilman's supposed response would have been, like that of the plaintiff in *Mombourquette*, *supra*, highly suspect.  Since there is no factual foundation upon which to base any argument regarding this particular "police interest" in respect to this particular right, Defendants' argument must be rejected.

Next, Defendants Cason, Moreno, and Berglind invoke the time-worn defense of "I was only following orders." That position might be more understandable, and perhaps even reasonable, if they had provided Ms. Eilman access to care before transporting her to the Eighth District (as Plaintiff's expert Dr. Dvoskin has testified they should), or they were specifically ordered not to take her to a hospital. Defendants suggest that that is precisely what Lt. Earnest did when he directed Sgt. Berglind to interview Ms. Eilman. But on that point, there is at least a question of fact, as disclosed by Officer Moreno's testimony. The officer testified that the watch commander did tell the officers to drive her to the hospital. They didn't, however, because,

according to Moreno's partner Cason, they didn't have a squad car. (See Moreno Dep., pp. 98-100).

Finally, if, as Defendants suggest, paramilitary discipline, *espirit de corps*, and the like are of such paramount importance, how then do the Defendants explain their total failure to follow the departmental general orders regarding arrestees exhibiting serious mental health needs? Those general orders, after all, go hand-in-hand with the "paramilitary discipline" model.

Notwithstanding their attempt to paint a veneer of "police interests" over their conduct, the Defendants here acted in an objectively unreasonable manner in failing to provide Ms. Eilman with any access to needed care while in their custody.

### E.     Plaintiff is not asserting a "medical malpractice" claim against Defendants.

Defendants liken Plaintiff's claim to one for medical malpractice and argue that § 1983 is not a "means to recovery" under such a theory. This effort to re-cast Plaintiff's unreasonable seizure claims must be rejected. None of the Defendants are medical personnel, and none of them are being faulted for negligently performing any professional medical duty. It is not medical judgment, or a delay on the part of medical professionals in rendering treatment that is at issue here, but rather the failure of police personnel to afford an individual in their custody *access* to needed care.

The cases on which Defendants' argument rests do not provide the support Defendants attribute to them. *Estelle v. Gamble*, 429 U.S. 97 (1976), for example, differs materially because it did involve a prisoner's malpractice claim against a physician who doubled as both his treating doctor and the corrections department medical director. The prisoner was provided medical care. He was seen on seventeen occasions over three months. He nonetheless contended it was cruel and unusual punishment not to provide him with all the diagnostic tests to which he believed he was entitled. The Court determined there was no Eighth Amendment "malpractice" claim against the physician. However, the Court also remanded the matter for further consideration whether other prison officials may have committed constitutional violations in carrying out their respective roles in conjunction with responding to the prisoner's medical needs.

*Higgins v. Correctional Medical Services of Ill., Inc.,* 178 F.3d 508 (7th Cir. 1999), also involved a claim against medical providers, including a physician, nurses, and a psychologist. The plaintiff contended they had rendered inadequate care for his injured shoulder. In *Bryant v. Madigan*, the court did not even reach the merits of plaintiff's Eighth Amendment claim, instead

remanding it for further consideration. The statement to which Defendants allude is purely dicta within the court's discussion whether the plaintiff-prisoner could proceed with a claim under the ADA. *Mayan v. Weed* , 310 Fed. Appx. 38 (7th Cir. 2009), is also distinguishable. In *Mayan*, the plaintiff complained of the jail staff's deliberate indifference to his need for medication for panic attacks. His first onset did not occur until after he had already been in jail for ten months. Further, the staff had already communicated with his former doctor regarding his need for medication, and learned there was no active prescription. The jail nurse had daily interaction with him. Under the circumstances, claimant's disagreement with the jail staff's assessment and response to his condition involved no deliberate indifference.

> **F.     Even if deliberate indifference is the standard against which Defendants'
> conduct is to be measured, genuine material issues remain regarding
> Defendant's liability.**

In their Memorandum, Defendants argue they are entitled to qualified immunity because it was not clearly established as of May, 2006 that the Fourth Amendment objective reasonableness standard applied to the specific context of an arrestee's medical needs. They further contend that the Fourteenth Amendment's deliberate indifference standard controlled as of that date. Plaintiff disagrees and addresses this argument in section IV, *infra.* However, in the event the Court were to decide that the deliberate indifference standard was the clearly established standard at the time of Ms. Eilman's arrest, there would nonetheless remain genuine issues of material fact as to whether the Defendants violated Ms. Eilman's rights through their deliberate indifference.

The Fourteenth Amendment requires government actors to provide treatment for serious medical conditions – those that *may* be life threatening or pose a risk of needless pain or lingering disability if not treated at once. *Davis, supra,* at 973. Deliberate indifference in the prison context requires that: (1) the danger to be objectively serious, posing a substantial risk of serious harm; and (2) the prison official must have a culpable state of mind – one of deliberate indifference to the inmate's health or safety. *Langston v. Peters,* 100 F.3d 1235 (7th Cir. 1996), citing *Haley v. Gross*, 86 F.3d 630, 640-41 (7th Cir. 1996), *Farmer, supra* at 1997. Deliberate indifference is more than mere negligence but less than purposeful or knowing infliction of harm. *Farmer, supra* at 836, *Estelle, supra*, at 106. The standard has two elements: First, was the defendant subjectively aware of a substantial risk of serious harm to the inmate's health or safety? Second, if the defendant was aware, did he respond reasonably to the risk? *See*

*Mombourquette*, *supra*, at 638, citing *Farmer* at 842.

When a defendant denies awareness or belief of a plaintiff's serious medical need, his subjective awareness can still be proved through circumstantial evidence. *Wade v. Castillo*, *supra* at *7 ("Even a lay person could infer that a person with a diagnosis of a psychiatric disorder and history of mental illness may need medication and, at the very least, should be seen by a psychiatrist…"). When a reasonable jury could find that the defendants were aware of such a risk and failed to reasonably respond, summary judgment is inappropriate. Here, no less than seventeen lay witnesses described their own awareness that Ms. Eilman was suffering from a psychiatric episode before, during and after her arrest. Defendants' denial of any awareness or belief that Ms. Eilman had a serious medical need must, therefore, be measured against that additional testimony to gauge whether Defendants were being deliberately indifferent. That is a quintessential jury function.

The Defendants' deliberate indifference cases are readily distinguishable. For example, in *Davis v. Jones*, *supra*, there was no deliberate indifference because plaintiff conceded that his injuries (a minor cut and scraped elbow) did not require medical attention. Thus, no objectively reasonable person would have been concerned about those wounds. *Id.* In our case, Plaintiff certainly does not concede that her mania, which landed her in a hospital for 37 days just 15 months prior to her arrest in Chicago, is as innocuous as a minor cut or scraped elbow.

In addition, despite Defendants' suggestion to the contrary, Plaintiff does not have to show that each Defendant believed that actual harm would result. It is sufficient that the Defendant acted or failed to act despite knowledge *of a substantial risk of serious harm*. *Cavalieri, supra*, at *622. The facts discussed above establish, or at a minimum give rise to material issues, that each Defendant had knowledge of a substantial risk of harm.

Further, certain Defendants' (Williams, Mabery, and Hudson) "sarcastic or mocking manner" can indicate deliberate indifference, since it suggests they were aware of the Plaintiff's condition but consciously and deliberately refused to take any necessary responsive steps. (P 56.1 ¶346) Similarly, ignoring a plaintiff's pleas for medical care can support a finding of deliberate indifference. *See Castellano v. Chicago P.D.*, 129 F. Supp. 2d 1184, 1191 (N.D. of Ill. 2001) ("allegations that prison officials ignored [or mocked] an inmate's plea for medical care may be sufficient to withstand a motion to dismiss").

## II.      THE DEFENDANTS' FAILURE TO PROVIDE MS. EILMAN WITH ACCESS

**TO CARE PROXIMATELY CAUSED HER INJURIES**

Defendants argue their actions were not the legal or actual, i.e. proximate, cause of Ms. Eilman's injuries. However, the evidence viewed in light of the applicable law demonstrates otherwise.

Defendants cannot escape liability simply because *they* did not sexually assault Ms. Eilman or force her out a seventh story window at the Robert Taylor Homes after she was released from the Second District station house. As the Seventh Circuit noted long ago, "[M]any factors or things or the conduct of two or more persons may operate at the same time, either independently or together, to cause injury or damage. In such a case *each* may be a proximate cause." *Beard v. Mitchell*, 604 F.2d 485, 497 (7th Cir. 1979) (emphasis supplied). Furthermore, an injury is proximately caused when it appears from the evidence that the act or failure to act was of such a character that an ordinarily prudent person could reasonably foresee it as being likely to occur. *Id.* at 498. "[I]f reasonable men could differ as to whether the torts or criminal acts of a third person were intentional or foreseeable, the court should leave the application of the rules to the jury." *Hibma v. Odegaard*, 769 F.2d 1147 (7th Cir. 1985). *See also Ritchie v. Glidden*, 242 F.3d 713 (7th Cir. 2001) (since more than one conclusion can be drawn on the issue of proximate cause, defendant cannot prevail on summary judgment); *Peck v. Ford Motor Co.*, 603 F.2d 1240 (7th Cir. 1979) (if different minds might reasonably draw different inferences from the facts given, the court must defer to the judgment of the jury on the issues of foreseeability and the effect of an intervening cause).

Under these well-settled principles, the Defendants' conduct, *as well as* that of Marvin Powell, proximately caused Ms. Eilman's injuries. Defendants' efforts to deflect the issue entirely onto Powell and away from their own unreasonable failure to provide Ms. Eilman with access to medical treatment must accordingly be rejected. At a minimum, the issue of proximate cause must go to the jury in view of the genuine material issues of fact that permeate the record.

**A.     The acts perpetrated by Marvin Powell do not sever the causal relationship between the Defendants' conduct and Ms. Eilman's injuries.**

Defendants contend that Ms. Eilman's release from police custody serves as a cut-off point regarding legal causation. They claim that whatever happened to her after they bonded her out was the result of "an outside force" that was "too remote to hold any defendant responsible." (Deft's Memo, p.42) However, contrary to Defendants' view, so long as the evidence shows that a defendant could have foreseen that his or her conduct would result in *some type of injury*, the

precise nature or method of injury need not have been foreseeable. *Enis v. Ba-Call Bldg. Corp.*, 639 F.2d 359, 362 (7th Cir.1980). Just as a hospital providing care for suicidal patients cannot escape liability if its unreasonable failure to monitor a patient results in his suicide, Defendants in this case, beginning with the officers in the Eighth District and including the officers and detention aides in the Second District, cannot avoid liability after continually and unreasonably failing to refer Ms. Eilman for a mental health evaluation, despite her obvious signs of psychiatric illness.

On the issue of remoteness, the cases holding that an injury was too remote, and hence not foreseeable, have all involved months and years between the act and the injury. *See Cleveland v. Rotman*, 297 F.3d 569 (7th Cir. 2002) (suicide one year after tax advice that resulted in an IRS audit); *Martinez v. California*, 444 U.S. 277 (1980) (child killed by parolee five months after his release); *Bowers v. DeVito*, 686 F.2d 616 (7th Cir. 1982) (woman killed by mental patient one year after his release); *Horwitz v. Board of Education*, 260 F.3d 602 (7th Cir. 2001) (termination of teacher 18 months later too remote to infer retaliation for the exercise of her First Amendment rights). Our case, on the other hand, involves less than 5 hours. Ms. Eilman left the Second District lock-up at approximately 6:37 p.m. (Ex. 79) Paramedics were dispatched to 5135 South Federal in response to her fall at 11:22 p.m. (P 56.1 ¶14; Ex. 36) Clearly, this was not a "remote" event, as the court have construed that term.

Contrary to Defendants' position, Plaintiff's claims are not simply "mere assertion[s] that the defendant's conduct started a chain of events which led to an injury." (Deft's Memo, p.42) Defendants point to *Martinez v. State of California*, *supra*, as support, but their reliance is misplaced. In *Martinez*, a fifteen year-old girl was tortured and killed by a sex offender who had been paroled five months earlier. Her estate sought to hold the parole board liable. The court understandably found this action "too remote a consequence" to hold the parole officers responsible. *Id.* at 559. But five hours is not five months. Furthermore, Ms. Eilman's injuries occurred within a few hundred yards of the Second District police station. Lastly, the victim was not some "innocent bystander" as in *Martinez*. It was Ms. Eilman herself.

Defendants also contend that since Ms. Eilman's bipolar/mania condition was pre-existing and unchanged during the time she was in custody, their conduct did not place her at an increased risk for future harm upon her custodial release. (Deft's Memo, p.43) They argue that Plaintiff must establish that their conduct during her detention increased her risk of future injury.

In support, Defendants cite *Henderson v. Sheahan*, 169 F.3d 839 (7th Cir. 1999).

The *Henderson* court stated that, to withstand summary judgment, plaintiff had to proffer competent and reliable expert testimony that there was a reasonable medical certainty that he faced *some* defined level of increased risk of developing a serious medical condition, and that the increased risk was proximately caused by the conditions during his detention. *Id.* at 852. A plaintiff need only prove that he or she faced an increased risk, "whether it be twenty percent, fifty-one percent, or ninety-nine percent," and that the risk was proximately caused by Defendants' wrongful conduct. *Id.* at 851. There, the Court concluded that proximate cause was not established because the expert, Dr. Klein, could only testify generally that exposure to excessive levels of second-hand smoke leads to a twenty percent increase in developing atherosclerosis, but could not say within a reasonable degree of medical certainty whether a *particular person* will develop a smoking-related disease.

In our case, on the other hand, the testimony of psychiatry expert Dr. Craig Nelson, corrections psychologist Dr. Joel Dvoskin and Chicago neighborhoods criminologist Dr. Robert Sampson establishes that Ms. Eilman's attack within hours after her release was manifestly foreseeable, and not "too remote" as claimed by Defendants.

Dr. Nelson testified that Ms. Eilman suffered from bipolar disorder and was in the midst of a manic episode when she interacted with Chicago police in May of 2006. Furthermore, her abnormal behaviors in Chicago warranted psychiatric evaluation and treatment at an appropriate facility. (P 56.1 ¶136) Not only was Ms. Eilman unable to protect herself from serious harm, her symptoms were provocative and put her in harm's way. (P 56.1 ¶148 Nelson pp. 188-190, 260-263)

Dr. Joel Dvoskin, Ph.D. a psychologist with special expertise in access treatment programs and mental health for persons confined in lock-ups, jails and prisons, testified that Ms. Eilman was in a psychiatric crisis before, during and after she was in custody. (P 56.1 ¶153). He explained, "I think that her mental illness led her to put herself in harm's way." (P 56.1 ¶154). He also stated, "She was—the reason they removed her from Midway Airport was because of behaviors that I believe were symptomatic of her mental illness, of her disability. They then took her into their custody, and she ended up in the parking lot of a very dangerous neighborhood."

(P 56.1 ¶154)[14]

When viewed against the backdrop of this evidence, and the cases cited, the tragic events that transpired here were not too remote, and were entirely foreseeable to Defendants.

**B.     Defendants' conduct is the actual cause of Eilman's injuries.**

Defendants argue that Plaintiff cannot establish that "but for" the lack of access to mental health care Eilman would not have been injured.   This contention is misguided.   Defendants misinterpret Eilman's claims by stating, "The issue is whether the lack of treatment during the period that Eilman was in each defendant's custody caused her harm, not whether Eilman was entitled to psychiatric treatment after she was no longer in custody."[15]    Plaintiff is claiming that each Defendant is culpable because each failed to provide Ms. Eilman with *access to psychiatric care while she was in custody* – not for failing to assure she gained psychiatric care *after* she was released.   The evidence warrants submission to a jury to determine whether the Defendants unreasonably failed to refer Eilman for a mental health evaluation while she was in custody.

Defendants contend Plaintiff cannot establish that the failure to receive medical treatment caused Eilman to have an acute psychiatric episode, or aggravated her psychiatric condition, and thus there is no evidence that Eilman suffered any physical harm due to not obtaining treatment. (Defts' Memo, p. 37)   They assert that the testimony of experts Nelson and Dvoskin is insufficient on the issue of proximate cause because they do not offer opinions as to the nature of the medical treatment Eilman needed while in custody.   However, Defendants misunderstand the primary issue here.   The issue is not *what medical treatment* Eilman needed while in custody but instead that she required *referral and access* to treatment.   The Second District was not and never has been staffed or trained to treat psychiatric patients.   Experts Nelson and Dvoskin, a psychiatrist and psychologist respectively, described what the professional mental health evaluation and treatment would have been if Defendants had assured Ms. Eilman was brought to a local hospital – and further that she unquestionably would have been admitted instead of being released into the community at large.

Dr. Dvoskin, the psychologist with expertise in mental health access programs for persons confined in lock-ups, jails and prisons, testified that Ms. Eilman would not have ended

---

[14]    The testimony of Plaintiff's third expert, Dr. Robert Sampson, is discussed at length in Section III of this Memorandum.

[15]    See Defendants' Memorandum, p. 36-37.

up in the Robert Taylor Homes and been injured if she had been transported by Defendants for an assessment by a mental health professional, since she would have been involuntarily committed at a hospital due to her mental illness. Her condition placed her in danger and at great risk of harm to herself in light of her grossly impaired judgment, which made her gravely disabled.  (P 56.1 ¶149)

In response to a question whether, when brought to a designated mental health facility, Ms. Eilman would have been involuntarily admitted, Dr. Dvoskin testified, "*I believe that she would have been involuntarily committed as a danger to herself.*"  (P 56.1 ¶461, 463, 464)  He also testified that, in his opinion, while Ms. Eilman was in Chicago up until the time she got to the Robert Taylor Homes, "she posed a threat to herself."  (P 56.1 ¶466)  He explained, "I think that her mental illness led her to put herself in harm's way, and that it would have met the criteria for involuntary commitment either under the danger to self standard or the gravely disabled standard."  (P 56.1 ¶467)

Dr. Craig Nelson, a licensed psychiatrist who was on the staff at Yale University School of Medicine and is now at University of California at San Francisco, testified that due to her severe manic condition arising from Bipolar I Disorder, Eilman was certainly unable to protect herself from serious harm. Furthermore, her symptoms were provocative and put her in harm's way.  (P 56.1 ¶148)  Her manic episode continued following her custodial release. The record demonstrates that she continued to display signs of mania.  (P 56.1 ¶151)  Dr. Nelson also opined that Ms. Eilman's manic behavior revealed a glaringly obvious psychiatric episode – glaringly obvious to dozens of lay people who consistently described Ms. Eilman in synonymous terms, including goofy, crazy, having mood swings, etc.  In Nelson's opinion, Ms. Eilman should have been brought to a hospital where she would have been admitted and *not harmed*.  (P 56.1 ¶144)

Thus, *Ortiz v. City of Chicago*, 2008 WL 4681156 (N.D.Ill.), cited by Defendants at page 38 of their Memorandum, is distinguishable. There, the district court found the testimony of Plaintiff's expert too speculative. Of note, the *Ortiz* court had previously excluded the expert's opinion pursuant to *Daubert v. Merrell Dow Pharmaceuticals, Inc.,* 509 U.S. 59, 113 S.Ct. 2786 (1993), but was required to consider an additional affidavit submitted to forestall summary judgment.  The issue in *Ortiz* was whether two lock-up officers proximately caused the plaintiff's injury or death by depriving him of certain medication.  The court assumed that, had

47

these individuals "sounded the alarm," plaintiff would have been taken immediately to the hospital. The court pointed out that the expert's conclusions were made without his awareness of the decedent's underlying medical conditions, her earlier treatment regimen, or her medication dosages. Further, he had not accessed any of the decedent's treating physician's findings, as disclosed through discovery in the case. *Id.*, at 9. Here, Plaintiff's experts, Nelson and Dvoskin, have reviewed the substantial discovery that has taken place, including dozens of fact witness depositions and medical records, prior to formulating their opinions.

The *Crowley v. Hedgepeth*, 109 F.3d 500 (8th Cir. 1997) and *Brownell* cases[16] cited by Defendants are clear instances where the element of causation was factually unsupported, and thus are also distinguishable. *Crowley* involves an alleged delay in providing sunglasses after an inmate's eye surgery. The court held that affirmative medical testimony from the inmate's doctor established that the lack of sunglasses did not result in any damage to his eye. *Crowley*, 109 F.3d at 501. *Brownell* involves an arrestee who developed paralysis following his automobile accident and ensuing arrest for drunk driving. There was evidence of a spinal fracture, but the court noted there was no further evidence specifically linking the fracture to the arresting officers' conduct. It could just as well have resulted from the automobile accident. *Brownell*, 950 F.2d at 1293.

In our case, Plaintiff's experts establish that Ms. Eilman's sexual assault and fall from a seventh floor window was a proximate result of the Defendants' unreasonable failure to provide her with access to medical care while she was in their custody. Thus, unlike *Crowley* and *Brownell*, there is no legal basis to withhold Plaintiff's claims from a jury's consideration.

## III. DEFENDANT HEARD AFFIRMATIVELY PLACED MS. EILMAN INTO AN ENVIRONMENT OF INCREASED DANGER

Defendant Heard is also requesting summary judgment on Plaintiff's claim that Heard violated Ms. Eilman's rights by affirmatively placing her into a position of increased danger. Heard denies that she created or increased any danger to Ms. Eilman. Instead, in her view, all she did was "point north toward 51st Street."

Contrary to Heard's argument, the evidence overwhelmingly shows that her conduct falls squarely within the "state-created danger" exception recognized by the Seventh Circuit in the wake of *DeShaney v. Winnebago County Department of Social Services*, 489 U.S. 189 (1989). After failing to provide Ms. Eilman with access to medical and mental health care while she

---

[16]    *Crowley v. Hedgepeth*, 109 F.3d 500 (8th Cir. 1997); *Brownell v. Figel*, 950 F.2d 1285 (7th Cir. 1991).

remained in custody at the Second District, Heard compounded her deprivation of Ms. Eilman's rights by affirmatively placing Ms. Eilman into a heightened position of danger by directing her into an extraordinarily high violent crime neighborhood while aware that Eilman was psychiatrically compromised. In effect, Heard abandoned Eilman to fend for herself in an unfamiliar, dangerous environment, knowing full well that Eilman would face a substantial risk of danger due to her glaringly obvious adverse psychiatric condition.

In *DeShaney*, the Supreme Court held that the Fourteenth Amendment's due process clause does not impose a general, affirmative obligation upon the State to protect its citizens against the deprivation of life, liberty, and property by private actors. *Id.*, at 195. However, the courts of appeal, including the Seventh Circuit, have acknowledged that this rule is subject to two exceptions. For purposes of our case, it is the second of these exceptions, the so-called "state-created danger exception," that is implicated.

State actors may be held liable for due process violations if they place an individual in a position of danger she would not otherwise have faced. *See Monfils v. Taylor*, 165 F.3d 511, 516 (7th Cir. 1990); *Estate of Stephens v. City of Green Bay*, 105 F.3d 1169, 1174 (7th Cir. 1987). The exception essentially prohibits the State's affirmative placement of an individual in harm's way. *Kneipp v. Tedder*, 95 F.3d 1199 (3rd Cir. 1996). If the State does so, it must protect that individual from harm. *Bowers v. DeVito*, *supra* at 618 ("If the state puts a man in a position of danger from private persons and then fails to protect him, it will not be heard to say that its role was merely passive; it is as much an active tortfeasor as if it had thrown him into a snake pit."); see also *Reed v. Gardner*, 986 F.2d 1122 (7th Cir. 1993).

The State's failure to protect the individual from danger must be a proximate cause of the injury to the individual. *Buchanan-Moore v. County of Milwaukee*, 570 F.3d 824, 827 (7th Cir. 2009). In addition, because the right of protection is derived from the due process clause, the State's failure to protect the individual must shock the conscience. *Monfils, supra* at 516; *see also Witkowski v. Milwaukee County*, 480 F.3d 511, 513 (7th Cir. 2007).

In this case, the evidence presents, at a minimum, a genuine issue of material fact over Heard's role in placing Ms. Eilman into danger. Heard did more than merely "point to 51st Street." She knew the locale just outside the Second District station house premises was among Chicago's worst for violent crime. As demonstrated earlier, she was also aware that Ms. Eilman faced a substantially greater risk of danger due to her adverse psychiatric condition, coupled with

her other individual characteristics. By affirmatively directing Ms. Eilman into that particular environment under those particular conditions, Heard essentially tossed Eilman into a snake pit.

### A. Heard did not simply "give Ms. Eilman directions."

Heard claims there is no evidence showing she placed Eilman in a worse position than that in which she would have found herself had Heard not acted at all. Since, in Heard's view, Eilman *chose* to walk toward the nearby Robert Taylor Homes once she exited the police parking lot, Eilman is essentially responsible for her own injuries. After all, the only thing Heard did once she was out in the parking lot was point north toward 51st Street.

Defendant's "finger-pointing," however, did not take place within a vacuum. Heard knew of Eilman's bizarre behavior in the Second District lockup during the same afternoon and early evening before Eilman was released. Her personal observations of Eilman, both while in the lockup and at the time of her discharge from custody, provided Heard with sufficient knowledge of Eilman's particular risk upon her release into the community. Furthermore, Heard knew that Eilman was from California and was likely not familiar with the neighborhood in which the Second District police station was situated. (P 56.1 ¶412; Exs. 45, 53, 79, 106) Heard, on the other hand, had worked for the Chicago Police Department since 1990, including the last eight years in the Second District. She was, or should have been, aware that the neighborhood immediately adjacent to the police station was notorious for extraordinary levels of violent crime.

Heard argues that while she "directed" Eilman to the north, "Eilman was not forced to proceed north, nor did Heard encourage Eilman to travel east on 51st Street, toward the Robert Taylor Homes." (Deft's Memo, p. 48) The record reveals that Heard never mentioned *any* particular direction for Eilman to travel. Furthermore, the exit from the police parking lot onto 51st Street just happened to be north of where Heard was standing. (P 56.1 ¶440) A reasonable jury could infer that Heard did not literally intend for Eilman to continue traveling only in that particular direction.

Contrary to Heard's contentions, Plaintiff is not claiming that Heard's assistance to Eilman was "merely inadequate." Instead, the evidence shows that Heard affirmatively acted by escorting Eilman from the lockup into the hallway leading to the exit doors. She watched Eilman leave the building, and then affirmatively directed Eilman in the parking lot towards 51st Street *after Eilman appeared confused*. (P 56.1 ¶433, 439). Within moments thereafter, as Ms. Eilman

made her way to the exit, she was observed by Detective John Zalatoris. She approached his squad car, peered at him, and then made the "sign of the cross." Ms. Eilman was ill and needed care, and instead was dumped into the streets, the proverbial "snake pit."

Heard contends that it is "rare" for the Seventh Circuit to find a "state-created danger." Then she cites *four* cases, together with another case from the Ninth Circuit. (Deft's Memo, p. 47.) Rather than highlighting how "rare" it is for courts *to recognize* examples of state-created danger, these cases provide plenty of reason for including Ms. Eilman's claim as yet another example.

Even before *DeShaney*, the Seventh Circuit recognized, in *White v. Rochford*, 592 F.2d 381 (7th Cir. 1979), that police officers could not, consistent with their constitutional duties, create a dangerous situation and then abandon someone in its midst. There, the police stranded three children in an automobile parked on the side of the Chicago Skyway after arresting the driver. The Seventh Circuit found that the police officer's unjustified, arbitrary refusal to lend aid to the children, following their affirmative decision to simply leave the children on the side of the road, violated the due process clause, since that refusal caused the children physical and/or emotional injury.[17]

In *Gibson v. City of Chicago*, 910 F.2d 1510 (7th Cir. 1990), a police officer was suspended for lack of mental fitness and ordered to turn in his shield and police identification card, but not his service revolver and ammunition. Three months later, the still-suspended officer shot and killed a man. The Seventh Circuit held that by permitting the mentally unfit officer *to retain* his weapon and ammunition after otherwise stripping him of his police authority, the city rendered the public more vulnerable to danger. The city's policy of permitting a suspended officer to retain his service revolver and ammunition was a sufficient affirmative act that not only created an increased danger, but also proximately caused the decedent's shooting death.

In *Ross v. United States*, 110 F.2d 1422 (7th Cir. 1990), a twelve-year-old child attending a lakefront festival fell off of a breakwater into the lake and sank. A county deputy sheriff arrived in a marine patrol boat. Based on an intergovernmental agreement between the county

---

[17] Applying Defendant Heard's argument to the facts in *White*, the children's harm would have been their own responsibility, since no one compelled them to leave the car and expose themselves to the elements and to other vehicles zooming past at highway speeds.

and one of the nearby cities, the sheriff's department was responsible for patrolling and responding to emergency situations on the water. The department had a policy directing its personnel to prevent any civilian from attempting to rescue a person in danger of drowning in the lake. Because of the policy, the deputy ordered all persons then on the scene to cease their rescue efforts, including several civilian scuba divers who volunteered to attempt a rescue at their own risk. The deputy responded that he would arrest them upon their entry into the water, and even positioned his boat to prevent their dive. Approximately 30 minutes after the boy had fallen into the water, the "officially authorized" rescue divers arrived and retrieved his body. Despite the fact that the child had essentially created his own danger by walking out onto the breakwater and then falling into the lake, the Seventh Circuit held that the defendants enhanced or increased the boy's danger in violation of his Fourteenth Amendment right to life. *Ross*, 910 F.2d at 1430.

In *Reed v. Gardner*, *supra*, the Court found that a police officer's affirmative act of handing car keys to an intoxicated passenger after arresting the driver was sufficient to hold the officer liable for violating the due process rights of several persons injured when the drunk passenger drove off and crashed into another vehicle. The Court held that the police officers created a danger rendering others on the road more vulnerable. *Reed v. Gardner*, 986 F.2d at 1125.

Similarly, the State action here did not simply evaporate once Ms. Eilman signed her personal recognizance bond. The State's duty continued when Defendant Heard, fully aware of Ms. Eilman's existing vulnerability, not only escorted Ms. Eilman to the station house doors, but then affirmatively directed her toward 51st Street and into the surrounding high crime community. Heard's awareness and familiarity with the particular dangers lurking in that neighborhood, in light of both the published (and even internet accessible) Chicago Police crime data[18] and her own eight-year work experience in the Second District, coupled with her awareness of Eilman's gender, youth, lack of mental alertness, and obvious incapacity to exercise appropriate judgment elevated an already vulnerable situation to a more gravely dangerous one, certainly as dangerous (if not more so) as those in the cases discussed above.

*Wood v. Ostrander*, 879 F.2d 583 (9th Cir. 1989) sheds further light on why Heard's motion must be denied. In *Wood*, a police officer stranded a young woman in an area the court

---

[18] https://portal.chicagopolice.org/portal/page/portal/ClearPath/News/Statistical%20Reports/Index%20Crime%20Stat

described as the "highest aggravated crime rate area in the county," with little or no money on her person, after stopping and arresting the intoxicated driver of her car and having the car towed. The woman had no other way to get home, located five miles away, other than to walk or flag down a passing car. She ended up accepting a ride from an unknown man, who then took her to a secluded area and raped her. In reversing the summary judgment entered in defendant's favor, the Ninth Circuit, citing *DeShaney*, *supra*, and *Jackson v. City of Joliet*, 715 F.2d at 1204 (7th Cir. 1983), explained:

> The fact that Ostrander arrested [the driver], impounded his car, and apparently stranded Wood in a high crime area at 2:30 a.m. distinguishes Wood from the general public and triggers a duty of the police to afford her some measure of peace and safety.
>
> * * *
>
> Wood has also raised at least a triable issue (if not an undisputed one) regarding Ostrander's knowledge of the danger: official crime reports show that the area where Wood was stranded had the highest violent crime rate in the county outside the City of Tacoma. Ostrander, a state trooper stationed in that area since 1981, may well be chargeable with knowledge of these facts. Moreover, the inherent danger facing a woman left alone at night in an unsafe area is a matter of common sense. *Cf. White v. Rochford*, *supra*.

*Wood*, 879 F.2d at 590. Here, Defendant Heard effectively stranded Christina Eilman, an unescorted young woman unfamiliar with the surrounding community, in a high crime area at sunset with little money on her person when Heard affirmatively directed her to 51st Street. Moreover, Heard, like the defendant in *Wood*, was an experienced officer – sixteen years on the force and eight in the particular district. She, like Trooper Ostrander, is chargeable with knowledge regarding the high violent crime rate in the immediate neighborhood where the Second District police station is situated.

Thus, rather than presenting aberrational departures that do not inform the question whether Defendant Heard violated Ms. Eilman's rights in this additional wa *White*, *Ross*, *Gibson*, *Reed* and *Wood* furnish a compelling legal foundation for judging Defendant Heard's conduct for what it really was – a clear deprivation of Eilman's rights. Defendant Heard affirmatively placed an already vulnerable Christina Eilman into an environment that was significantly more dangerous than the location where Ms. Eilman had first been seized by the Chicago Police, namely the Clearing community around Midway Airport. As in *Wood*, there are, at a minimum, triable issues warranting a jury's consideration.

**B.      Defendant Heard's affirmative acts proximately caused Eilman's injuries.**

Heard argues that her actions were neither the actual or legal cause of Ms. Eilman's injuries. Heard's contentions, however, have been soundly rejected by the Seventh (and Ninth) Circuit cases discussed in the preceding subsection.

First, as to actual cause, Plaintiff need not prove knowledge of the identity of Ms. Eilman's likely attacker, or the precise mechanism or timing of the harm, but only the prevalence of a danger likely to ensue due to the state actor's conduct.  In *Wood, supra*, for example, the court of appeals upheld Ms. Wood's claim even though Trooper Ostrander was not aware that the eventual assailant was likely to travel to the location where Wood was stranded, abduct her, and rape her. In *Gibson*, *supra*, the City's weapon-retention policy caused a constitutional violation, even though the relevant state actors did not know whom the mentally unfit, suspended police officer was likely to assault. In *Ross*, *supra*, the policy directing a sheriff's deputy to prevent private rescue efforts led to unconstitutional and tragic results, notwithstanding the absence of evidence showing which specific members of the community would be placed at risk or affected by enforcement of the policy. Similarly, in *Reed v. Gardner*, *supra*, the affirmative act of giving the car keys to an intoxicated passenger should have made the state actor aware he was placing *someone on the road* at risk, but not necessarily the actual victims injured by the drunken passenger's subsequent reckless driving. To paraphrase, it is placing the plaintiff into the snake pit, not determining which snake is likely to bite her, that is at issue.

Defendant Heard's "legal cause" argument also does not hold water. Defendant contends that her affirmative act must have led to a risk which is "familiar and specific" such that the "immediate threat of harm has a limited range and duration," citing *Reed v. Gardner*, *supra* at 1127.  Here, the evidence shows that Ms. Eilman left the Second District parking lot near sunset between 6:37 and 7:00 p.m. (P 56.1 ¶524; Exs. 52, 397). Up until the time of her sexual assault and fall from the seventh floor window, she was never more than three city blocks from the Second District stationhouse. Her assault happened at 5135 South Federal, one-and-one-half blocks from the police station – and clearly within the range of potential victims of sexual assault.[19]  (P 56.1 ¶490-491; Ex. 435, 440-448) Moreover, as described in the expert opinion

---

[19]    The evidence implicitly shows Eilman followed Heard's direction by walking to 51st Street and then walked east to the JJ Fish Restaurant at 51st and Wabash three blocks from the police station and then walked west a city block to the Robert Taylor Homes building at 5135 South Federal where she was assaulted and then injured.  (P. 56.1 ¶454-455; Exs. 425-431)

testimony of criminologist Dr. Robert Sampson, Eilman presented a wide array of characteristics placing her at significantly higher risk of violent crime victimization than other members of the general public.

Sampson, the Chair of the Department of Sociology and the Henry Ford II Professor of Social Sciences at Harvard University, serves as a Senior Advisor in Social Sciences at the Radcliffe Institute for Advanced Study. Before Harvard, he taught for twelve years in the University of Chicago's Department of Sociology and seven years at the University of Illinois, Urbana-Champaign. Sampson has published widely in the areas of crime and deviancy, neighborhood effects, community, and the social organization of cities. (P 56.1 ¶470-471, 473-474; Ex. 271, 383.) Much of his work on neighborhood effects stems from the University of Chicago's Project on Human Development in Chicago Neighborhoods, for which Sampson has served as Scientific Director since 1994. (P 56.1 ¶473; Ex. 271, 383.) A recipient of multiple scholarly awards, during his tenure as a professor at the University of Chicago, he chaired a university-wide committee on crimes and security for the Hyde Park community, which is adjacent to the area where Ms. Eilman was sexually assaulted and injured. (P 56.1 ¶468, 473; Ex. 400, Ex. 401.) He knows Chicago neighborhoods and has studied and has written extensively as an academic on the neighborhoods at issue here. (P 56.1 ¶474; Ex. 271, Ex. 383.)

Sampson's analysis of the Chicago Police Department's own crime statistics shows that the Second District police station sits in or is adjacent to the three "community areas"[20] having near the worst violent crime rates in Chicago. (P 56.1 ¶477-480, 483-487, 495-496; Ex. 272.) Two of those community areas are Grand Boulevard (immediately north and east of the police station) and Washington Park (immediately south and east of the Second District station). The third community area, Fuller Park (in which the station house itself is situated) has boundaries primarily north and south of the station, but also includes a narrow strip west of the Dan Ryan Expressway. (P 56.1 ¶482-487; Exs. 400-409.)[21]

---

[20] The 77 "community areas" in Chicago are widely recognized, ecologically distinctive, relatively homogenous, and have key social characteristics. (P 56.1 ¶480) Their boundaries do not strictly coincide with police district boundaries (Ex. 403).

[21] Exhibit 272 includes a Google map prepared by Dr. Sampson demonstrating the area of exposure, with the star on the map to identify the location of the Second District station house. (P 56.1 ¶492) Exhibits 400 through 409 are City of Chicago community area maps depicting the three subject communities, as well as the Clearing community (Community #64 on Exhibit 403).

When Heard directed Ms. Eilman out of the police parking lot and toward 51st Street, she caused Eilman to travel toward Grand Boulevard, Washington Park, and Fuller Park. (P 56.1 ¶488; Exs. 435A, 435B)   Because Ms. Eilman was not familiar with Chicago, and was, as Officer Heard observed, confused, Eilman could have wandered in any direction, which she apparently did. (P 56.1 ¶489-490)   Thus, in terms of proximity, all three community areas' violent crime rates are relevant to a valid evaluation of the relative risk of danger to which Ms. Eilman was exposed by Heard's conduct.  (P 56.1 ¶491)  Furthermore, since Eilman was first picked up in the Clearing community, its crime rate is also relevant for comparison purposes.

From Dr. Sampson's review of the CPD's data for 2006, Washington Park and Fuller Park remained highly ranked in relative risk of violence.  In fact, those two communities had the highest rates of criminal sexual assault of all communities in Chicago, with Fuller Park increasing quite dramatically during the period 2004 to 2006.  (P 56.1 ¶496; Ex. 275.)

Washington Park and Grand Boulevard alone had criminal sexual assault rates near the highest for the entire City.[22]  When Fuller Park is included, the 2006 data revealed almost 740 sexual assaults and aggravated assaults/batteries *reported* in these three communities.  (P 56.1 ¶301; Exs. 272, 275)   Based on a valid and accepted methodology of assessing crime data, including estimated underreporting of such crimes, Sampson estimates approximately 3000 aggravated batteries, aggravated assaults and sexual assaults actually occurred in these three specific communities, generating *an average of over eight per day* for 2004 to 2006.  (P 56.1 ¶504; Ex. 272)

Sampson's review of the data also revealed a consistent pattern whereby the rate of personal violence (rape, robbery, assault, or homicide) in the three subject communities was among the highest, and in some cases the very highest, in all of Chicago. (P 56.1 ¶506; Ex. 272). Sampson prepared a graph illustrating the reported crimes of sexual assault for all 77 communities in the City, comparing 2004 and 2006 crime data. The graphic data reveals the overall predictability of criminal sexual assault in Washington Park, Fuller Park, Grand Boulevard, and Clearing . That graph, marked as Exhibit 272(A) (P 56.1 ¶507), shows that Clearing's rate of sexual assaults was dramatically less than the other three communities'

---

[22]   The building that was located at 5135 South Federal Street, where Ms. Eilman was assaulted and injured, would have been within Washington Park. The building was demolished a few months after Ms. Eilman's tragedy.  (P 56.1 ¶476, 490) The eastern boundary of the Second District police station is one-and-one-half blocks west of the former building site. Grand Boulevard begins north of 51st Street.  (P 56.1 ¶480, 48, 485; Exs. 408, 409, 435A, 435B.)

corresponding rates. (P 56.1 ¶498; Exs. 272, 272A, 407-409)  In fact, Clearing had the lowest or near the lowest rate of personal violence than any other community throughout Chicago.  (P 56.1 ¶498-499; Ex. 272)

Sampson concluded from his review of the CPD crime data that Clearing had a rate of approximately 9 sexual assaults per 100,000 population in 2006, compared to 132 for Grand Boulevard, 263 for Fuller Park and 175 for Washington Park.  (P 56.1 ¶498; Exs. 272, 275)  As the graph shows, Clearing is at or near the bottom of the risk profile for criminal sexual assaults in 2006. The other three communities are at the opposite end, with a risk rate nearly 15 times greater than Clearing.  (P 56.1 ¶499; Exs. 272A, 275)  Therefore, competent evidence of record exists showing that Ms. Eilman was released into the penultimate "snake pit" for violent crime in Chicago, especially for criminal sexual assault, compared to the community where she was initially arrested and taken into custody.

Significantly, Sampson's analysis encompasses more than just the CPD statistics.  Based on his years of research and study in the fields of sociology, criminology, and neighborhoods, he described other factors relating to Ms. Eilman that made her a "suitable target" for victimization. She was at much higher risk of predatory victimization due to her gender, the fact that she was alone and unfamiliar with the community (P 56.1 ¶522; Ex. 272), and her appearance – she was vulnerable to attackers because she looked either intoxicated or lacking mental alertness, or both. (P 56.1 ¶512; Ex. 272) In Sampson's opinion, the descriptions of Ms. Eilman's behavior contained in the testimonies of the various other Second District detainees, the people in the neighborhood, and the residents in and around 5135 S. Federal buttress that conclusion.[23] (P 56.1 ¶510-512)

The fact that Eilman was an unescorted young female presenting with bizarre behavior was, in Sampson's view, more significant in increasing her risk of harm than being Caucasian in a predominantly black neighborhood.   (P 56.1 ¶513; Ex. 272)  The latter characteristic only made her more conspicuous.[24]   (P 56.1 ¶513; Ex. 272)  But it was because she was alone,

---

[23]     Several of the residents 5135 S. Federal and customers at the JJ Fish Restaurant one block from that building consistently characterized Ms. Eilman's behavior as bizarre, strange, or otherwise indicative of a psychiatric problem.  (P 56.1 ¶449-454)

[24]     Residents of the 5135 building testified they were surprised to see a white girl standing at the building's front entrance. She drew a crowd. Certain witnesses testified they openly suggested Eilman leave the building because it was unsafe for her. (P 56.1 ¶459)  Others testified that white women were

without a capable guardian, exhibiting strange behavior, and walking in an area where conditions were conducive to criminal acts (e.g. vacant lots, abandoned or partially occupied buildings) that she was more at risk than residents of that community. (P 56.1 ¶514)

From his review of the data, the testimony of community residents and Second District detainees, and research and review of principles generally accepted by the criminological and sociological professional community, Sampson opines it was manifestly foreseeable before Eilman's release from police custody that she was at particular risk of becoming a victim of criminal sexual assault or other violent crimes. (P 56.1 ¶517; Ex. 272) In sum, the "ecological context" and Eilman's other combined characteristics known to the police put her at a significantly increased risk, fifteen times as great as that posed in the locale where she was arrested, of experiencing the criminal sexual assault she eventually did, in fact, endure. (P 56.1 ¶500, 514; Ex. 272)

Notwithstanding this evidence, Defendant Heard claims that the five hours that elapsed between the time she directed Ms. Eilman toward 51st Street and the time of Ms. Eilman's assault renders the assault too remote an event to deem Heard's conduct a proximate cause of Ms. Eilman's injuries. The Seventh Circuit disagrees. In *Gibson v. City of Chicago*, *supra*, the Court held *a three month* period did not erase proximate causation. In *Reed v. Gardner*, *supra*, the car crash injuring the plaintiffs happened two hours after the police relinquished the car keys to an intoxicated individual. In *White v. Rochford*, *supra*, the three minor children were left stranded in their arrested uncle's automobile for a "prolonged, unspecified length of time." 592 F.2d at 382. In sum, these court decisions do not establish any bright line test for determining what length of time severs "legal cause." Instead, reviewing courts have relied on the totality of the circumstances in assessing whether legal cause is supported by the evidence. *See Monfils v. Taylor*, *supra* (police informant found dead at 7:30 a.m. the day after police wrongfully released a tape recorded statement he had provided).

Here, the evidence shows that the risk of harm to Ms. Eilman was sufficiently particularized, was certainly foreseeable, and was anything but remote. In sum, the justifications articulated by Defendant Heard in an effort to undo the causal nexus between her affirmative acts and Ms. Eilman's injuries must be rejected.

---

rarely seen in that neighborhood. When they did appear, they were assumed to be working prostitutes or seeking to buy street drugs. (P 56.1 ¶460)

### C. Heard had the requisite state of mind.

Defendant Heard argues that she did not have the necessary state of mind for committing a due process violation. She asserts she did not know, or have reason to know, that Eilman was at particular risk of being a crime victim, and therefore, cannot be held culpable for Eilman's injuries. (Defs' Memo, p. 53) She also claims she had no reason to conclude from Eilman's behavior in the lockup that Eilman would be attacked if she exited the parking lot onto 51st Street, and thus did not "subjectively believe" Eilman faced a risk of violent crime in the neighborhood.[25] In sum, she contends that her conduct does not "shock the conscience" since, in her view, the evidence does not show that she was "deliberately indifferent" to Ms. Eilman's safety and welfare.

Defendant Heard's arguments must be rejected, insofar as there are numerous issues of material fact bearing upon the question whether her conduct in directing an obviously vulnerable Christina Eilman toward a veritable snake pit right next door to police territory shocks the conscience. The testimony provided by several detainees in the lockup identified Defendant Heard as being personally present for a wide array of Ms. Eilman's aberrant behaviors for approximately 4 ½ hours before Eilman was released. (P 56.1 ¶338-352, 353-362). This evidence, coupled with Defendant Heard's experience and training as a police officer, specifically her eight years of working in the Second District, her expected knowledge of the community, and her affirmative act of directing Ms. Eilman into one of the most violent neighborhoods in Chicago, underscores the conscience-shocking nature of her conduct that led Ms. Eilman directly to her unfortunate fate.

## IV. DEFENDANTS ARE NOT ENTITLED TO QUALIFIED IMMUNITY

The final basis upon which the Defendants seek summary judgment is their claimed entitlement to qualified immunity. Such immunity shields governmental officials performing discretionary functions from damages liability "insofar as their conduct does not violate clearly established statutory or constitutional rights." *May v. Sheahan*, 226 F.3d 876, 881 (7th Cir. 2000), citing *Harlow v. Fitzgerald,* 457 U.S. 800, 818, 102 S.Ct. 2727, 73 L.Ed.2d 396 (1982). To determine whether qualified immunity applies in a given case, courts examine two factors:

---

[25] Heard neglects to provide any evidence supportive of her new contention she did not "subjectively believe" the environs surrounding her police station were high crime. That contention is first advanced in her summary judgment motion and is unsupported by the evidence. It should be disregarded.

(1) whether the facts alleged or shown by the plaintiff make out a violation of a constitutional right, and (2) whether that right was clearly established at the time of defendant's challenged conduct. Under *Pearson v. Callahan*, 129 S.Ct. 808, 172 L.Ed.2d 565 (2009), courts may exercise their discretion regarding the order in which they address those factors.[26]

In Section IV of their Memorandum, the Defendants point out they have presented their arguments concerning the first of the two factors earlier in their Memorandum. The Plaintiff has done likewise.[27] For the purpose of fully addressing Defendants' qualified immunity contentions, Plaintiff hereby reiterates and incorporates her earlier arguments demonstrating that each of the Defendants violated Ms. Eilman's constitutional rights. Thus, the balance of this Section will address the "clearly established" factor.

Whether an official may be held personally liable for his or her unlawful actions turns on "the objective legal reasonableness of the action, assessed in light of the legal rules that were clearly established at the time it was taken." *May*, 226 F.3d at 881, citing *Wilson v. Layne*, 526 U.S. 603, 614, 119 S.Ct. 1692, 143 L.Ed.2d 818 (1999). To be "clearly established," the contours of an asserted right must be sufficiently clear that a reasonable official would understand that what he or she is doing violates that right. *Id.*, citing *Anderson v. Creighton*, 483 U.S. 635, 640, 107 S.Ct. 3034, 97 L.Ed.2d 523 (1987).

While true, as Defendants allude, that courts are to evaluate whether the law was clear in relation to the specific context of the case, and not merely as a broad general proposition, see *Saucier*, 533 U.S. at 201, the courts do not require the degree of specificity the Defendants seek to have imposed. In *Rackovich v. Wade*, 850 F2d 1180 (1987), the Seventh Circuit explained:

> We caution that just as the right allegedly violated should not be characterized or defined so generally that invariably guiding law is found to show the right was clearly established, the right should not be defined so intricately that invariably guiding law never can be found. A practical appraisal shows that the process of defining the factual situations from disparate types of cases results in some flexibility within the limits of the objective inquiry and within the limits of *Anderson* and its progeny. Courts are able to carefully consider the proper characterization. It need only be kept in mind that the characterization used must be sufficiently particularized to

---

[26] Previously, under *Saucier v. Katz*, 533 U.S. 194, 121 S.Ct. 2151, 150 l.Ed.2d 272 (2001), lower courts were required to examine and rule upon the two factors in the order set forth above.

[27] See Sections I through III , *supra*.

> enable the district court to determine whether the officers were *on notice* that their actions violated clearly established law.

*Id.* at 1211; see also *Wood v. Ostrander*, *supra*, at 592 (". . . it is not the case that 'an official action is protected by qualified immunity unless the very action in question has previously been held unlawful . . .'"); *Finsel v. Cruppenink*, 326 F.3d 903, 906 (7th Cir. 2003), citing *Hope v. Pelzer*, 536 U.S. 730, 122 S.Ct. 2508, 2516, 153 L.Ed.2d 666 (2002) (". . . officials can still be on notice that their conduct violates established law even in novel factual circumstances"); *Board v. Farnham*, 394 F.3d 469, 477 (7th Cir. 2005) (" . . . officials are considered 'on notice' that conduct is violative of established law if the state of the law at the time gave them 'fair warning' that their conduct would be unconstitutional"); *Riordan v. City of Joliet*, 3 F.Supp. 2d 889, 898 (N.D. Ill. 1998) (no requirement that a plaintiff "show that a prior case is 'on all fours' with the facts of his situation . . .").

In several of the cases discussed earlier in this Memorandum, the courts rejected qualified immunity defenses where, despite the absence of a particularized precedential case holding, other "clearly established law" provided the requisite notice and fair warning to the defendant that his conduct was unconstitutional. In *Wood v. Ostrander*, for example, the court found no prior Ninth Circuit case on point. It nonetheless determined, based on several "non-binding authorities" from the Seventh Circuit, that the law was sufficiently established to place Trooper Ostrander on notice that by affirmatively abandoning Ms. Wood in a high crime area, where she was then sexually assaulted by a stranger, he would be violating her liberty interest in personal security under the Fourteenth Amendment. *Wood*, 870 F.2d at 595-96. And in *Ross v. United States*, *supra*, the court of appeals rejected the defendant deputy sheriff's qualified immunity defense when he prevented "unauthorized" private rescue personnel from attempting to save a drowning boy, choosing instead to wait twenty minutes for an "authorized" rescue squad to arrive. There was no previous case directly on point, but the court recognized that two earlier fire death cases "demonstrate what has always been a fundamental tenet of our constitutional jurisprudence, even before the *DeShaney* and *Archie* decisions: the state cannot arbitrarily assert its power so as to cut short a person's life." *Ross*, 910 F.2d at 1433.

In addition, this Court must consider another overarching principle that Section IV of the Defendants' Memorandum does not squarely address: "[W]hen the qualified immunity inquiry cannot be disentangled from disputed facts, the issue cannot be resolved without a trial." *Gonzalez v. City of Elgin*, 578 F.3d 526, 540 (7th Cir. 2009), citing *Clash v. Beatty*, 77 F.3d 1045,

1048 (7th Cir. 1996). Examples abound where courts have rejected qualified immunity claims because of material factual disputes that must first be resolved by the jury. See *Egebergh v. Nicholson*, 272 F.3d 925, 927-28 (7th Cir. 2001) (reasonable jury could infer that arresting officers knew that depriving diabetic arrestee of insulin shot would endanger his health, and that they in fact did so for no better reason than to get him out of the police station); *Lewis v. Downey,* 581 F.3d 467, 476 (7th Cir. 2009) (disputed question whether jail guard had any penological justification to use taser on inmate); *Gonzalez, supra,* at 541 (dispute whether police officers started beating, pepper-spraying, kicking, and otherwise mistreating group of people without provocation); *Holmes v. Village of Hoffman Estates*, 511 F.3d 673, 687-88 (7th Cir. 2007) (disputed issues regarding nature and degree of force used by arresting officer); *Sallenger v. Oakes*, 473 F.3d 731, 741-42 (7th Cir. 2007) (dispute whether officers struck arrestee in head after he was handcuffed); see also *Sledd v. Lindsay*, 102 F.3d 282, 287-88 (7th Cir. 1996); *Hall v. Ryan*, 957 F.2d 402, 404-06 (7th Cir. 1992).

Plaintiff has amply demonstrated earlier in this Response that numerous material factual disputes exist. As in the cases cited in the preceding paragraph, these disputed issues of material fact nullify Defendants' entitlement to qualified immunity.

A. **Defendants are not entitled to qualified immunity for their failure to provide Christina Eilman with access to necessary medical and/or mental health care.**

In its November 7, 2008 Memorandum Opinion and Order, this Court construed Plaintiff's Fourteenth Amendment due process claims against the individual Defendants for failure to provide Eilman with access to medical or mental treatment as claims for unreasonable seizure in violation of the Fourth Amendment, as incorporated against the states under the Fourteenth Amendment. See Document 419 at p.13. The Court ruled that these claims are governed by the Fourth Amendment and its "objectively unreasonable" standard. *Id.*

Defendants contend it was not clearly established in May 2006 that a police officer's failure to address an arrestee's medical needs could be actionable as "objectively unreasonable," since the Seventh Circuit "first applied the . . . standard to a claim of inattention to medical needs" sixteen months later in *Sides v. City of Champaign*, 496 F.3d 820 (7th Cir. 2007). ( Defendants' Memo, p. 57.) Defendants' argument must be rejected for the following reasons.

First, though true that *Sides* was decided in 2007, the Seventh Circuit cited the Supreme Court's 1989 decision in *Graham v. Connor*, 490 U.S. 386, 394-95, for the proposition that "[t]he governing standard at the time of arrest is the Fourth Amendment's ban on unreasonable

seizures." *Sides*, 496 F.3d at 828. Thus, the standard itself was first judicially recognized at least seventeen years earlier. Furthermore, *Sides* was not the Seventh Circuit's first occasion to apply the standard following *Graham*. In *Lopez v. City of Chicago*, *supra*, the Court declared that "the protections of the Fourth Amendment apply at arrest and through the *Gerstein* probable cause hearing, [while] due process principles govern a pretrial detainee's conditions of confinement after the judicial determination of probable cause . . ." *Id.* at 719. Though *Lopez* was not decided until September 2006, it cited four pre-2006 decisions[28] in which the Court acknowledged the distinct time frame during which the Fourth Amendment's unreasonable seizure standard applied, rather than a due process standard. *Id.* Furthermore, at least two district court decisions have applied the Fourth Amendment standard to arrestees' claims for denial of medical care arising out of incidents predating Ms. Eilman's arrest and detention. See *Petrovic v. City of Chicago*, 2008 WL 4286954 (N.D.Ill.) at *7; *Smith v. Village of Norridge*, 2009 WL 210458 (N.D. Ill.) at *9-10.

Despite this line of cases from *Graham* forward, Defendants nonetheless persist, based on *Collignon, supra*, and *Chapman v. Keltner*, 241 F. 3d 842 (7th Cir. 2001), that the Fourteenth Amendment deliberate indifference standard controlled any questions relating to an *arrestee's* medical or mental health needs, and that under this standard, "a reasonable officer in May 2006 would not be on notice that his [unreasonable failure to attend to those needs] violated the constitution." (Defendants' Memo, p.57.) To the extent Defendants rely on *Chapman*, their position has been explicitly rejected by the Seventh Circuit. In *Sides*, the Court observed:

> Although *Chapman v. Keltner* . . . asks whether the officers' conduct at the time of arrest evinced "deliberate indifference to a serious injury or medical need," the parties to *Chapman* did not join issue on the proper standard or discuss the bearing of *Graham* and *Bell* [*v. Wolfish*, 441 U.S. 520, 99 S. Ct. 1970, 60 L.Ed.2d 447 (1979)] on contentions of this kind. A decision that employs a mutual (and mutually mistaken) assumption of the parties without subjecting it to independent analysis does not constitute a holding on the subject. *Chapman* should not be understood as extending the domain of Eighth Amendment analysis beyond the bounds set by *Graham* and *Bell*.

---

[28]  *Villanova v. Abrams*, 972 F.2d 792, 797 (7th Cir. 1992); *Brokaw v. Mercer County*, 235 F.3d 1000, 1018 n. 14 (7th Cir. 2000); *Luck v. Rovenstine*, 168 F.3d 323, 326 (7th Cir. 1999); and *Reed v. City of Chicago*, 77 F.3d 1049, 1052 (7th Cir. 1996).

*Sides*, 496 F.3d at 828. The court's reasoning effectively eliminates *Collignon's* authority as well. The plaintiffs in that case characterized the decedent not as an arrestee but as a pretrial detainee, and framed their federal issue solely in terms of Fourteenth Amendment due process. *Collignon*, 163 F.3d at 986-87. Consequently, neither the parties, nor the court, addressed whether the defendants' conduct should more appropriately be measured by a Fourth Amendment reasonableness standard. Thus, like *Chapman*, *Collignon* "should not be understood as extending the domain of Eighth [or Fourteenth] Amendment analysis beyond the bounds set by *Graham* and *Bell*."

Defendants' additional argument that *Collignon* "would have advised defendants that their conduct was lawful" (Defendants' Memo, p.58) is also incorrect. For one thing, the decision does not, as Defendants maintain, "specifically address[] an arrestee's right to mental health treatment." The parties did not argue that Jonathan Collignon was an arrestee, but rather a pretrial detainee, and therefore the court had no occasion to specifically address an *arrestee's* rights. Furthermore, the excerpt Defendants cite from 163 F.3d 992 must be considered in its context. The court was addressing an officer's alleged failure to provide a temporarily detained person who was not placed under arrest or being held in a jail or lockup with "access to medical personnel capable of assessing his known serious medical condition." Under those circumstances, the officer committed no due process violation. In our case, on the other hand, Ms. Eilman was arrested and held in custody not at one but at two separate police facilities, where she exhibited symptoms of her bipolar disorder. Unlike *Collignon*, she could not be immediately released to the custody of her parents, since they were two thousand miles away. Thus, Defendants' reliance on *Collignon* is misplaced.

Defendants also take refuge behind another purported ruling in *Collignon* whereby the court "noted that the jailers' conduct comported with due process in that they protected the arrestee from harm while in custody." (Defendants' Memo, p.58.) To the contrary, *Collignon* did not squarely determine an individual *jailer's* liability or lack thereof. Instead, the referenced portion of the decision addressed whether a county jail *psychiatrist* could be held liable under "the professional judgment standard". None of the present Defendants are psychiatrists whose professional therapeutic judgment is on the line. Thus, the *Collignon* opinion provides no relevant support for the Defendants' qualified immunity argument.

Defendants next draw the line between suicidal and non-suicidal arrestees for purposes of informing whether the relevant law was clearly established, declaring they are "aware of no case law finding liability for deliberate indifference to mental health needs of an arrestee who was not suicidal." (Defendants' Memo, pp. 58-59). For the reasons discussed at the outset of this section, Plaintiff need not, however, come forward with a case meeting that level of exactitude. Here, Defendants concede there are cases establishing the rights of non-suicidal inmates and detainees,[29] but claim that these cases "would not have put the reasonable person on notice of the rights of [a non-suicidal] arrestee." (Defendants' Memo, p.58.) Defendants overlook *Hall v. Ryan*, 957 F.2d 402 (7th Cir. 1992). Though *Hall* involves a pre-*Graham v. Connor* attempted suicide in a police lockup that the court consequently analyzed as a due process rather than a Fourth Amendment case,[30] the Seventh Circuit's language is nonetheless instructive: "It was well established in 1986 that police officers could not be deliberately indifferent to a detainee who is in need of medical attention because of a mental illness *or* who is a substantial suicide risk." 957 F.2d at 404-05 (emphasis added). By phrasing the basis for necessary care in the disjunctive, the court clearly signaled that a detainee *need not be suicidal* to have a right to mental health care while in custody, as Defendants now suggest. Since *Hall* was decided in 1992, a reasonable officer would have realized, as of May, 2006, that non-suicidal arrestees in need of medical care, as well as suicidal arrestees, were entitled to constitutional protection.

Defendants next urge that it is incumbent upon Plaintiff to demonstrate clearly established law addressing "how defendants should resolve the conflict between Eilman's right to medical care and her other rights."[31] (Defendants' Memo, p. 49). Based on that purported conflict, Defendants see a need to balance interests, in which case, they contend, "courts require a higher level of factual similarity for the law to be clearly established." *Id*. Defendants' contention is faulty for several reasons.

---

[29] Though Defendants characterize *Joseph v. Brierton* as a pretrial detainee case, the opinion describes the plaintiff's decedent as a prisoner who died while under the care of Stateville Prison's hospital unit, and analyzes his claim under the Eight Amendment, citing *Estelle v. Gamble*, 429 U.S. 97, 104, 97 S.Ct. 285, 50 L.Ed 2d 251 (1976). See *Joseph*, 739 F.2d at 1245-46.

[30] The plaintiff's decedent in *Hall* had not yet been taken before a court for a probable cause determination before he attempted suicide.

[31] Defendants' Memo points to other rights that "are fully addressed in Section I(E)(1) and I(E)(2) and incorporated herein." See Defendants' Memo, p. 59, n. 16. However, the Memo does not contain any Section I(E)(1) and I (E)(2). Plaintiff assumes Defendants meant to refer to I(D)(1) and I(D)(2), which mention Eilman's Fourth Amendment right not to be unreasonably detained, her right not to be involuntarily committed, and her right "not to …receive unwanted mental health treatment."

Defendants' argument proceeds from two erroneous premises. The first is that there is a conflict *among or between Ms. Eilman's rights*. There is no such legal conflict, however, since all of Ms. Eilman's in-custody claims share a common nucleus, namely her Fourth Amendment right to be free from unreasonable seizure. The second is that Ms. Eilman *did not consent to mental health treatment*. (Defendants' Memo, p.57.) As shown earlier in this Memorandum, the Defendants have no evidentiary basis for arguing that Ms. Eilman did not, consciously and knowingly, withhold her consent to treatment. It was never specifically or unambiguously offered to her.

As for "balancing interests," the cases cited by Defendants at page 59 do not reinforce their point since none of those cases involve, as Defendants appear to be suggesting, a perceived need to resolve conflicting interests *all on the Plaintiff's side of the case*. Nor do any of the cases impose a universal "balancing of interests" approach to be followed *every time a defendant invokes qualified immunity. Benson v. Allphin*, 786 F.2d 268 (7th Cir. 1986) and *Rackovich v. Wade, supra*, for example, both addressed a balancing test specific to cases involving First Amendment interests. Our case does not include such a claim. *Sherman v. Four County Counseling Center*, 987 F.2d 397 (7th Cir. 1993), did not impose any balancing test on a police officer's qualified immunity claim. Instead, the case addressed an assertion of qualified immunity by a private counseling center, not a police officer. Furthermore, the balancing at issue, once again, was not directed at supposedly conflicting rights on the plaintiff's side. If anything, the facts in *Sherman* signaled to the present Defendants that they would have had a basis for asserting qualified immunity *had they decided to provide Ms. Eilman with access to mental health care.*

### B. Defendant Heard had ample notice she could not affirmatively place Ms. Eilman into a position of danger and leave her to fend for herself.

Lastly, Defendant Heard invokes qualified immunity in response to Plaintiff's Fourteenth Amendment claim that the Defendant affirmatively placed Ms. Eilman in a position of danger she would not have otherwise faced. Heard contends that all she did was point or give directions, and that no court has ever found such conduct to create a danger. Heard's argument must be rejected for several reasons.

First, consistent with the case law discussed earlier in this section, the concept of "clearly established law" does not require Plaintiff to come forward with a case that necessarily involves the exacting level of factual specificity that Defendant Heard demands, i.e. "pointing or giving

directions." Second, the Defendant merely glosses over the facts and circumstances known to her ("Heard observed that Eilman was confused, and pointed in the direction of an exit . . .") without taking into account the complete factual record. See section I(A)(6), *supra*. Defendant Heard knew more about Ms. Eilman, her condition while in police custody, and the danger she faced (and toward which Heard directed her) upon her release than Defendants' argument lets on. Clearly, she was not simply "giving directions to a confused person."

Nonetheless, Defendant cites *Jackson v. City of Joliet* as "the only case which involved giving any form of directions." (Defendants' Memo, p.61). *Jackson*, however, is inapposite. The officer in that case did not point or direct the plaintiff's decedents toward danger. The decedents had already crashed their vehicle before the officer arrived on the scene. Upon his arrival, he directed *other traffic away from the scene*, rather than pointing the decedents toward danger. Here, on the other hand, Officer Heard did not play "traffic cop" *to someone else*.

The cases set forth at page 62 of Defendants' Memo do not involve an officer (or other state actor) affirmatively placing *the claimant* into danger. Thus the requisite affirmative act is absent when a state penal or mental health system paroles or otherwise releases from custody an arguably dangerous person who then proceeds to harm someone else (*Martinez, Bowers, Buchanan-Moore*), when the police fail to take action to investigate a reported threat (*Hernandez*), when a state school superintendent fails to place a special needs student in a residential facility offering a more secure environment (*Stevens*), when a school fails to allow a student re-entry into the school building after hours (*King*), when a county sheriff fails to revoke a prisoner's work-release status (*Sandage*), or when an undercover informant accompanies a subject under investigation to the scene of a crime (*Beard*).

*Wood v. Ostrander*, on the other hand, presents a prime example of actionable affirmative conduct, as this Court recognized in its November 7, 2008 Memorandum Opinion and Order. See Document 419 at pp. 21-22. The fact that the officer in *Wood* did not "give directions" to the plaintiff was not, as Defendants suggest, the key aspect of that case. Rather, as this Court and others have recognized, *Wood* teaches that so long as the officer takes some affirmative act to thrust a plaintiff into danger, that act could result in a constitutional violation

Interestingly, though Defendants push hard to distinguish *Wood*, they do not argue that it should be disregarded *because* it emanates from the Ninth, rather than the Seventh, Circuit. Even if Defendants had argued that position, it would not hold up. This Court may look to the

law of other circuits in determining whether a particular proposition is clearly established. See *Vodak v. City of Chicago*, 624 F. Supp. 2d 933, 954 (N.D. Ill. 2009). Besides, *Wood* itself relies heavily on prior Seventh Circuit law, namely *White v. Rochford*, *Jackson v. City of Joliet*, and *Bowers v. DeVito*. Therefore, in relying on *Wood*, this Court would also rely upon established Seventh Circuit law.

Finally, two pre-2006 district court decisions, *Riordan v. City of Joliet*, *supra*, and *McLin v. City of Chicago*, 742 F. Supp. 994 (N.D. Ill. 1990), reinforce the clearly established principle emanating from *Wood* and the cases cited therein. The Court may certainly take these decisions into account. See *Quade v. Kaplan*, 2008 WL 905187 (N.D. Ill.) at *10, citing *Donovan v. City of Milwaukee*, 17 F.3d 944, 947 (7th Cir. 1994) and *Jacobs v. City of Chicago*, 215 F. 3d 758, 767 (7th Cir. 2000).

In *Riordan*, District Judge Shadur ruled: "[The] Officers should have realized that leaving Riordan in an incapacitated state [highly intoxicated] in a dangerous situation [inadequately dressed for sub-zero wind chill weather] would deprive him of his liberty interest in his own personal safety." 3 F.Supp.2d at 898. Thus, *Riordan* informed Officer Heard that she could not, figuratively speaking, leave Christina Eilman out in the cold. In *McLin*, the court allowed the plaintiff's civil rights action to proceed against the City after two Caucasian officers abandoned two young African American men in a racially hostile neighborhood, and thereby thrust them into a perilous situation. Officer Heard would be somewhat hard pressed to deny reasonable notice based on *McLin* since the case involved members of her own department, and the events took place in close proximity to the district station house out of which she worked.

## V.     **CONCLUSION**

For the foregoing reasons, and based upon the authorities cited, Plaintiff respectfully requests that Defendants' Motion for Summary Judgment be denied in its entirety.

Respectfully submitted,

KATHLEEN PAINE, as Guardian of the Estate of
CHRISTINA ROSE EILMAN, a Disabled Person

By:/s/ Jeffrey Singer
      One of Her Attorneys

Jeffrey Singer, Esq. (ARDC #02620510)
Misty R. Martin, Esq. (ARDC #6284999)
Mitchell P. Morinec, Esq. (ARDC #6290282)
Kimberly Kayiwa Esq. (ARDC# 6274510)
Segal McCambridge Singer & Mahoney, Ltd.
233 S. Wacker Drive - Suite 5500
Chicago, Illinois 60606
(312) 645-7800
#1457485.1

69

## <u>CERTIFICATE OF SERVICE</u>

I, the undersigned, being first duly sworn on oath, depose and state that a copy(ies) of PLAINTIFF'S BRIEF IN OPPOSITION TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT ON § 1983 CLAIMS was served on the party(ies) via the Court's electronic filing system on this 16th day of November, 2009.

/s/ Jeffrey Singer
Attorney for Plaintiff