IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

KATHLEEN PAINE, as Guardian of the )
Estate of CHRISTINA ROSE EILMAN, )
a Disabled Person, )
                                )    Case No. 06 C 3173
           Plaintiff, )
                                )    Judge Virginia M. Kendall
    v. )
                                )
OFFICER JEFFREY JOHNSON, OFFICER )
RICHARD CASON, OFFICER ROSENDO )
MORENO, LIEUTENANT CARSON EARNEST, )
SERGEANT DAVID BERGLIND, )
DETENTION AIDE SHARON STOKES, )
OFFICER TERESA WILLIAMS, DETENTION )
AIDE CYNTHIA HUDSON, DETENTION AIDE )
CATONIA QUINN, OFFICER DEBORAH )
MABERY, OFFICER PAMELA SMITH, )
OFFICER BENITA MILLER, OFFICER )
PAULINE HEARD, and CITY OF CHICAGO, )
a municipal corporation, )
                                )
          Defendants. )

## MEMORANDUM OPINION AND ORDER

Plaintiff Kathleen Paine ("Paine"), as Guardian of the Estate of Christina Rose Eilman ("Eilman"), filed this suit against various members of the Chicago Police Department and the City of Chicago (collectively "Defendants"), alleging civil rights violations in connection with Eilman's arrest and subsequent release from the Second District women's lockup without providing her access to mental health treatment. Pursuant to Federal Rule of Civil Procedure 56 and Local Rule 56.1, Defendants have filed a Motion for Summary Judgment on Counts II, VI, X, XV, XVIII, XX, XXII, XXIV, XXVI, XXVIII, XXXIII (claims against Defendants Cason, Moreno, Earnest, Berglind, Stokes, Williams, Hudson, Quinn, Mabery, Smith and Heard for failure to provide medical care), XXXIV (claim against Heard for failure to respond after creating increased risk) and XXXVIII

(*Monell* claim against the City of Chicago) of Paine's Third Amended Complaint.[1]  For the reasons

stated herein, Paine's Motion for Summary Judgment is granted as to Count XXVI and denied as

to Counts II, VI, X, XV, XVIII, XX, XXII, XXIV, XXVIII, XXXIII, XXXIV and XXXVIII.

## STATEMENT OF FACTS[2]

On May 5, 2006, Eilman, a twenty-one year old college student from Los Angeles, California

traveled to Chicago, Illinois.  (Def. 56.1 Reply ¶¶ 10, 12, 13.)  On May 8, 2006, less than five hours

after being released from the Second District women's lock-up, Eilman was found, wearing nothing

but her bra and panties, lying on the ground outside of the Robert Taylor public housing building

after having been raped.  (Def. 56.1 Reply ¶ 15; Pl. 56.1 Resp. ¶¶ 357, 361.)  She had fallen from

a seventh floor apartment window.  (Def. 56.1 Reply ¶ 15; Pl. 56.1 Resp. ¶¶ 357, 361.)  Remarkably,

Eilman survived the fall; however, she suffered sever injures including brain damage and spine

damage.  (Def. 56.1 Resp. ¶ 16.)  Prior to the fall, Eilman suffered from bipolar disorder, which

tended to be episodic, and often severe enough to require hospitalization.  (Def. 56.1 Reply ¶ 10, 24,

25.)  One year prior to her travel to Chicago, Eilman was injured in a one-car accident in California.

---

[1] Defendants have also filed a Motion for Summary Judgment on Paine's ADA Claim, Count XXXIX of her Complaint; however, the Court addresses that motion in a separate Memorandum Opinion.

[2] Throughout this Opinion, the Court references the Parties' Local Rule 56.1 Statements of Undisputed Material Facts as follows: citations to Plaintiff's Response to Defendants' Statement of Facts have been abbreviated to "Pl. 56.1 Resp. ¶ __." ; citations to Defendants' Reply to Paine's Statement of Additional Material Facts have been abbreviated to "Def. 56.1 Reply ¶ __."

As an initial matter, the Court notes that all facts relying upon the text of the Chicago Police Department's General Orders, policies, and regulations, or detailing Defendants' compliance or lack of compliance with such orders, policies or regulations, are inadmissible and have been stricken because a violation of police orders, practices or regulations is immaterial as to the question of whether a violation of the federal constitution has been established.  *See Thompson v. City of Chicago*, 472 F.3d 444, 455 (7th Cir 2006); *Scott v. Edinburg*, 346 F.3d 752, 760 (7th Cir. 2003); *Pasiewick v. Lake County Forest Preserve Dist.*, 270 F.3d 520, 526 (7th Cir. 2001); *Stoller v. Moore*, 84 F.3d 964, 969 (7th Cir. 1996).  Such internal policies and procedures are deemed too variable to constitute an effective measure of whether the Defendants' conduct was objectively reasonable under the Fourth Amendment. *See Whren v. United States*, 517 U.S. 806, 815 (1996); *Thompson*, 472 F.3d at 455.

At that time, she displayed bizarre behavior, such as slurred speech and scattered thought process, and she physically attacked a friend. (Def. 56.1 Reply ¶ 19.) As a result, Eilman was involuntarily committed to a mental facility in California, where she remained for 37 days to treat her disorder. (Def. 56.1 Reply ¶¶ 10, 21.)[3]

## I.      May 6th, 2006–Midway Airport Frontier Airlines Ticket Counter

On May 6, 2006, Eilman went to Midway Airport in an effort return home to California. (Def. 56.1 Reply ¶ 39.) It is unknown why Eilman was in Chicago because she is the only one with that knowledge and she has little recollection of the events. (Pl. 56.1 Resp. ¶ 22.) What is known, is that, at the airport, she became involved in a verbal altercation with a Frontier Airlines ticket counter agent who told her that she did not have a reservation with the airline. (Def. 56.1 Reply ¶ 44.) Upon hearing this, Eilman appeared confused, began to swear at the Frontier Airlines' employees, tore up a $20 bill and threw it in the trash, and took her boots off and placed them on the ticket counter. (Def. 56.1 Reply ¶¶ 45, 46, 50.) Frontier Airlines' employees described her behavior as "crazy," "erratic," "forceful," "loud,"and "confrontational," and stated that she appeared to be having "mood swings" and to be "on drugs." (Def. 56.1 Reply ¶¶ 48, 49, 43.) Eilman left the airport that day without obtaining a flight to California. (Def. 56.1 Reply ¶ 37.)

## II.     May 7, 2006–Southwest Airlines Ticket Counter/Gate

The following day, on May 7, 2006, Eilman returned to Midway Airport wearing extremely short shorts, winter boots and a small top that showed her mid-section. (Def. 56.1 Resp. ¶ 42.) While at the Southwest Airlines ticket counter, Eilman became involved in another verbal altercation

---

[3] Defendants object that Eilman's medical records are not appropriate evidence to be considered on summary judgement; however, Defendants have stipulated to the accuracy and authenticity of the records and therefore, their objection is overruled.

that resulted in her taking off a boot and throwing it across the counter hitting a Frontier Airlines'

employee. (Def. 56.1 Reply ¶ 39.) Eilman continued to yell and scream for ten minutes and finally

screamed, "I want my fucking boot back." (Def. 56.1 Reply ¶ 39.) Eilman also approached an

infant, who was seated in his stroller, and began screaming "stop fucking crying." (Def. 56.1 Resp.

¶ 37.) The infant, however, was not crying or making any noise at all; rather, the infant was being

perfectly quiet at that time. (Def. 56.1 Resp. ¶ 37.) Aisha Miller ("Miller"), a Southwest customer

service agent, described Eilman's behavior as frightening and out of control. (Def. 56.1 Resp. ¶ 40.)

After Southwest personnel gave her a ticket to return to her home in California, Eilman

proceeded to the Southwest gating area where she began yelling at other passengers and airline

employees, using profanity, not using complete sentences and generally not making sense. (Def.

56.1 Resp. ¶ 38.) When she pet a blind man's guide dog, the man's caretaker asked her not to touch

the animal. (Def. 56.1 Resp. ¶ 52.) In response, Eilman became hostile and aggressive towards the

caretaker, yelling rap lyrics at him and screaming that the blind man had been exposed as a phony.

(Def. 56.1 Reply ¶¶ 52, 53.) At that point, Tessa Williams ("Williams"), a Southwest gate agent,

called the police. (Def. 56.1 Resp. ¶ 53.) Williams described Eilman's behavior as very "erratic,"

"bizarre," "wild" and "confrontational." (Def. 56.1 Reply ¶ 51.) Chicago Police Officers then

arrived on the scene and escorted Eilman out of the airport. (Def. 56.1 Reply ¶ 54.)

## III.    May 7th, 2006–Midway's CTA Station

At about 1:50 p.m., Midway Airport Chicago Police Department ("CPD") officers escorted

Eilman to Midway Airport's Chicago Transit Authority ("CTA") train and bus station. (Def. 56.1

Reply ¶¶ 54, 85.) While at the CTA station, Eilman created another disturbance, which CTA

customer service agents Velma Thompson ("Thompson") and Sharon Lewis ("Lewis") observed.

4

(Pl. 56.1 Resp. ¶ 24; Def. 56.1 Reply ¶ 55.)  Eilman started rapping, taking her clothes off and dancing provocatively for different men at the station.  (Def. 56.1 Reply ¶ 56.)  Her behavior was erratic; one minute she was crying and upset, the next she was calm, and the next she was dancing and singing.  (Def. 56.1 Reply ¶ 55.)  At one point, Lewis approached her and asked her to stop dancing, but Eilman refused.  (Def. 56.1 Reply ¶¶ 59, 55.)

Defendant Chicago Police Officers Richard Cason ("Officer Cason") and Rosendo Moreno ("Officer Moreno") were working the third watch at the CTA station on May 7, 2006.  (Pl. 56.1 Resp. ¶ 23.)  Initially, Thomson told Officer Cason that Eilman was approaching CTA patrons and causing a disturbance and that she had been escorted to the CTA station by three CPD officers from Midway Airport.  (Def. 56.1 Reply ¶ 85.)  Officer Cason approached Eilman and observed her arguing with a man about smoking and the price of oil.  (Pl. 56.1 Resp. ¶¶ 25, 27, 30.)  Eilman was moving into the man's personal space, acting aggressive and generally causing an annoyance.  (Def. 56.1 Reply ¶ 76; Pl. 56.1 Resp. ¶¶ 25, 27, 30.)  Eilman told Officer Cason that she wanted to take a train back to Los Angeles, and he told her he would help her take a train to the Amtrak station, where she could then take a train home.  (Pl. 56.1 Resp. ¶ 26.)

At that point, while Eilman continued to argue with the man next to her, Officer Cason told Eilman that she would have to either get on a train or leave the CTA station.  (Pl. 56.1 Resp. ¶ 27.)  Officer Cason then observed an instant change in Eilman's behavior; she became aggressive and confrontational towards him.  (Def. 56.1 Reply ¶ 83; Pl. 56.1 Resp. ¶ 28.)  Specifically, Eilman began to approach Officer Cason while screaming obscenities at him and threatened to take Officer Cason's gun and shoot him with it.  (Pl. 56.1 Resp. ¶ 28; Def. 56.1 Reply ¶ 87.)  Eventually, Eilman left the station and walked outside.  (Pl. 56.1 Resp. ¶ 29.)

5

At approximately 2:00 p.m., while Eilman was still outside the CTA station, Officer Moreno arrived for work and observed Eilman chastising another man for smoking cigarettes. (Pl. 56.1 Resp. ¶ 31.) Specifically, she screamed, "if you light that fucking cigarette, I leave. I'll fucking leave." (Pl. 56.1 Resp. ¶ 31.) At the time, Eilman's face was two to three inches from the man's face, and she was shouting and talking very fast. (Def. 56.1 Reply ¶ 61.) Officer Moreno approached Eilman, identified himself as a police officer, and told her that she could not yell and swear on CTA property. (Pl. 56.1 Resp. ¶ 32.) Although Eilman temporarily listened to Officer Moreno, after about a minute she began arguing with the man again and twice attempted to remove his cigarette from his mouth. (Pl. 56.1 Resp. ¶¶ 33, 35.) Officer Moreno subsequently learned that Eilman did not know this man and had never met him before she began to scream at him. (Def. 56.1 Reply ¶ 99.) While outside the CTA station, Eilman also began rubbing her butt into the groin of two other men who she did not know. (Def. 56.1 Reply ¶ 59.)

After observing Eilman's behavior, Officer Moreno went to the CTA's police office to tell Officer Cason about the disturbance. (Def. 56.1 Reply ¶ 34.) Officers Moreno and Cason then both came back outside and observed Eilman now arguing with two men about smoking and yelling "don't you understand, we are running out of oil." (Def. 56.1 Reply ¶¶ 77, 78.) At this point, Officers Cason and Moreno placed Eilman under arrest and took her to the police office at the CTA station. (Pl. 56.1 Resp. ¶ 35.) On the way to the police office, Eilman began dragging her feet, kicking, howling, and screaming bizarre and vulgar statements at them. (Pl. 56.1 Resp. ¶ 36; Def. 56.1 Reply ¶ 79.) Specifically, Eilman repeatedly told Officers Cason and Moreno to "fist fuck" her, while spreading her legs open and humping the air. (Def. 56.1 Reply ¶ 79.) Despite this behavior, Officer Cason did not believe that Eilman was resisting arrest. (Pl. 56.1 Resp. ¶ 37.)

6

While in the CTA police office, Eilman continued to yell and scream, often about the price of oil, and warned Officers Cason and Moreno that the United States was too dependent on oil. (Pl. 56.1 Resp. ¶ 39, Def. 56.1 Reply ¶ 103.) Although Officers Cason and Moreno were able to calm Eilman down a bit by talking to her, (Pl. 56.1 Resp. ¶ 47), Officer Cason was so concerned about Eilman's behavior that he requested the immediate arrival of a squad car to take her to the police station located at 3515 West 63rd Street in Chicago ("Eighth District Station") to process her arrest, as opposed to waiting the typical hour it would take for a squadrol to arrive. (Pl. 56.1 Resp. ¶ 49; Def. 56.1 Reply ¶ 81.) Approximately ten minutes later, the police squadrol arrived at the CTA station. (Pl. 56.1 Resp. ¶ 48.) Officer Cason walked Eilman outside and put her in the back of the vehicle while she screamed obscenities at him. (Pl. 56.1 Resp. ¶ 48.)

During their encounter with Eilman at the CTA station, Officers Cason and Moreno observed Eilman's mood shift dramatically from sweet and calm to aggressive and confrontational. (Pl. 56.1 Resp. ¶ 38; Def. 56.1 Reply ¶¶ 83, 102.) Officer Cason thought that Eilman's mood swings were atypical and were unlike anything he had ever seen before. (Def. 56.1 Reply ¶ 82.) In fact, they were so distinctive that they made her stand out in his mind from the 4,000 to 5,000 other arrests he had made in his 35 years with the CPD. (Def. 56.1 Reply ¶ 82.) During his time with Eilman, Officer Cason never called the airport police to find out why she had been removed from the airport nor did he inquire about her behavior in the airport. (Def. 56.1 Reply ¶¶ 86, 97.) Officer Cason never recommended that Eilman be taken to a mental health facility for an evaluation. (Def. 56.1 Reply ¶¶ 86, 97.)

## IV.    May 7, 2006–Transport to the Eighth District Police Station

When Eilman entered the squadrol, another detainee, Beatrice Martinez ("Martinez"), was already inside. (Def. 56.1 Reply ¶ 63.) During the half hour they spent together, Martinez heard Eilman sing a number of songs, including a hip-hop song by the rapper Notorious B.I.G. (Def. 56.1 Reply ¶ 67.) Martinez also observed Eilman talk to herself, answer her own questions and speak extremely fast. (Def. 56.1 Reply ¶ 65.) Most of the time, Martinez could not understand Eilman because she was talking "nonsense" and "gibberish." (Def. 56.1 Reply ¶¶ 68, 69.) Based on her observations, Martinez knew that there "was something wrong" with Eilman. (Def. 56.1 Reply ¶¶ 64, 70, 75.)

## V.     May 7, 2006–Eighth District Station

When Eilman arrived at the Eighth District Station, Officer Cason handcuffed her to a ring in the holding area while he began to process her arrest. (Pl. 56.1 Resp. ¶ 49.) While handcuffed in the processing room, Officer Cason observed Eilman exhibit spontaneous screaming and yelling fits. (Pl. 56.1 Resp. ¶ 50; Def. 56.1 Reply ¶ 71.) Officer Moreno observed Eilman "acting crazy," standing up on the stool in the processing area, being loud and cussing. (Pl. 56.1 Resp. ¶ 35; Def. 56.1 Resp. ¶ 104.) Both Officers Cason and Moreno observed Eilman experiencing mood swings– she would act calm and then suddenly become abusive and start crying. (Pl. 56.1 Resp. ¶ 50, 53; Def. 56.1 Reply ¶¶ 72, 89, 51.) During processing, Eilman would provide answers that had nothing to do with the questions she was being asked; instead, she would talk about the price of oil, how she did not want to be under arrest, and how she wanted to be a schoolteacher. (Pl. 56.1 Resp. ¶ 51; Def. 56.1 Resp. ¶ 74.) Because of her behavior, Officer Cason began to think that Eilman was not a typical arrestee, but he did not believe she was a danger to herself or anyone else. (Pl. 56.1 Resp. ¶¶ 52, 56.) Both Officers Cason's and Moreno's initial impressions were that Eilman was on drugs.

(Pl. 56.1 Resp. ¶ 52.)  Yet, after taking a good look at her, Officer Cason concluded that she was "clean," meaning that she was not on drugs.  (Def. 56.1 Reply ¶ 84.)  Despite his observations, Officer Moreno never told anyone at the Eighth District, including any supervisor, that he thought Eilman was "acting crazy."  (Def. 56.1 Resp. ¶ 107.)  When asked why he did not, Officer Moreno could not provide an explanation for his failure to report Eilman's "crazy" behavior to a supervisor. (Def. 56.1 Resp. ¶ 107.)

When Officer Cason asked Officer Yvonne Delia ("Officer Delia")[4] to search Eilman, Eilman would not stop crying.  (Def. 56.1 Reply ¶ 90.)  Officer Delia found her difficult to understand because she would start "jabbering" and then begin singing songs.  (Def. 56.1 Reply ¶ 90.)  When asked by Delia if she knew why she was at the police station, Eilman answered that she did not know why and kept talking instead about how oil companies were ruining the country.  (Def. 56.1 Reply ¶ 90.)  Officer Delia described Eilman as more hysterical than a normal detainee.  (Def. 56.1 Reply ¶ 90.) When she was done searching her, Officer Delia told Officer Cason that Eilman was acting strangely and might need to go to the hospital.  (Def. 56.1 Reply ¶ 91.)  Officer Delia also suggested to Officer Cason that he talk to Lieutenant Carson Earnest ("Lt. Earnest"), the watch commander for the third watch at the Eight District Station on May 7, 2006, about Eilman's behavior.  (Pl. 56.1 Resp. ¶¶ 54, 55.)

Officer Cason suspected that Eilman might have a mental illness and wanted the opinion of a supervisor who had the authority to determine whether Eilman was within the Department guidelines for being arrested, so Officer Cason sought help from Lt. Earnest.  (Pl. 56.1 Resp. ¶¶ 57, 60; Def. 56.1 Reply ¶ 93.)  Lt. Earnest, as watch commander, was the person ultimately responsible

---

[4]  Officer Delia is not a defendant in this action.

9

for the safety and welfare of detainees. (Pl. 56.1 Resp. ¶¶ 57, 60.) Officer Cason informed Lt. Earnest that Eilman had been "acting goofy" while in custody and that she was an unusual arrestee. (Pl. 56.1 Resp. ¶ 55.) He also told Lt. Earnest that Eilman was having major mood swings and did not appear to be on drugs. (Def. 56.1 Reply ¶ 127.) Lt. Earnest asked Officer Cason if Eilman had hurt or threatened to hurt herself or anyone else. (Pl. 56.1 Resp. ¶¶ 56, 58.) Officer Cason told him that she had not. (Pl. 56.1 Resp. ¶¶ 56, 58.) Lt. Earnest could see Eilman sitting in an interview booth through the glass partition in his office and did not believe that she was behaving abnormally at that time. (Pl. 56.1 Resp. ¶ 59.) Eilman, however, was only in his field of vision for fifteen minutes, during which time Lt. Earnest was attending to other matters. (Pl. 56.1 Resp. ¶ 59.)

Initially, based on his discussion with Officer Cason, Lt. Earnest told him that he and Officer Moreno should put Eilman in a car and take her to the hospital; however, Officer Cason informed Lt. Earnest that they did not have a car available. (Def. 56.1 Resp. ¶ 106.) At some point, Officer Cason relayed his conversation with Lt. Earnest to Officer Moreno. (Def. 56.1 Resp. ¶ 106.) Lt. Earnest admits that if an individual needs to be taken to a mental health facility for an evaluation and the arresting officers do not have a squad car assigned to them, the watch commander has the responsibility to assign them another car. (Def. 56.1 Reply ¶ 185.) After learning that no car was available, Lt. Earnest asked Sergeant David Berglind ("Sgt. Berglind") to interview Eilman to determine whether she was in need of a mental health evaluation. (Pl. 56.1 Resp. ¶¶ 61, 62.) The purpose of the interview was for Sgt. Berglind to ascertain whether Eilman was aware of her surroundings and understood what was going on, and whether she was a threat to herself or others. (Pl. 56.1 Resp. ¶ 63.) Sgt. Berglind is not a medical professional, has no specialized training in the assessment of mental illness, and admits that in a "close call" the safer route would be to take an

10

individual to a designated mental health facility for an evaluation by a clinician, psychologist or psychiatrist. (Def. 56.1 Reply ¶¶ 109, 110.)

Prior to Eilman's interview, Officer Cason informed Sgt. Berglind of what had happened earlier that day and described Eilman's behavior throughout the day. (Pl. 56.1 Resp. ¶¶ 65, 67.) Officer Cason also told Sgt. Berglind that he was not sure if Eilman was intoxicated, using drugs or simply trying to give Officer Cason a hard time. (Pl. 56.1 Resp. ¶ 67.) For the duration of Sgt. Berglind's interview with Eilman, Officer Cason was present, Officer Moreno was not present and Officer Delia came in and out of the interview room. (Pl. 56.1 Resp. ¶ 68.) Eilman was calm when Sgt. Berglind first introduced himself to her; however, when the interview began Eilman became a little upset and then once again calmed down. (Pl. 56.1 Resp. ¶¶ 69, 70.) Although Officer Cason testified that Eilman appeared to be composing herself and talking sensibly during the interview, Sgt. Berglind testified that she was crying, discussing the United States's over-dependence on oil and singing rap lyrics. (Pl. 56.1 Resp. ¶¶ 71, 75; Def. 56.1 Reply ¶ 114.) At one point, Eilman invited Sgt. Berglind to visit her in Los Angeles. (Def. 56.1 Reply ¶ 114.)

Despite this behavior, Sgt. Berglind did not think that Eilman was intoxicated, high, or in any way unusual compared to other arrestees; Sgt. Berglind concluded that Eilman gave him no reason to believe she was a threat to herself or others. (Pl. 56.1 Resp. ¶¶ 83, 84.) During the interview, Eilman was able to answer some basic questions such as her name and where she was from. (Pl. 56.1 Resp. ¶ 72.) Eilman stated that she was feeling fine, was upset about being stranded in Chicago and was not under a doctor's care. (Pl. 56.1 Resp. ¶ 73.) Sgt. Berglind testified that in response to his question about whether Eilman knew why she was being arrested, she stated that she understood that she was misbehaving, was sorry and asked when and how she could be released.

11

(Pl. 56.1 Resp. ¶¶ 74, 78.)   Officer Cason, however, testified that Eilman stated she did not understand why she was being arrested, despite the fact that he had explained this to her four to six times earlier that day.  (Def. 56.1 Reply ¶ 92.)  Officer Delia also stated that Eilman did not know why she was arrested when Officer Delia searched her.  (Def. 56.1 Reply ¶ 90.)  At no point during the interview did Sgt. Berglind ask Eilman if she had been hospitalized for psychiatric or psychological problems, or if she took psychotropic medication. (Def. 56.1 Resp. ¶ 115.)  Eilman had been involuntarily committed one year earlier in Sacramento, California for 37 days where she was being treated for bipolar disorder and was taking psychotropic medications.  (Def. 56.1 Reply ¶¶ 10, 11, 18, 22.)

When Sgt. Berglind asked if she had any family that the police could contact, Eilman initially stated that she did not want him contacting anyone and refused to give him her parents' phone numbers. (Pl. 56.1 Resp. ¶ 80.)  Eventually, however, Officer Delia convinced Eilman to give her the phone numbers for her stepfather and her mother. (Pl. 56.1 Resp. ¶ 81.)  Officer Delia left the interview room twice to call Eilman's parents, leaving voice messages for each of them.  (Pl. 56.1 Resp. ¶ 81.) Sgt. Berglind did not attempt to contact Eilman's parents before or after the interview. (Def. 56.1 Resp. ¶ 116.) While outside, Officer Delia also searched Eilman's luggage and found two bottles of prescription drugs, neither of which Officer Delia recalled specifically. (Pl. 56.1 Resp. ¶ 82.)  Eilman told Officer Delia the medications were for her acne. (Pl. 56.1 Resp. ¶ 82.) The record does not reflect that the type of prescription medications was ever recorded.

After the interview, Sgt. Berglind did not arrange for Eilman's transfer to a mental health facility for evaluation or treatment.  Instead, he informed Lt. Earnest that Eilman posed no threat to herself or others, did not claim to have any medical problems, was not under a doctor's care, knew

who she was, where she was from, and why she had been arrested. (Pl. 56.1 Resp. ¶¶ 85, 86.) Lt. Earnest asked Sgt. Berglind if he thought everything was okay and Sgt. Berglind responded affirmatively. (Pl. 56.1 Resp. ¶ 86.) At that time, Sgt. Berglind's concern was processing Eilman in a timely manner, in accordance with Eilman's rights. (Pl. 56.1 Resp. ¶ 87.) After reporting to Lt. Earnest, Sgt. Berglind left the Eight District Station to resume his duties elsewhere. (Pl. 56.1 Resp. ¶ 88.)

Meanwhile, Eilman's stepfather, Richard Paine ("Mr. Paine") called Officer Delia back. (Pl. 56.1 Resp. ¶ 89.) Mr. Paine informed Officer Delia that his stepdaughter suffers from bipolar disorder and had been institutionalized for that disorder in the past. (Pl. 56.1 Resp. ¶ 89.) Officer Delia agrees that Eilman's stepfather called and that bipolar disorder was discussed but only to the extent that Mr. Paine stated that he *assumed* she suffered from it but had not been diagnosed with it. (Pl. 56.1 Resp. ¶ 89; Def. 56.1 Resp. ¶ 135.) Officer Delia informed Officer Cason and Lt. Earnest of her phone conversation with Mr. Paine, relayed to them that Eilman may have bipolar disorder and that her family in California was concerned about her mood swings and behavior. (Pl. 56.1 Resp. ¶¶ 89, 91; Def. 56.1 Reply ¶ 94.) Officer Delia, however, never told Sgt. Berglind about her conversation with Mr. Paine. (Pl. 56.1 Resp. ¶ 90.) Although Officer Delia informed Lt. Earnest, he disregarded the call and considered it unverifiable because Officer Delia did not answer when Lt. Earnest asked how she could be sure that the individual on the phone was in fact Eilman's stepfather. (Def. 56.1 Reply ¶ 132.) Eilman's stepfather did not call the station unsolicited; but rather, returned Officer Delia's call placed to him at his California phone number. (Pl. 56.1 Resp. ¶ 89.)

13

As Watch Commander of the Eighth District Station, Lt. Earnest had the authority to transfer Eilman to Mt. Sinai Hospital, the designated intake facility for mental health evaluations of persons in police custody at the Eighth District, which is located approximately seven miles from the station, for evaluation and treatment. (Def. 56.1 Reply ¶¶ 123, 180.) Lt. Earnest also had the authority not to charge Eilman because of her mental condition, and had exercised this authority in the past with another arrestee. (Def. 56.1 Resp. ¶¶ 123, 124.) Lt. Earnest admits that if an arrestee exhibits signs that she is suffering from a mental illness, that individual should be taken to a hospital as opposed to being placed in the lock-up. (Def. 56.1 Reply ¶ 182.)

Lt. Earnest, however, did not order that Eilman be transferred to a mental health facility and did not exercise his discretion not to charge her; instead, he ordered Officer Cason to continue processing Eilman's arrest. (Pl. 56.1 Resp. ¶ 92.) Once Lt. Earnest made the decision to continue with Eilman's arrest, there was nothing more that Officer Cason, Officer Moreno or Sgt. Berglind could have done because Lt. Earnest, as watch commander, made the final decisions. (Pl. 56.1 Resp. ¶ 93.)

Because the Eighth District Station did not have a female holding facility, Eilman was transferred to the station located at 5101 South Wentworth Avenue in Chicago ("Second District Station"), approximately five miles away. (Pl. 56.1 Resp. ¶¶ 79, 103.) Prior to that transfer, Officer Cason placed Eilman in a glass bullpen to await transport. (Pl. 56.1 Resp. ¶ 96.) During that time, Officer Cason observed Eilman continue to exhibit mood swings. (Def. 56.1 Reply ¶ 96.) She was very excitable, would get up then sit down, cried periodically, and her eyes were roaming all over the place. (Def. 56.1 Reply ¶¶ 95, 96; Pl. 56.1 Resp. ¶ 97.) Officer Cason did not go back to Lt. Earnest to report this behavior; he felt there was no need to report it because Eilman's mood swings

14

were the same as they had been the entire day and Lt. Earnest had already signed her arrest report. (Def. 56.1 Reply ¶ 96; Pl. 56.1 Resp. ¶ 97.) Occasionally, Officer Cason would ask Eilman if she was okay and would tell her that she was not alone, and when he did this, she would talk sensibly to him. (Pl. 56.1 Resp. ¶ 98.) At one point, Officer Moreno saw Eilman standing on the walled partition near the toilet; she was being loud and swearing. (Pl. 56.1 Resp. ¶ 100.) When Officer Moreno told Eilman to get down, she did. (Pl. 56.1 Resp. ¶ 102.) According to Officer Cason, there are many times when arrestees jump up and down and are loud. (Pl. 56.1 Resp. ¶ 97.)

**VI.     May 7, 2006-Second District Police Station, Third Watch (2:00-10:00p.m.)**

The Second District desk is typically staffed by a desk sergeant and three other officers. (Pl. 56.1 Resp. ¶ 104.) On May 7, 2006, during the third watch, which is from 2:00 p.m. to 10:00 p.m., Benita Miller (Sgt. Miller)[5], acting desk sergeant, Defendant Pamela Smith ("Officer Smith"), and Renee Sanders ("Officer Sanders")[6] worked the front desk. (Pl. 56.1 Resp. ¶¶ 105, 106, 109, 110, 152.) At the desk, all three officers and the sergeant are responsible for answering the phone, and officers who are near the desk will occasionally answer the phone as well. (Pl. 56.1 Resp. ¶¶ 106, 107.) The Second District, in particular, receives a high volume of phone calls because it is also home to the Area One Detective Division and two courthouses. (Pl. 56.1 Resp. ¶ 108.) On May 7, 2006, Eilman's mother, Kathline Paine ("Paine") called the Second District station at 6:49 p.m. and again at 10: 35 p.m. (Def. 56.1 Resp. ¶¶ 114, 392.) Both calls were made to the phone number corresponding to the front desk of the station house. (Def. 56.1 Resp. ¶ 392.) During the first call, Paine spoke to an African American female officer, but could not recall the name of the individual

---

[5] Sgt. Miller is no longer a defendant in this action because the Court previously dismissed her out of the case.

[6] Officer Sanders is not a defendant in this action.

she spoke with. (Pl. 56.1 Resp. ¶ 114.) During the call, Paine informed the officer that she was concerned because she believed Eilman had bipolar disorder and could be having a manic episode. (Pl. 56.1 Resp. ¶ 114.) Officer Smith, who was working the front desk at that time, does not recall receiving any phone calls from Paine or anyone else who was inquiring about Eilman. (Pl. 56.1 Resp. ¶ 113.) Defendant Officer Teresa Williams ("Officer Williams") served as the lock-up keeper for the Second District Station's female lock-up area during the third watch on May 7, 2006. (Def. 56.1 Reply. ¶ 195.) As lock-up keeper, Officer Williams had responsibility for processing and monitoring detainees in the female lock-up area. (Def. 56.1 Reply. ¶ 217.) Lock-up personnel sit outside of the lock-up when they are not processing an arrestee; however, they come and go and are not always sitting at their post. (Pl. 56.1 Resp. ¶ 150.)

Eilman arrived at the Second District lock-up at approximately 7:35 p.m. and Officer Williams processed her. (Pl. 56.1 Resp. ¶ 127; Def. 56.1 Reply. ¶ 195.) During intake, when Officer Williams asked Eilman questions, she would speak incessantly about things other than the information that Officer Williams requested. (Def. 56.1 Reply ¶ 196.) Eilman insisted that she was going home in a few hours and refused to answer Officer Williams' questions. (Pl. 56.1 Resp. ¶ 146; Def. 56.1 Reply. ¶¶ 197, 198.) Officer Williams learned some information from Eilman during the processing: Eilman told Officer Williams that she was from California, had no way of getting home, was wealthy, attended UCLA, and was a personal fitness instructor. (Pl. 56.1 Resp. ¶ 133.) When Officer Williams asked if she was sick, injured or in need of medical attention, Eilman replied, "[n]o, I just need a Pepsi." (Pl. 56.1 Resp. ¶ 131.) When Officer Williams asked Eilman if she had been drinking or doing drugs, Eilman replied that she had been drinking even though she had been in police custody for nearly five hours at this point. (Pl. 56.1 Resp. ¶ 132.) Officer Williams

16

thought Eilman was "arrogant" and "silly," but that her temperament appeared "even toned." (Pl. 56.1 Resp. ¶ 147.)

Defendant Detention Aide Sharon Stokes ("Detention Aide Stokes") and Johnnie Smith ("Detention Aide J. Smith")[7] also worked the female lock-up in the Second District Station during the third watch on May 7, 2006. (Pl. 56.1 Resp. ¶ 129; Def. 56.1 Reply. ¶ 211.) While Officer Williams was screening Eilman during intake, Detention Aide Stokes searched her and inventoried her personal property. (Def. 56.1 Reply. ¶ 211.)[8] The parties failed to place any information in their respective Rule 56 statements regarding the seizure of Eilman's personal property and where it was inventoried or held. Certain property referred to in various undisputed fact statements include a purse with medications, a plane ticket to California, and some type of luggage or bag. During the search, Eilman was rude and uncooperative and refused to answer any questions. (Def. 56.1 Reply. ¶ 212.) When Detention Aide Stokes informed Eilman that she could not go back into the cell block with her bikini on, because it had long strings on it, Eilman took it off and threw it on the table. (Def. 56.1 Reply. ¶ 213.) It was soiled with menstrual blood. (Def 56.1 Reply. ¶ 216.) Detention Aide Stokes asked Eilman if she wanted a sanitary pad, but Eilman refused. (Def. 56.1 Reply. ¶ 214.) When Eilman was told that she had to take out her tampon and replace it with a pad, Eilman refused to be fingerprinted or answer anymore questions. (Pl. 56.1 Resp. ¶¶ 138, 140.) Officer Williams asked Eilman if she was taking medication or had a history of medical or mental problems, but Eilman refused to answer. (Pl. 56.1 Resp. ¶ 139.) When Detention Aide Stokes informed Officer Williams that Eilman was carrying medication, Officer Williams asked her what it was for

---

[7] Detention Aide J.Smith is not a defendant in this action.

[8] Defendants did not submit any facts in their Rule 56.1 Statement as to what of Eilman's property was inventoried.

17

and Eilman again refused to answer. (Def. 56.1 Reply. ¶ 200, 207.) Eilman also refused to give Officer Williams any emergency contact information. (Pl. 56.1 Resp. ¶ 139.) Eilman's parents had already made contact with the Eighth District Station and had conveyed that she was bipolar to the police at that time.

At this point, Officer Williams told Detention Aide Stokes that Eilman appeared to be irrational and Detention Aide Stokes agreed. (Def. 56.1 Resp. ¶ 221.) While Officer Williams claims that "most people in the lock-up are irrational," Sergeant Miller, who also works at the Second District Station and who has been a police officer since 1986, testified that she has only deemed an arrestee to be irrational approximately six or more times. (Pl. 56.1 Resp. ¶ 144.) Despite her feeling that Eilman was acting irrational Officer Williams did not notify Sgt. Miller, the acting desk sergeant, or the watch commander of her concern, and neither Officer Williams nor Detention Aide Stokes recommended that Eilman be taken to St. Bernard Hospital for a mental health evaluation. (Pl. 56.1 Resp. ¶ 149; Def. 56.1 Reply. ¶ 197, 199.) St. Bernard Hospital is the designated mental health facility for the Second District and is located at 63rd and Harvard, in the Englewood neighborhood. (Pl. 56.1 Resp. ¶ 128.) It is approximately two miles from the Second District Station. (Def. 56.1 Reply ¶ 175.) Had Officer Williams informed Sgt. Miller or the watch commander of Eilman's behavior and recommended that she be taken for a mental health evaluation, she would have been taken for an evaluation. (Def. 56.1 Reply ¶ 208.) Instead, Officer Williams escorted Eilman to Cell 8, a cell usually reserved for uncooperative prisoners. (Def. 56.1 Reply ¶¶ 202, 203, 218.)

Martinez, an arrestee, who was transported from the Eighth District Station to the Second District lock-up shortly before Eilman arrived, was placed in Cell 7, next to Cell 8. (Def. 56.1 Reply

18

¶¶ 225, 226.) Martinez was held in the lock-up from 5:00 p.m. to 9:00 p.m. on May 7, 2006. (Pl. 56.1 Resp. ¶ 160.) While Detention Aides J. Smith and Stokes and Officer Williams testified that they did not hear Eilman yelling during the third watch on May 7, 2006, Martinez testified that while in her cell, she heard Eilman screaming and the guards yelling back at her to shut up. (Pl. 56.1 Resp. ¶ 157, 221; Def. 56.1 Reply ¶ 227.) Detention Aides J. Smith and Stokes and Officer Williams all deny that they told Eilman to shut up. (Pl. 56.1 Resp. ¶ 160.) While in her cell, Martinez yelled two or three times to the guards, one of which she believes was Officer Williams, that Eilman could not understand them because Eilman was "not all there" and suffered from bipolar disorder. (Def. 56.1 Reply ¶¶ 228, 232.) When Martinez saw Eilman being escorted to her cell she observed Eilman stop and point to her groin with her index finger. (Def. 56.1 Reply ¶ 229.) At this point, Eilman would not talk at all and was acting like a mute. (Def. 56.1 Reply ¶ 230.) While in their cells, Eilman and Martinez played thumb wars through the bars. (Pl. 56.1 Resp. ¶ 226.)

Tanya Hall ("Hall")[9] was placed in Cell 8 with Eilman. (Def. 56.1 Reply ¶ 233.) While Detention Aide J. Smith claims that the arrestees were relatively quiet in the lock-up, Hall testified that Eilman, while in her cell, became agitated, started shaking the bars and repeatedly jumped from the bench to the floor. (Pl. 56.1 Resp. ¶ 153; Def. 56.1 Reply ¶ 233.) At one point, when Eilman was standing in the cell, Officer Williams walked over to her and told her to sit down because she wasn't going anywhere. (Def. 56.1 Reply ¶ 206.) Eilman, however, refused to talk and would only communicate through the use of hand gestures. (Def. 56.1 Reply ¶ 234.) If Hall tried to talk to her, Eilman would place her hand over her mouth, put her index finger to her lips, indicating for Hall to

---

[9] Tanya Hall also goes by the name LaTanya Johnson. (Pl. 56.1 Resp. ¶ 152.)

be quiet, and would point to the ceiling as if to signal that someone was watching them. (Def. 56.1 Reply ¶ 234.) While sharing a cell with Eilman, Hall never heard her speak. (Pl. 56.1 Resp. ¶ 238.)

Detention Aide Stokes conducted several inspections of the female lock-up during the third watch. (Def. 56.1 Resp. ¶ 219.) During her inspections, Detention Aide Stokes observed Eilman standing on the bench in her cell and later holding hands with another detainee located in the adjacent cell while singing a song. (Def.56.1 Reply ¶ 219.) Officer Williams heard Eilman singing in her cell as well. (Pl. 56.1 Resp. ¶ 154.) Detention Aide Stokes testified that it is not unusual for detainees to "sometimes" hold hands between the cells. (Pl. 56.1 Resp. ¶ 156.) Despite the fact that her clothes were soiled with menstrual blood, at no time during Detention Aide Stokes' shift did Eilman ask her for a sanitary pad. (Def. 56.1 Reply ¶ 220.) Officer Williams testified that Eilman did not request medical care or complain of pain or discomfort and Detention Aides Stokes and J. Smith testified that Eilman did not ask to go to the hospital during the third watch on May 7, 2006. (Pl. 56.1 Resp. ¶¶ 159, 161.) Martinez, however, testified that Eilman's need for assistance was obvious. (Pl. 56.1 Resp. ¶ 161.) When her shift ended, Detention Aide Stokes did not notify the officers coming on duty for the first watch on May 8, 2006, that Eilman was exhibiting any abnormal behavior. (Def. 56.1 Reply ¶ 224.)

**VII.    May 7-8, 2006–Second District Police Station, First Watch (10:00 p.m-6:00 a.m.)**

On May 7, 2006 and May 8, 2006, Defendant Detention Aides Cynthia Hudson ("Detention Aide Hudson") and Catonia Quinn ("Detention Aide Quinn") worked the first watch at the Second District women's lock-up, replacing Detention Aide Stokes and Officer Williams. (Pl. 56.1 Resp. ¶¶ 163, 164; Def. 56.1 Resp. ¶ 247.) The first watch began at 10:00 p.m. on May 7, 2006 and lasted until 6:00 a.m. on May 8, 2006. (Pl. 56.1 Resp. ¶ 162.) During her shift, Detention Aide Quinn

20

conducted checks of the lock-up every fifteen minutes from 1:15 a.m. until 3:45 a.m. (Def. 56.1 Reply ¶ 248.) Detainees Gloria Range ("Range"), Natasha Washington ("Washington"), Senora Baker ("Baker") and Euraina Hawkins ("Hawkins") were all brought to the Second District lock-up during the first watch on May 8, 2006. (Pl. 56.1 Resp. ¶ 174.)

When Detention Aide Hudson arrived at the lock-up she learned that Eilman was a "refusal," which she understood to mean that Eilman did not want to be processed, fingerprinted or searched. (Pl. 56.1 Resp. ¶ 166.) When Detention Aide Hudson asked Eilman her name, Eilman would not respond. (Pl. 56.1 Resp. ¶ 167.) Detention Aide Hudson called Officer Williams to Eilman's cell and asked, "[w]hat's wrong with her? She's not talking," to which Officer Williams responded, "she's just being silly." (Def. 56.1 Reply ¶¶ 204, 205.) Later in her shift, Detention Aide Hudson approached Eilman and asked to fingerprint her; Eilman responded, "no." (Pl. 56.1 Resp. ¶ 169.) When Detention Aide Hudson offered Eilman a sandwich, Eilman took it and asked for another one, which Detention Aide Hudson gave her. (Pl. 56.1 Resp. ¶ 170.) Detention Aide Hudson claims that she had no further verbal interaction with Eilman during her shift; however, Hall, Eilman's cellmate, and Washington, another detainee, testified that Detention Aide Hudson had several other interactions with Eilman during her shift. (Pl. 56.1 Resp. ¶ 171.)

Washington, another arrestee, arrived at 10:15 p.m. on May 7, 2006 and was released at 9:54 a.m. on May 9, 2006. (Pl. 56.1 Resp. ¶ 259.) Shortly after her arrival, while being fingerprinted, Washington heard a woman screaming for the guards, saying she "wasn't supposed to be there" and asking for a sanitary napkin. (Pl. 56.1 Resp. ¶ 260; Def. 56.1 Reply ¶ 251.) Eventually, one of the guards, gave a napkin to a detainee who handed it to Eilman. (Def. 56.1 Reply ¶¶ 254, 287.) Washington was then taken to cell 7, which is next to the cell where Eilman was being housed. (Pl.

21

56.1 Resp. ¶ 261.) While in her cell, Washington heard the same voice that she had heard ask for a sanitary napkin scream intermittently from cell 8. (Pl. 56.1 Resp. ¶ 264.) She could also feel the impact of the cell wall being kicked and banged. (Def. 56.1 Reply ¶ 252.) Washington maintains that the voice she heard was Eilman's; however, she could not see into cell 8 from her cell. (Pl. 56.1 Resp. ¶¶ 262, 263; Def. 56.1 Resp. ¶ 253.) Washington heard a guard tell Eilman to "shut the fuck up," but she could not identify which guard was speaking. (Pl. 56.1 Resp. ¶ 265.) Washington heard Eilman screaming off and on until her release. (Def. 56.1 Resp. ¶¶ 255, 265.) Washington also heard other detainees screaming in the lock-up. (Pl. 56.1 Resp. ¶¶ 266, 267, 269.) At one point, Washington heard Detention Aide Hudson tell Eilman to calm down, sit down, and be quiet. (Pl. 56.1 Resp. ¶ 274.) At another point, Eilman and Washington began talking through their cells and Eilman told Washington that famous rap artists, including some that were dead, were going to come and rescue her. (Pl. 56.1 Resp. ¶¶ 276, 278; Def. 56.1 Reply ¶ 263.) After listening to Eilman talk, Washington thought that there was something wrong with her. (Def. 56.1 Resp. ¶ 264.) Washington never heard Eilman complain about heart problems or shortness of breath, or request medical attention. (Pl. 56.1 Resp. ¶ 274.)

On two separate occasions, Hall observed Eilman place her hand down her pants, stick her fingers in her vagina and smear her menstrual blood on the cell's wall and bench. (Pl. 56.1 Resp. ¶ 231; Def. 56.1 Reply ¶ 236.) Hall asked Eilman why she was doing that. (Def. 56.1 Reply ¶ 237.) Eilman would not respond. (Def. 56.1 Reply ¶ 237.) Moreover, despite the fact that her clothes were soiled with menstrual blood, Eilman did not ask anyone for a sanitary pad. (Def. 56.1 Reply ¶ 220.) Hall, however, called out to the detention aides to bring Eilman a sanitary pad, and Detention Aide Hudson responded by bringing one. (Def. 56.1 Reply ¶¶ 238, 239.) Hall testified

that Detention Aide Hudson "looked at [Eilman] crazy and walked away." (Pl. 56.1 Resp. ¶ 236.)
Hall was so disturbed by Eilman's behavior that she asked to be moved to a different cell. (Def.
56.1 Reply ¶ 240.) In response, Detention Aide Quinn removed her and transferred her to a different
cell. (Def. 56.1 Reply ¶¶ 241, 242.) Hall never heard Eilman request medical attention. (Pl. 56.1
Resp. ¶ 244.) Detention Aides J. Smith and Stokes and Officer Williams all claim that they never
heard anyone discuss Eilman smearing blood on the cell walls and bench. (Pl. 56.1 Resp. ¶ 158.)
Sgt. Miller testified that she does not think wiping menstrual blood on the wall of a cell indicates
that a detainee is a threat to herself or others. (Pl. 56.1 Resp. ¶ 233.)

Later on, Detention Aides Hudson and Quinn placed Hawkins, another detainee, in cell 8
with Eilman. (Def.. 56.1 Reply ¶¶ 257, 294, 295.) As Hawkins approached the cell, she could hear
Eilman pounding on the bars. (Def. 56.1 Reply ¶ 296.) Some of the other detainees were yelling
at Eilman because she was making so much noise. (Def. 56.1 Reply ¶ 297.) As Hawkins entered
the cell she saw blood and started screaming that she did not want to go in. (Def. 56.1 Reply ¶¶ 257,
298, 301.) It looked as though Eilman had taken her finger and wiped blood all over the cell with
it. (Def. 56.1 Reply ¶ 299.) Detention Aide Quinn responded to Hawkins by telling her, "[y]our
going in that cell. She is no crazier than you is," referring to Eilman. (Def. 56.1 Reply ¶ 301.)
Once inside the cell, Hawkins saw Eilman dance around, twirl in circles and stand on the bench
while waiving her arms, like she was trying to fly. (Def. 56.1 Reply ¶ 302.) Eilman stuck her hand
down her pants and into her vagina and pulled her hand out with blood on it. (Def. 56.1 Reply ¶
303.) Eilman continued to spin around and attempted to hug Hawkins with her bloody hands. (Def.
56.1 Reply ¶ 304.) Hawkins beat on the cell bars and yelled to Detention Aides Hudson and Quinn,
demanding to be taken out of the cell. (Def. 56.1 Reply ¶¶ 259, 260, 308.) Detention Aides Hudson

and Quinn came back to the cell three or four times to tell Hawkins to "shut up," and when Hawkins

told them there was something wrong with Eilman, they stated, "[s]he is no crazier than you." (Def.

56.1 Reply ¶¶ 305, 310.)

Detainee Washington testified that she heard Detention Aide Hudson become upset, raise

her voice, ask Eilman why she was spreading her blood on the cell and tell her that she would have

to clean the blood up herself. (Pl. 56.1 Resp. ¶ 171; Def. 56.1 Reply ¶ 258.) Despite the blood,

Detention Aides Hudson and Quinn left Hawkins in the cell with Eilman, where she continued to

protest. (Def. 56.1 Reply ¶¶ 308, 309.) Eilman did not say a word nearly the entire time that

Hawkins was in the cell with her; rather, she attempted to use sign language and bobbed her head.

(Def. 56.1 Reply ¶¶ 306, 307.)

When detainee Range arrived at the Second District she heard a young woman with long

blond hair screaming that she wanted to go to the hospital. (Def. 56.1 Resp. ¶¶ 279, 280, 283.) On

May 14, 2006, in a signed statement to Detectives from the CPD's Internal Affairs Division, Range

identified the screaming individual as Eilman. (Pl. 56.1 Resp. ¶ 255.) She also stated that Detention

Aides Hudson, Quinn and Officer Williams were all present in the lock-up when she was detained

with Eilman. (Def. 56.1 Reply ¶ 284.) Range recalled hearing Eilman screaming from her cell that

her chest was hurting and that she wanted to go to the hospital. (Def. 56.1 Reply ¶ 285.) Range then

heard Detention Aide Hudson say to Officer Williams, "[t]hat white girl is still acting crazy back

there and now she wants to go to the emergency room," and Officer Williams respond, "[a]in't

nothing wrong with her and she ain't going to the hospital and if she keeps on screaming we are

going to send her crazy ass to the crazy hospital, that's where the fuck she is going." (Def. 56.1

Reply ¶¶ 285, 286.) Range stated that Eilman continued to scream for a sanitary pad so Detention

Aide Hudson gave one to her to give to Eilman. (Def. 56.1 Reply ¶ 287.) A few minutes later, Range heard Eilman's cell mate, who she could not identify, screaming that Eilman was acting crazy, wiping her bloody pad on the walls and bars of the cell and taping the pad to the wall of the cell. (Def. 56.1 Reply ¶ 288.) Range stated that Detention Aides Hudson and Quinn walked back to Eilman's cell and stated, "[y]ou crazy white bitch, you nasty bitch get that nasty shit off my walls." (Def. 56.1 Reply ¶ 289.) After the bloody pad incident, Eilman continued to scream that she was having heart trouble. (Def. 56.1 Reply ¶ 291.)

In contrast to her IAD statement, during her deposition Range stated that she did not know who the individual was that was screaming, she could not identify any police personnel that were working the lock-up while she was there, and when she got to her cell she went to sleep and did not notice anything else about the woman who she had previously heard screaming. (Pl. 56.1 Resp. ¶ ¶ 255, 256, 257.)

Detainee Baker arrived at the Second District lock-up at about 11:00 p.m. on May 7, 2006, and was released the next morning at 5:15 a.m. (Pl. 56.1 Resp. ¶ 245.) While Baker was being fingerprinted she heard a "white girl" screaming that she wanted to go home and saying "violent" words. (Pl. 56.1 Resp. ¶ 246; Def. 56.1 Reply ¶ 272.) The guard who was fingerprinting Baker told the girl to "shut [her] ass up." (Pl. 56.1 Resp. ¶ 247.) Baker could not see the detainee who was screaming. (Pl. 56.1 Resp. ¶ 248.) Baker was taken to cell 4, where she continued to hear the "white girl" screaming. (Pl. 56.1 Resp. ¶ 250; Def. 56.1 Reply ¶ 274.) This time she was saying that she was bleeding and that she needed help. (Pl. 56.1 Resp. ¶ 250; Def. 56.1 Reply ¶ 274.) Baker heard the guards yell back to the girl and tell her to "shut the fuck up you white bitch" about four or five times. (Pl. 56.1 Resp. ¶ 252; Def. 56.1 Reply ¶ 275.) Baker also heard one of the guards

25

say, "[s]hut your white ass up. You got the blood all over the cell with your nasty ass." (Pl. 56.1 Resp. ¶ 251; Def. 56.1 Reply ¶ 276.) Baker could identify which guards she heard screaming. (Pl. 56.1 Resp. ¶ 253.) The "white girl" continued to yell for two to three hours; she was crying and sounded disturbed and upset. (Def. 56.1 Resp. ¶¶ 277, 278.)

Detention Aides Hudson and Quinn did not provide any of the officers arriving for the second watch with any information about Eilman's behavior during their shift, although they may have informed Officer Deborah Mabery, a lock-up officer reporting for the second watch on May 8, 2006, that Eilman had not been processed. (Def. 56.1 Resp. ¶¶ 246, 250.)

## VIII.    May 8, 2006– Second District Police Station, Second Watch (6:00 a.m.-2:00 p.m.)

On May 8, 2006, Defendant Officer Deborah Mabery ("Officer Mabery") and Jacqueline Roberson ("Officer Roberson")[10] worked the second watch in the Second District Station's female lock-up, relieving Detention Aides Hudson and Quinn. (Pl. 56.1 Resp. ¶ 182; Def. 56.1 Reply ¶ 314.) When she arrived for her shift, Officer Mabery was informed that Eilman had not been fingerprinted, and she conveyed this to Officer Roberson. (Pl. 56.1 Resp. ¶ 183; Def. 56.1 Reply ¶ 315.) Either Officer Mabery or Officer Roberson conducted cell checks every fifteen minutes during their shift. (Pl. 56.1 Resp. ¶ 184.) During her first cell check, Officer Mabery saw Eilman standing silently behind the bars of her cell and when she asked Eilman her name, she responded. (Def. 56.1 Reply ¶ 316.) Lt. Joseph Berry ("Lt. Berry"), the acting watch commander, was advised by various lock-up personnel that Eilman had refused to cooperate and may have been under the influence of drugs or alcohol. (Pl. 56.1 Resp. ¶ 181.) At 6:30 a.m., Lt. Berry inspected the lock-up with Officer Mabery and observed Eilman sitting on the bench in her cell, looking out. (Pl. 56.1

---

[10]  Officer Roberson is not a defendant in this action.

Resp. ¶ 179.)  Lt. Berry did not see any blood in her cell.  (Pl. 56.1 Resp. ¶ 180.)  Although Eilman

was being "verbal and loud," Officer Mabery claims that she did not observe anything unusual about

Eilman's behavior during her shift.  (Pl. 56.1 Resp. ¶¶ 186, 187.)  However, Tamalika Harris

("Harris"), who was arrested and brought to the Second District on the morning of May 8, 2006,

stated that Eilman was kicking the bars of her cell, yelling for help and saying that she had a heart

murmur and needed to go to the hospital.  (Pl. 56.1 Resp. ¶¶ 186, 299; Def. 56.1 Reply ¶ 325, 326.)

Officer Mabery denies that Eilman ever complained that she had a heart murmur or asked to go to

the hospital.  (Pl. 56.1 Resp. ¶¶ 198, 199, 201.)  Harris testified that after Eilman had been screaming

for thirty to forty-five minutes, Officer Mabery walked back to Eilman's cell stated, "Shut the fuck

up, there's nothing wrong with you."  (Pl. 56.1 Resp. ¶¶ 186, 310-11; Def. 56.1 Reply ¶¶ 327, 329.)

Officer Mabery claims that neither she nor Officer Roberson ever told Eilman to keep her voice

down.  (Pl. 56.1 Resp. ¶ 189.)  Harris was housed in Cell 1, which is in the row behind Cell 8, and

admits that she never saw Cell 8.  (Pl. 56.1 Resp. ¶ 303.)  Eilman was released from the lock-up at

6:37 or 6:30 pm., and her medical records do not reveal that she was ever diagnosed with a heart

murmur, which is a condition that can only be detected with the aid of a stethoscope.  (Pl. 56.1 Resp.

¶¶ 306-08.)  At one point, Officer Roberson did hear Eilman singing rap songs, and when she asked

her if she liked rap music and hanging out with black people Eilman responded, "yes."  (Pl. 56.1

Resp. ¶ 188.)

    At about 11:30 a.m. on May 8, 2006, Eilman was fingerprinted by Ricky Aldridge

("Aldridge").  (Pl. 56.1 Resp. ¶ 190.)  Aldridge recalls that Eilman was calm, friendly, very nice,

and very charming.  (Pl. 56.1 Resp. ¶ 191.)  While Eilman was being processed, she had a pleasant

conversation with Officer Mabery.  (Pl. 56.1 Resp. ¶ 192.)  When Officer Mabery was about to

photograph Eilman, Eilman struck a pose and put her hair up, but stopped when Officer Mabery told

her she could not take her picture like that. (Pl. 56.1 Resp. ¶ 193.) After she was processed, Eilman

asked for a sandwich, which Officer Roberson brought her. (Pl. 56.1 Resp. ¶ 194.) Eilman thanked

Officer Roberson for the sandwich and told her she was a "beautiful black nice officer." (Pl. 56.1

Resp. ¶ 194.)

At the end of Officer Mabery's shift, she did not provide the next shift's lock-up officers

with any information about Eilman or her behavior. (Def. 56.1 Reply ¶ 319.)

**IX.    May 8, 2006–Second District Police Station, Third Watch (2:00-10:00 p.m.)**

On May 8, 2006, Sgt. Miller worked the third watch at the Second District Station as the

acting desk sergeant from 2:00 p.m. to 10:00 p.m. (Pl. 56.1 Resp. ¶ 105.) Officers Smith, Suzette

Foster ("Officer Foster") and Anglette Ashford ("Officer Ashford"),[11] all African American

females, sat at the desk with Sgt. Miller. (Pl. 56.1 Resp. ¶¶ 111, 112.) The desk officers' duties

included fielding incoming telephone calls and preparing paperwork necessary to release persons

in custody. (Def. 56.1 Reply ¶ 363.) Sgt. Miller inspected the female lock-up at 2:15 p.m. and

observed Eilman sitting in her cell on the bench. (Pl. 56.1 Resp. ¶ 206.)

Also working the third watch as lock-up personnel were Officer Williams, the designated

booking officer, Detention Aide J. Smith and Pauline Heard ("Officer Heard"). (Pl. 56.1 Resp. ¶¶

105, 109; Def. 56.1 Reply ¶ 410.) J. Smith conducted sixteen cell checks during the third watch and

checked Eilman's cell off as "ok." (Pl. 56.1 Resp. ¶ 205.)

Officer Heard has worked at the Second District since she began her employment with the

CPD in 1998. (Def. 56.1 Reply ¶ 408.) When Officer Heard began her shift on May 8, 2006, she

---

[11]  Officers Foster and Ashford are not defendants in this action.

did not speak with any of the lock-up officers from the previous shift, and was not made aware that any female detainees had been uncooperative or created a disturbance. (Def. 56.1 Reply ¶ 409; Pl. 56.1 Resp. ¶ 214.) No one reported to Officer Heard that Paine had called to notify the officers that Eilman was bipolar or to express any concern about her mental health. (Pl. 56.1 Resp. ¶ 215.) Officer Heard did, however, read Eilman's Transportation Transmittal, which revealed Eilman's age and California residency. (Def. 56.1 Reply ¶ 412.) Officer Heard inspected the women's lock-up cells at approximately 4:30, 4:45 and 7:45 p.m., and first saw Eilman during her 4:30 p.m. check. (Def. 56.1 Reply ¶ 415, 416.) Eilman was standing near the bars of her cell, blinking. (Def. 56.1 Reply ¶ 416.) Officer Heard saw Eilman again when she performed her 4:45 p.m. cell check, and Eilman was silent at that time. (Def. 56.1 Reply ¶ 419.) Officer Heard did not observe Eilman crying, lying on the floor, singing, kicking or pulling her pants down. (Pl. 56.1 Resp. ¶ 209.) At some point while Officer Heard was sitting outside of lock-up, she heard Eilman repeatedly scream, "[b]itch feed me" for a period of thirty to forty minutes. (Def. 56.1 Reply ¶¶ 420, 421, 423.) Officer Heard did not feed Eilman because it was not the regularly scheduled meal time. (Def. 56.1 Reply ¶ 422; Pl. 56.1 Resp. ¶ 217.)

A woman named Corliss Holland ("Holland") was detained in a cell behind the row containing Cell 8 with an opening facing in the opposite direction from Cell 8 between 3:00 p.m. and 4:00 p.m. on May 8, 2006, and released at approximately 10:30 a.m. on May 9, 2006. (Def. 56.1 Reply ¶ 338; Pl. 56.1 Resp. ¶ 313-14.) Holland saw a young blond girl whom she identified as Eilman as she was escorted to her cell. (Pl. 56.1 Resp. ¶ 315.) Holland heard Eilman yell for the guards and ask to use the phone approximately four to six times; the guards did not respond. (Def. 56.1 Reply ¶¶ 339-40.) Officers Williams and Heard testify that Eilman did not request medical

attention from them (Pl. 56.1 Resp. ¶ 216), but Holland avers that Eilman started to scream that her

heart hurt and she could not breathe. (Def. 56.1 Reply ¶ 341.) For approximately 15 minutes,

Eilman complained that her heart hurt and banged on the bars of the lock-up. (Def. 56.1 Reply ¶

344.) Although Officers Williams, Heard, and Smith testify that they did not hear anyone yelling

or complaining during the third watch (Pl. 56.1 Resp. ¶ 213), Holland heard two guards joking about

Eilman's heart hurting as if they did not take her pleas seriously. (Def. 56.1 Reply ¶ 346.) Holland

also identified Officer Heard as being present while Eilman was screaming, but does not know what

contact Officer Heard had with Eilman, if any. (Def. 56.1 Reply ¶ 349; Pl. 56.1 Resp. ¶ 321.)

Furthermore, even though Officer Williams testifies that she had no contact with Eilman and did not

hear her voice until she retrieved her from her cell to be released (Pl. 56.1 Resp. ¶¶ 210-211),

Holland testified that she heard Eilman tell Officer Williams that she could not click her shoes

together because her heart hurt. (Def. 56.1 Reply ¶¶ 347-48.) At some point, Eilman was

transferred to a different cell and began to make noise and bang against the bars of the new cell.

(Def. 56.1 Reply ¶ 351.)

Another arrestee named Kimberly Warren ("Warren") was detained in the Second District

women's lock up between 12:50 p.m. on May 8, 2006 and 10:23 p.m. on May 9, 2006, in a cell

block behind Eilman's row with an opening facing the opposite direction. (Def. 56.1 Reply ¶ 353;

Pl. 56.1 Resp. ¶ 294-95.) Warren heard (but never saw) a woman, who she identified as both young

and Caucasian by the sound of her voice, yelling from another cell: "I'm sick," "help me" and "I

have to go to the hospital." (Def. 56.1 Reply ¶¶ 354, 356; Pl. 56.1 Resp. ¶ 363.) The yelling

persisted for one to two hours, and originated from a cell behind Warren. (Def. 56.1 Reply ¶ 297.)

Warren heard a fellow detainee ask why no one was helping the white girl, calling out "why don't

you help her" five to six times; Warren did not hear any of the guards offer to help. (Def. 56.1 Reply ¶¶ 357-58.) Warren did, however, hear a guard yell "shut the fuck up" and "shut the hell up," after which the white girl continued to yell and kick the bars of her cell. (Def. 56.1 Reply ¶¶ 359, 361.) At first, Warren thought the white girl was merely seeking attention, but later felt that she was in need of help. (Def. 56.1 Reply ¶ 362.)

In the meantime, Paine placed four calls to the station's front desk during the third watch on May 8, 2006: at 2:47 p.m., 3:15 p.m., 8:16 p.m. and 8:18 p.m. (Def. 56.1 Reply ¶ 392.) Paine made her first call at 2:47 p.m. (Pl. 56.1 Resp. ¶ 116.) During this call, Paine inquired into Eilman's release and did not mention Eilman's mental health issues. (Pl. 56.1 Resp. ¶¶ 116, 117.) Paine made her next call at 3:15 p.m. and claims she spoke with Officer Smith during this call. (Pl. 56.1 Resp. ¶ 122; Def. 56.1 Reply ¶ 376.) Officer Smith admits that early in her shift she received a phone call from Paine, who identified herself as Eilman's mother, and based on the fact that Paine knew Eilman's court date, Officer Smith believed that it was not Paine's first call to inquire about Eilman. (Def. 56.1 Reply ¶ 364, 365, 366.) During this call, Paine and Officer Smith discussed Eilman's release and Paine asked if she could pay Eilman's bond with a credit card because Eilman was from out of town and she was 2,000 miles away. (Def. 56.1 Reply ¶¶ 367, 368, 379.) Officer Smith then informed Paine that Eilman would be released on an I-bond. (Pl. 56.1 Resp. ¶¶ 117, 118; Def. 56.1 Reply ¶¶ 370, 371.)

Officer Smith claims that the conversation ended at this point; however, Paine maintains that she informed Officer Smith that she was concerned because she believed Eilman was bipolar and might be having an episode. (Pl. 56.1 Resp. ¶ 118; Def. 56.1 Reply ¶¶ 372, 380.) Paine did not ask that Eilman be brought to a hospital for a mental health evaluation, or inform anyone at the Second

31

District station that Eilman might hurt herself or was unable to provide for her basic needs. (Pl. 56.1 Resp. ¶ 125.)  Neither Kathleen nor Richard Paine made travel arrangements to go to Chicago between May 6 and May 8, 2006, asked friends in the Chicago area to pick up Eilman or provide her housing, or asked anyone in the Second District to keep Eilman there until they could send someone to help.  (Pl. 56.1 Resp. ¶¶ 126, 326-27.)  Paine, however, claims that she told Officer Smith that she did not want Eilman released on the streets of Chicago with no belongings and nowhere to go.  (Pl. 56.1 Resp. ¶ 125.)  In response, Officer Smith told Paine that Eilman would be free to go after she signed her I-bond because she was over the age of 21.  (Pl. 56.1 Resp. ¶ 118; Def. 56.1 Reply ¶ 381, 382.)

Officer Smith did not inform the lock-up personnel or anyone else at the Second District station about her phone call with Eilman's mother; she did not make a record of the conversation and she did not inquire into Eilman's behavior.  (Def. 56.1 Reply ¶¶ 373, 374.)  Officer Smith, however, admits that if she was told by a detainee's family member that the detainee suffered from a mental illness that would be cause for concern.  (Def. 56.1 Reply ¶ 386.)  After Officer Smith's conversation with Paine, she went back to her desk and wrote Eilman's I-bond.  (Def. 56.1 Reply ¶ 375.)  Officer Smith also prepared Eilman's "package" for Miller, the desk sergeant.  (Def. 56.1 Reply ¶ 389.) The "package" included: her arrest report, which included her California address and the property taken from her, which included prescription medication, a cell phone and wallet with cash; her mug shot; and her bond slip.  (Def. 56.1 Reply ¶ 389.)  Sgt. Miller signed Eilman's personal recognizance bond, which enabled Eilman to leave police custody on May 8, 2006.  (Def. 56.1 Reply ¶ 426.)

At approximately 6:30 p.m., Officer Williams walked up to Eilman's cell, where she was sitting alone and quietly on a bench, and released her. (Pl. 56.1 Resp. ¶ 322.) Officer Heard gave Eilman her property receipt and property bag, which contained a pair of sweat pants. (Def. 56.1 Reply ¶ 427, 428.) Officer Heard does not recall seeing any medication or anything but sweat pants in Eilman's property bag. (Def. 56.1 Reply ¶ 427.)[12] Sgt. Miller informed Eilman that she would need to appear in court because she was being released on bond; Eilman replied "okay," signed the bond, and asked if she was free to leave. (Pl. 56.1 Resp. ¶¶ 323-24.) Sgt. Miller said that Eilman was free to leave and then asked Eilman twice if she would like to make a phone call; Eilman responded "no." (Pl. 56.1 Resp. ¶¶ 324-25.) At approximately 6:37 p.m., Sgt. Miller and Officer Heard then escorted Eilman, undirected, out of a side door of the Second District Station leading into the east parking lot. (Def. 56.1 Reply ¶¶ 429, 430; Pl. Resp. ¶¶ 329, 336.) After the officers escorted Eilman out of the Second District Station, Eilman gestured towards Chicago Police Detective John Zalatoris ("Zalatoris") as if to bless him by making the Sign of the Cross. (Def. 56.1 Reply ¶¶ 441, 442.) Officer Heard did not see Eilman make the Sign of the Cross or say anything upon her release. (Pl. 56.1 Resp. ¶ 333.)

Officer Heard then walked out into the parking lot to get some air. (Pl. 56.1 Resp. ¶¶ 328.) She observed Eilman standing in the lot with a puzzled look on her face, so Officer Heard pointed her towards 51st Street, and Eilman began walking. (Def. 56.1 Reply ¶¶ 431, 432, 433, 434, 438, 439, 488; Pl. 56.1 Resp. ¶ 330) Eilman was not familiar with Chicago. (Def. 56.1 Reply ¶ 489.)

---

[12]The parties failed to provide facts in their Rule 56 statements regarding the exact property given to Eilman upon her release in spite of being given the opportunity to file 930 undisputed facts. When the Court asked the parties about the lack of information regarding the property, Defense counsel stated in open court that they "didn't see it relevant to the summary judgment analysis." The Court relies on the Rule 56 statements which provide solely that Eilman was released with a pair of sweatpants.

Officer Heard did not ask Eilman where she needed to go, where she lived or if she needed directions to public transportation; indeed, Officer Heard did not speak to her at all, despite the fact that Officer Heard was aware that two separate CTA trains stopped near the Second District station. (Def. 56.1 Reply ¶¶ 435, 436, 437; Pl. 56.1 Resp. ¶ 330.)

Eilman proceeded through the parking lot of the Second District Station and made her way to JJ Fish Restaurant, located two blocks east of Federal Street at 51st and Wabash, where she asked for a glass of water to take her medication–medication which was presumably not in her possession since it was seized and inventoried at the Second District Station and only sweatpants were returned to her. (Def. 56.1 Reply ¶¶ 439, 449, 490; Pl. 56.1 Resp. ¶ 337.) Tyrone Porter ("Porter"), an individual who worked at the restaurant, observed Eilman while she was there and thought that her "head just wasn't right," that "something was wrong with her" and that "she was not holding a full deck." (Def. 56.1 Reply ¶ 449.) Robert Kimble ("Robert"), and Timothy Kimble ("Timothy") also observed Eilman at JJ Fish Restaurant and described her behavior as crazy. (Def. 56.1 Reply ¶ 453, 453.) Specifically, Robert heard Eilman talking about superheros and saying that she was Superman or Wonder Woman. (Def. 56.1 Reply ¶ 453.) Timothy saw Eilman laugh for no reason, blank out mid conversation and then start talking about a different topic. (Def. 56.1 Reply ¶ 454.) Eilman purchased a bottle of water and stayed at JJ Fish Restaurant for approximately one hour and nine minutes. (Pl. 56.1 Resp. ¶ 338.)

At around 7:00 p.m., Eilman left JJ Fish Restaurant. (Def. 56.1 Reply ¶ 456; Pl 56.1 Resp. ¶ 339.) Outside JJ Fish, Eilman spoke with Robert Kimble and Floyd Fulton ("Fulton"). (Pl. 56.1 Resp. ¶ 340-41.) Eilman and another woman followed Robert and Fulton and proceeded west. (Pl. 56.1 Resp. ¶¶ 339, 342.) The other woman stopped at a bus stop, and Eilman followed Robert and

Fulton through a field and toward 5135 South Federal, where Eilman stood outside talking with 15 to 20 people for 10 to 15 minutes. (Pl. 56.1 Resp. ¶¶ 342-43.) The South Federal address is located one and a half blocks east of the Second District station. (Pl. 56.1 Resp. ¶ 334.) Outside 5135 South Federal, several individuals observed Eilman and thought that she was crazy and that there was something wrong with her. (Def. 56.1 Reply ¶¶ 450, 455.) Theodore Powell ("Powell"), for instance, observed Eilman calling others by various rap star names and telling people that her father worked for the government. (Def. 56.1 Reply ¶ 456.) Richard Paine, Eilman's stepfather, did not work for the government. (Def. 56.1 Reply ¶ 457.) Eilman told Jerrel Sanford ("Jerrel"), who she kept referring to as her boyfriend despite the fact that she had just met him, that her daddy dropped her off there to play basketball. (Def. 56.1 Reply ¶¶ 452.)

Eilman then accompanied several young men inside of the Federal Street property, known as the Robert Taylor Homes, to Apartment 702, which was a vacant apartment where people went to sleep or hang out and where a number of people had congregated that evening. (Pl. 56.1 Resp. ¶¶ 343, 348.) Residents of the neighborhood were surprised to see a white girl in the building. (Def. 56.1 Reply ¶ 459.) Some individuals even told Eilman that she should leave the building because it was not safe for her to be there. (Def. 56.1 Reply ¶ 459.) While inside the apartment, Eilman said that she needed to use a phone and asked someone to get one for her. (Pl. 56.1 Resp. ¶ 344.) After approximately 20 or 30 minutes, Eilman left with Jerrell and another individual named Osman to buy beers, and then went to Jerrell's grandmother's house. (Pl. 56.1 Resp. ¶ 345.) Jerrell told Eilman that she could stay in Apartment 702 after she told him she needed a place to stay. (Pl. 56.1 Resp. ¶ 346.) Eilman and Jerrell then went back to Apartment 702. (Pl. 56.1 Resp. ¶ 347.)

At some point, Marvin Powell, a.k.a. Red ("Red"), an individual who did not live at 5135 South Federal or in the community, entered Apartment 702, told everyone to leave, and said he was going to "show this bitch who the real killer is." (Pl. 56.1 Resp. ¶¶ 349-51.) Prior to that time, no one had harmed Eilman or tried to force her to do anything, and Eilman had not been the victim of a crime in the several hours preceding Red's entrance. (Pl. 56.1 Resp. ¶ 352, 362.)

When Eilman tried to leave the room, Red pulled her inside and locked the door. (Pl. 56.1 Resp. ¶ 353.) Eilman screamed, and Osman, Jerrell, Timothy and Robert banged and kicked the door trying to help her. (Pl. 56.1 Resp. ¶¶ 354-55.) Red and Eilman were alone in the room. (Pl. 56.1 Resp. ¶ 356.) Red then put a knife to Eilman's neck and told her he "would kill her" if she did not finish a sex act, and Eilman threatened to jump out of the window. (Pl. 56.1 Resp. ¶ 356; Def. 56.1 Reply ¶ 458.) Dr. J. Craig Nelson ("Nelson"), Paine's psychiatry expert, opines that Eilman recognized that Red was a threat to her, and knew enough to try to get away and call for help. (Pl. 56.1 Resp. ¶ 363.) Less than five hours after Eilman was released from the Second District lockup, the paramedics were dispatched to 5135 South Federal, where Eilman had fallen out of a seventh floor apartment window wearing nothing but a bra and panties. (Def. 56.1 Reply ¶ 15; Pl. 56.1 Resp. ¶¶ 357, 361**.**) It is unknown whether she fell, jumped or was thrown from the building.

Meanwhile, Paine was unaware that Eilman had been released and she continued to call the Second District station to find out what was happening with her daughter. (Def. 56.1 Reply ¶ 406.) Paine called at 8:16 p.m. and spoke with a "very rude" black female who hung up on her without providing any information about Eilman. (Def. 56.1 Reply ¶ 405.) Paine immediately called back at 8:18 p.m. and spoke with Officer Ashford, a different individual. (Def. 56.1 Reply ¶ 406.) Paine

stated that she was trying to find out when Eilman would be released, and Officer Ashford told her that Eilman had been released about an hour earlier.  (Def. 56.1 Reply ¶ 406.)

As a result of her fall, Eilman sustained severe bodily injuries, causing her to be hospitalized at Stroger Cook County Hospital until June 28, 2006, followed by three and a half months of therapy at the Rehabilitation Institute of Chicago and years of rehabilitation.  (Def. 56.1 Resp. ¶ 16.) Plaintiff's counsel has informed the Court that she is now able to walk with assistance and speak, although her brain functioning remains at that of a much younger child.  Eilman returned home to Los Angeles with her family in mid-October 2006.  (Def. 56.1 Resp. ¶ 16.)

## X.  Expert Testimony

The parties have submitted the testimony of 14 experts as part of their respective Rule 56 statements.  Six of these experts pertain solely to the damages aspect of the case and comprise those doctors and treaters who opine about the psychological and physical condition of Eilman, and other rehabilitation and occupational experts who opine about Eilman's furture.  Other experts include those who opine about bipolar disorder and offer expert opinion regarding whether Eilman was in fact suffering from bipolar disorder at the time of her arrest and subsequent injuries–a fact that is disputed by Defendants who assert that due to her previous head injury from the car accident, the doctors can not rule out the existence of an organic brain injury.  The majority of these experts are irrelevant to the issues before the court since the focus at this point in the review is whether the officers acted within Constitutional standards when they held Eilman and failed to transport her to a hospital for treatment.  A few experts, however, offer insight into this analysis: the police practices expert, James Kennedy, and the sociologist Robert Sampson, Dr. Joel Dvoskin, Paine's psychology expert and Dr. Craig Nelson, Paine's psychiatry expert.  Kennedy provides insights into the normal

procedures for dealing with mentally ill individuals when they are in police custody and Sampson

discusses the unique neighborhood within which Eilman was released after being in police custody.

**XI.     Causation**

The City's Police Practices Expert James Kennedy ("Kennedy") states that the majority of people are not happy about being in lock up, and that it is not unusual for people in lock-up to feign medical problems or ask to see a doctor to be taken away from lock-up.  (Pl. 56.1 Resp. ¶¶ 389-90.) Kennedy opines that a person in lock-up does not have to be taken for a mental health evaluation just because they have a possible history of bipolar disorder or make the statement "bitch, feed me." (Pl. 56.1 Resp. ¶¶ 218, 393.)  Kennedy testified that goes on to detail the procedures involved in seeking mental illness treatment for a detainee.  When the police transport an individual in their custody to the hospital for mental illness treatment, a police officer is assigned to guard the prisoner. (Pl. 56.1 Resp. ¶¶ 395-96, 398.)  At facilities like the triage center at St. Bernard Hospital, an emergency room physician and Community Mental Health Council make a judgment call as to whether that person should be admitted for mental health treatment.  (Pl. 56.1 Resp. ¶¶ 395-96, 398.) One way that medical health professionals measure the extent of psychiatric illness is through ability to control one's behavior. (Pl. 56.1 Resp. ¶ 394.)  If an arrestee requires psychiatric admission, he or she must be transferred to Cermak Hospital though a complicated, up to two day long process where the police appear in court to secure an order transferring custody to the Cook County Sheriff. (Pl. 56.1 Resp. ¶ 397.)  A decision to admit a patient into a psychiatric unit must be endorsed by a psychiatrist.  (Pl. 56.1 Resp. ¶ 399.)  If the patient is not deemed a risk to herself or others, he or she may be discharged back into police custody or admitted to the psyche unit based on another admission criteria.  (Pl. 56.1 Resp. ¶ 400.)

Paine's expert, Dr. Joel Dvoskin ("Dvoskin"), a psychologist, opines that if Eilman would have been taken to a mental health facility and evaluated, she probably would have been kept there, either voluntarily or involuntarily. (Def. 56.1 Reply ¶ 461; Pl. 56.1 Resp. ¶ 368.) If released, she would have been given some type of discharge plan to account for her personal safety, and someone would have likely come to get her and assist her in remaining safe. (Def. 56.1 Reply ¶ 461; Pl. 56.1 Resp. ¶ 368.) Kennedy disagrees with Dvoskin and opines that Eilman might have been released from an emergency room into the Robert Taylor Homes area, or, if she were brought to St. Bernard Hospital, released into a more dangerous area than Robert Taylor Homes. (Pl. 56.1 Resp. ¶¶ 364-65.) Dvoskin acknowledges that if not involuntarily committed, Eilman would have been released and free to go out in the neighborhood. (Pl. 56.1 Resp. ¶¶ 376.)

Dvoskin further opines that in determining whether to involuntarily commit Eilman, mental health professionals would likely try to persuade her to agree to treatment, observe her over time, talk to her family, and try to get a broad perspective as to her behaviors. (Pl. 56.1 Resp. ¶¶ 376-77.) Dvoskin would expect the hospital to make an effort to talk to Eilman about where she would go, contact her parents, and arrange for her to leave in a safe manner. (Pl. 56.1 Resp. ¶ 378.) Dvoskin opines that if the hospital had been fully informed of her behavior the previous two days, it would have involuntarily committed her as a danger to herself, even though she never showed signs of being suicidal. (Def. 56.1 Reply ¶¶ 463, 465, 467; Pl. 56.1 ¶¶ 369, 375.) Dr. J. Craig Nelson ("Nelson"), Paine's psychiatry expert, concurs that Eilman would have met the criteria for involuntary admission at a mental facility because her behavior demonstrated that she was unable to provide for her own basic needs and unable to protect herself from serious harm. (Def. 56.1 Reply ¶ 462.) Indeed, her symptoms were provocative and put her in harm's way. (Def. 56.1 Reply

¶ 462.)        Turning to the actual events that unfolded, Dvoskin opines that during and following her detention, Eilman was in florid psychosis and experiencing a severe manic episode. (Pl. 56.1 Resp. ¶ 372.)  Nelson concurs that Eilman suffered from bipolar disorder and was in the middle of a manic episode when she interacted with police in May 2006, and further opines that her abnormal behaviors warranted psychiatric evaluation and treatment. (Pl. 56.1 Resp. ¶ 380.)  Dvoskin further states that her behavior was suggestive of the use of stimulants like methamphetamine, and that without collateral information, the distinction between drug use and manic disorder is a difficult one to make.  (Pl. 56.1 Resp. ¶ 374.)  Although Dvoskin opines that Eilman's psychiatric condition was not getting better and not getting worse in May 2006, Nelson disagrees and testified that her psychiatric condition continued to worsen from the time her mania began in March and April 2006 through May 7, 2006. (Pl. 56.1 Resp. ¶¶ 371.)

Treatment of mania  takes somewhere between 7 and 20 days, as a general matter.  (Pl. 56.1 Resp. ¶ 381.)  During an involuntary admission to Sierra Vista Hospital in 2005, for instance, Eilman was diagnosed with and received medication for bipolar disorder, and over the last 13 days of her hospitalization, her condition improved. (Pl. 56.1 Resp. ¶ 383.)  After that hospitalization, Eilman was prescribed medication for bipolar disorder and for the treatment of manic episodes, which she did not take between the first week after she was released from Sierra Vista in March of 2005 through the events in Chicago.  (Pl. 56.1 Resp. ¶ 381.)

While in Chicago, Eilman was jovial and in an elevated mood at times, showing an independent streak and ability to fare for herself.  (Pl. 56.1 Resp. ¶¶ 385-86.)  Although Dvoskin admits that there were times during her detention when Eilman didn't demonstrate characteristics of mental illness, he believes that Eilman's behavior supports the conclusion that she was a danger

41

to herself while she was in Chicago. (Def. 56.1 Reply ¶ 466; Pl. 56.1 Resp. ¶¶ 372, 379.) Dvoskin opines that Eilman's mental illness "might have affected her choices, for example, she might have complied with his–she might have been raped and not thrown out or jumped out the window." (Pl. 56.1 Resp. ¶ 370.) Sgt. Berglind admitted that a young woman, unfamiliar with Chicago, walking in the Robert Taylor Homes is exposed to certain risks or dangers, which would be heightened if the woman was in the throes of a manic episode. (Def. 56.1 Reply ¶ 468.) Although Eilman put herself into the situation, Red's criminal act put her in the room, and whether someone is mentally ill is not of consequence when someone wants to intentionally harm her. (Pl. 56.1 Resp. ¶ 360, 392.)

## XII.  Dr. Sampson/Washington Park and Fuller Park Communities

The Second District Police Station is located at 51st and Wentworth and is situated in the Fuller Park community. (Def. 56.1 Reply ¶ 480.) 5135 South Federal Street in Chicago is located in the Washington Park community. (Def. 56.1 Reply ¶ 476.) Dr. Robert Sampson ("Sampson"), a sociologist who studies crime rates, opines that in the year 2006, when Eilman was victimized, Fuller Park and Washington Park (the community areas where Eilman was released) had the highest rates, per 100,000 population, of criminal sexual assault of all community areas in Chicago. (Def. 56.1 Reply ¶¶ 469, 474, 496, 521.) These community areas had a nearly 15 times higher risk of criminal sexual assault when compared with the community area where Eilman was arrested. (Def. 56.1 Reply ¶¶ 499, 500.) Although one can be a victim of crime in any neighborhood, these communities are "high crime" neighborhoods relative to other neighborhoods in Chicago. (Def. 56.1 Reply ¶ 520; Pl 56.1 Resp. ¶¶ 333, 366.) The crime statistics for these areas, as well as all areas in Chicago, are available to Chicago Police Officers, as well as to the general public. (Def. 56.1 Reply ¶¶ 477, 478, 529.)

Sampson further opines that in 2006, the population in the Fuller Park and Washington Park communities was over 90% African American, and because Eilman was a white female in a predominantly black, poor neighborhood she had a much higher risk of predatory victimization. (Def. 56.1 Reply ¶¶ 505, 513, 523.) The fact that Eilman was alone, unfamiliar with her surroundings, and appeared vulnerable as a result of lack of mental alertness, also put her in a manifestly foreseeable increased risk of violent crime victimization. (Def. 56.1 Reply ¶¶ 511, 512, 514, 523.) Sampson opines that it was Eilman's unusual behavior prior to her release from the Second District Station that made her particularly more at risk and more of a suitable target for violent crime, especially in light of the fact that she was released at night. (Def. 56.1 Reply ¶¶ 522, 524.)

### STANDARD OF REVIEW

Summary judgment is proper when "the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). In determining whether a genuine issue of fact exists, the Court must view the evidence and draw all reasonable inferences in favor of the party opposing the motion. *See Bennington v. Caterpillar Inc.*, 275 F.3d 654, 658 (7th Cir. 2001); *see also Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986). However, the Court will "limit its analysis of the facts on summary judgment to evidence that is properly identified and supported in the parties' [Local Rule 56.1] statement." *Bordelon v. Chicago Sch. Reform Bd. of Trustees*, 233 F.3d 524, 529 (7th Cir. 2000). Where a proposed statement of fact is supported by the record and not adequately rebutted, the court will accept that statement as true for purposes of summary judgment. An adequate rebuttal requires a citation to specific support in the

record; an unsubstantiated denial is not adequate.  *See Albiero v. City of Kankakee*, 246 F.3d 927, 933 (7th Cir. 2001); *Drake v. Minnesota Mining & Mfg. Co.*, 134 F.3d 878, 887 (7th Cir. 1998) ("'Rule 56 demands something more specific than the bald assertion of the general truth of a particular matter[;] rather it requires affidavits that cite specific concrete facts establishing the existence of the truth of the matter asserted.'").

## DISCUSSION

### I.  Motion to Strike

As an initial matter, Defendants move to strike portions of Paine's Rule 56.1 submissions for non-compliance with L.R. 56.1.  Specifically, Defendants move to strike various portions of Paine's Response to its Rule 56.1 Statement of Material Facts.  In support of its motion, Defendants assert that Paine's responses are neither "concise" nor "short," contain inappropriate legal argument, include additional facts, rely on inadmissible evidence and fail to directly admit or deny the statements of fact.  (*See* R.581, Def. Mot. Strike.)

Local Rule 56.1 allows a party opposing summary judgment to file a concise response to the movant's Statement of Facts including, in the case of disagreement, specific references to materials relied upon.  *See* L.R. 56.1(b)(3)(B) & ©.  The requirements for responses under Local Rule 56.1 are "not satisfied by evasive denials that do not fairly meet the substance of the material facts asserted." *Bordelon v. Chicago School Reform Bd. of Trustees*, 233 F.3d 524, 528 (7th Cir. 2000). Nonconformity with the Local Rules and the standing orders of the Court is not without consequence.  *See e.g. Green v. Harrah's Illinois Corp.*, No. 03 C 2203, 2004 WL 1102272, at *8 (N.D. Ill. Apr. 29, 2004) (St. Eve, J.) (refusing to consider statements of fact in excess of the number permitted by Local Rule 56.1).  The Seventh Circuit has "repeatedly held that a district court is

entitled to expect strict compliance with Rule 56.1." *Ammons v. Aramark Uniform Servs., Inc.*, 368 F.3d 809, 817 (7th Cir. 2004) (citing *Bordelon*, 233 F.3d at 527) ("Given their importance, we have consistently and repeatedly upheld a district court's discretion to require strict compliance with its local rules governing summary judgment."). "A district court does not abuse its discretion, when, in imposing a penalty for a litigant's non-compliance with Local Rule 56.1, the court chooses to ignore and not consider the additional facts that a litigant has proposed." *Cichon v. Exelon Generation Co., L.L.C.*, 401 F.3d 803, 809-10 (7th Cir. 2005).

Here, the Court has not considered portions of both parties' Rule 56.1 submissions that do not conform to L.R. 56.1. Specifically, the Court has not considered facts that do not contain proper support from the parties' citations to the record or contain inappropriate legal argument, irrelevant information or inadmissible evidence. *See Cady v. Sheahan*, 467 F.3d 1057, 1060 (7th Cir. 2006) (rule 56.1 statements that contain "irrelevant information, legal arguments, and conjecture" do not comply with the Local Rules); *Cichon,* 401 F.3d at 809-10 (court may disregard statements and responses that do not properly cite to the record); *Eisenstadt v. Centel Corp.,* 113 F.3d 738, 742 (7th Cir.1997) ("hearsay is inadmissible in summary judgment proceedings to the same extent that it is inadmissible in a trial").

## II.    Failure to Provide Eilman with Mental Health Treatment-Counts II, VI, X, XV, XVIII, XX, XXII, XXIV, XXVI, XXVIII, and XXXIII[13]

In Counts II, VI, X, XV, XVIII, XX, XXII, XXIV, XXVI, XXVIII, and XXXIII, Paine's Complaint states claims under § 1983 against individual CPD officers for failure to provide Eilman with mental health treatment in violation of the Fourth Amendment (as incorporated against the states under the Fourteenth Amendment). "Claims regarding conditions of confinement for pretrial detainees such as [Eilman] who have not yet had a judicial determination of probable cause (a *Gerstein* hearing), are governed by the Fourth Amendment and its objectively unreasonable standard." *Williams v. Rodriguez*, 509 F.3d 392, 403 (7th Cir. 2007); *see also Lopez v. City of Chicago*, 464 F.3d 711, 719 (7th Cir. 2006). The deliberate indifference standard of the Eighth and Fourteenth Amendments requires a higher showing on a plaintiff's part than is necessary under the objective reasonableness standard. *Williams*, 464 F.3d at 403. Once a state takes a person into its custody, it assumes an obligation to provide for his basic needs, including "food, clothing, shelter, medical care, and reasonable safety." *DeShaney v. Winnebago County Dept. of Social Servs.*, 489 U.S. 189, 1005 (1989). Courts apply a four-factor test to evaluate the objective reasonableness of

---

[13] In their Motion for Summary Judgment, Defendants spend a significant portion of their brief discussing their alleged failure to provide Eilman with medical treatment in response to Eilman's physical complaints of a heart murmur and chest pain. Plaintiff's Third-Amended Complaint, however, does not allege that the Defendants failed to provide Eilman with appropriate medical care with respect to her physical condition; rather, the complaint focuses exclusively on Defendants' alleged failure to respond to Eilman's "obvious mental health needs." *See* Pl. Third Am. Compl. ¶¶ 21, 134, 172, 232, 251, 277, 303, 331, 355, 368, 411. Paine strictly framed her claim for denial of medical treatment in terms of Eilman's mental illness and she cannot, at the summary judgment phase, make a new claim for denial of medical treatment with respect to Eilman's physical condition. *See Whitaker v. T.J. Snow Co.*, 151 F.3d 661, 664 (7th Cir. 1998) (plaintiff may not amend her complaint through arguments in her brief in opposition to a motion for summary judgment.) Therefore, the Court will only address whether the Defendants acted reasonably in failing to provide Eilman with mental health treatment; however, the Court will consider Eilman's pleas for help with respect to her heart condition in the context of analyzing whether she had a serious mental health condition. Furthermore, even if Paine had alleged that the Defendants failed to provide medical care for Eilman's physical ailment, Paine has set forth no evidence to support the conclusion that Defendants' denial of medical treatment for Eilman's alleged heart condition had a causal connection to her injuries. *See Berman v. Young*, 291 F.3d 976, 982 (7th Cir. 2002) (causal connection required to establish liability under § 1983 claim).

46

an officer's conduct in the medical needs context. *See Sides v. City of Champaign*, 496 F.3d 820, 823 (7th Cir. 2007). The first factor measures whether the officer has received notice of the detainee's medical need either through the detainee's words or through observation of the detainee's physical symptoms. *Id.* at 823, 828. The second factor considers the seriousness of the medical need. *Id.* at 828. "The severity of the medical condition under this standard need not, on its own, rise to the level of objective seriousness required under the Eighth and Fourteenth Amendments. Instead, the Fourth Amendment's reasonableness analysis operates on a sliding scale, balancing the seriousness of the medical need with the third factor--the scope of the requested treatment." *Williams*, 509 F.3d at 403. Police interests factor into the reasonableness determination under the fourth factor. *Sides*, 496 F.3d at 828. This final factor "is wide-ranging in scope and can include administrative, penological, or investigatory concerns." *Williams*, 509 F.3d at 403.

### A. Serious Medical Need/Scope of Requested Treatment

A pretrial detainee is entitled to prompt medical attention only if the injury is serious. *See Davis v. Jones*, 936 F.2d 971, 972 (7th Cir. 1991). The relevant inquiry is whether the injury appears to be serious at the time, even if it later proves to be less serious. *Id.* A serious mental illness, like any serious medical condition, requires treatment appropriate to the situation. *See Sanville v. McCaughtry*, 266 F.3d 724, 734 (7th Cir. 2001).

As an initial matter, in an attempt to show that Eilman's medical condition was not "serious," Defendants repeatedly refer to the standard used to define an objectively serious medical condition under the Eighth and Fourteenth Amendments and provide caselaw applying that standard. While the Seventh Circuit has not clearly established the factors guiding the Court's determination of the seriousness of Eilman's medical needs under the Fourth Amendment, it has explained that the

47

seriousness of a medical condition under the Fourth Amendment's reasonableness standard need not rise to the level of objective seriousness required under the Eighth and Fourteenth Amendments. *See Williams*, 509 F.3d at 403. Therefore, the Court is not confined to measuring Eilman's condition against this standard. With this in mind, the Court looks to what constitutes a serious medical condition under a due process analysis merely as a guide, recognizing that Eilman's condition need not rise to this level to survive the Defendant's motion for summary judgment on the issue of whether she exhibited a serious medical condition.

An objectively serious medical condition is one that "has been diagnosed by a physician as mandating treatment or one that is so obvious that even a lay person would perceive the need for a doctor's attention." *Hayes v. Snyder*, 546 F.3d 516, 522 (7th Cir. 2008); *see also Davis*, 936 F.2d at 972 (objectively reasonable officer would not have thought that shallow one-inch cut suffered by pretrial detainee in course of his arrest was serious.) A medical condition need not be life-threatening to be serious; rather, it could be a condition that would result in further significant injury or unnecessary and wanton infliction of pain if not treated. *See Gayton v. McCoy*, No. 08-2187, 2010 WL 308756, at *8 (7th Cir. Jan. 28, 2010). Circumstances indicating that an inmate has a serious medical condition include the "existence of an injury that a reasonable doctor or patient would find important and worthy of comment or treatment; the presence of a medical condition that significantly affects an individual's daily activities; or the existence of chronic and substantial pain." *Hayes*, 546 F.2d at 522-23 (citation omitted); *compare Lopez*, 464 F.3d at 719 (finding plaintiff's allegations were sufficient to form objectively unreasonable conduct where he alleged he was shackled to a wall of an interrogation room for four days and nights and deprived of food, drink, and sleep) *with Sides*, 496 F.3d at 828 (finding plaintiff's allegations did not rise to the level of

48

unreasonableness required for a Fourth Amendment claim where he was forced to stand against an officer's car during which time his buttocks hurt and he felt dizzy and dehydrated). Whether a medical condition is "serious" is a factual inquiry to be resolved by the jury if the plaintiff provides enough evidence to survive summary judgment. *See id*. at 523.

Despite the fact that the record contains evidence that Eilman exhibited recurring bizarre behavior, the Defendants maintain that Paine has failed to establish that Eilman had a serious mental health condition. Specifically, Defendants assert that Eilman's mental health condition was not serious because it was not a "life-threatening condition or a situation where it was apparent that delay would detrimentally exacerbate her mental state." (Def. Memo at 6.) Defendants also argue that Eilman's mental health condition was not serious because she did not request medical attention; they point to the fact that Eilman, when asked whether she was sick, injured or in need of medical attention, replied, "[n]o, I just need a Pepsi." (Pl. 56.1 Resp. ¶ 131.)

Drawing all reasonable inferences in a light most favorable to the plaintiff, however, Paine has presented sufficient evidence to create a genuine issue of material fact as to whether Eilman's bizarre behavior was so obvious that even a lay person would know she needed a doctor's immediate attention. *See Hayes*, 546 F.3d at 522. Eilman had been diagnosed with bipolar disorder one year prior to her trip to Chicago, for which she received treatment prior to her time in Chicago. Although disputed by the Defendants, there is evidence in the record that both Eilman's mom and stepdad informed various CPD officers of their daughter's mental health condition. It is undisputed that at least one conversation between the police and the parents involved a discussion of bipolar disorder which may constitute a serious medical or psychological condition. S*ee Antonelli v. Sheahan*, 81 F.3d 1422, 1432 (7th Cir. 1996) ("inmates may not be denied all treatment of a serious psychiatric

or psychological condition"); *Meriwether v. Faulkner*, 821 F.2d 408, 413 (7th Cir. 1987) (a psychiatric or psychological condition may present a "serious medical need"). Moreover, the record reflects that while in police custody on May 7 and 8, 2006, Eilman frequently screamed and yelled, was non-responsive when questioned, exhibited significant mood swings, randomly discussed the United States' over-dependence on oil, frequently talked about famous rap artists, even telling detainee Washington that certain dead rap artists were going to come and rescue her. Eilman would start crying, then stop, then begin to sing rap songs. Her moods would fluctuate between sweet and calm, quiet and withdrawn, and aggressive and confrontational. When she was first taken into custody, Eilman repeatedly shouted "fist fuck" me while spreading her legs open and throwing her hips in the air. Her fellow detainees at both the Eighth and Second District stations testified that after seeing and hearing Eilman, they thought that there was something wrong with her. There is also testimony in the record that while Eilman was in custody she was talking "nonsense" and "gibberish," consistently banging on the walls and bars of her cell and screaming "bitch feed me."

Eilman's bizarre behavior did not stop there. While being held at the Second District station, Eilman smeared her own menstrual blood on the cell's walls and bench on at least two separate occasions. On one occasion, Eilman smeared menstrual blood from a sanitary napkin on the cell's bars and then stuck the blood-stained pad to the wall of the cell. There were also times when Eilman refused to speak; instead, she would communicate though the use of hand gestures. When her cellmate, detainee Hall, attempted to talk to her, Eilman placed her hand over her mouth, put her index finder to her lips and pointed to the ceiling as if to signal that someone was watching them. Moreover, at one point while incarcerated at the Second District, a fellow detainee heard a young white girl yelling from another cell: "I'm sick," "help me" and "I have to go to the hospital."

50

The seriousness of Eilman's mental health condition is highlighted by the fact that several officers thought it prudent to call attention to her bizarre behavior. Specifically, Cason admits that he was so concerned about Eilman's behavior that he requested the immediate arrival of a squad car to take her the Eighth District station. Cason also testifies that he thought Eilman's mood swings were atypical and unlike anything he had ever seen before. In fact, Cason found Eilman's behavior so distinctive that she stood out in his mind amongst the 4,000 to 5,000 other arrests he has made in his 35 years with the CPD. Officer Delia told Cason that Eilman was acting strange and may need to go to the hospital. Because of Cason's suspicions that Eilman may be suffering from a mental illness, he sought assistance from Lieutenant Earnest, who told him to take Eilman to the hospital. Earnest admits that if an arrestee exhibits signs that she is suffering from a mental illness, he or she should be taken to a hospital for evaluation. While at the Second District, both Williams and Stokes agreed that Eilman was acting "irrational." Although Williams testified that most people in the lock-up are irrational, Sergeant Miller, who has been a police officer since 1986, testified that she has only deemed an arrestee "irrational" approximately six or more times. If these facts were found to be true by a jury, that jury could reasonably conclude that Paine was suffering from a serious mental health condition that required immediate attention and that the officers failed to provide her with that attention. *See e.g. Hayes*, 546 F.2d at 522-23.

The record also contains evidence that Eilman repeatedly requested to go to the hospital and complained of chest pains and a heart murmur. More specifically, multiple other detainees testified that they heard Eilman yell that she had a heart murmur and scream that she needed to go to the hospital. On one occasion, Eilman complained for approximately fifteen minutes that her heart hurt and that she could not breathe, while banging on the bars of her cell. Detainee Holland recalls

51

hearing two guards joke about Eilman's heart complaints as if they did not take her pleas seriously. Other detainees sought to be removed from the cell that housed Eilman due to her erratic and frightening behavior. A reasonable jury could find that Eilman's complaints of a physical ailment is further evidence of, and consistent with, a serious mental health condition, particularly in light of the fact that chest pains and difficulty breathing can be symptomatic of anxiety and stress, which are triggered by manic episodes. (Pl. 56.1 Resp. ¶ 36.)

Moreover, Paine's expert Dr. Dvoskin, a psychologist, opines that Eilman's behavior while in custody demonstrates that she was suffering from a severe manic episode. Dr. Nelson, Paine's psychiatry expert, concurs that Eilman was suffering from bipolar disorder and was in the midst of a manic episode when she interacted with the police in May 2006, and further opines that her abnormal behavior warranted psychiatric evaluation and treatment. Nelson also testified that Eilman's psychiatric condition continued to worsen from the time her mania began in March and April 2006 through May 7, 2006. Even the Defendants' police practices expert, James Kennedy, admits that Eilman's behavior could have been interpreted as problematic and may have been sufficient for Eilman to be transported for a mental health evaluation. (Pl. 56.1 ¶ 148.)

Defendants claim that Eilman's failure to complain about her mental state, and failure to ask for mental health treatment, indicates that she did not have a serious need of mental health care. In support they point to *Estate of Novack v. County of Wood*, 226 F.3d 525 (7th Cir. 2000), where a plaintiff, after being questioned regarding his mental health, responded that he was not contemplating suicide and had never attempted suicide. *Id*. at 530. Here, in contrast, Eilman was not questioned specifically regarding her mental health history in spite of being informed by her parents that such a history existed and in spite of seizing prescription medications from her at the

52

time of her arrest. Eilman never affirmatively indicated that she was not in need of mental health treatment; rather, her complaints that she needed to go the hospital indicate that Eilman did in fact make a plea for medical treatment. At a minimum, Eilman's complaints of a heart murmur and chest pains while she was incarcerated, coupled with her erratic, unusual behavior, could lead a jury to believe that she had a serious mental health condition. *See Meriwether*, 821 F.2d at 413 (transsexualism is a mental health disorder that constitutes a "serious medical need"). The focus remains, however, as it must, on whether the behavior that she exhibited to the officers was indicative of someone in need of medical treatment. The facts presented at this stage are more than sufficient to establish that this dispute should go to a jury even if she never asked specifically for treatment herself. At some point, the officers can not shield themselves by stating that she failed to ask for mental health treatment if her behavior is so bizarre and out of the ordinary realm of human interaction that it would be clear to a reasonable officer that she is incapable of asking for such help. Accordingly, Paine has established a genuine issue of material fact whether Eilman had a serious mental health condition.

Lastly, a reasonable juror could find that the Defendants' conduct was unreasonable in light of the means available to them to address Eilman's needs. A reasonable juror could find that taking Eilman to a mental health facility for an evaluation would not have been overly burdensome in light of the seriousness of her medical need. *See, e.g.*, *Crenshaw v. Rivera*, No. 05-440, 2009 WL 377985, at * 23 (N.D. Ind. Feb. 12, 2009) (Cherry, J) (denying summary judgment as to plaintiff's claim for unreasonable medical care under Forth Amendment where officers waited to take her to a hospital to receive medical care for a non-life threatening leg injury). Indeed, the Eighth District Station is located approximately seven miles from Mt. Sinai Hospital—the Eighth District's

designated mental health evaluation facility. Despite this short distance, Defendants declined to assess Eilman's mental health condition before transferring her five miles away to the Second District for lockup. St. Bernard Hospital is the Second District's designated mental health facility and is located approximately two miles from the station. Moreover, the circumstances of Eilman's arrest were not such that the officers needed to delay attending to Eilman's medical needs: they were not transporting a dangerous suspect or bringing Eilman in for processing in a case that required the immediate involvement of additional officers. Instead, the record demonstrates that Officers Cason and Moreno arrested Eilman for a misdemeanor and were simply bringing her in for booking. A reasonable juror could find that Defendants' conduct was unreasonable based upon Eilman's drastic and unnatural behavior and the nominal effort required to properly assess Eilman's mental health.

### B.    Notice of Eilman's Medical Need

Eilman's behavior while in custody could lead a jury to believe that she had a serious mental health condition. If individual Defendants were aware of her serious mental illness, moreover, they had a duty to provide adequate care. *See Cavalieri v. Shepard*, 321 F.3d 616, 621-22 (7th Cir. 2003); *Hall v. Ryan*, 957 F.2d 402, 405-06 (7th Cir. 1992); *see also Grieveson v. Anderson*, 538 F.3d 763, 776 (7th Cir. 2008) ("A plaintiff bringing a civil rights action must prove that the defendant personally participated in or caused the unconstitutional actions") (citation omitted); *Johnson v. Snyder*, 444 F.3d 579, 583 (7th Cir. 2006) ("To recover damages under § 1983, [Eilman] must establish that a defendant was personally responsible for the deprivation of a constitutional right.").

Therefore, each individual Defendant's liability depends on his or her knowledge regarding Eilman's condition and how each responded. Many of the facts pertaining to each individual's knowledge are disputed. Often, for example, another pretrial detainee describes the lock-up and

54

Eilman's condition in stark contrast to the same scene described by a law enforcement officer. In each instance, where evidence exists in the form of a first-hand observer or listener that Eilman was exhibiting completely abnormal and erratic behavior and pleading for help and an officer states that she was sitting mildly in her cell without any such outbursts, the case must be resolved by a jury.

An officer can be provided with notice of an arrestee's medical need through her words or through observation of her physical symptoms. *Williams*, 509 F.3d at 403. Circumstantial evidence—such as visible symptoms or other detainees' complaints—can be used to establish such knowledge. *Thomas v. Cook County Sheriff's Dept.*, 588 F.3d 445, 452–53 (7th Cir. 2009) (testimony from fellow detainees placing plaintiff within plain view of the officers on duty the day before he died was sufficient to suggest that they were aware of the risk to plaintiff's health, either from inmates' complaints or from his visible symptoms); *see e.g. Ortiz v. City of Chicago*, No. 04 C 7423, 2008 WL 4681156, *6 (N.D. Ill. May 13, 2008) (Grady, J.) (testimony from plaintiff's attorney and fellow arrestee that plaintiff was yelling for the guards was sufficient to create a genuine material fact as to whether officers were put on notice that plaintiff a serious medical condition). Where a defendant does not observe any symptoms indicating that a medical condition is serious, however, he may not have sufficient notice. *See Williams*, 509 F.3d at 402 (where the only evidence in the record was plaintiff's own attempt to control his breathing, defendant was not on notice that plaintiff was exhibiting physical symptoms reflective of an asthma attack).

As an initial matter, Defendants contend that the Court cannot rely on the testimony of the various detainees who were being housed at the Second District lock-up with Eilman. They assert that the detainees' testimony with respect to Eilman's pleas for help and requests to be taken to the hospital are unreliable because the detainees were not familiar with Eilman's voice prior to hearing

55

her scream and call for help, and therefore cannot identify Eilman as the woman they heard. However, as the advisory committee notes to Federal Rule of Evidence 901(b)(5) clarify, "[s]ince aural voice identification is not a subject of expert testimony, the requisite familiarity may be acquired *either before or after the particular speaking which is the subject of the identification . . .*." Fed.R.Evid. 901 advisory committee's notes (emphasis added). Additionally, even minimal familiarity is sufficient for admissibility purposes; such minimal familiarity may be established after the particular speech was heard by listening to a voice exemplar. *Id.* Moreover, attacks on the accuracy of identification go to the weight and credibility of the evidence, an issue for the jury to decide. *See United States v. Alvarez*, 860 F.2d 801, 809 (7th Cir. 1988). As long as Paine lays the proper foundation at trial, any disputes over voice-authentication are more properly addressed during cross-examination, and, as such, the Court rejects Defendants' argument that Eilman's fellow detainees' testimony should be disregarded.

Defendants also contend that Eilman's short period of confinement was insufficient to put them on notice of her serious medical need and was too short for their denial of medical care to cause her any harm. Courts have found a significantly shorter time period than 28 hours–the amount of time Eilman was in custody–sufficient for a jury to find that the defendant was on notice of an detainee's serious medical condition. *See, e.g.*, *Crenshaw*, 2009 WL 377985 at *23 (finding a two hour time period sufficient). Here, the officers exposed to Eilman's bizarre behavior included officers from different shifts and different interactions with her over the course of an afternoon, evening and day. Thus, the period of Eilman's confinement is more properly addressed by the jury in weighing whether Defendants' conduct was objectively reasonable.

Defendants further contend that Eilman's stated denial of a need for medical treatment absolves them from any liability. The Court first notes that the record does not support that Eilman "repeatedly" denied a need for medical treatment, as Defendants maintain. On one specific occasion, when asked if she "was sick, pregnant, injured, or in need of medical attention," Eilman replied, "no, I just need a Pepsi." On another occasion, when asked if she was under a doctor's care, Eilman stated that she was not – even though her parents had conveyed to the police that she was and even though the police seized prescription medications from her. Even under the more stringent standard applicable to Eighth and Fourteenth Amendments claims, knowledge can be inferred from circumstantial evidence and does not rest on the plaintiff's self-reported need or lack of need for medical treatment. *See Farmer v. Brennan*, 511 U.S. 825, 842 (1994); *see also Mombourquette v. Amundson*, 469 F. Supp. 2d 624, 643 (W.D. Wisc. 2007) (there is questionable value in the plaintiff's self assessment of mental state when other circumstantial evidence indicates otherwise). Here, the evidence of Eilman denying a need for medical care, when viewed against the backdrop of her other statements and her behavior, is insufficient to determine as a matter of law that no Defendants had notice of Eilman's serious mental health condition. To support their position that they were entitled to reasonably rely on Eilman's denial of a need for medical care, Defendants cite to various suicide risk cases; however, those cases are distinguishable because they all apply the more stringent deliberate indifference standard. Moreover, whether someone is at risk for suicide—a very unpredictable action—is much more difficult to perceive than whether a person might have a mental health condition as evidenced by their outward actions. Although the jury can take Eilman's denials into consideration when determining whether a specific defendant was on

notice of her mental health condition, at this stage it would be inappropriate for the Court to determine how much weight they should carry.

Having dealt with Defendants' broad contentions, the Court now examines the Defendants' knowledge and actions individually.

### 1. Cason (Count II)

Defendant Cason witnessed Eilman's odd behavior and drastic mood swings both at the CTA station, where he arrested her, and at the Eighth District Station. At the CTA Station, Cason observed Eilman rapping, taking her clothes off and dancing provocatively for different men. Her behavior was erratic; she was calm and complacent one minute and aggressive and confrontational the next. While at the CTA station, Eilman even threatened to take Cason's gun and shoot him with it. After being informed that Eilman had been escorted to the CTA station by three CPD officers from Midway Airport, Cason never called the officers to find out what had happened or to inquire into her behavior while there. During the time he spent with Eilman, Cason also heard her discuss the price of oil, chastise men she did not know for smoking, and scream bizarre and vulgar statements. Specifically, when Cason and Moreno took Eilman to the CTA office, she began kicking, howling and repeatedly told Cason and Moreno to "fist fuck" her, while spreading her legs open and thrusting her hips into the air. Cason admits that he was so concerned about Eilman's behavior that he requested the immediate arrival of a squad car to take her to the police station, as opposed to waiting the typical hour it would take for a squadrol to arrive.

While at the Eighth District Station, Cason continued to observe Eilman act out in a strange and unusual manner. After he handcuffed her in the holding area, Cason saw Eilman engage in spontaneous screaming and yelling fits and continue to exhibit vast mood swings. During

processing, Eilman gave answers that had nothing to do with the questions Cason was asking her. Cason concedes that, because of her behavior, Eilman stands out in his mind among the 4,000 to 5,000 other arrests he has made in his thirty-five year career as a CPD officer. Although Cason claims he did not think Eilman was a danger to herself or anyone else, he admits that he did not think she was a typical arrestee. Even though his initial impression was that Eilman was on some type of drug, after awhile Cason determined that she was "clean." Moreover, after Officer Delia, a fellow officer, searched Eilman, she told Cason that Eilman was acting strangely and might need to go to the hospital. Officer Delia also suggested that Cason talk to Lieutenant Earnest about Eilman's behavior. Because Cason suspected that Eilman might have a mental illness, he approached Earnest, asking for help. After telling Earnest about Eilman's unusual behavior, Earnest told Cason and Moreno to take Eilman to the hospital; however, Cason and Moreno did not do so because they did not have a car available.

Cason was also present when Sergeant Berglind interviewed Eilman. Although Cason testified that Eilman appeared composed during the interview, Berglind testified that she was crying, discussing the United States' over-dependence on oil and singing rap lyrics. Cason also stated that Eilman kept repeating that she did not understand why she was under arrest, in spite of the fact that this had been explained to her four to six times. After the interview, Officer Delia informed Cason that she had spoken to Eilman's father. Although Officer Delia testified that Mr. Paine told her that Eilman had not been formally diagnosed with bipolar disorder, it is not disputed that the issue of bipolar disorder was discussed in the phone call. Mr. Paine maintains that he told Officer Delia that Eilman suffers from bipolar disorder and had been institutionalized for the disorder in the past. Finally, before transferring Eilman to the Second District Station, Cason observed her continue to

exhibit mood swings while her eyes roamed all around. These facts are sufficient to create a genuine issue of material fact as to whether Cason was placed on notice that Eilman had a serious mental health condition that required medical attention and acted unreasonably in failing to secure her such attention.[14]

### 2. Moreno (Count IV)

Like Cason, Moreno observed Eilman's erratic and abnormal behavior at the CTA station and at the Eighth District Station. Moreno specifically saw Eilman yell at strange men that she did not know and exhibit severe mood swings over a short period of time. At the Eighth District Station, Moreno watched Eilman cry, stand up on a stool then spontaneously sit down, randomly start swearing, and, in his own words, "act[] crazy." Despite observing this behavior, Moreno never took Eilman to a hospital, suggested that she be examined by a doctor, or informed a supervisor that he thought Eilman was "acting crazy." When asked why he did not do any of these things, he could not provide an explanation. These facts raise a genuine issue of material fact as to whether Moreno was put on notice that Eilman had a serious mental health condition that required medical attention and acted unreasonably in failing to secure her such attention.

### 3. Earnest (Count X)

Lieutenant Earnest was the Watch Commander at the Eighth District Station when Eilman arrived. Earnest received multiple reports of Eilman's erratic behavior. First, Cason informed him that Eilman was acting "goofy," experiencing major mood swings and did not appear to be on drugs. Based upon this information, Earnest told Cason and Moreno to take Eilman to the hospital.

---

[14] Defendants cite to *Gibson v. County of Washoe*, 290 F.3d 1175 (9th Cir. 2002), a Ninth Circuit case from 2002, for the proposition that an inmates' abusive behavior and mood swings are insufficient to put an officer on notice of a serious mental illness. In that case, however, the court was applying the Fourteenth Amendment's deliberate indifference standard. Moreover, determination of whether a defendant had notice of a serious mental illness is a factual inquiry that is to be decided on the unique facts of each case.

However, Cason and Moreno did not have a car to transport Eilman to the hospital. Instead of assigning them a different squad car, which he had the authority to do, Earnest ordered Sergeant Berglind (who is not a medical professional) to interview Eilman to determine whether she needed a mental health evaluation. Although after conducting the interview, Berglind informed Earnest that he thought everything was ok, Officer Delia later informed Earnest that she had spoken to Mr. Paine who, according to her testimony, told her that Eilman may have bipolar disorder and that he was concerned about her mood swings. Earnest decided to disregard the call by challenging its authenticity and ordered Cason to continue processing Eilman's arrest.

As Watch Commander, Earnest had the authority to transfer Eilman to the hospital for a mental health evaluation. Furthermore, he admits that if an arrestee exhibits signs of a mental illness, that individual should be taken to a hospital. Earnest, however, never checked on Eilman and decided not to send her to the hospital. These facts are sufficient to raise a genuine issue of material fact as to whether Earnest was put on notice that Eilman had a serious mental health condition that, more likely than not, required medical attention, and that he acted unreasonably in failing to secure that attention for her. *See Sanville*, 266 F.3d at 740 (supervisor "will be deemed to have sufficient personal responsibility if he directed the conduct causing the constitutional violation, or if it occurred with his consent or knowledge").

### 4. Berglind (Count XV)

Of the officers at the Eighth District Station, Sergeant Berglind's knowledge of Eilman's serious mental health condition is the most tenuous. Nonetheless, viewing the facts in a light most favorable to the Plaintiff, Paine has raised a genuine issue of material fact as to whether Berglind was put on notice that Eilman had some kind of serious mental health condition. Berglind

interviewed Eilman after Cason expressed concerns about Eilman's mental health. Prior to the interview, Cason informed Berglind of what had happened earlier that day and described Eilman's behavior throughout the day. During the interview, Berglind testified that Eilman was crying, discussing the United States' consumption of oil and singing rap lyrics. At one point, Eilman even invited Berglind to visit her in Los Angeles. While Eilman was able to answer some questions during the interview, Berglind and Cason disagree over whether Eilman was able to comprehend and articulate why she had been arrested. Despite her behavior, Berglind testified that he did not think Eilman was intoxicated or high on drugs but admitted that at no point during the interview did he ask Eilman if she had been hospitalized for psychiatric or psychological problems, or if she took psychotropic medication. Following the interview, instead of arranging for Eilman's transfer to a mental health facility for evaluation or treatment, Berglind told Earnest that Eilman posed no risk to herself and that everything was ok. Berglind, however, admits that in a "close call" the safer route would be to take an individual to a designated mental health facility for an evaluation by a clinician, psychologist or psychiatrist. Eilman's odd behavior during the interview and her inability to understand why she was there, coupled with Berglind's knowledge of her bizarre behavior throughout the day and his fellow officers' concerns, is sufficient to raise a genuine issue of material fact as to whether Berglind was put on notice that Eilman had some kind of serious mental health condition that, more likely than not, required medical attention, and that his actions in failing to secure her some type of medical attention was unreasonable.

### 5.      Stokes and Williams (Counts XVIII and XX)

Defendants Stokes and Williams worked the Second District lockup during the third watch on May 7, 2006.  Williams served as the station's lock-up keeper and processed Eilman when she arrived around 7:35 p.m. Lock-up keepers sit outside of the lock-up when they are not processing an arrestee, but they do get up and move around during their shifts.  During intake, Eilman spoke nonstop about things other than the information that Williams requested.  Specifically, Eilman told Williams that she was from California, had no way of getting home, was wealthy, and was a personal fitness instructor.  When Williams asked Eilman if she was sick, injured, or needed medical attention, Eilman responded, "[n]o, I just need a Pepsi."  When Williams asked Eilman if she had been drinking or doing drugs, Eilman told her that she had been drinking.  While Williams was screening Eilman, Stokes searched her and inventoried her belongings.  During the search, Eilman was rude and uncooperative.  When Stokes told Eilman she could not go back to the cell with her bikini on, Eilman took it off and flung it on the table; it was soiled in menstrual blood.  When Stokes asked Eilman if she wanted a sanitary pad, Eilman refused and would not answer anymore questions. While searching Eilman, Stokes found some medication and informed Williams. When Williams asked Eilman what the medication was for, Eilman would not answer.  Williams told stokes that Eilman was "irrational" and Stokes agreed.  While Williams claims that "most people in the lock-up are irrational," Sergeant Miller who has been a police officer since 1986 disagrees and avers that she had only deemed six or more individuals irrational in her entire career.  Despite classifying Eilman as irrational, Williams did not notify Miller, the acting desk sergeant, or the Watch Commander, of her concerns.  And, neither Williams nor Stokes recommended that Eilman be taken to a hospital for an evaluation.  Kennedy, Defendants' police practices expert, opines that Williams' and Stokes'

observations of Eilman could have been interpreted as problematic and may have been sufficient to transport her for a mental health evaluation.

During their inspections of the cells on May 7, 2006, Stokes and Williams both heard Eilman singing in her cell, and Stokes observed Eilman standing on the cell's bench and holding hands with another inmate through the bars of her cell. Moreover, despite the fact that Eilman's clothes were soiled with menstrual blood, she never asked Stokes for a sanitary pad.

While Williams and Stokes claim that Eilman did not yell, scream, bang on the bars of her cell or make any kind of disturbance, their testimony is contradicted by the testimony of several detainees who were present in the Second District lock-up during their shifts. Detainee Martinez, who arrived at the lock-up at about 5:00 p.m. on May 7, 2006, and was placed in cell 7, which was adjacent to Eilman's cell, testified that she heard Eilman yelling for the lock-up keepers, who sometimes ignored her and sometimes told her to "shut up." On at least two occasions, Martinez yelled to the guards, one of which she believes was Williams, that Eilman could not understand them because she suffered from bipolar disorder and was "not all there." While Eilman was being escorted to her cell, Martinez saw Eilman stop, squat down and point to her crotch. Eilman would not speak and was acting like a mute.

Detainee Hall, who was present in the lock-up when Eilman arrived and stayed until 5:00 a.m. on May 8, 2006, shared a cell with Eilman and testified that Eilman repeatedly shook the cell bars and would not stop jumping onto the cell's bench. Hall testified that, at one point, Williams walked over to Eilman and told her to sit down because she wasn't going anywhere. Eilman, however, refused to talk to Williams or anyone else.

Williams also worked in the lock-up during the third watch on May 8, 2006, where she

witnessed more of Eilman's bizarre behavior. Detainee Holland, who was in the lock-up from 4:00 p.m. on May 8, 2006 until 10:30 a.m. on May 9, 2006, testified that she heard Eilman yell, call for the guards and ask to use the phone approximately four to six times but that the guards ignored her. Holland also avers that she heard Eilman scream for approximately fifteen minutes that her heart hurt and that she could not breathe. While she screamed, Eilman banged on the bars of her cell. Holland was able to hear the guards joking and laughing about Eilman's complaints. Holland also recalls Eilman telling Williams that "she would not click her shoes together because her heart hurt."

Defendants contend that nothing in the record indicates that Williams and Stokes heard Martinez or any other detainee call out to them and that even if they had heard them, another arrestee's comments would not necessarily put them on notice of a need for medical attention. This argument, however, invites the Court to make credibility determinations and at the summary judgment phase, a court's role is not to evaluate the weight of the evidence or to judge the credibility of witnesses; instead, its role is limited to determining whether there is a genuine issue of triable fact. *See Anderson*, 477 U.S. at 249-50. Therefore, the Court cannot accept the Defendants' invitation to ignore the detainees' testimony.

The testimony of detainees Martinez and Hall along with Stokes' and Williams' observations during intake and inspection are sufficient to raise a genuine issue of material fact as to whether Williams and Stokes were put on notice that Eilman had some kind of serious mental health condition that, more likely than not, required medical attention, and that their actions in failing to secure her some type of medical attention was unreasonable. Moreover, the testimony of detainee Holland lends further support to the notion that a reasonable jury could find that Williams had notice of Eilman's serious mental health condition and failed to act reasonably. *See Walker v. Benjamin*,

293 F.3d 1030, 1037 (7th Cir. 2002) (quoting *Farmer*, 511 U.S. at 842) ("[A] factfinder may conclude that a prison official knew of a substantial risk from the very fact that the risk was obvious.").

### 6. Hudson and Quinn (Counts XXII and XXIV)

Defendants Hudson and Quinn worked the Second District's lock up during the first watch on May 8, 2006. Their shift began at 10:00 p.m. on May 7, 2006, immediately following Williams' and Stokes' shift, and continued through 6:00 a.m. on May 8, 2006. During this time, detainees Baker, Hall, Hawkins and Washington were all being housed in the women's lock-up. Washington heard Eilman screaming on and off until her release and heard her banging on the bars of her cell. In response to Eilman's screaming, Washington heard one of the guards tell her to "shut the fuck up."

Hall, Eilman's cellmate, observed Eilman place her hand down her pants and smear her menstrual blood on the cell's wall and bench. Hall called out to the guards to bring Eilman a sanitary pad and when Hudson arrived at the cell, she "looked at [Eilman] crazy and walked away." Hall was so disturbed by Eilman's behavior that she asked to be moved to a different cell. Eventually, Quinn moved her and Hudson and Quinn placed Hawkins, another detainee, in Eilman's cell. As Hawkins approached the cell, she could hear Eilman pounding on the bars. As she entered the cell, Hawkins saw blood on the bars and bench and began to scream that she did not want to go inside. Hawkins testified that it looked as though Eilman had taken her finger and wiped blood all over the cell with it. In response to Hawkins pleas, Quinn stated, "[y]our going in that cell. She is no crazier than you is," referring to Eilman. Once inside the cell, Hawkins saw Eilman dance around, twirl in circles and stand on the bench while waiving her arms like she was trying to fly.

66

Eilman again reached down her pants and pulled out her hand, which had blood all over it. Hawkins yelled to Hudson and Quinn, asking to be taken out of the cell. In response to Hawkins requests, Hudson and Quinn came back to the cell three or four times and told her to "shut up."

Detainee Range, who was in the lock-up from 10:30 p.m. on May 7, 2006 until 5:15 a.m. on May 8, 2006, told CPD internal affairs investigators that Eilman was screaming that her chest hurt and that she wanted to go to the hospital. Range also stated that she heard Hudson tell Williams, "[t]hat white girl is still acting crazy back there and now she wants to go to the emergency room," and Williams respond by saying, "[a]in't nothing wrong with her and she ain't going to the hospital and if she keeps on screaming we are going to send her crazy ass to the crazy hospital, that's where the fuck she is going." Range also testified that she heard Eilman's cell mate screaming that Eilman was crazy and that she was wiping her bloody pad on the cell walls and taping it to the side of the cell. The Court notes that during Range's deposition she gave a completely different version of the events, stating that she did not know who she heard screaming and did not know who was working the lock-up while she was there.

Detainee Baker, who was in the lock-up from 11:00 p.m. on May 7, 2006 until 3:00 a.m. on May 8, 2006, testified that she heard a "white girl" screaming from her cell, saying she was bleeding and that she needed help. In response, Baker heard the guards say, "[s]hut your white ass up. You got blood all over the cell with your nasty ass," and "shut the fuck up you white bitch." Baker avers that the "white girl" continued to yell for two to three hours, was crying and sounded disturbed and upset.

Here, Hudson's and Quinn's observations coupled with the testimony of detainees Washington, Hall, Hawkins, Range, and Baker is more than sufficient to raise a genuine issue of

material fact as to whether Hudson and Quinn were put on notice that Eilman had some kind of serious mental health condition that, more likely than not, required medical attention, and that their actions in failing to secure her some type of medical attention was unreasonable. *See Walker*, 293 F.3d at1037 (quoting *Farmer*, 511 U.S. at 842) ("[A] factfinder may conclude that a prison official knew of a substantial risk from the very fact that the risk was obvious.").

### 7. Mabery (Count XXVI)

Mabery worked the Second District lockup during the second watch on May 8, 2006. When Mabery performed her first inspection of the lockup, she saw Eilman standing silently and when Mabery asked Eilman her name, she responded. Moreover, the record reflects that neither Hudson nor Quinn provided Mabery with any information about Eilman's behavior during the previous shift, other than the fact that she had not been processed. Although Eilman was verbal and loud during Mabery's watch, Mabery testified that there was nothing unusual about her behavior. Harris, a detainee who arrived around noon on May 8, 2006, however, testified that during Mabery's shift, Eilman was kicking the bars of her cell and yelling for help. Specifically, Harris avers that Eilman was screaming that she had a heart murmur and needed to go to the hospital. Harris recalls that Eilman continued on like this for thirty to forty-five minutes and that Mabery responded by telling Eilman to "shut the fuck up" and telling her that there was nothing wrong with her. The only other interaction Mabery had with Eilman was during Eilman's processing. At that time, the two had a pleasant conversaton and when Mabery told Eilman she could not "pose" for her jail photograph, Eilman listened.

Construing these facts in the light most favorable to the Plaintiff, they show that Mabery was put on notice that Eilman had a heart murmur and wanted to go to the hospital. There is no evidence

in the record that Mabery observed Eilman behave in a bizarre or strange manner, or that she observed Eilman exhibit any behavior consistent with a mental illness. At best, Eilman's screams about her heart murmur would put Mabery on notice of a potential *medical* issue; however, as discussed previously, Plaintiff's denial of medical care claim is limited to a denial of *mental health* treatment. Paine has not presented any specific facts that Mabery was aware of Eilman's serious mental health condition. Without more, the Court cannot conclude that Paine has presented evidence raising a genuine issue of material fact as to whether Mabery knew that Eilman had some kind of serious mental health condition that, more likely than not, required medical attention. Because there is insufficient evidence in the record that Mabery was aware of the seriousness of Eilman's mental health condition, Paine cannot establish that Mabery's conduct in failing to secure her some type of medical attention was objectively unreasonable. *See Lopez*, 464 F.3d at 718-19; *see also Williams*, 509 F.3d at 402-03. Therefore, the Court grants Defendants' Motion for Summary Judgement with respect to Defendant Mabery.

### 8.      Smith (Count XXVIII)

As an initial matter, Defendants contend that any phone calls to Smith by a person claiming to be "Christine's mom" are inadmissible because they cannot be authenticated. Defendants take this position despite the fact that Smith, herself, admits she received a phone call from Mrs. Paine. Defendants assert that self-identification *alone* is insufficient to authenticate the source of a phone call. While this is true, self-identification coupled with the existence of circumstantial evidence indicating that the speaker is who she identifies herself to be, is sufficient to authenticate a phone conversation. *United States v. Roberts*, 22 F.3d 744, 754 (7th Cir. 1994) (citation omitted). Here, the undisputed facts demonstrate that: 1) Paine called the particular phone number assigned to the

front desk at the Second District Station, 2) the call was made while Smith was on duty, 3) Smith acknowledged speaking with Paine ("Christina's mom"), and 4) both Smith and Paine testified to the substance of the conversation. These facts support a finding that during the relevant phone conversation, the person Paine spoke to when she called the Second District station was Smith.

Having dealt with Defendants' admissibility contention, this Court now turns to whether there is a genuine issue of material fact as to whether Defendant Smith was aware of the seriousness of Eilman's mental health condition. Smith worked the front desk of the Second District Station during the third watch on May 8, 2006. While Smith was on duty, Paine placed four calls to the station's front desk: at 2:47 p.m., 3:15 p.m., 8:16 p.m., and 8:18 p.m. During Paine's 3:15 p.m. call she claims she spoke with Smith, who also testified that she spoke with Paine early in her shift. During the call, Paine and Smith discussed Eilman's release and Paine asked if she could pay Eilman's bond with a credit card because she was from out of town. Smith informed Paine that Eilman would be released on an I-bond, so there was no need to post any cash. While Smith claims the conversation ended there, Paine maintains that she informed Smith that she was concerned because she believed Eilman was bipolar and might be having an episode. Paine also claims she told Smith that she did not want Eilman released on the streets of Chicago with no belongings and nowhere to go. Paine admits that she never told Smith that Eilman might hurt herself and that she never asked that Eilman be brought to a hospital for a mental health evaluation. After talking to Paine, Smith did nothing; she did not inform anyone of her phone conversation, she did not inquire into Eilman's behavior and she did not go and check on Eilman. Smith admits that if she was told by a detainee's family member that the detainee suffered from a mental illness, that would be a cause for concern. Despite the fact that Smith did not observe Eilman's behavior first hand, a reasonable

70

jury could find that she was given enough information during her telephone conversation with Paine to put her on notice that Eilman had a serious mental health condition–not only did Paine inform Smith that Eilman may suffer from bipolar disorder, she specifically stated that she was concerned that she may be in the midst of an psychotic episode– and that her conduct in failing to secure her some type of medical attention was objectively unreasonable.

### 9. Heard (Count XXXIII)

Heard worked the Second District lockup with Williams during the Third Watch on May 8, 2006. At some point during Heard's shift, she heard Eilman repeatedly yell, "[b]itch feed me." As previously mentioned, Detainee Holland, who was in the lock-up from 4:00 p.m. on May 8, 2006 until 10:30 a.m. on May 9, 2006, testified that she heard Eilman yell, call for the guards and ask to use the phone approximately four to six times but that the guards ignored her. Holland also avers that she heard Eilman scream for approximately fifteen minutes that her heart hurt and that she could not breathe. While she screamed, Eilman banged on the bars of her cell. Holland was able to hear the guards joking and laughing about Eilman's complaints. While Holland identified Heard as one of the guards that was present while Eilman was screaming, she does not know what, if any, contact she had with Eilman. Detainee Warren, who was in the lock-up from 12:50 p.m. on May 8, 2006 to 10:23 p.m. on May 9, 2006, testified that she heard (but never saw) a woman, who she identified as both young and Caucasian, yell: "I'm sick," "help me" and "I have to go to the hospital." Warren stated that this woman's yelling persisted for one to two hours and originated from a cell behind hers. Warren's cell was located in a cell block behind Eilman's with an opening facing the opposite direction. In response to the yelling, Warren heard a guard yell "shut the fuck up," and "shut the hell up." Here, Eilman's odd behavior in repeatedly yelling "bitch feed me," coupled with her general

pleas for help, which unlike the ones heard by detainee Harris were not only in specific reference to her heart condition, and her prolonged screaming for hours on end, is sufficient to raise a genuine issue of material fact as to whether Heard was put on notice that Eilman had some kind of serious mental health condition that, more likely than not, required medical attention, and that Heard's actions in failing to secure her some type of medical attention was unreasonable.

### C.    Police Interests

Finally, the Court must take into account police interests in determining whether the Defendants' conduct was objectively unreasonable. *See Williams*, 509 F.3d at 403. These considerations include administrative, penological, and investigatory interests. *Id.* The Defendants contend that three police interests favored their decision not to provide Eilman with mental health treatment. First, they contend that the Eilman's expeditious processing weighs against the delay needed to examine and treat her. Second, they argue that subjecting Eilman to unwanted mental health treatment would violate her Fourth Amendment right not to be involuntarily committed. Third, they state that there is a police interest in obeying the chain of command.[15] Paine addresses these interests by pointing to the fact that: 1) Eilman was only in custody for 28 hours; she was not reaching the forty-eight hour mark at which point she would have to be released or brought before a judge for a *Gerstein* hearing, 2) Eilman was never consulted on whether she would like mental health treatment and thus never refused it, and 3) Earnest, a supervisor, specifically told Cason and Moreno to take Eilman to the hospital for an evaluation at one point. Since a reasonable juror could conclude that police interests did not weigh in favor of denying Eilman mental health treatment,

---

[15] Defendants, however, do not indicate why this interest favors Cason's and Moreno's decision not to take Eilman to a mental health facility after their interactions with her at the CTA station and prior to Earnest's order that Eilman be processed for arrest. Both Cason and Moreno observed Eilman exhibit extreme mood swings and aggressive, confrontational behavior prior to bringing her to the Eight District station where Earnest declined to provide her mental health treatment.

there is a genuine issue of material fact as to whether police interests support the conclusion that the Defendants' conduct was objectively reasonable.

Drawing all reasonable inferences in a light most favorable to the Plaintiff, Paine has presented a genuine issue of material fact whether the Defendants' conduct in denying Eilman mental health treatment was objectively unreasonable. A reasonable juror could find that Eilman's diagnosed bipolar disorder and bizarre behavior coupled with her complaints of chest pain and difficulty breathing constituted a serious mental health condition, that the Defendants, with the exception of Mabery, were aware of her condition, and that their failure to take any steps to secure medical attention for Eilman was unreasonable. There is ample evidence in the record to question whether the officers should have provided Eilman with a simple transport to the hospital based on her bizarre and grossly unconventional manner during her time within police custody. A reasonable juror could find that police interests did not weigh in favor of denying Eilman mental health treatment under such circumstances.

### III.     "DeShaney" Action Against Heard

In Count XXXIV, Paine asserts a "*DeShaney*" claim against Heard under § 1983. As a preliminary matter, the Court notes that *DeShaney* did not create a cause of action; rather, it defined the duties that a State owes it citizens under the Due Process Clause of the Fourteenth Amendment. *See DeShaney*, 489 U.S. at197. The Court in *DeShaney* held that generally, the state is not under a duty to protect individuals from harm by private actors. *Id.* at 195. The state does, however, assume a duty to protect individuals in two situations where a special relationship has been formed: 1) in custodial settings where the state has limited the individual's ability to care for himself; and 2) when the state affirmatively places the individual in a position of danger that he or she would not

have otherwise faced. *See Estate of Stevens v. City of Green Bay*, 105 F.3d 1169, 1174 (7th Cir. 1997). The second exception is commonly referred to as a "state created danger exception." *Monfils v. Taylor*, 165 F.3d 511, 516 (7th Cir. 1998). Because *DeShaney* did not create a separate cause of action, the Court analyzes Count XXXIV as a § 1983 action alleging a violation of Eilman's substantive due process rights.

To recover under the state created danger exception, a plaintiff must demonstrate that: 1) the state, by its affirmative acts, created or increased a danger faced by an individual; 2) the state's failure to protect that individual from such a danger was the proximate cause of the injury to the individual;[16] and 3) the state's failure to protect the individual "shocks the conscience." *King v. East St. Louis School Dist.*, 496 F.3d 812, 817-18 (7th Cir. 2007).

### A.     State Created Danger

The state creates a dangerous situation or renders an individual more vulnerable to danger "when the state affirmatively places a particular individual in a position of danger the individual would not otherwise have faced." *Monfils*, 165 F.3d at 516-17. "[T]he key question in determining whether state behavior violated the victim's constitutional rights is: 'What actions did the state actor affirmatively take, and what dangers would the victim otherwise have faced?'" *Windle v. City of Marion, Ind.*, 321 F.3d 658, 661 (7th Cir. 2003) (citations omitted); *see Jackson v. City of Joliet*, 715 F.2d 1200, 1204 (7th Cir. 1983) (distinguishing situation where arrest creates the danger, actionable under section 1983, from situation which existed before the defendant acted); *see also DeShaney*, 498 U.S. at 200-01 (distinguishing situation where state "played no part" in creating the dangers that minor child faced by remaining in his father's custody "nor did [the state] do anything to render [the child] any more vulnerable to them."). Here, Paine has raised a triable issue of fact as to whether

---

[16]   The Court will address causation in Section IV.

Heard's conduct affirmatively placed Eilman in a position of danger.

Paine asserts that Heard violated Eilman's due process rights by placing her in a position of heightened risk when Heard released her from the Second District Station. Plaintiffs "may state claims for civil rights violations if they allege state action that creates, or substantially contributes to the creation of, a danger or renders citizens more vulnerable to a danger than they otherwise could have been." *Monfils*, 165 F.3d at 518 (quoting *Reed v. Gardner*, 986 F.2d 1122, 1126 (7th Cir. 1993)); *see also McLin v. City of Chicago*, 742 F.Supp. 994 (N.D. Ill. 1990) (Rovner, J.). "[T]he constitutional right involved was not a right to protection, per se, but rather a right not to be placed at harm by state officials." *Monfils*, 165 F.3d at 518.

In *Monfils*, where the state created danger exception was found to apply, an informant notified the police that his co-worker had stolen property from their employer. *Id.* at 513. The police had recorded the informant's phone call. *Id.* After making the phone call, the informant specifically informed the police department on numerous occasions that he wanted to remain anonymous because his co-worker "was known to be violent." *Id.* Despite their knowledge of this potential danger, the police subsequently disclosed a copy of the tape to the co-worker caught stealing. *Id.* at 515. When the co-worker played the tape, he recognized the informant's voice, and he and five other co-workers killed the informant. *Id.* By releasing the tape, the Court held that the police knowingly took an affirmative action that created a danger that the informant would not have otherwise faced. *Id.* at 518. Similarly, in *Reed*, the police knowingly created danger for the public when they took one driver into custody, leaving an obviously drunk passenger alone with the car and its keys. *Reed*, 986 F.2d at 1125. Because the police knowingly introduced a risk that did not exist before they took the action, they were held liable for the danger they created to others on the road

75

at the time. *Id.*

In *Wood v. Ostrander*, 879 F.2d 583, 599 (9th Cir. 1989), a police officer stopped a car for driving with its high beam lights turned on. *Id.* at 586. After the officer determined that the driver was intoxicated, he arrested the driver and called for a tow truck to have the car impounded. *Id.* When the officer impounded the car, he left the passenger stranded in a high-crime area. *Id.* The passenger walked towards her home until she accepted a ride from an unknown man. *Id.* After the passenger got into the car, the driver took her to a secluded area and raped her. *Id.* In that case, the Ninth Circuit found that the officer assumed a duty to afford the passenger some measure of safety because the officer arrested the driver, impounded his car, and stranded the passenger on the side of a road in a high crime area at 2:30 a.m. *Id.* at 590.

This Court notes that the Ninth Circuit did not analyze that case under *DeShaney*. Rather, the court found the relevant inquiry to be "whether the deprivation is sufficiently serious that the constitutional line has been crossed so as to constitute a deprivation of substantive due process." *Id.* at 589. The court's language closely reflects the analysis under *DeShaney*, however, where it finds that the officer assumed a duty to protect the passenger, not by restraining her freedom to act on her own behalf, but by knowingly stranding her in the middle of a high crime area at 2:30 a.m. *See id.* at 590.

Here, Paine has created a genuine issue of material fact as to whether Heard placed Eilman in a position of heightened risk when she released her from the Second District Station and pointed her north toward 51st Street--an area known for violent crime. Viewing the facts in the light most favorable to Paine, here, as in *Monfils*, Heard had actual knowledge of Eilman's mental health condition based on observations of her behavior while in custody. She listened to Eilman yell for

an extended period of time to no one in particular that she wanted to eat, that she wanted to make a phone call, that her heart hurt and that she could not breathe. Before releasing her, Heard gave Eilman a property bag containing only a pair of sweatpants.[17] In spite of the fact that Heard knew that Eilman was from California and did not have family in the area, she did not provide Eilman with a phone, money, or medication. When Heard saw Eilman acting confused in the parking lot of the Second District Station, Heard pointed Eilman towards 51st Street; she never asked Eilman where she needed to go or if she needed directions to public transportation. Additionally, while Heard denies seeing it, Detective Zelatoris observed Eilman gesture toward him as if to bless him by making the Sign of the Cross while standing in the station's parking lot. Despite being aware of Eilman's bizarre behavior, Heard released and directed Eilman--a young, white woman, thousands of miles from her home--into a high crime area alone and at night with no physical means to leave the area and arguably with an impaired mental ability to think through potential options. Heard was aware of the behavior, her inability to communicate effectively while in custody, and from her police report, Heard was also aware that her home was California and not Chicago. A reasonable jury could find that, like the officer's act of leaving the passenger stranded in *Wood*, 879 F.2d at 599, Heard's actions placed Eilman in dangerous situation that she would not have otherwise faced.

### B.    Conscience Shocking

Whether an individual's conduct "shocks the conscience" in a given case is necessarily a fact-bound inquiry. *County of Sacramento v. Lewis*, 523 U.S. 833, 850 (1998). Here, Paine has raised a triable issue as to whether Heard's conduct in releasing Eilman into a high crime neighborhood and pointing her north across 51st Street shocks the conscience. Because official

---

[17]    The Court notes that although the record reflects that Eilman's property bad contained only a pair of sweatpants, there is also testimony in the record that Eilman later purchased a bottle of water at JJ Fish. However, there is nothing in the record indicating where Eilman obtained the money to purchase the water.

crime reports show that the area where Eilman was left had the highest criminal sexual assault rates in Chicago, Paine has created a genuine issue of material fact regarding Heard's knowledge of the danger Eilman faced. Heard, an officer stationed in that area for the past eight years, may well be chargeable with knowledge of these facts. The inherent danger to a young, white woman left alone at night in a poor, high-crime area with no ability to leave that area is obvious. Exacerbating that situation was Eilman's lack of familiarity with public transportation in Chicago, her unfamiliarity with the Chicago area in general, her lack of clear mental processing that might aid her in problem solving, and her lack of ability to contact her family. The record does not reflect that Eilman had a cell phone, cash, or the articles of personal belongings that were seized from her at the time of her arrest including her plane ticket home on a flight which had long since left the airport terminal.[18] If the jurors find that the officers left a vulnerable, mentally unstable woman to fend for herself when she did not have the physical capability, the tools, or the mental capacity to protect herself from basic harm, the police behavior in this case shocks the conscience.

### IV. Causation

---

[18]Although the parties informed the Court at a status that Eilman had more than those items including a wallet with $7, neither side presented this within their numerous Rule 56 statements. The Court can, and should, require strict adherence to the rules governing summary judgment and is not required to sort through the fourteen file boxes of exhibits and filings to cull the important facts for the parties. *See Cichon*, 401 F.3d at 809-810; *Ammons*, 568 F.3d at 817. Although the Court finds that the lack of certain types of property such as cash for a taxi cab or a working cell phone to place a phone call, could have exacerbated Eilman's situation by leaving her without any access to an avenue of self-help; identifying the exact items of property within her possession when she was released, does not change the Court's analysis that Eilman was left in a significantly more dangerous situation than she would have been had she been treated at a medical facility precisely because if a jury were to find that her mental condition was impaired, even access to this property would not provide her with the avenue of self-help necessary since she would have been incapable of problem-solving, thinking clearly, and utilizing those objects. The record reflects that she was incapable of taking care of her basic bodily functions, namely, her menstrual cycle, so there is little to support that the property could have been used to help her.

To establish liability under § 1983, Paine must "produce evidence . . . that her injuries had a causal connection with the alleged [Section 1983] due process violation." *See Berman v. Young*, 291 F.3d 976, 982 (7th Cir. 2002). More specifically, Paine must demonstrate that the Defendants' actions were the actual and legal causes of Eilman's injuries. *See Ciomber v. Cooperative Plus, Inc.*, 527 F.3d 635, 640 n.1 (7th Cir. 2008).

## A.    Actual Cause

Actual causation exists where an injury would not have occurred but for the Defendants' conduct. *See Hibma v. Odegaard*, 769 F.2d 1147, 1155 (7th Cir. 1985). Here, Defendants dispute that any failure to provide Eilman with access to care or affirmative placement of Eilman into a situation of increased danger actually caused her injuries. The Court addresses their arguments with respect to failure to provide access to care and placing Eilman in a more dangerous position in turn.

### 1)    Access to Care

Defendants first maintain that because their conduct in no way aggravated Eilman's psychiatric or physical ailments, they cannot be held responsible for her psychiatric condition upon release. Defendants are correct that even Paine's expert, Dr. Dvoskin, admits that Eilman's psychiatric condition "was not getting better and was not getting worse." However, Defendants misconstrue the nature of Paine's § 1983 claim. Paine is not claiming that Eilman suffered psychological harm while in custody that lead to her injuries, but that Defendants' failure to take the *affirmative* action of providing medical care to Eilman was an actual cause of her injuries.

Here, Dvoskin's testimony is sufficient to create a genuine issue of material fact as to whether Eilman would not have been injured absent Defendants' failure to provide medical care. Dvoskin opines that if Eilman had been taken to a mental health facility and evaluated, she probably

would have been kept there, either voluntarily or involuntarily. Moreover, if the hospital had been fully informed about her behavior over the course of the previous two days, Dvoskin testifies that it would have involuntarily committed Eilman, and not released her into the surrounding community. He further opines that even if released, Eilman likely would have been given a discharge plan to account for her personal safety, and someone would have likely come to pick her up and assist her in remaining safe. Unlike in *Collignon v. Milwaukee County*, where the expert's "opinion that such an alternative treatment plan would have been more beneficial or even acceptable to Jonathan [was] pure speculation" because there was "no evidence in the record that Jonathan would have submitted to such treatment," 163 F.3d 982, 989 (7th Cir. 1998), here Dvoskin asserts that Eilman would either have been given a safe discharge plan or would have been involuntarily committed. Dvoskin's testimony is also more concrete and based on greater knowledge of Eilman's conditions than the expert's testimony in *Ortiz v. City of Chicago*, where the expert merely speculated as to what might have been without "knowing anything about what [the plaintiff's] medical conditions actually were." *See* 2008 WL 4681156 at *1-2. Although Defendants' expert, Dr. Kennedy, disagrees with Dvoskin and opines that Eilman might have been released into the Robert Taylor Homes area if she were brought to the hospital, Dvoskin's testimony sufficiently establishes a genuine issue of material fact as to whether Eilman would not have been released on her own and later violently injured if Defendants had provided her with access to psychiatric care.

### 2)      Increased Danger

Defendants assert that Paine cannot establish actual causation based on Heard placing her in a position of increased danger because the record does not detail all that transpired from the time Eilman was released from the Second District through Powell's assault. In support, Defendants rely

on *Estate of Stevens*, 105 F.3d at 1169. In *Stevens*, the plaintiff sued the City of Green Bay after Stevens was killed by a driver while intoxicated and wandering in the middle of the road. *Id.* at 1171. Earlier in the night, officers had responded to a bar disturbance and encountered Stevens, who was heavily intoxicated. *Id.* The officers offered to drive Stevens to a nearby gas station so that he could use a pay phone to call for a ride home. *Id.* at 1172. Approximately 90 minutes after the officers left Stevens at the gas station, he was struck by a car and killed. *Id.* at 1172-73. The court held that the plaintiff could not establish "but for" causation because various other factors contributed to this tragedy, primarily Stevens' intoxication. *Id.* at 1177. Specifically, the court stated "because little is know about Stevens' exact whereabouts and actions during the 90 minutes between when the officers dropped him off and he was killed, including whether he drank more during that interval . . . we do not know if he was more or less intoxicated at his death than at the time of his encounter with the police." *Id.* Here, contrary to Defendants' contentions and unlike the situation in *Stevens*, the record provides detailed information as to Eilman's whereabouts between the time that she left the Second District and her attack. Moreover, Eilman's mental condition is not akin to Stevens' intoxication, which Stevens may have voluntarily exacerbated by consuming more alcohol after the officers' involvement in the situation ended. Indeed, Dr. Dvoskin testifies that throughout her time in Chicago, Eilman's psychiatric condition "was not getting better and was not getting worse." (Pl. 56.1 Resp. ¶ 371.) Unlike Eilman, Stevens may have taken an affirmative step to aggravate his condition, thereby contributing to his own injuries. As discussed more fully in the legal cause section below, because Heard placed Eilman into a potentially dangerous situation and cut off all channels of access to self-help, there is a genuine issue of material fact as to whether Eilman would have been attacked absent Heard's actions.

## B.    Legal Cause

To establish legal causation, Paine must demonstrate that Eilman's injury was the "natural and probable or direct consequence" of the Defendants' actions. *See Himba*, 769 F.2d at 1155. "Many factors or things or the conduct of two or more persons may operate at the same time, either independently or together, to cause injury or damage. In such a case *each* may be a proximate cause." *Beard v. Mitchell*, 604 F.2d 485, 497 (7th Cir. 1979). Here, Paine alleges that both Defendants' failure to provide Eilman with access to care and their affirmative placement of Eilman into a situation of increased danger proximately caused her injuries.

### 1)    Access to Care

Paine claims that Defendants failed to provide Eilman with access to psychiatric care while she was in custody, and that their failure to do so proximately caused Eilman's injuries. "Proximate cause is a question to be decided by a jury, and only in the rare instance that a plaintiff can proffer no evidence that a delay in treatment, [or no treatment at all,] exacerbated [or caused] an injury should summary judgment be granted on the issue of causation." *Gayton*, 2010 WL 308756 at *13. Expert testimony that the plaintiff suffered because of a delay in treatment satisfies this requirement. *See Grieveson*, 538 F.3d at 779 (citing *Liefer*, 491 F.3d at 715).

In order to hold Defendants liable for harm to Eilman caused, in a more immediate sense, by Powell's actions, Paine must establish that: 1) Defendants could have foreseen that their conduct would result in some type of injury and that any intervening cause did not sever that foreseeability, *see Enis v. Ba-Call Bldg. Corp.*, 639 F.2d 359, 362 (7th Cir. 1980); 2) the injury is not too remote, *see Martinez v. California*, 444 U.S. 277, 285 (1980); and 3) Defendants' conduct increased the risk of future harm, *Himba*, 769 F.2d at 1155.

82

First, with respect to foreseeability, although the evidence must show that a defendant could have foreseen that his conduct would result in some type of injury, "it is not necessary that the precise injury which occurred should have been foreseen." *See Enis*, 639 F.2d at 362. Defendants claim that Powell's actions constituted an intervening force that severed any foreseeability of Eilman's injuries from their failure to provide access to psychological care. An intervening force may "relieve a defendant from liability for his wrongful conduct" if that intervening force is "outside of the range of reasonable anticipation as a consequence of the defendants' wrongful conduct." *See id.* Here, Dvoskin opines, and Defendants' experts do not refute, that Eilman was a danger to herself while in Chicago and that her mental illness "might have affected her choices"; for example, she might not otherwise have been "thrown out or jumped out the window." Nelson further opines that in her untreated psychological state, Eilman was unable to protect herself from serious harm.

In *Himba v. Odegaard*, the court concluded that "superseding causes prevented" the acts of deputy sheriffs in framing Himba for various crimes from "being a legal cause in bringing about the sexual assault" that later occurred while he was in custody. 769 F.2d at 1147. The rape of the plaintiff, the court held, was a "wholly unforeseen accident[]." *Id.* at 1155. The crucial difference between this case and *Himba*, however, is that Paine's experts have testified that the general type of injury sustained by Eilman was foreseeable given her mental condition at the time. Nelson's and Dvoskin's testimony suffices to create a genuine issue of material fact as to whether Eilman's mental illness, left untreated, affected her choices in such a way that she could foreseeably be vulnerable to being injured by someone like Powell. More specifically, Nelson's opinion that Eilman was unable to protect herself from serious harm indicates that it was foreseeable that she might have experienced "an injury," and that the "precise injury" she suffered–being thrown or jumping from

83

a window--was in that category of serious harm. *See Enis*, 639 F.2d at 362. Similarly, Dvoskin's opinion that she was a danger to herself indicates that it was foreseeable that she might have undertaken an action like jumping out of a window. *See id.* Because "the court should leave the application of the rules to the jury" if "reasonable men could differ as to whether the torts or criminal acts of a third person were intentional or foreseeable," *Himba*, 769 F.2d at 1156, the Court finds that Paine has established a sufficient possibility that Eilman's injury was a foreseeable consequence of the failure to provide care to send the issue to the jury.

Defendants next argue that the injury suffered by Eilman occurred too long after any failure to provide psychological treatment to establish legal causation. As Paine rightly notes, courts have found future events too remote in cases where the injury occurred between five months and eighteen months after the failure to provide care. *See e.g.*, *Cleveland v. Rotman*, 297 F.3d 569 (7th Cir. 2002) (suicide one year after IRS audit); *Martinez*, 444 U.S. at 285 (1980) (child killed five months after the release of a parolee); *Bowers v. DeVito*, 686 F.2d 616 (7th Cir. 1982) (woman killed one year after mental patient's release). Unlike in cases like *Martinez*, where the Court held that the killing of a child was "too remote a consequence" five months after the parolee's release, *id.* at 559, here the injuries to Eilman occurred less than five hours after her release. (Def. 56.1 Reply ¶ 15; Pl. 56.1 Resp. ¶¶ 357; 361.) The remoteness of Eilman's injury alone is thus insufficient to defeat proximate causation.

Finally, Defendants claim that their conduct did not create any increased risk of future harm to Eilman. *Henderson v. Sheahan*, 169 F.3d 839 (7th Cir. 1999). To demonstrate legal causation, plaintiff must show some increased risk of harm, "whether it be twenty percent, fifty-one percent, or ninety-nine percent." *Id.* at 851. In *Henderson*, the court found proximate causation lacking

84

where the plaintiff's expert could not say within a reasonable degree of medical certainty whether a particular person will develop a disease from smoking, such that he could not link the plaintiff's jail conditions to an increased risk to plaintiff's future health. *Id.* at 853. Here, however, Dvoskin opines that if provided with access to psychological treatment, Eilman would have likely been kept at a mental health facility, either involuntarily or voluntarily. Nelson concurs that Eilman would have met the criteria for involuntary admission at a mental facility. Unlike in *Henderson*, where a fact-finder could not infer an increased risk from the expert's testimony, the jury could reasonably infer from Dvoskin's and Nelson's testimony that because Eilman's risk of injury would have decreased had she been provided with access to medical treatment, Defendants' inaction increased her risk of experiencing the type of harm she suffered.

### 2) Increased Danger

Defendants contend that Heard's conduct was not the proximate cause of Eilman's injuries because Heard's actions did not increase the risk of her injury, the risk of any harm was not familiar and specific, and she was not a foreseeable victim of Heard's acts. The Court finds that Paine has set forth a sufficient factual dispute so as to render summary judgment on the issue of legal causation inappropriate.

Defendants first maintain that Paine cannot establish that Heard's act of pointing Eilman toward 51st Street was the legal cause of her injuries where her harm resulted from an outside force, the "risk of which [was] not increased by [Heard's] act." *Hibma*, 769 F.2d at 1155. Here, however, drawing all reasonable inferences in Plaintiff's favor, a reasonable jury could find that Heard's act *did* increase Eilman's risk of being attacked by Powell. Defendants' reliance on *Hibma* is misplaced. As mentioned above, in *Hibma* the plaintiff was framed by various police officers and

ultimately sent to prison where he was sexually assaulted by other inmates. *See id.* In holding that the officers actions were not the legal cause in bringing about the sexual assaults, the court emphasized that when Hibma was transferred from the officers' custody to the custody of the prison system, the duty to protect Hibma shifted from the officers to the prison system. *See id.* The court stated that "when the duty to prevent harm to a tort-feasor's victim shifts from the tort-feasor to a third party, the third party's failure to prevent harm to the victim may become a superseding cause and relieve the tort-feasor from liability." *Id.* at 1156.

Here, unlike the plaintiff in *Hibma*, Eilman was *not* released into the custody of a third party who had an affirmative duty to protect her. Instead, she was released alone, at night, without any protection, money or a phone, into a high crime neighborhood that the officers knew to be a high crime neighborhood during a time when she was in a weakened mental state not capable of full mental functioning in order to protect herself.[19] Moreover, the record reflects that Heard knew that Eilman was not from Chicago and had no family in the area, and saw that she had a "confused" look on her face when she was standing in the parking lot of the Second District station. To make matters worse, Eilman was a young white woman being released into a predominately black, poor neighborhood. Dr. Sampson, Paine's criminology expert, opined that these factors, combined with Eilman's lack of familiarity with her surroundings and apparent vulnerability, put her at a much greater risk of predatory victimization. Additionally, unlike the third party sexual assault in *Hibma*, which is theoretically not expected to happen in a controlled environment like a prison, Dr. Sampson testified that in 2006, the year that Eilman was victimized, Fuller Park and Washington Park (the

---

[19]Eilman's lack of ability to care for herself is exhibited in her inability to keep her basic bodily function, menstruation, in an hygenic and socially acceptable manner. If that basic function was so impaired, and was not remedied prior to her release, how would a reasonable person believe that she could care for herself in a foreign city at night?

community areas where Eilman was released) had the highest rates of criminal sexual assault of all community areas in Chicago. Who better to know this fact than the police officers assigned to those areas? Sampson opines that the Fuller Park and Washington Park communities had a nearly 15% higher risk of criminal sexual assault when compared with the community where Eilman was first arrested. While Defendants are correct that one can be a victim of crime in any neighborhood, a reasonable jury could find that Heard, being an officer in the Second District for eight years, knew of the increased risk Eilman faced when she directed her north across 51st street in "high crime" neighborhood. Lastly, Sampson opines that Eilman's unusual behavior prior to her release from the Second District station put her particularly at risk of being a victim of violent crime, especially in light of the fact that she was released at night.

Next, Defendants assert that if Heard's act created a risk, the risk was not "familiar and specific" so as to limit the range and duration of the threat of harm. (R. 520, p. 58.) Whether a risk is familiar is a fact-specific inquiry and involves consideration of time, geography, range of potential victims, and the nature of the harm that occurred. *See Buchanan-Moore v. County of Milwaukee*, 570 F.3d 824, 829 (7th Cir. 2009). In *Reed v. Gardner*, 986 F.2d 1122 (7th Cir. 1993), the court held that the plaintiffs had sufficiently stated a claim that the state affirmatively created a danger and that the plaintiffs were foreseeable victims. *Id.* at 1127. In *Reed*, a drunk driver crossed the center line of the highway and crashed into Reed's car. *Id.* at 1123. Earlier in the day, the defendant officers had arrested the original driver of the car and left behind the individual that ultimately caused the car crash. *Id.* at 1123-24. In finding that the risk to Reed was foreseeable, the court emphasized that the police could be expected to know that the intoxicated man they placed behind the wheel suffered from impaired judgment and diminished motor skills; these were dangers that

87

were familiar and specific, and the threat of harm to other motorists was limited in time and scope. *Id.* at 1127.

Here, like in *Reed*, releasing Eilman–a young, white and potentially mentally unstable woman– into a high crime neighborhood and directing her out of the parking lot alone without access to transportation or familial support created a danger that was familiar and specific to Heard. While Defendants are correct that a risk faced by the "public at large" is not sufficiently specific to be a foreseeable result of state action, *see Martinez*, 444 U.S. at 285, the risk to Eilman when she was released was much more particularized. Indeed, the crux of Paine's allegation that Eilman was a foreseeable victim does not rest merely on the fact that she was released into high crime neighborhood, but rather that she was released into such a neighborhood with no mechanism for self-protection and no reasonable alternatives to accommodate for her safety. *Compare Buchanan-Moore*, 570 F.3d at 828 (plaintiff's claim that he was a foreseeable victim because he lived in a geographic area where the County released a convicted felon failed because such a generalized, amorphous zone of danger is insufficient to trigger a state duty to protect). Moreover, Eilman was attacked less than five hours after being released, at a location that was a mere block and half from the Second District station.

With respect to Defendants' argument that Eilman was not a foreseeable victim, the Court again notes that it must leave the issue of legal causation to the jury if reasonable minds could differ as to whether a third party's criminal acts were foreseeable. *See Hibma*, 769 F.2d at 1155. Drawing all reasonable inferences in Paine's favor, Heard placed Eilman in a high crime neighborhood, without to place a call to her friends or family and without inquiring into her ability to reach a safe destination. The record reflects that Eilman knew no one in Chicago and had asked to use

someone's phone at the restaurant. Put simply, Eilman was left with only a single, dangerous alternative: she had to interact with a member of the community in order to have any hope of removing herself from the situation in which Heard placed her and that interaction would inherently reveal that she was vulnerable. *See Estate of Stevens*, 105 F.3d at 1177 (state created danger established where state greatly increased danger to plaintiff while cutting off all avenues of aid without providing a reasonable alterative). Additionally, as discussed above, a reasonable jury could find that Eilman's behavior while in custody demonstrated that she had a serious mental health condition, such that any alternatives to interacting with a community member upon her release were inhibited by Eilman's mental state. The cumulative impact of the unique set of circumstances at issue, then, creates a genuine issue of material fact as to whether Eilman's injury was a foreseeable consequence of Heard's actions. *See Wood*, 879 F.2d at 590 (defendant officer engaged in reckless conduct where he left plaintiff alone and on foot in a high crime area); *White v. Rochford*, 592 F.2d 381 (7th Cir. 1979) (defendant officers engaged in reckless conduct where they arrested a driver and left young children stranded on the highway).

Lastly, Defendants argue that Paine cannot establish legal causation because "there is no indication that Heard knew that Powell existed, that Powell was currently in the area, or that Powell had a propensity for violent crime." (R. 520, at p. 59.) The relevant inquiry, however, is not whether Heard knew that Powell himself posed a risk to Eilman, but rather whether a reasonable jury could find it foreseeable that Eilman would suffer some type of injury as a result of her actions. *See Enis*, 639 F.2d at 362 (plaintiff must show that defendant could have foreseen that his conduct would result in some type of injury, "it is not necessary that the precise injury which occurred should have been foreseen."). Drawing all reasonable inferences in the Plaintiff favor, therefore, Paine has

89

created a genuine issue of material fact as to whether Heard's actions were the legal cause of Eilman's sexual assault and subsequent injuries.

### V.        Qualified Immunity

Finally, Defendants contend that they are shielded from liability by qualified immunity. Qualified immunity protects government officials performing discretionary functions from liability "insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982); *see Akande v. Grounds*, 555 F.3d 586, 589 (7th Cir. 2009). The availability of qualified immunity turns on a two-part analysis: (1) whether the facts alleged or shown by the plaintiff make out a violation of a constitutional right; and (2) whether that right was clearly established at the time of the defendant's misconduct. *Pearson v. Callahan*, 129 S.Ct. 808, 818 (2009). Under *Pearson*, the Court may exercise discretion as to which of these issues it addresses first. *See id.* at 818.

Because Paine has established a genuine issue of material fact regarding Defendants' violation of Eilman's Fourth Amendment rights by denying her mental health treatment and Fourteenth Amendment due process rights by failing to act after creating a danger, the Court turns to whether these rights were clearly established at the time of Defendants' alleged misconduct. Under this standard, "[t]he contours of [the constitutional] right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right." *Anderson v. Creighton*, 483 U.S. 635, 640 (1987); *see also Chaklos v. Stevens*, 560 F.3d 705, 716 (7th Cir. 2009). A plaintiff may defeat a qualified immunity defense by pointing "to a clearly analogous case establishing a right to be free from the specific conduct at issue" or by showing that "the conduct is so egregious that no reasonable person could have believed that it would not violate clearly

established rights." *Wheeler v. Lawson*, 539 F.3d 629, 640 (7th Cir. 2008) (citations omitted). The Supreme Court has rejected the notion that analogous cases must be exactly the same before an official is on notice that his conduct was unconstitutional. *See Hope v. Pelzer*, 536 U.S. 730, 741 (2002).

**A.     Fourth Amendment Violations for Failure to Provide Medical Treatment**

Because the Counts at issue state claims against the officers for unreasonably failing to provide Eilman with medical or mental treatment under the Fourth Amendment, as incorporated against the states through the Fourteenth Amendment's Due Process Clause, the Court must determine whether access to mental health care was a clearly established right for pre-trial detainees in May 2006.

Courts evaluate whether the law was clearly established in the context of a specific case. *See Saucier v. Katz*, 533 U.S. 194, 201 (2001). However, a right need not be defined "so intricately that invariably guiding law never can be found." *Rackovich v. Wade*, 850 F.2d 1180, 1211 (7th Cir. 1987) (en banc); *see also Board v. Farnham*, 394 F.3d 469, 477 (7th Cir. 2005). To qualify as a clearly established right it need only be "sufficiently particularized to enable [courts] to determine whether the officers were on notice that their actions violated clearly established law." *Id.* at 1211.

When the Supreme Court decided *DeShaney* in 1989, it reasoned: "when the state by the affirmative exercise of its power so restrains an individual's liberty that it renders him unable to care for himself, and at the same time fails to provide for his basic human needs–*e.g.*, food, clothing, shelter, *medical care*, and reasonable safety–it transgresses the substantive limits on state action set by . . . the Due Process Clause." *DeShaney*, 489 U.S. at 1005 (emphasis added). Moreover, a pretrial detainee's "right to receive adequate treatment for serious medical needs is a clearly

91

established constitutional right." *Board v. Farnham*, 394 F.3d at 485; *see also Collignon*, 163 F.3d at 991(substantive due process requires the state to provide for the basic medical needs of pretrial detainees). It is also well established that a serious mental illness, like any serious medical condition, requires treatment appropriate to the situation. *See Sanville*, 266 F.3d at 734; *see also Antonelli*, 81 F.3d at 1432 ("inmates may not be denied all treatment of a serious psychiatric or psychological condition"); *Meriwether*, 821 F.2d at 413 (a psychiatric or psychological condition may present a "serious medical need"). Because these cases clearly establish that a pre-trial detainee is entitled to mental health treatment for a serious mental health condition, Defendants had fair warning that their treatment of Eilman was unconstitutional. *See Hope*, 536 U.S. at 740-41; *Wheeler*, 539 F.3d at 640.

Defendants assert that they are entitled to qualified immunity because it was not clearly established in May 2006 that a police officer's failure to provide medical treatment would be evaluated under an objective reasonableness standard as opposed to a deliberate indifference standard. Defendants note that the Seventh Circuit first applied an objective reasonableness standard to a claim of inattention to medical needs in 2007. *See Sides*, 496 F.3d at 823. In applying an objective reasonableness standard to an arrestee's conditions of confinement prior to a *Gerstein* hearing, however, the court in *Sides* cited the Supreme Court's decision in *Graham v. Connor*, 490 U.S. 386 (1989), for the proposition that "[t]he governing standard at the time of arrest is the Fourth Amendment's ban on unreasonable seizures." *Id*. at 394-95. This objective reasonableness standard was recognized over twenty years ago. Moreover, the Seventh Circuit consistently held in decisions prior to May 2006 that Fourth Amendment protections apply from one's arrest through a *Gerstein* probable cause hearing, while Fourteenth Amendment due process principles govern a pretrial

detainee's conditions of confinement after the judicial determination of probable cause. *See e.g.,*
*Brokaw v. Mercer County*, 235 F.3d 1000, 1018 n. 14 (7th Cir. 2000); *Luck v. Rovenstine*, 168 F.3d
323, 326 (7th Cir. 1999); *Reed v. City of Chicago*, 77 F.3d 1049, 1052 (7th Cir. 1996); *Villanova
v. Abrams*, 972 F.2d 792, 797 (7th Cir. 1992).

Defendants next point to *Collignon*, 163 F.3d 982, and *Chapman v. Keltner*, 241 F.3d 842
(7th Cir. 2001), where the court analyzed the failure to provide medical needs to arrestees under the
Fourteenth Amendment's deliberate indifference standard. Defendants' reliance on these cases is
misplaced because "a decision that employs a mutual (and mutually mistaken) assumption of the
parties without subjecting it to independent analysis does not constitute a holding on the subject."
*Sides*, 496 F.3d at 828. Additionally, the Court notes that even if evaluated under the Fourteenth
Amendment's deliberate indifference standard, the record contains genuine issues of material fact
that precludes summary judgment on Paine's denial of mental health care claim. A reasonable jury
could find that Eilman had an objectively serious mental health condition that Defendants knew
about and disregarded. *See Hayes*, 546 F.3d at 522.

Defendants then maintain that Eilman did not have a right to be involuntarily committed to
a mental health facility. *See Wilson v. Formigoni*, 42 F.3d 1060, 1066 (7th Cir. 1994) ("[T]here is
no constitutional right to be deprived of liberty . . . ."); *Archie v. City of Racine*, 847 F.2d 1211, 1221
(7th Cir. 1988) (*en banc*) ("[T]he Due Process Clause does not require the state to imprison [insane
persons] or protect its citizens from them."). While that is a correct statement of the law, Defendants
ignore that the police had already taken Eilman into custody. *See Collignon*, 163 F.3d at 987
("When a state actor . . . deprives a person of his ability to care for himself by . . . detaining him .
. ., it assumes an obligation to provide some minimum level of well-being and safety."). In

93

*Collignon*, the state had an obligation to provide a detainee with constitutionally adequate mental health treatment while it detained him. *Id.* at 991. Once the detention ended, however, Collignon no longer had a right to receive treatment from the state or to receive an involuntary commitment to a mental health facility. *Id.* at 991-92. Although Defendants rely on *Collignon* to argue that Eilman had no right to involuntary commitment, *Collignon* clearly establishes Eilman's due process right to receive basic medical treatment while in custody, including mental health treatment. *Id.* at 991. Here, Paine alleges that Eilman received no such treatment despite exhibiting the symptoms of a serious psychiatric episode. Lastly, Defendants argue that Paine cannot show that it was clearly established that an arrestee who was not suicidal would be constitutionally entitled to involuntary mental health treatment. First, there is nothing in the record to reflect that Eilman's mental health treatment would have been involuntary: she never refused treatment or stated that would not consent to treatment. Moreover, Defendants misstate the standard and downplay Eilman's medical condition. A plaintiff need only "show, on some level, that a violation of this right has been found in factually similar cases, or that the violation was so clear that a government official would have known that his actions violated the plaintiff's rights even in the absence of a factually similar case." *Lee*, 533 F.3d at 512. Case law establishes that a pre-trial detainee need not be suicidal in order to receive mental health treatment. *See Meriwether*, 821 F.2d at 414 (detainee entitled to mental health care for gender dysphoria); *Joseph v. Brierton*, 739 F.2d 1244, 1246 (7th Cir. 1984) (pre-trial detainee entitled to mental health care for acute psychosis). Any distinction Defendants try to draw between an arrestee's right to mental health treatment and a pre-trial detainee's right to mental health treatment is unfounded. There is no material difference between what constitutes a serious mental health condition for an arrestee and a pre-trial detainee; the clearly established rights of pre-

94

trial detainees should have put officers on notice of the rights of an arrestee. The distinctions that Defendants draw are too particularized to deny that Paine's right was clearly established. *See Rackovich*, 850 F. 2d at 1211. In short, there need not be a non-suicidal mental health need case involving an arrestee that is squarely on point in order for the Court to find that the right at issue was clearly established. *See McGreal v. Ostrov*, 368 F.3d 657, 683 (7th Cir. 2004) ("The salient question is not whether there is a prior case on all fours with the current claim but whether the state of the law at the relevant time gave the defendants fair warning that their treatment of the plaintiff was unconstitutional."). In sum, qualified immunity does not shield the Defendants Cason, Moreno, Berglind, Earnest, Stokes, Williams, Quinn, Hudson, Smith and Heard from liability as to Counts II, VI, X, XV, XVIII, XX, XXII, XXIV, XXVIII, and XXXIII of Paine's Third Amended Complaint.

### B. Fourteenth Amendment Violation for Failure to Act After Creating Risk

Having determined that there is a genuine issue of material fact as to whether Heard's actions violated Eilman's due process rights under the Fourteenth Amendment, the Court now addresses whether the defense of qualified immunity shields Heard from that claim. When the state affirmatively places an individual in a position of danger that the individual would not have otherwise faced, the state assumes a duty to protect the individual. *See Stevens*, 105 F.3d at 1174; *see also Monfils*, 165 F.3d at 518; *Reed*, 986 F.2d at 1125. Even before the Supreme Court decided *DeShaney*, the Seventh Circuit recognized that the police violate constitutional rights when they create a dangerous situation for an individual and subsequently fail to protect the individual from harm. *See White v. Rochford*, 592 F.2d 381 (7th Cir. 1979) (finding allegations stated a claim for constitutional violations when police arrested a man for drag racing and left his passengers, who were young children, stranded on the side of the Chicago Skyway on a cold evening); *Wallace v.*

*Adkins*, 115 F.3d 427, 429 (7th Cir. 1997) (state creates "special relationship" and an obligation to provide protection when it "affirmatively places the individual in a position of danger the individual would not have otherwise faced."). It is also clearly established that the act of affirmatively placing someone in a dangerous situation with no reasonable mechanisms for self-help places an individual in a position of danger. *See Wood*, 879 F.2d at 583; *Bowers*, 686 F.2d at 618 (abandoning a person in a position of danger is no less a tort than to throw him into a "snake pit"); *Spence v. Staras*, 507 F.2d 554, 557 (7th Cir. 1974) (state prison personnel can be liable under § 1983 when they place a prisoner in a cell knowing he is likely to be a victim of violence by another inmate). Therefore, clearly established law indicated that Heard could not release Eilman from custody in a manner that increased her risk of harm, and Heard is not entitled to qualified immunity for her actions.

In sum, qualified immunity does not shield Defendants' actions because there are genuine issues of material fact as to whether Defendants violated Eilman's clearly established constitutional rights.

96

## CONCLUSION AND ORDER

For the reasons stated, Defendants' Motion for Summary Judgment is granted with respect to Count XXVI (claim against Defendant Mabery for failure to provide medical care) of Paine's Third Amended Complaint and denied as to Counts II, VI, X, XV, XVIII, XX, XXII, XXIV, XXVIII, XXXIII (claims against Defendants Cason, Moreno, Earnest, Berglind, Stokes, Williams, Hudson, Quinn, Smith and Heard for failure to provide medical care), XXXIV (claim against Heard for failure to respond after creating increased risk) and XXXVIII (*Monell* claim against the City of Chicago).

Virginia M. Kendall, United States District Judge
Northern District of Illinois

Date: February 22, 2010