IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| KATHLEEN PAINE, as Guardian of the Estate of CHRISTINA ROSE EILMAN, a Disabled Person, | )<br>)<br>) |
| Plaintiff, | ) Case No. 06 C 3173<br>) |
| v. | ) Judge Virginia M. Kendall<br>) |
| OFFICER JEFFREY JOHNSON, OFFICER, RICHARD CASON, OFFICER ROSENDO MORENO, LIEUTENANT CARSON EARNEST, SERGEANT DAVID BERGLIND, DETENTION AIDE SHARON STOKES, OFFICER TERESA WILLIAMS, DETENTION AIDE CYNTHIA HUDSON, DETENTION AIDE CATONIA QUINN, OFFICER DEBORAH MABERY, OFFICER PAMELA SMITH, OFFICER BENITA MILLER, OFFICER PAULINE HEARD, and CITY OF CHICAGO, a municipal corporation, | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) |
| Defendants. | ) |

**MEMORANDUM OPINION AND ORDER**

Plaintiff Kathleen Paine ("Paine"), as Guardian of the Estate of Christina Rose Eilman ("Eilman"), filed this suit against the City of Chicago and various members of the Chicago Police Department (collectively, "Defendants"), alleging violations of Eilman's constitutional rights and violations of federal and Illinois law. As more fully set forth in this Court's Memorandum Opinion and Order dated February 22, 2010, Paine brings this suit on behalf of Eilman, her daughter, for injuries that Eilman incurred after the Chicago Police Department released her from custody. Paine has now moved to exclude all or parts of the proposed testimony of eight expert witnesses. Defendants have moved to exclude all or parts of the proposed testimony of seven expert witnesses.

For the reasons stated below, Defendants' Omnibus Motion to Exclude Certain Expert Testimony is denied as to the expert testimony of Dr. Robert Sampson.

## STANDARD OF REVIEW

The admissibility of expert testimony is governed by Federal Rule of Evidence 702 ("Rule 702") and *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993) and its progeny. *See Ervin v. Johnson & Johnson, Inc.*, 492 F.3d 901, 904 (7th Cir. 2007). Rule 702 states: "If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise." The Seventh Circuit has developed a three-step admissibility analysis for expert testimony under Rule 702 and *Daubert*. *See Ervin*, 492 F.3d at 904. First, "the witness must be qualified 'as an expert by knowledge, skill, experience, training, or education.'" *Id.* (quoting Fed.R.Evid. 702). Second, "the expert's reasoning or methodology underlying the testimony must be scientifically reliable." *Id.* (citing *Daubert*, 509 U.S. at 592-93). Courts are, however, granted "broad latitude when [they] decide[] *how* to determine reliability." *Kumho Tire Co. v. Carmichael*, 526 U.S 137, 142 (1999). Finally, the expert's testimony must be relevant, or "assist the trier of fact to understand the evidence or to determine a fact in issue." *Ervin*, 492 F.3d at 904.

## DISCUSSION

I. **Defendants' Motion to Bar the Expert Testimony of Dr. Robert Sampson**

Dr. Robert Sampson is an expert criminologist who opines that it was manifestly foreseeable that Eilman's personal characteristics and the characteristics of the neighborhood into which she was released would combine to put her at an increased risk of personal harm. Defendants argue that his

2

opinions are unreliable because they were not reached via a proper methodology, that they are irrelevant to the determinative issues in this case, and that they should not be admitted because Sampson's testimony would confuse and mislead the jury and be unfairly prejudicial.

### A. Qualifications

Defendants do not challenge Sampson's qualifications to testify as a sociological expert. According to his "Biographical Sketch," Sampson is currently the Chairman of the Department of Sociology at Harvard University. (*See* R. 573, Ex. F, Biographical Sketch of Robert J. Sampson, Ph.D.) He has several decades of experience in the fields of sociology and criminology, and an extensive list of relevant scholarly publications. (*See id.*) The Court accordingly finds him qualified on the basis of his education and extensive experience to offer expert testimony on sociological issues. *See Reilly v. Blue Cross & Blue Shield United of Wisc.*, 846 F.2d 416, 421 (7th Cir. 1988) (reviewing experts' curricula vitae in order to support an unchallenged finding that the experts were qualified in their fields).

### B. Methodology

Defendants challenge the methodology by which Sampson reached his opinions on four grounds: 1) that his opinions are not based on sufficient facts or data; 2) that his opinions rely on untested and untestable theories; 3) that the standards applied in Sampson's Report are entirely different from those used in his regular professional work; and 4) that his opinions extend into areas where he is not an expert and therefore rest upon an unreliable foundation.

#### *1. Foundation and Basis of Opinions*

With respect to their challenge to the underlying basis for Sampson's opinions, Defendants are apparently challenging the factual basis for Sampson's conclusion that Eilman was at an

3

increased risk of harm due to her personal characteristics. They make no argument concerning the basis for his conclusions regarding the characteristics of the neighborhood into which Eilman was released. In support of their challenge, Defendants primarily rely upon the argument that Sampson's identified individual risk factors are at odds with the data collected in the National Crime Victimization Survey ("NCVS"), which Sampson described during his deposition as "a high-quality data set." (*See* R. 610, Ex. C, Deposition Testimony of Robert Sampson, at 146.) (hereinafter "Sampson Dep."). This particular challenge would go to the weight of Sampson's testimony, and not to its admissibility. The mere fact that Sampson did not rely upon Defendants' preferred data set, even if that data set is one he admits to be reliable and respected, does not mean that the materials upon which he did rely were insufficient to support his conclusion. Defendants attempt to brush aside the materials upon which did Sampson rely by erroneously stating in their Motion that Sampson "did no research about the facts of the case other than reading newspaper reports and facts sent to him by" Paine's counsel. (R. 573 at 2.) However, Defendants were aware from their questioning of Sampson during his deposition that Sampson had reviewed, at the very least, numerous depositions taken from other witnesses in this case. (*See, e.g.*, Sampson Dep. at 33-34, 41, 65, 66-67). The Court does not find Defendants' misleading and incomplete attack on the basis of Sampson's opinions to be a sufficient reasons to bar his opinions as unreliable.

### *2. Tested or "Testable" Theory*

However, Defendant's argument that Sampson's conclusions about Eilman's individual risk factors did not result from a tested or "testable" theory does present a cognizable *Daubert* challenge to the reliability of Sampson's opinion. The conclusions of social science experts must meet the same standards as those of experts in the hard scientists, although "the measure of intellectual rigor

4

will vary by the field of expertise . . . ." *Tyus v. Urban Search Mgmt.*, 102 F.3d 256, 263 (7th Cir. 1996). That means that the Court must consider whether Sampson's conclusions are testable, subjected to peer review or publication, produced by a reliable method using some discernable technique, and the result of a generally accepted methodology or process. *See Zenith Electronics Corp. v. WH-TV Broadcasting Corp.*, 395 F.3d 416, 418 (7th Cir. 2005).

Here, Defendants argue that the sociological theory upon which Sampson relies, the Routine Activities Theory ("RAT"), is "too vague to be applied to individuals" and, for that and other reasons, cannot meet *Daubert*'s admissibility requirements. (R. 573 at 11.) In support of this contention, Defendants cite to the deposition testimony of their rebuttal expert, Callie Rennison, who testified at deposition that RAT is difficult to apply because "there's not good data out there even to test it." (*See* R. 573, Ex. E, Deposition Testimony of Callie M. Rennison, at 282.) (hereinafter "Rennison Dep.) Rennison also stated, however, that RAT is a theory that "has been around for several decades" and one that is used by at least some criminologists to "guide their research . . . ." (Rennison Dep. at 125, 134.) More importantly, Rennison stated that RAT "doesn't necessarily apply to [her] work" and that she doesn't "spend a lot of time thinking about it one way or another." (Rennison Dep. at 135.)

The Court declines to accept a *Daubert* challenge to Sampson's methodology based upon the testimony of one competing criminologist who specifically conceded a lack of expertise in the reliability or use of the challenged theory. The available evidence, including Rennison's own testimony, reflects that RAT is an accepted theory in the field of criminology and that various criminological researchers have used it in their work. To the extent that Rennison disagrees with Sampson's specific application of the theory to the facts of the case, Defendants may elicit her

5

testimony in that regard during trial, and may cross-examine Sampson himself on the issue of whether he properly applied the theory to the facts of this case. These are, once again, issues that properly go to the weight of Sampson's testimony, and not to its admissibility.

### *3. Departure from Standard Practices*

As a final challenge to Sampson's methodology, Defendants argue that his "own professional work further indicts the reliability of his opinions because his regular work is so entirely different from his work on this case." (R. 573 at 11.) Defendants state that Sampson has never previously used the phrase "manifestly foreseeable" in his prior research, and thus this opinion represents a departure from his established areas of expertise. Defendants also argue that Sampson's "entire career rests on the use of sophisticated quantitative methods to prove or disprove a theory" and that his opinion here is unreliable because it does not rely upon such methods.

Expert witnesses are required to "adhere to the same standards of intellectual rigor that are demanded in their professional work" when testifying in court. *Rosen v. Ciba-Geigy Corp.*, 78 F.3d 316, 318 (7th Cir. 1996). This does not equate to a requirement, however, that experts use precisely the same terminology in court as in their professional lives, or even that they use the same methodology. Defendants present no evidence in support of their contention that Sampson's methodology represented an abandonment of "the norms of his profession," instead only demonstrating that it different from his typical practice. (R. 573 at 12-13.)

As discussed above, the Court finds the basis for Sampson's opinions to be adequate and his methodology sufficient. The difference between Sampson's methods here and those used in his extensive research history is an appropriate subject for cross-examination, but not a reason to bar his testimony entirely.

### *4. Opinions Outside Sampson's Area of Expertise*

Finally, Defendants argue that Sampson's opinions are unreliable because "too much" of his testimony draws from fields of expertise in which he is not an expert. First, Defendants argue that Sampson's opinions comprise commentary on "policing strategies" and recommendations about what police policies should be, and that he is unqualified to offer testimony about policing strategies. Sampson does not appear to have considered any potentially inadmissible conclusions about police practices in formulating his ultimate conclusion, however; rather, the challenged testimony about police practices was elicited at deposition (*see* Sampson Dep. at 120-22; 171-74), and not mentioned in Sampson's Report. Thus, there is no indication that any ideas that Sampson may have about police practices formed a basis for his ultimate opinion in this case, and his opinion cannot be barred as unreliable on this ground.

Second, Defendants argue that Sampson is unqualified to reach the conclusion that Eilman was impaired at the time she was released from the Second District, and thus that his opinion must be barred to the extent it relies upon this conclusion. Sampson clearly stated that his opinion about Eilman's mental state was only a lay opinion, however, and does not put himself forward as a psychological or psychiatric expert. (*See* Sampson Rep. at 4, 5.) He need not be qualified as a mental health expert in order to draw the conclusion, on the basis of ample eyewitness testimony and testimony from other experts in this case, that Eilman was impaired at the time of her release.

Sampson's offered opinions, therefore, are not based on any knowledge of police practices, and his conclusion about Eilman's psychiatric state is not offered as expert testimony. Thus, Sampson's opinion will not be barred on the grounds that its bases are outside his area of expertise.

**C. Relevance**

Defendants argue that Sampson's testimony is not relevant because it does not relate to the issues of whether it was reasonable for Defendants to fail to provide Eilman with mental health treatment or whether Defendant Heard increased Eilman's risk of harm by pointing north upon releasing Eilman from the Second District police headquarters. Defendants are correct that Sampson's testimony does not relate to the issue of medical treatment, but err in framing the question of Defendants' liability as turning solely on whether Defendant Heard increased Eilman's risk of harm by pointing her north from the police station. As more fully described in this Court's Opinion and Order addressing Defendants' Motion for Summary Judgment on Paine's § 1983 claims, the jury must decide whether Defendants' conduct created an increased risk of future harm to Eilman. *See Henderson v. Sheahan*, 169 F.3d 839 (7th Cir. 1999). Sampson's testimony is highly relevant to the issue of whether Defendants created an increased risk of harm by releasing an individual with Eilman's particular characteristics into a neighborhood, or set of neighborhoods, with the characteristics of those areas surrounding the Second District Station. Sampson's testimony is also relevant to the question of whether Defendants could have foreseen the intervening criminal act that ultimately led to Eilman's severe injuries. The testimony regarding crime rates within various areas of the City is also helpful to the jurors who would not normally have that type of information within their ken.

Sampson's testimony is therefore relevant and will be helpful to the trier of fact in determining issues critical to the Defendants' liability for Eilman's injuries.

**D. Rule 403**

Finally, Defendants challenge Sampson's testimony on the grounds that it is "nothing better than ethnic or cultural stereotyping" that will encourage the jury to focus on "whether the South Side of Chicago is 'too black' or 'too poor' or has 'too much crime' for a white woman to walk through it." (R. 573 at 13-14.) If the probative value of Sampson's opinions are outweighed by the danger

that they will create unfair prejudice or confusion of the issues, they may be excluded. *See* Fed. R. Evid. 403.

However, it is not Sampson's testimony, but rather Defendants' misleading characterization of it, that will tend to mislead and confuse the jury. Sampson stated at his deposition that he would have the same opinion regarding Eilman's risk of victimization even if she were African-American and not Caucasian. (*See* Sampson Dep. at 151.) When asked what policy policies he would recommend that police departments adopt with respect to the release of particular individuals, he specifically stated that he "would not start with the race of the person" but rather "take into account the conditions under which they released people and the crime rate of the neighborhood as the primary marker of risk . . . ." (*See* Sampson Dep. at 166.) For Defendants to then characterize Sampson's opinion as stating "that a young, white woman should not have been released into a poor black neighborhood" is inflammatory and prejudicial, but the opinion itself is not. (R. 573 at 14.)

For the same reason, Sampson's opinions are not inadmissible on the grounds that it would be confusing to the jury. Defendants argue that Sampson's testimony is misleading because it implies that police have a duty to "determine whether the race, gender and age of a released prisoner fits the neighborhood of her release . . . ." (R. 573 at 15.) Sampson does not offer any such opinion. Rather, he states as an expert in the field of sociology and criminology that race, gender and age are victimization risk factors, and that these factors, in combination with the characteristics of the neighborhood into which Eilman was released, placed her at an increased risk of harm. His opinions are therefore highly relevant to the jury's determination of Defendants' liability for Eilman's injuries.

Because Sampson's opinions, when accurately described and characterized, are not unduly prejudicial nor unduly likely to mislead or confuse the jury, his testimony will not be barred on Rule 403 grounds.

**CONCLUSION AND ORDER**

Sampson's proposed testimony sets forth the reliable, relevant, and highly probative opinions of a well-qualified expert in the fields of criminology and sociology. Defendants' Omnibus Motion to Exclude Certain Expert Testimony is denied as to the expert testimony of Dr. Robert Sampson.

_____
Virginia M. Kendall
United States District Court Judge
Northern District of Illinois

Date: February 25, 2010