IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| KATHLEEN PAINE, as Guardian of the Estate of CHRISTINA ROSE EILMAN, a Disabled Person, | ) ) ) | |
| | ) | Case No. 06 C 3173 |
| Plaintiff, | ) | |
| v. | ) | Judge Virginia M. Kendall |
| | ) | |
| OFFICER JEFFREY JOHNSON, OFFICER, RICHARD CASON, OFFICER ROSENDO MORENO, LIEUTENANT CARSON EARNEST, SERGEANT DAVID BERGLIND, DETENTION AIDE SHARON STOKES, OFFICER TERESA WILLIAMS, DETENTION AIDE CYNTHIA HUDSON, DETENTION AIDE CATONIA QUINN, OFFICER DEBORAH MABERY, OFFICER PAMELA SMITH, OFFICER BENITA MILLER, OFFICER PAULINE HEARD, and CITY OF CHICAGO, a municipal corporation, | ) ) ) ) ) ) ) ) ) ) ) ) ) ) | |
| Defendants. | ) | |

**MEMORANDUM OPINION AND ORDER**

Plaintiff Kathleen Paine ("Paine"), as Guardian of the Estate of Christina Rose Eilman

("Eilman"), filed this suit against the City of Chicago ("the City") and various members of the

Chicago Police Department (collectively "Defendants"), alleging violations of Eilman's

constitutional rights and federal law. The City has moved for summary judgment on Count XXXIX

of Paine's Third Amended Complaint, which brings a claim against the City pursuant to Title II of

the Americans with Disabilities Act ("ADA"), 42 U.S.C. § 12132. For the reasons set forth herein,

the City's Motion for Summary Judgment as to Count XXXIX is denied.

## STATEMENT OF UNDISPUTED FACTS

In February of 2005, Christina Eilman suffered from her first known manic episode. (Pl. 56.1 Resp. ¶ 45.)[1] During this episode, she was involuntarily committed to Sierra Vista Hospital, a mental health facility, because she was deemed a threat to herself or others. (Def. 56.1 Reply ¶ 10.) Eilman was subsequently diagnosed with bipolar disorder. (Pl. 56.1 Resp. ¶ 1.) Bipolar disorder is a severe mental illness and more than 90% of bipolar individuals who suffer one manic episode have subsequent episodes. (Def. 56.1 Reply ¶ 1.) Manic episodes are characterized by exhibition of traits such as inflated self-esteem, decreased need for sleep, rapid or pressured speech, increased activity and distractability, and excessive involvement in activities that have a high risk of negative consequences. (Def. 56.1 Reply ¶ 3.)

From at least November of 2005 until May 16, 2006, there is no documented evidence showing that Eilman received treatment or prescriptions for any mental health conditions. (Pl. 56.1 Resp. ¶ 14.) Individuals with bipolar disorder may be prescribed medications to help control their symptoms and to help prevent new manic and depressive episodes. (Pl. 56.1 Resp. ¶¶ 15, 16.)

From April 2005 through May 2006, Eilman was employed by 24 Hour Fitness. (Pl. 56.1 Resp. ¶ 18.) In September 2005, after being accepted as a student at UCLA, she moved to Los Angeles where she rented a room. (Pl. 56.1 Resp. ¶¶ 21, 22.) In the fall of 2005, Eilman enrolled in three classes at UCLA, finishing the semester with a C- average. (Pl. 56.1 Resp. ¶ 26.)

---

[1] Throughout this Opinion, the Court references the Parties' Local Rule 56.1 Statements of Undisputed Material Facts as follows: citations to Paine's Response to the City's Statement of Facts have been abbreviated to "Pl. 56.1 Resp. ¶ __." ; citations to the City's Reply to Paine's Statement of Additional Material Facts have been abbreviated to "Def. 56.1 Reply ¶ __."

In March and April of 2006, Eilman began exhibiting changes in her behavior. (Pl. 56.1 Resp. ¶ 46.) On May 3, 2006, Eilman met with Kyle McJunkin ("McJunkin"), an academic advisor at UCLA, in order to retroactively withdraw from the Winter 2006 term. (Pl. 56.1 Resp. ¶ 42.) McJunkin did not refer Eilman to the student psychiatric center or the student counseling center. (Pl. 56.1 Resp. ¶ 42.)

On May 5, 2006, Eilman flew to Chicago, Illinois. (Pl. 56.1 Resp. ¶ 43.) On May 6th and May 7th, Eilman spent time at Midway Airport. (Pl. 56.1 Resp. ¶ 44.) While at Midway, her behavior was erratic and impulsive, including screaming at a quiet baby, yelling at a blind man claiming that he was a phony, and throwing her boot at airline personnel. (Def. 56.1 Reply ¶ 20.) She was arrested by the Chicago police on May 7th, held until the following day, and released. (Pl. 56.1 Resp. ¶¶ 48-50.) During her time in detention, eyewitnesses observed at various times that Eilman was excitable and yelling profanities; kicking, banging, and pounding the cell walls and bars; and dancing around, twirling in circles, and flapping her arms. (Def. 56.1 Reply ¶ 19.) Witnesses to Eilman's behavior also observed that her mood would change from jovial and pleasant to angry, abusive, and profane. (Def. 56.1 Reply ¶ 21.) During her detention, Eilman smeared her menstrual blood on her cell bench and walls, after which more than one of her cellmates requested a transfer to another cell. (Def. 56.1 Reply ¶ 28.)

Officers at the facilities where Eilman was detained testified that she was uncooperative, irrational, and refused to answer questions. (Def. 56.1 Reply ¶ 24.) Numerous officers and detention aides described Eilman's behavior as "crazy," "nutty," or "erratic." (Def. 56.1 Reply ¶ 36.)

Officer Yvonne Delia ("Delia") reported to at least two other officers that, according to Eilman's father, Eilman had not been diagnosed with bipolar disorder but could be bipolar. (Def.

56.1 Reply ¶ 33.) Paine, Eilman's mother, told a CPD officer during a phone call on the evening of May 7th, and again on the afternoon of May 8th, that Eilman had bipolar disorder. (Def. 56.1 Reply ¶¶ 34, 35.) In both conversations Paine stated that Eilman could be having a bipolar episode. (Def. 56.1 Reply ¶¶ 34, 35.)

Dr. Nelson, an expert psychologist, opined that Eilman was in the midst of a manic episode on May 7th and 8th. (Pl. 56.1 Resp. ¶ 51.) Dr. Dvoskin, also an expert psychologist, opined that Eilman was experiencing a severe manic episode before, during, and after her detention by the Chicago police. (Pl. 56.1 Resp. ¶ 54.)

Subsequent to her time in Chicago, Eilman has been involuntarily admitted to a mental health facility on three occasions; on all three occasions the commitment was pursuant to "5150," a California statute authorizing the involuntary detention of those deemed to be a threat to themselves or others or "gravely disabled." (Def. 56.1 Reply ¶¶ 15, 16.)

## STANDARD OF REVIEW

Summary judgment is proper when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). In determining whether a genuine issue of fact exists, the Court must view the evidence and draw all reasonable inferences in favor of the party opposing the motion. *Bennington v. Caterpillar Inc.*, 275 F.3d 654, 658 (7th Cir. 2001); *see also Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986). However, the Court will "limit its analysis of the facts on summary judgment to evidence that is properly identified and supported in the parties' [Local Rule 56.1] statement." *Bordelon v. Chicago Sch. Reform Bd. of Trustees*, 233 F.3d 524, 529 (7th Cir. 2000). Where a

proposed statement of fact is supported by the record and not adequately rebutted, the court will

accept that statement as true for purposes of summary judgment. An adequate rebuttal requires a

citation to specific support in the record; an unsubstantiated denial is not adequate. *See Albiero v.*

*City of Kankakee*, 246 F.3d 927, 933 (7th Cir. 2001); *Drake v. Minnesota Mining & Mfg. Co.*, 134

F.3d 878, 887 (7th Cir. 1998) ("'Rule 56 demands something more specific than the bald assertion

of the general truth of a particular matter[;] rather it requires affidavits that cite specific concrete

facts establishing the existence of the truth of the matter asserted.'").

## DISCUSSION

### I.      Motion to Strike

As an initial matter, the City moves to strike various portions of Paine's Response to its Rule

56.1 Statement of Material Facts. In support of its motion, the City asserts that Paine's responses

include additional facts, improperly attempt to contradict admissions, and fail to directly admit or

deny the statements of fact. (*See* R.577, Def. Mot. Strike.)

Local Rule 56.1 allows a party opposing summary judgment to file a concise response to the

movant's Statement of Facts including, in the case of disagreement, specific references to materials

relied upon. *See* L.R. 56.1(b)(3)(B) & (C). The requirements for responses under Local Rule 56.1

are "not satisfied by evasive denials that do not fairly meet the substance of the material facts

asserted." *Bordelon v. Chicago School Reform Bd. of Trustees*, 233 F.3d 524, 528 (7th Cir. 2000).

Nonconformity with the Local Rules and the standing orders of the Court is not without

consequence. *See, e.g., Green v. Harrah's Illinois Corp.*, No. 03 C 2203, 2004 WL 1102272, at *8

(N.D. Ill. Apr. 29, 2004) (St. Eve, J.) (refusing to consider statements of fact in excess of the number

permitted by Local Rule 56.1). The Seventh Circuit has "repeatedly held that a district court is

entitled to expect strict compliance with Rule 56.1." *Ammons v. Aramark Uniform Servs., Inc.*, 368

F.3d 809, 817 (7th Cir. 2004) (citing *Bordelon*, 233 F.3d at 527) ("Given their importance, we have

consistently and repeatedly upheld a district court's discretion to require strict compliance with its

local rules governing summary judgment."). "A district court does not abuse its discretion, when,

in imposing a penalty for a litigant's non-compliance with Local Rule 56.1, the court chooses to

ignore and not consider the additional facts that a litigant has proposed." *Cichon v. Exelon*

*Generation Co., L.L.C.*, 401 F.3d 803, 809-10 (7th Cir. 2005).

Here, the Court has not considered portions of *either* party's Rule 56.1 submissions that do

not conform to L.R. 56.1. Specifically, the Court has not considered facts that do not contain proper

support from the parties' citations to the record or contain irrelevant information or inadmissible

evidence. *See Cady v. Sheahan*, 467 F.3d 1057, 1060 (7th Cir. 2006) (rule 56.1 statements that

contain "irrelevant information, legal arguments, and conjecture" do not comply with the Rule);

*Cichon,* 401 F.3d at 809-10 (court may disregard statements and responses that do not properly cite

to the record); *Eisenstadt v. Centel Corp.,* 113 F.3d 738, 742 (7th Cir.1997) ("hearsay is inadmissible

in summary judgment proceedings to the same extent that it is inadmissible in a trial").

## II. Paine's ADA Claim[2]

Title II of the ADA provides that "no qualified individual with a disability shall, by reason

of such disability, be excluded from participation in or be denied the benefits of the services,

programs or activities of a public entity, or be subjected to discrimination by any such entity."

---

[2] Subsequent to the events at issue in this litigation, Congress enacted the ADA Amendments Act of 2008, which took effect on January 1, 2009 and significantly altered the scope and intended interpretation of the ADA. The Amendments Act is not retroactive, however, and the Court therefore applies "the law in place prior to the amendments." *Fredricksen v. United Parcel Serv.*, 581 F.3d 516, 521 n.1 (7th Cir. 2009).

42 U.S.C. § 12132. For purposes of the ADA, "discrimination" includes "not making reasonable accommodations to the services, programs, or activities of a public entity . . . ." 42 U.S.C. § 12112(b)(5)(A); *see also Wisc. Cmty. Servs., Inc. v. City of Milwaukee*, 465 F.3d 737, 753-54 (7th Cir. 2006) (en banc); 28 C.F.R. 35.130(b)(7) ("A public entity shall make reasonable modifications in polices, practices, or procedures when the modifications are necessary to avoid discrimination on the basis of disability. . . .").

In an Order granting in part and denying in part the City's Motion to Dismiss Paine's ADA claim, this Court ruled that Eilman had stated a cognizable claim that the City had failed to provide Eilman with a reasonable accommodation in the form of access to medical or mental health assistance, in violation of Title II. (*See* R. 463.) The Court granted the City's Motion to Dismiss with respect to other potential theories of liability under the ADA.

The City's Motion for Summary Judgment on the ADA claim now argues that Eilman cannot recover under the ADA for the City's failure to reasonably accommodate her bipolar disorder because she failed to take steps to control her condition, and because Eilman has failed to demonstrate that she is a qualified individual with a disability who was subjected to discrimination by the CPD or the City because of her disability.

**A. Eilman's Failure to Control a Controllable Disability**

The City argues that Eilman's ADA claim must fail because she failed to control her bipolar disorder by taking appropriate medications, and failure to control a controllable disability is a bar to recovery under the ADA. It is undisputed that certain medications may help control the symptoms of bipolar disorder and there is no evidence that Eilman received any treatment or medications for her disorder for approximately a year preceding her time in CPD custody.

In support of its legal argument, the City relies upon *Siefken v. Village of Arlington Heights*, 65 F.3d 664, 667 (7th Cir. 1995). In *Siefken*, the court held that an employee who knows he has a disability and does not request or receive any accommodation from his employer, but fails to meet the employer's legitimate job expectations due to his failure to control a controllable disability, cannot state a claim under Title I of the ADA. A district court decision subsequently interpreted *Siefken* as stating "that a plaintiff cannot recover under the ADA if through plaintiff's own fault plaintiff fails to control an otherwise controllable illness." *Nunn v. Illinois State Bd. of Educ.*, 448 F. Supp. 2d 997, 1001 (C.D. Ill. 2006). The district court therefore held that a bipolar employee whose uncontrolled condition created significant disruptions in the work place could not prevail on an ADA claim. *Id.* at 1002.

*Siefken* and other cases arising in the employment discrimination context are easily distinguishable. An employee who seeks to bring an ADA claim brings that claim under Title I, 42 U.S.C. § 12112, not under Title II, 42 U.S.C. § 12132, as is the case here with Eilman's "public entity" ADA claim. Under § 12112, an employee must prove that she was meeting legitimate employment expectations at the time that the alleged discrimination occurred. *See DeLuca v. Winter Indus., Inc.*, 53 F.3d 793, 797 (7th Cir. 1995) (setting forth the requirements for a prima facie case of disability discrimination in the employment context). In *Siefken* and the cases that have followed it, however, the plaintiffs' failure to control their controllable disabilities had led to conduct that clearly constituted a failure to meet legitimate job expectations. *See Siefken*, 65 F.3d at 665-66 (plaintiff's uncontrolled diabetes led to erratic driving of a squad car at high speeds); *Nunn*, 448 F. Supp. 2d at 1001 (plaintiff's uncontrolled bipolar disorder caused her to act in an egregiously unprofessional manner); *Brookins v. Indianapolis Power & Light Co.*, 90 F. Supp. 2d 993, 1006

8

(S.D. Ind. 2000) (employee's uncontrolled depression led to his failing to report to work and failing to call in sick). The plaintiffs were therefore barred from recovery under the ADA not simply because they had not controlled their illnesses, but because this failure to control led to a failure to satisfy one of § 12112's threshold requirements.

There is no such requirement here. Under § 12132, a plaintiff alleging discrimination by a public entity must only show that he is a qualified individual with a disability who was subjected to discrimination by a public entity. Title 42 U.S.C. § 12131 defines a "qualified individual with a disability" as one who, with or without reasonable accommodations, "meets the essential eligibility requirements for the receipt of services or the participation in programs or activities provided by a public entity." There is no requirement, express or implied, that an individual with an allegedly controllable disability must control her condition in order to be protected by Title II. Therefore, Eilman's failure to take appropriate medications (if that were the case) in order to control her bipolar disorder does not bar recovery for discrimination by a public entity under Title II of the ADA.

**B. Qualified Individual with a Disability**

To succeed on her ADA claim, Eilman must first show that she has a physical or mental impairment that substantially limits one or more of her major life activities,[3] or has a record of having such an impairment. *See* 42 U.S.C. § 12102(2)(A)-(B). An impairment is substantially limiting when an individual "is either unable to perform a major life activity or is significantly

---

[3] Certain of the Defendants' proposed expert witnesses reflected an intent to argue at trial that Eilman is required both to prove that she had a specific impairment and that her impairment significantly impacted one or more major life activities. As more fully described in this Court's Order barring the proposed testimony of David Dix, this is not the case. Rather, "[t]he determination of whether an individual has a disability is not necessarily based on the name or diagnosis of the impairment the person has, but . . . on the effect of that impairment on the life of the individual." App'x to Part 1630–Interpretive Guidance on Title I of the Americans with Disabilities Act, 29 C.F.R. 1630.2(j).

restricted as to the condition, manner or duration under which the individual can perform the major life activity as compared to the average person in the general population." *Furnish v. SVI Sys., Inc.*, 270 F.3d 445, 450 (7th Cir. 2001) (citations omitted). This analysis requires consideration of the impairment's nature and severity, its duration or expected duration, and its permanent or long term effect on the activity at issue. *See* 29 C.F.R. § 1630.2(j)(2).

Bipolar disorder, a qualifying mental impairment, can constitute a disability within the meaning of the ADA. *See Duda v. Bd. of Educ. of Franklin Park Pub. Sch. Dist. No. 84*, 133 F.3d 1054,1059 n.10 (7th Cir. 1998); *Bultemeyer v. Fort Wayne Comm. Schs.*, 100 F.3d 1281, 1284 (7th Cir. 1996). For summary judgment purposes, the City does not dispute that Eilman was diagnosed with bipolar disorder in 2005 after suffering from a manic episode, and that she was in a manic phase of her disorder while she was in CPD custody. (*See* Pl. 56.1 Resp. ¶ 1; Def. 56.1 Reply ¶ 38.**)** The mere diagnosis and presence of a qualifying impairment does not end the analysis, however, because the inquiry into whether an impairment is disabling "is an individualized one, and must be determined on a case-by-case basis." *Roth v. Lutheran Gen. Hosp.*, 57 F.3d 1446, 1454 (7th Cir. 1995). The City argues that Eilman's experience of bipolar disorder did not render her disabled, because she was not substantially limited on a consistent basis in the performance of one or major life activities and because she could have easily taken medication to ameliorate any periodic effect that her disorder may have had on her major life activities.

### 1. The Episodic Nature of Eilman's Condition

The City has conceded both that Eilman was in a manic phase during her time in Chicago (*see* Def. 56.1 Reply ¶ 38) and that she is "substantially limited from performing at least one major life activity" during a manic episode. (R. 588, Def. Reply Memo., at 4.) Nevertheless, the City

argues that she is not disabled under the ADA because these episodes constitute only periodic "flare-ups" of her condition, and she is not routinely and consistently limited in her performance of major life activities.

The City relies primarily upon one case in which the Seventh Circuit held that a condition characterized by infrequent "flare-ups" did not qualify as a disability. In *Moore v. J.B. Hunt Transportation, Inc.*, 221 F.3d 944 (7th Cir. 2000), plaintiff Moore suffered from rheumatoid arthritis and had one or two severe episodes per year during which, his doctor testified, he might have difficulty performing manual tasks, might be unable to bend his fingers, and could possibly have difficulty walking. *Id.* at 948. The court rejected his claim that the arthritis was disabling during the non-severe periods, and further explained that Moore could not "use his intermittent flare-ups to establish that his impairment is a disability." *Id.* at 952. Thus, because Moore's condition in its general or default state did not constitute a disability, Moore could not establish a disability by pointing to certain times when his condition was at its worst.

The manic episodes from which Eilman undisputedly suffers, and which are hallmarks of bipolar disorder, are not akin to occasional "flare-ups" of an underlying condition. Rather, manic episodes are an intrinsic part of the psychological condition that is bipolar disorder, and "an intermittent impairment that is a characteristic manifestation of an admitted disability is, we believe, a part of the underlying disability . . . ." *Vande Zande v. State of Wis. Dept. of Admin.*, 44 F.3d 538, 544 (7th Cir. 1995); *see also Haschmann v. Time Warner Entm't Co.*, 151 F.3d 591, 599-600 (7th Cir. 1998) (periodic severe symptoms found to be "episodic manifestations characteristic of" the plaintiff's underlying lupus and sufficient to constitute a disability). "Often the disabling aspect of a disability is, precisely, an intermittent manifestation of the disability, rather than the underlying

11

impairment." *Vande Zande*, 44 F.3d at 544. Eilman is disabled because her manic episodes, the intermittent manifestations of her underlying impairment, substantially limit one or more of her major life activities. Unlike Moore's arthritic flare-ups, which only may have limited certain of his physical activities, the manic phases of Eilman's disorder render her profoundly disabled. On one occasion prior to her detention by the CPD, and on three subsequent occasions, Eilman has been involuntarily committed to mental health institutions because her mental state was such that she posed a danger to herself or others or was "gravely disabled."

Thus, the mere fact that Eilman's condition is cyclical does not automatically preclude her from qualifying as disabled under the ADA. Instead, the relevant inquiry is whether she was substantially limited in the performance of one or more major life activities at the time during which it is alleged that the City failed to reasonably accommodate her bipolar disorder. *Cf. Duda*, 133 F.3d at 1059 (noting that the determination of whether an individual qualifies for ADA protection "should be based on the . . . individual's capabilities at the time of the employment decision.") The City having chosen to devote the majority of its Rule 56.1 statement to supporting an argument that Eilman was not consistently disabled before her arrival in Chicago, there are few facts that go directly to her condition while in CPD custody. However, the City has conceded both that Eilman was in a manic phase during her time in Chicago (*see* Def. 56.1 Reply ¶ 38) and that she is "substantially limited from performing at least one major life activity" during a manic episode. (R. 588, Def. Reply Memo., at 4.) These concessions alone preclude summary judgment in the City's favor on this prong of Eilman's ADA claim.

### 2. Eilman's Ability to Ameliorate The Effects of Her Disability

The City further argues that Eilman is not disabled within the meaning of the ADA because medications are available to ameliorate the limiting effects of bipolar disorder. Prior to the enactment of the ADA Amendments Act of 2008, whether an individual was considered disabled was decided with reference to the mitigating effects of any corrective measures that the disability plaintiff was using at the time of the alleged discrimination. *See Sutton v. United Air Lines, Inc.*, 527 U.S. 471, 482 (1999). This analysis is not relevant here, however, because it is undisputed that Eilman was not taking any medications to control her disorder while she was in Chicago, and had not taken any such medications for a significant amount of time previous to her visit. *Sutton* required only that courts consider the mitigating or ameliorative effects of measures that otherwise disabled plaintiffs were actually using to control their disabilities, and did not mandate the consideration of hypothetical or even known measures available to treat the condition that the particular individual was not using. *See Sutton*, 527 U.S. at 483-84 (mandating that ADA plaintiffs be treated and analyzed as individuals, rather than "as members of a group of people with similar impairments," and cautioning courts to analyze the particular effect of a condition on the individual plaintiff, rather than speculating as to a condition's usual effects on the average individual).

Moreover, where medications are not able to perfectly control a mental illness, an individual may be considered disabled under the ADA even if she is completely medication compliant. *See Taylor v. Phoenixville Sch. Dist.*, 184 F.3d 296, 306 (3rd Cir. 1999) (plaintiff's medication could not perfectly control her mental illness; thus, she was considered disabled under the ADA, since her condition substantially limited her ability to think). Here, there is at least a disputed issue of material fact as to whether Eilman could have controlled her disorder by taking appropriate medications, not

least because there is evidence supporting the fact that Eilman has continued to have gravely disabling manic episodes even under a controlled medication regime. (*See* Def. 56.1 Resp. ¶¶ 14, 15.) Eilman is therefore not barred as a matter of law from recovering under the ADA simply because it is undisputed that there are medications available that are prescribed to alleviate the disabling effects of bipolar disorder.[4]

Therefore, none of the grounds upon which the City would prevent Eilman from establishing that she was a qualified individual with a disability during her time in CPD custody are persuasive or warrant summary judgment in its favor.

### C. Discrimination by a Public Entity

As this Court has previously held, a disability discrimination claim under Title II may arise from a failure to reasonably accommodate a person's disability after arresting her for a crime unrelated to the disability. (*See* R. 463.) Paine alleges that the City failed to reasonably accommodate Eilman's disability by providing her with medical or mental health treatment. The City argues that failure to provide medical treatment to disabled persons in custody is not an act of discrimination under the ADA.

In support of its argument, the City relies upon *Bryant v. Madigan*, 84 F.3d 246 (7th Cir. 1996), in which the court held that the prisons were not required, under the ADA, to provide special accommodation for a disabled prisoner's medical needs, in the absence of any allegation that the disabled prisoner was excluded from a prison activity, service, or program because of his disability.

---

[4] The City twice erroneously quotes *Moore v. J.B. Hunt Transp., Inc.*, 221 F.3d 944 (7th Cir. 2000), as stating that the Seventh Circuit is "less likely to find an individual disabled if she can easily take medicine to ameliorate the condition." (See Def. Memo. at 14, Def. Reply Memo. at 3.) This quotation actually appears in *Robinson v. Morgan Stanley & Co., Inc.*, 269 Fed. App'x 603, 607 (7th Cir. 2008). In any event, the City has offered no undisputed facts or argument supporting their implication that Eilman can "easily" take medication to alleviate her condition. The plaintiff in *Robinson* had conceded this issue. *See id.* at 608.

*See id.* at 249; *but see Penn. Dep't of Corr. v. Yeskey*, 524 U.S. 206, 210 (1998) (holding that Title

II applies to state prison inmates, and noting that medical services are benefits provided to inmates

within the meaning of Title II). In *Bryant* and the other case cited by the City, however, the plaintiffs

were not alleging a failure to reasonably accommodate their disability—rather, they were each

alleging that the treatment that they were offered for their disabilities was flawed or constituted

medical malpractice. *See Bryant*, 84 F.3d at 249 (plaintiff "is complaining about incompetent

treatment of his paraplegia"); *see also Grzan v. Charter Hosp. of Nw. Ind.*, 104 F.3d 116, 120 (7th

Cir. 1997) (plaintiff "alleges she received poor treatment, defective treatment, and thereby different

and unequal treatment").

This is not a case in which an ADA claim is brought as a disguised medical malpractice

claim. Once an arrestee with a disability is in custody, the police have a duty to reasonably

accommodate the arrestee's disability. *See Penn. Dep't of Corr.,* 526 U.S. at 210 (noting that "penal

institutions" provide medical and other services covered by Title II); *see also Conway v. Henze*, 14

Fed. App'x 645, 651 (7th Cir. 2001) (upholding the district court's grant of summary judgment on

a pre-trial detainee's ADA claim for failure to establish violations of the ADA, but implying that the

claim was viable as a matter of law). Violations of a public entity's duty to accommodate disabilities

can provide a basis for liability under Title II of the ADA. *See Wisc. Cmty. Servs.,* 465 F.3d at 753.

Here, it is undisputed that the City had notice that Eilman had been diagnosed with bipolar

disorder. (*See* Def. 56.1 Reply ¶¶ 34, 35.) It is also undisputed that various officers and aides who

encountered Eilman during her time in CPD custody described her behavior as "crazy," "nutty," or

"erratic." (Def. 56.1 Reply ¶ 36.) There are disputed issues of fact as to the severity and import of

Eilman's unusual behavior, but it is undisputed that Eilman was not taken for any psychiatric evaluation or potential treatment prior to her release from custody.

The City has thus failed to establish facts sufficient to support its claim for summary judgment on the grounds that it did not discriminate against Eilman by failing to reasonably accommodate her known, and arguably manifest, mental illness by taking her for mental health care while she was in CPD custody.

### D. Discrimination by Reason of Disability

The City has not presented a cognizable argument that it is entitled to summary judgment because Eilman has failed to establish that any discrimination that she suffered was by reason of her disability. Instead, it has only stated the conclusory claim that Eilman was not subjected to discrimination by the City and that the Court therefore "need not reach the third requirement that [Paine] must satisfy in order to prove her ADA claim." As explained above, however, the City's assumption that it is entitled to summary judgment on non-discrimination grounds is ill-founded. The City is therefore not entitled to summary judgment on Paine's ADA claim on the grounds that she has not demonstrated that any discrimination she suffered was on account of her disability.

### CONCLUSION AND ORDER

Material issues of disputed fact exist as to whether Eilman can prevail on a claim under the Title II of the ADA. Eilman is not barred from recovery merely because she failed to take medications in order to control her bipolar disorder or because such medications could have ameliorated any periodic disability that her disorder may have created. The City has conceded that she is disabled during a manic episode and that she was suffering from a manic episode during her time in CPD custody, and thus the Court cannot find as a matter of law that Eilman was not a

16

qualified individual with a disability. The City's reliance upon cases in the medical malpractice

context is misplaced, and does not entitle them to summary judgment where Paine has established

facts supporting her claim that the City failed to reasonably accommodate Eilman's mental illness.

The City of Chicago's Motion for Summary Judgment As to Count XXXIX is denied.


_____
Virginia M. Kendall
United States District Court Judge
Northern District of Illinois


Date: February 26, 2010