IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

KATHLEEN PAINE, as Guardian of the )
Estate of CHRISTINA ROSE EILMAN, )
a Disabled Person, )
)
)
Plaintiff, )      Case No. 06 C 3173
v. )
)      Judge Virginia M. Kendall
SERGEANT DAVID BERGLIND, )
DETENTION AIDE SHARON STOKES, )
OFFICER TERESA WILLIAMS, DETENTION )
AIDE CYNTHIA HUDSON, DETENTION )
AIDE CATONIA QUINN, OFFICER PAMELA )
SMITH, and CITY OF CHICAGO, a municipal )
corporation, )
)
Defendants. )
)

**MEMORANDUM OPINION AND ORDER**

Plaintiff Kathleen Paine ("Paine"), as Guardian of the Estate of Christina Rose Eilman

("Eilman"), filed this suit against various members of the Chicago Police Department and the City

of Chicago, alleging civil rights violations in connection with Eilman's arrest and subsequent release

from the Second District women's lockup without providing her access to mental health treatment.

Pursuant to Federal Rule of Civil Procedure 56 and Local Rule 56.1, Defendant City of Chicago (the

"City") has renewed its Motion for Summary Judgment on Count XXXIX of Paine's Third Amended

Complaint, which brings a claim against the City pursuant to Title II of the Americans with

Disabilities Act ("ADA"), 42 U.S.C. § 12132. Defendants David Berglind, Sharon Stokes, Teresa

Williams, Cynthia Hudson, Catonia Quinn and Pamela Smith (collectively, the "Individual

Defendants") have, pursuant to Federal Rule of Civil Procedure 56 and Local Rule 56.1, renewed

their combined Motion for Summary Judgment on Counts XV, XVIII, XX, XXII, XXIV, and XXVIII, which collectively allege that the Individual Defendants violated 42 U.S.C. § 1983 by failing to provide medical care to Eilman while she was in police custody.[1]  Paine has filed a Motion to Strike the City's and the Individual Defendants' renewed Motions for Summary Judgment. Finally, Defendant Pamela Smith ("Officer Smith") filed a Motion for an Order Barring Plaintiff from Pursuing an "Augmented Danger" Claim Against Her at Trial.  For the reasons set forth below, all the motions are denied.

## BACKGROUND

This case, now six-years old, raises the issue of whether the Chicago Police Department, and certain of its officers, violated a young, mentally ill woman's constitutional rights when they failed to provide her with mental health treatment while she was in their custody; released her in a dangerous part of the city without her wallet or cellular telephone; after which she was raped and fell from a seventh-story window in a housing project nearby.  Ms. Eilman suffers from permanent brain damage as a result of the fall.  The specific facts of this case were previously described in copious detail in the Court's February 22, 2010 opinion and its February 26, 2010 opinion and are incorporated herein by reference.  However, the facts that are relevant to the instant motions are set forth below.

In its February 22, 2010 opinion, this Court denied all of the Individual Defendants' motions for summary judgment.  *See Paine v. Johson,* 689 F. Supp. 2d 1027, 1087-88 (N.D. Ill. 2010).  The

---

[1]With respect to Count XXVIII, the Individual Defendants' motion is only a motion for partial summary judgment.  As is described in more detail below, Count XXVIII alleges a Section 1983 claim against Officer Smith on two distinct theories of liability.  The Individual Defendants' Motion only addresses the failure to provide medical care theory.

Court found that there was a genuine issue of material fact as to whether the defendants violated the Plaintiff's clearly established constitutional rights: (1) to receive care for her medical condition while in the custody of the police; and (2) to not have a state actor, without justification, increase her risk of harm. *Id.* In its February 26, 2010 Opinion, the Court denied the City's original Motion for Summary Judgment on Paine's ADA claim because it found that material issues of disputed fact existed as to whether Paine can prevail on this claim. *See Paine v. Johnson,* No. 06 C 3173, 2010 WL 785397 (N.D. Ill. Feb. 26, 2010).

After this Court issued those opinions, ten of the thirteen individual defendants filed an interlocutory appeal in the Seventh Circuit on the question of whether they are protected from this suit by the doctrine of qualified immunity. *Paine v. Cason,* 678 F.3d 500 (7th Cir. 2012). On April 26, 2012, the Seventh Circuit affirmed the Court's decision in part, reversed it in part, and remanded the case for further fact-finding to determine whether two defendants are entitled to qualified immunity. *See id.* at 513. The Court's decision to deny summary judgment to the City on Paine's ADA claim was not appealed to the Seventh Circuit. After the remand, the Court set this case for a jury trial to begin on January 14, 2013.

Pursuant to the Seventh Circuit's and this Court's direction, the parties filed additional motions for summary judgment regarding whether Defendants Carson Earnest and Pauline Heard were entitled to qualified immunity. After considering the parties' briefs, the Court granted summary judgment in favor of those two defendants on October 11, 2012. *See Paine v. Johnson,* No. 06 C 3173, 2012 WL 4852540 (N.D. Ill. Oct. 11, 2012).

On November 9, 2012, the Defendants filed a flurry of motions. Despite the fact the Court previously denied the City's Motion for Summary Judgment on Paine's ADA claim on February 26,

3

2010, the City re-raises its motion now. (Doc. 829.) In addition, the Individual Defendants moved

for summary judgment, again, on claims that they failed to provide medical care to Eilman while she

was in custody. (Doc. 831.) Finally, Defendant Pamela Smith moved to bar Paine from pursuing

an "augmented danger" claim against her at trial. (Doc. 833.)

## STATEMENT OF FACTS RELEVANT TO THESE MOTIONS

In February of 2005, Christina Eilman suffered from her first known manic episode. (Pl. 56.1

Resp. ¶ 45.)[2] During this episode, she was involuntarily committed to Sierra Vista Hospital, a mental

health facility, because she was deemed a threat to herself or others. (Def. 56.1 Reply ¶ 10.) Eilman

was subsequently diagnosed with bipolar disorder. (Pl. 56.1 Resp. ¶ 1.) Bipolar disorder is a severe

mental illness and more than 90% of bipolar individuals who suffer one manic episode have

subsequent episodes. (Def. 56.1 Reply ¶ 1.) Manic episodes are characterized by exhibition of traits

such as inflated self-esteem, decreased need for sleep, rapid or pressured speech, increased activity

and distractability, and excessive involvement in activities that have a high risk of negative

consequences. (Def. 56.1 Reply ¶ 3.)

From at least November of 2005 until May 16, 2006, there is no documented evidence

showing that Eilman received treatment or prescriptions for any mental health conditions. (Pl. 56.1

---

[2] Throughout this Opinion, the Court references the Parties' Local Rule 56.1 Statements of Undisputed Material Facts as follows: citations to Paine's Response to the City's Statement of Facts have been abbreviated to "Pl. 56.1 Resp. ¶ __." ; citations to Paine's Statement of Additional Material Facts have been abbreviated to "Pl. Add. 56.1 ¶__"; citations to the City's Reply to Paine's Statement of Additional Material Facts have been abbreviated to "Def. 56.1 Reply ¶ __"; citations to the City's ADA Statement of Material Facts have been abbreviated to "City ADA 56.1 ¶__"; citations to the Individual Defendants' Statement of Undisputed Facts Material to their Renewed Summary Judgment Motion have been abbreviated to "ID Und. 56.1 ¶__"; citations to Paine's Response to the Individual Defendants' Statement of Undisputed Facts have been abbreviated to "Paine ID Resp. ¶__."

Resp. ¶ 14.)  Individuals with bipolar disorder may be prescribed medications to help control their symptoms and to help prevent new manic and depressive episodes.  (Pl. 56.1 Resp. ¶¶ 15, 16.)

From April 2005 through May 2006, Eilman was employed by 24 Hour Fitness.  (Pl. 56.1 Resp. ¶ 18.)  In September 2005, after being accepted as a student at UCLA, she moved to Los Angeles where she rented a room.  (Pl. 56.1 Resp. ¶¶ 21, 22.)  In the fall of 2005, Eilman enrolled in three classes at UCLA, finishing the semester with a C- average.  (Pl. 56.1 Resp. ¶ 26.)

In March and April of 2006, Eilman began exhibiting changes in her behavior.  (Pl. 56.1 Resp. ¶ 46.)  On May 3, 2006, Eilman met with Kyle McJunkin ("McJunkin"), an academic advisor at UCLA, in order to retroactively withdraw from the Winter 2006 term.  (Pl. 56.1 Resp. ¶ 42.) McJunkin did not refer Eilman to the student psychiatric center or the student counseling center.  (Pl. 56.1 Resp. ¶ 42.)

On May 5, 2006, Eilman flew to Chicago, Illinois.  (Pl. 56.1 Resp. ¶ 43.)  On May 6th and May 7th, Eilman spent time at Midway Airport.  (Pl. 56.1 Resp. ¶ 44.)  While at Midway, her behavior was erratic and impulsive, including screaming at a quiet baby, yelling at a blind man claiming that he was a phony, and throwing her boot at airline personnel.  (Def. 56.1 Reply ¶ 20.) She was arrested by the Chicago police on May 7th, held until the following day, and released.  (Pl. 56.1 Resp. ¶¶ 48-50.)  During her time in detention, eyewitnesses observed at various times that Eilman was excitable and yelling profanities; kicking, banging, and pounding the cell walls and bars; and dancing around, twirling in circles, and flapping her arms.  (Def. 56.1 Reply ¶ 19.)  Witnesses to Eilman's behavior also observed that her mood would change from jovial and pleasant to angry, abusive, and profane.  (Def. 56.1 Reply ¶ 21.)  During her detention, Eilman smeared her menstrual

blood on her cell bench and walls, after which more than one of her cellmates requested a transfer to another cell. (Def. 56.1 Reply ¶ 28.)

Officer Yvonne Delia ("Delia") reported to at least two other officers that, according to Eilman's father, Eilman had not been diagnosed with bipolar disorder but could be bipolar. (Def. 56.1 Reply ¶ 33.) Paine, Eilman's mother, told a CPD officer during a phone call on the evening of May 7th, and again on the afternoon of May 8th, that Eilman had bipolar disorder. (Def. 56.1 Reply ¶¶ 34, 35.) In both conversations Paine stated that Eilman could be having a bipolar episode. (Def. 56.1 Reply ¶¶ 34, 35.) The City concedes that it had notice that Eilman had been diagnosed with bipolar disorder. (City ADA 56.1 ¶ 2.)

Officers at the facilities where Eilman was detained testified that she was uncooperative, irrational, and refused to answer questions. (Def. 56.1 Reply ¶ 24.) Numerous officers and detention aides described Eilman's behavior as "crazy," "nutty," or "erratic." (Def. 56.1 Reply ¶ 36.) However, they never reported Eilman's behavior to a desk sergeant or watch commander. (Pl. Add. 56. 1 ¶¶ 199, 209-10, 318, 323.) Instead, the lockup personnel harangued Eilman by telling her to: (1) "shut the fuck up"; (2) "shut the hell up, white bitch, you got the blood - you got the blood all over the cell"; (3) "shut you white ass up! You got blood all over the cell with your nasty ass"; (4) "you crazy white bitch, you nasty bitch, get that nasty shit off my walls"; and (5) "shut your ass up and go to sleep." (Pl. Add. 56.1 ¶¶ 266, 273, 275-76, 289, 329, 346, 359.)

Dr. Craig J. Nelson, an expert psychologist, opined that Eilman was in the midst of a manic episode on May 7th and 8th. (Pl. 56.1 Resp. ¶ 51.) Dr. Joel Dvoskin, also an expert psychologist, opined that Eilman was experiencing a severe manic episode before, during, and after her detention by the Chicago police. (Pl. 56.1 Resp. ¶ 54.) Dr. Nelson opined that during a manic episode,

6

appropriate medical care required hospital admission. (ID Und. 56.1 ¶ 3). Dr. Nelson further opined that Eilman could not have been treated at the Second District lockup. (ID Und. 56.1 ¶ 3).

St. Bernard Hospital, which was the designated intake facility for mental health evaluations for persons in Chicago police custody at the Second District lockup, was less than two miles away from the police station. (Pl. Add. 56.1 ¶ 175.) It takes approximately three minutes to drive from the Second District to St. Bernard. (Pl. Add. 56.1 ¶ 175.) While Eilman was in custody at the Second District, the police provided medical treatment to other detainees by taking them for an evaluation at a hospital. (Pl. Add. 56.1 ¶ 443-48.) Specifically, in the early morning hours of May 7, 2006, another arrestee, Dorsie Tullock, was brought into the Second District lock up. (Pl. Add. 56. 1 ¶ 443-48.) She was transferred to Michael Reese Hospital for medical care at approximately 6:23 a.m., and returned to the Second District lockup at 12:51 p.m. (Pl. Add. 56.1 ¶ 443-48.)

Without ever providing medical treatment to Eilman, the police released her on her own recognizance at approximately 6:30 p.m. on May 7, 2006. (ID Und. 56.1 ¶ 1.) Despite the fact that Eilman was not from Chicago, and that the Second District Lockup was located in a neighborhood of Chicago with an extremely high crime rate, Eilman was released from the lock up with no direction as to how to get out of the area. After she was released, Eilman proceeded through the parking lot of the Second District Station and made her way to JJ Fish Restaurant, located two blocks east of Federal Street at 51st and Wabash, where she asked for a glass of water to take her medication–medication which was presumably not in her possession since it was seized and inventoried at the Second District Station and only sweatpants were returned to her. (Def. 56.1 Reply ¶¶ 439, 449, 490; Pl. 56.1 Resp. ¶ 337.) Individuals who observed Eilman at JJ Fish described her behavior as crazy and that her "head just wasn't right." (Def. 56.1 Reply ¶¶ 449, 453, 454.)

7

At around 7:00 p.m., Eilman left JJ Fish Restaurant. (Def. 56.1 Reply ¶ 456; Pl 56.1 Resp. ¶ 339.) Outside JJ Fish, Eilman spoke with Robert Kimble and Floyd Fulton ("Fulton") and followed them to the Robert Taylor Homes located at 5135 South Federal. (Pl. 56.1 Resp. ¶ 340-43.) Outside 5135 South Federal, several individuals observed Eilman and thought that she was crazy and that there was something wrong with her. (Def. 56.1 Reply ¶¶ 450, 455.) Eilman then accompanied several young men into the Robert Taylor Homes, to Apartment 702, which was a vacant apartment where people went to sleep or hang out and where a number of people had congregated that evening. (Pl. 56.1 Resp. ¶¶ 343, 348.) Residents of the neighborhood were surprised to see a white girl in the building. (Def. 56.1 Reply ¶ 459.) Some individuals even told Eilman that she should leave the building because it was not safe for her to be there. (Def. 56.1 Reply ¶ 459.)

At some point, Marvin Powell, a.k.a. Red ("Red"), an individual who did not live at 5135 South Federal or in the community, entered Apartment 702, told everyone to leave, and said he was going to "show this bitch who the real killer is." (Pl. 56.1 Resp. ¶¶ 349-51.) Prior to that time, no one had harmed Eilman or tried to force her to do anything, and Eilman had not been the victim of a crime in the several hours preceding Red's entrance. (Pl. 56.1 Resp. ¶ 352, 362.)

When Eilman tried to leave the room, Red pulled her inside and locked the door. (Pl. 56.1 Resp. ¶ 353.) Eilman screamed, and Osman, Jerrell, Timothy and Robert banged and kicked the door trying to help her. (Pl. 56.1 Resp. ¶¶ 354-55.) Red and Eilman were alone in the room. (Pl. 56.1 Resp. ¶ 356.) Red then put a knife to Eilman's neck and told her he "would kill her" if she did not finish a sex act, and Eilman threatened to jump out of the window. (Pl. 56.1 Resp. ¶ 356; Def. 56.1 Reply ¶ 458.) Dr. Nelson opined that Eilman recognized that Red was a threat to her, and knew enough to try to get away and call for help. (Pl. 56.1 Resp. ¶ 363.) Less than five hours after Eilman

was released from the Second District lockup, the paramedics were dispatched to 5135 South Federal, where Eilman had fallen out of a seventh floor apartment window wearing nothing but a bra and panties. (Def. 56.1 Reply ¶ 15; Pl. 56.1 Resp. ¶¶ 357, 361**.)** It is unknown whether she fell, jumped or was thrown from the building.

As a result of her fall, Eilman sustained severe bodily injuries, causing her to be hospitalized at Stroger Cook County Hospital until June 28, 2006, followed by three and a half months of therapy at the Rehabilitation Institute of Chicago and years of rehabilitation. (Def. 56.1 Resp. ¶ 16.) Plaintiff's counsel has informed the Court that she is now able to walk with assistance and speak, although her brain functioning remains at that of a much younger child. Eilman returned home to Los Angeles with her family in mid-October 2006. (Def. 56.1 Resp. ¶ 16.)

During discovery, the City's Police Practices Expert James Kennedy ("Kennedy") stated that the majority of people are not happy about being in lock up, and that it is not unusual for people in lock-up to feign medical problems or ask to see a doctor to be taken away from lock-up. (Pl. 56.1 Resp. ¶¶ 389-90.) Kennedy opined that a person in lock-up does not have to be taken for a mental health evaluation just because they have a possible history of bipolar disorder or make the statement "bitch, feed me." (Pl. 56.1 Resp. ¶¶ 218, 393.) Kennedy also detailed the procedures involved in seeking mental illness treatment for a detainee. When the police transport an individual in their custody to the hospital for mental illness treatment, a police officer is assigned to guard the prisoner. (Pl. 56.1 Resp. ¶¶ 395-96, 398.) At facilities like the triage center at St. Bernard Hospital, an emergency room physician and Community Mental Health Council make a judgment call as to whether that person should be admitted for mental health treatment. (Pl. 56.1 Resp. ¶¶ 395-96, 398.) One way that medical health professionals measure the extent of psychiatric illness is through ability

to control one's behavior. (Pl. 56.1 Resp. ¶ 394.) If an arrestee requires psychiatric admission, he or she must be transferred to Cermak Hospital though a complicated, up to two day long process where the police appear in court to secure an order transferring custody to the Cook County Sheriff. (Pl. 56.1 Resp. ¶ 397.) A decision to admit a patient into a psychiatric unit must be endorsed by a psychiatrist. (Pl. 56.1 Resp. ¶ 399.) If the patient is not deemed a risk to herself or others, he or she may be discharged back into police custody or admitted to the psyche unit based on another admission criteria. (Pl. 56.1 Resp. ¶ 400.)

Paine's expert, Dr. Dvoskin, opined that if Eilman would have been taken to a mental health facility and evaluated, she probably would have been kept there, either voluntarily or involuntarily. (Def. 56.1 Reply ¶ 461; Pl. 56.1 Resp. ¶ 368.) If released, she would have been given some type of discharge plan to account for her personal safety, and someone would have likely come to get her and assist her in remaining safe. (Def. 56.1 Reply ¶ 461; Pl. 56.1 Resp. ¶ 368.) Kennedy disagreed with Dvoskin and opined that Eilman might have been released from an emergency room into the Robert Taylor Homes area, or, if she were brought to St. Bernard Hospital, released into a more dangerous area than Robert Taylor Homes. (Pl. 56.1 Resp. ¶¶ 364-65.) Dvoskin acknowledged that if not involuntarily committed, Eilman would have been released and free to go out in the neighborhood. (Pl. 56.1 Resp. ¶¶ 376.)

Dvoskin further opined that in determining whether to involuntarily commit Eilman, mental health professionals would likely try to persuade her to agree to treatment, observe her over time, talk to her family, and try to get a broad perspective as to her behaviors. (Pl. 56.1 Resp. ¶¶ 376-77.) Dvoskin would expect the hospital to make an effort to talk to Eilman about where she would go, contact her parents, and arrange for her to leave in a safe manner. (Pl. 56.1 Resp. ¶ 378.) Dvoskin

10

opined that if the hospital had been fully informed of her behavior the previous two days, it would have involuntarily committed her as a danger to herself, even though she never showed signs of being suicidal.  (Def. 56.1 Reply ¶¶ 463, 465, 467; Pl. 56.1 ¶¶ 369, 375.)  Dr. Nelson, Paine's psychiatry expert, concurred that Eilman would have met the criteria for involuntary admission at a mental facility because her behavior demonstrated that she was unable to provide for her own basic needs and unable to protect herself from serious harm.  (Def. 56.1 Reply ¶ 462.)  Indeed, her symptoms were provocative and put her in harm's way.  (Def. 56.1 Reply ¶ 462.)  Turning to the actual events that unfolded, Dvoskin opined that during and following her detention, Eilman was in florid psychosis and experiencing a severe manic episode. (Pl. 56.1 Resp. ¶ 372.)  Nelson concurred that Eilman suffered from bipolar disorder and was in the middle of a manic episode when she interacted with police in May 2006, and further opined that her abnormal behaviors warranted psychiatric evaluation and treatment. (Pl. 56.1 Resp. ¶ 380.)  Dvoskin further stated that her behavior was suggestive of the use of stimulants like methamphetamine, and that without collateral information, the distinction between drug use and manic disorder is a difficult one to make.  (Pl. 56.1 Resp. ¶ 374.)  Although Dvoskin opined that Eilman's psychiatric condition was not getting better and not getting worse in May 2006, Nelson disagreed and testified that her psychiatric condition continued to worsen from the time her mania began in March and April 2006 through May 7, 2006. (Pl. 56.1 Resp. ¶¶ 371.)

Treatment of mania  takes somewhere between 7 and 20 days, as a general matter.  (Pl. 56.1 Resp. ¶ 381.)  During an involuntary admission to Sierra Vista Hospital in 2005, for instance, Eilman was diagnosed with and received medication for bipolar disorder, and over the last 13 days of her hospitalization, her condition improved. (Pl. 56.1 Resp. ¶ 383.)  After that hospitalization, Eilman

11

was prescribed medication for bipolar disorder and for the treatment of manic episodes, which she did not take between the first week after she was released from Sierra Vista in March of 2005 through the events in Chicago.  (Pl. 56.1 Resp. ¶ 381.)

While in Chicago, Eilman was jovial and in an elevated mood at times, showing an independent streak and ability to fare for herself.  (Pl. 56.1 Resp. ¶¶ 385-86.)  Although Dvoskin admitted that there were times during her detention when Eilman did not demonstrate characteristics of mental illness, he believes that Eilman's behavior supports the conclusion that she was a danger to herself while she was in Chicago.  (Def. 56.1 Reply ¶ 466; Pl. 56.1 Resp. ¶¶ 372, 379.)  Dvoskin opined that Eilman's mental illness "might have affected her choices, for example, she might have complied with his–she might have been raped and not thrown out or jumped out the window."  (Pl. 56.1 Resp. ¶ 370.)  Sgt. Berglind admitted that a young woman, unfamiliar with Chicago, walking in the Robert Taylor Homes is exposed to certain risks or dangers, which would be heightened if the woman was in the throes of a manic episode.  (Def. 56.1 Reply ¶ 468.)  Although Eilman put herself into the situation, Red's criminal act put her in the room, and whether someone is mentally ill is not of consequence when someone wants to intentionally harm her.  (Pl. 56.1 Resp. ¶ 360, 392.)

## STANDARD OF REVIEW

Summary judgment is proper when "the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(c).  In determining whether a genuine issue of fact exists, the Court must view the evidence and draw all reasonable inferences in favor of the party opposing the motion.  *See Bennington v. Caterpillar Inc.*, 275 F.3d 654, 658

(7th Cir. 2001); *see also Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986).  However, the Court will "limit its analysis of the facts on summary judgment to evidence that is properly identified and supported in the parties' [Local Rule 56.1] statement." *Bordelon v. Chicago Sch. Reform Bd. of Trustees*, 233 F.3d 524, 529 (7th Cir. 2000).  Where a proposed statement of fact is supported by the record and not adequately rebutted, the court will accept that statement as true for purposes of summary judgment.  An adequate rebuttal requires a citation to specific support in the record; an unsubstantiated denial is not adequate.  *See Albiero v. City of Kankakee*, 246 F.3d 927, 933 (7th Cir. 2001); *Drake v. Minnesota Mining & Mfg. Co.*, 134 F.3d 878, 887 (7th Cir. 1998) ("'Rule 56 demands something more specific than the bald assertion of the general truth of a particular matter[;] rather it requires affidavits that cite specific concrete facts establishing the existence of the truth of the matter asserted.'").

Since this case is on remand, the Court must also properly apply the Seventh Circuit's mandate in reaching its decision.  *See Gertz v. Robert Welch, Inc.,* 680 F.2d 527, 532 (7th Cir. 1982). This requires the Court to execute the decision of the Seventh Circuit.  *See id.*; *see also Vendo v. Lektro-Vend Corp.,* 434 U.S. 425, 427-28 (1978).  However, observations, commentary or mere dicta touching upon issues that were not formally before the Seventh Circuit do not constitute binding determinations encompassed within the mandate.  *See Gertz,* 680 F.3d at 532; *see also Quern v. Jordan,* 440 U.S. 332, 347 n. 18 (1979).

13

## DISCUSSION

**I.     Defendant City of Chicago's Motion for Summary Judgment on Paine's ADA Claim[3]**

Title II of the ADA provides that "no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs or activities of a public entity, or be subjected to discrimination by any such entity."  42 U.S.C. § 12132.  For purposes of the ADA, "discrimination" includes "not making reasonable accommodations to the services, programs or activities of a public entity..."  42 U.S.C. § 12112(b)(5)(A); *see also Wisconsin Community Services, Inc. v. City of Milwaukee,* 465 F.3d 737, 753-54 (7th Cir. 2006) (en banc).

On February 26, 2010, this Court issued an order in which it denied the City's motion for summary judgment on Paine's ADA claim.  *See Paine,* 2010 WL 785397 (Doc. 722.)  The Court found that "[m]aterial issues of disputed fact exist as to whether Eilman can prevail on a claim under Title II of the ADA.**"**  *Id.* at *9.  In reaching its decision, the Court held that "[t]he City has not presented a cognizable argument that it is entitled to summary judgment because Eilman has failed to establish that any discrimination that she suffered was by reasons of her disability...[t]he City is therefore not entitled to summary judgment on Paine's ADA claim on the grounds that she has not demonstrated that any discrimination she suffered was on account of her disability."  *Id.*  This interlocutory order has not been addressed by the Seventh Circuit.  Thus, it constitutes the law of this case.  *See Gertz,* 680 F.2d at 532 (holding that the law of the case doctrine "is a rule of practice,

---

[3] Subsequent to the events at issue in this litigation, Congress enacted the ADA Amendments Act of 2008, which took effect on January 1, 2009 and significantly altered the scope and intended interpretation of the ADA.  The Amendments Act is not retroactive, however, and the Court therefore applies "the law in place prior to the amendments." *Fredricksen v. United Parcel Serv.,* 581 F.3d 516, 521 n.1 (7th Cir. 2009).

based on sound policy that, when an issue is once litigated and decided, that should be the end of the matter.") (internal citations omitted).

Despite this ruling, the City has moved for summary judgment on Paine's ADA claim again arguing to this Court that the law had changed in this area and therefore new briefing was required. (Doc. 829.) The putative basis for this motion is that "there is no evidence that the City's failure to provide Eilman with access to psychiatric services was 'by reason of' her mental disability." (*Id.* at 2.) In support of its argument, the City cites three recent opinions issued by district courts in the Ninth Circuit. *See id.* at 2 (citing *Kamakeeaina v. City of Honolulu,* No. 11-00770, 2012 WL 3113174 (D. Haw. July 31, 2012); *Cavalieri v. Las Vegas Metro. Police Dep't,* No. 11 C 00351, 2012 WL 846466 (D. Nev. Mar. 13, 2012); *Estate of Bock v. County of Sutter,* No. 11 C 00536, 2012 WL 423704 (E.D. Cal. Feb. 8, 2012). However, nothing in these opinions, or the City's motion, compels this Court to reconsider its prior decision. Accordingly, the City's Motion is denied.

### A. The City Waived the Issue It Raises in its Motion for Summary Judgment on the ADA Claim

While the City styles its motion as a motion for summary judgment, it is really a motion for this Court to reconsider its prior decision on the City's earlier motion for summary judgment on the ADA claim. A motion to reconsider is not the appropriate vehicle to rehash previously rejected arguments or to introduce new legal theories. *See Musch v. Domtar Industries, Inc.,* 587 F.3d 857, 861 (7th Cir. 2009); *Bally Export Corp. v. Baliscar Ltd.,* 804 F.2d 398, 404 (7th Cir. 1986). Nor should it be used to advance arguments or legal theories that could and should have been made before the district court rendered its decision. *See Sigsworth v. City of Aurora,* 487 F.3d 506, 512 (7th Cir. 2007) (citing *LB Credit Corp. v. Resolution Trust Corp.,* 49 F.3d 1263, 1267 (7th Cir.

1995)); *Anderson v. Flexel, Inc.,* 47 F.3d 243, 247-48 (7th Cir. 1995). Indeed, any arguments that are raised for the first time in a motion for reconsideration are waived. *See Brooks v. City of Chicago*, 564 F.3d 830, 833 (7th Cir. 2009) ((citing *Kunz v. DeFelice,* 538 F.3d 667, 681 (7th Cir. 2008)).

In its February 26, 2010 Opinion, the Court found that the City failed to raise the issue of whether there was a genuine issue of material fact that the alleged discrimination Eilman suffered was by reason of her disability. Indeed, the City affirmatively told the Court that it "need not reach the third requirement that [Paine] must satisfy in order to prove her ADA claim." *See Paine,* 2010 WL 785397 at *9. As a result, the Court held that "[t]he City is therefore not entitled to summary judgment on Paine's ADA claim on the grounds that she has not demonstrated that any discrimination she suffered was on account of her disability." *Id.* Since the City did not raise this argument in its initial Motion for Summary Judgment, the argument is waived and the City's motion is denied. *See Harvey v. Town of Merrillville,* 649 F.3d 526, 532 (7th Cir. 2011) ("We have repeatedly warned that perfunctory and undeveloped arguments, and arguments that are unsupported by pertinent authority, are waived.") (internal citations and quotations omitted).

No doubt realizing its waiver, the City cites *Whitford v. Boglino* and argues that they have asserted a proper basis for this Court to reconsider its prior ruling because they have presented the Court with new ADA case law. In *Whitford,* the Seventh Circuit held that a "district court may, in its discretion, allow a party to renew a previously denied summary judgment motion or file successive motions, particularly if good reasons exist." 63 F.3d 527, 530 (7th Cir. 1995). The Seventh Circuit identified the following grounds as appropriate for renewing a summary judgment motion: (1) an intervening change in controlling law; (2) the availability of new evidence or an

expanded factual record; and (3) a need to correct a clear error or to prevent manifest injustice. *See id.* The City does not argue that there is new evidence, a need to correct a clear error, or a need to prevent manifest injustice. Instead, the City appears to argue there has been an intervening change in the controlling law.[4]

As an initial matter, the cases cited by the City are opinions issued by district courts sitting in the Ninth Circuit. *See* Doc. 829. They are not binding on this Court. As a result, they do not meet the standard for reconsideration established by *Whitford* because they do not constitute an intervening change in the controlling law. Indeed, these cases actually applied the same standard described by the Seventh Circuit in *Wisconsin Community Services* and applied by this Court. Specifically, those cases held, as this Court held, that for a detainee to sufficiently allege a violation of Title II of the ADA they must allege: (1) there is a qualified individual with a disability; (2) who was discriminated against by a public entity, such as by failing to make a reasonable accommodation to that qualified individual; (3) because of his or her disability. Just because those courts found that their plaintiffs failed to allege facts sufficient to show they were discriminated against because of their disabilities does not mean they constitute a change in the law. Rather, those plaintiffs' complaints simply had factual deficiencies that are not present here. Accordingly, the Court finds that the City has waived this argument on summary judgment and there is no basis for the Court to exercise its discretion to allow the City to renew its previously denied summary judgment motion.

---

[4] *Whitford* did not limit a district court's discretion to these grounds; however, it cautioned litigants not to renew a previously denied motion for summary judgment by raising a different argument than was previously presented. *See Whitford,* 63 F.3d at 530. While this Court has discretion to entertain such a motion, it chooses not to do so and holds that a previously denied motion for summary judgment should only be renewed based on one of the three specific grounds identified by *Whitford.*

**B. Paine Presented Sufficient Evidence to Raise a Genuine Issue of Material Fact as to Whether the City's Discrimination was by Reason of Eilman's Disability**

Even if the City had not waived this argument on summary judgment, its motion would still be denied because Paine has presented sufficient evidence to raise a genuine issue of material fact as to whether the City's discrimination of Eilman was by reason of Eilman's disability. For purposes of this motion, the City concedes that it had notice that Eilman had been diagnosed with bipolar disorder. (City ADA 56.1 ¶ 2.) Additionally, it concedes that police officers described Eilman's behavior as "crazy." (*Id.*) This Court has already found that Eilman was not taken for any psychiatric evaluation or treatment prior to her release from custody.

In addition, there are a number of disputed facts that create a genuine issue of material fact as to whether the City failed to provide Eilman with a reasonable accommodation because of her disability. First Dr. Nelson, an expert psychologist, opined that Eilman was in the midst of a manic episode on May 7th and 8th. (Pl. Add. 56.1 ¶ 51.) Dr. Dvoskin, also an expert psychologist, opined that Eilman was experiencing a severe manic episode before, during and after her detention by the Chicago police. (Pl. Add. 56.1 ¶ 54.) These opinions are supported by the testimony of various individuals who were detained in the lockup on May 7th and 8th. Specifically they testified to hearing Eilman screaming and yelling at various points throughout her detention. (Pl. Add. 56.1, ¶¶ 251-53, 255, 256, 272, 274, 278, 279, 280, 283, 291, 325-28, 339, 341, 354-55.) Two witnesses also testified that Eilman smeared menstrual blood throughout her cell. They further testified they brought this behavior to the attention of the guards. (*Id.* at ¶¶ 298-300, 303, 308, 310, 236-41.) Since the guards

18

were aware that Eilman was bipolar, this testimony raises a genuine issue of material fact as to whether they were aware Eilman was having a manic episode while she was detained.

In addition, other testimony suggests the guards sought to punish Eilman for her manic behavior. For example, the guards did not report Eilman's behavior to the desk sergeant or watch commander, which is the first step to accommodating a detainee's need for medical treatment. (*Id.* at ¶¶ 199, 209-10, 318, 323.) Instead, they harangued Eilman by ordering her to: (1) "shut the fuck up"; (2) shut the hell up, white bitch, you got the blood - you got the blood all over the cell"; (3) "shut your ass up and go to sleep"; (4) "shut your White ass up! You got blood all over the cell with your nasty ass"; and (5) "you crazy white bitch, you nasty bitch, get that shit off my walls." (*Id.* at ¶¶ 266, 273, 275-76, 289, 329, 346, 359.) This evidence is sufficient to raise a genuine issue of material fact as to whether the City failed to provide Eilman with an accommodation because of her disability. Specifically, the jury could draw a reasonable inference that the lockup personnel were angered by Eilman's manic conduct and the mess it made of the cell, and consciously decided to teach Eilman a lesson by berating her instead of getting her treated.

This inference is bolstered by the fact that other evidence in the record shows that such a reasonable accommodation was available and had been provided to others. Specifically, there is evidence that on the same day that Eilman was detained, another arrestee, Dorsie Tullock, was brought into the Second District lock up but then was subsequently transferred to Michael Reese Hospital for treatment. (*Id.* at ¶¶ 443-448.) Furthermore, St. Bernard Hospital, which was the designated intake facility for mental health evaluations for persons in Chicago police custody at the Second District, was less than two miles away from the station house. (*Id.* at ¶ 175.) Thus, there was a reasonable accommodation that was close and available to Eilman and the police at the Second

District provided similar accommodations to other detainees suffering medical problems. Accordingly, there is a material issue of genuine fact as to whether or not the City failed to provide Eilman with an accommodation, *i.e.* medical treatment, because of her disability, *i.e.* her outward manifestation of her mania. As a result, and for the reasons set forth in the Court's February 25, 2010 opinion, there are material issues of disputed fact as to whether Paine can prevail on a claim under Title II of the ADA. Therefore, summary judgment on this claim is inappropriate and the City's motion is denied.

## II. Individual Defendants' Motion for Summary Judgment on Claims that they Failed to Provide Medical Care to Eilman while in Custody

While the City renewed its motion for summary judgment on the ADA claim, the Individual Defendants renewed their combined motion for summary judgment on the issue of whether they violated Section 1983 by failing to provide medical care to Eilman while she was in custody. (Doc. 831.) The Individual Defendants' renewed motion argues that based on the Seventh Circuit's opinion in *Paine v. Cason,* 678 F.3d 500 (7th Cir. 2012), Paine has failed to establish a theory of causation against the Individual Defendants that is not barred by the doctrine of qualified immunity.[5] In addressing this motion, the Court believes it is constructive to first describe its initial opinion on causation as well as the Seventh Circuit's opinion before turning to the merits of the Individual Defendants' motion.

---

[5]The doctrine of qualified immunity protects government officials performing discretionary functions from liability "insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982); *see Akande v. Grounds*, 555 F.3d 586, 589 (7th Cir. 2009).

A.      **This Court's February 22, 2010 Opinion on Causation**

In its February 22, 2010 Opinion, the Court held that Paine had presented sufficient evidence for a jury to reasonably conclude that because Eilman's risk of injury would have decreased had she been provided with access to medical treatment, Defendants' inaction increased her risk of experiencing the type of harm she suffered. *See Paine,* 689 F. Supp. 2d at 1079. In particular, the Court found that Paine's expert's, Dr. Dvoskin's, testimony was sufficient to create a genuine issue of material fact as to whether Eilman would not have been injured absent the Individual Defendants' failure to provide medical care because Dvoskin opined that if Eilman had been taken to a mental health facility and evaluated, she probably would have been kept there, either voluntarily or involuntarily. *See id.* at 1078-79. Moreover, if the hospital had been fully informed about her behavior over the course of the previous two days, Dvoskin testified that it would have involuntarily committed Eilman, and not released her into the surrounding community. *Id.* at 1078. He further opined that even if released, Eilman likely would have been given a discharge plan to account for her personal safety, and someone would have likely come to pick her up and assist her in remaining safe. *Id.* Dvoskin asserted that Eilman would either have been given a safe discharge plan or would have been involuntarily committed. *Id.*

The Court noted that although the Individual Defendants' expert, Dr. Kennedy, disagreed with Dvoskin and opined that Eilman might have been released into the Robert Taylor Homes area if she were brought to the hospital, Dvoskin's testimony sufficiently established a genuine issue of material fact as to whether Eilman would not have been released on her own and later violently injured if the Individual Defendants had provided her with access to psychiatric care. *Id.* at 1079.

21

The Court also found that Paine presented sufficient evidence to raise a genuine issue of material fact as to whether the Individual Defendant's inaction was the proximate cause of Eilman's injuries. *Id.* at 1080. Specifically, the Court found that Paine adduced sufficient evidence for a jury to reasonably conclude that: (1) the Individual Defendants could have foreseen that their conduct would result in some type of injury and that any intervening cause did not sever that foreseeability; (2) the injury was not too remote in time from the Individual Defendants' inaction; and (3) the Individual Defendants' conduct increased the risk of future harm to Eilman. *Id.*

**B.     The Seventh Circuit's *Paine* Opinion**

On March 1, 2010, the Individual Defendants filed an interlocutory appeal of this Court's order that the Individual Defendants were not entitled to summary judgment on their qualified immunity defense. In affirming, in part, and reversing, in part, this Court's decision, the Seventh Circuit noted that "[t]he district court rejected the defendants' claim of immunity because, in the judge's view, detainees' rights to medical care is clearly established–and because a reasonable jury could find that Eilman needed care, and the police knew it." *Paine,* 678 F.3d at 506. It also stated that:

> [a]lthough the district court saw only one legal theory, Paine actually has three, and these require separate treatment. The first theory is the one the district judge discussed: the right to medical care while in custody.[6] The second theory is that Eilman should have been kept in custody longer to facilitate medical care. These theories are related but distinct. The first theory takes the time of release as given and asks what medical treatment is required while custody continues; the second emphasizes the medical care and asks how this affects the time of release.

---

[6]In actuality, throughout the opinion, this Court also addressed the *DeShaney* theory of liability regarding placing the plaintiff in a position of greater risk to her safety. See Paine, 689 F. Supp. 1027, 1075-79; 1082-1084; 1087 (N. D. Ill. 2010).

22

*Id.* It concluded that these theories have different implications for qualified immunity.[7]

With respect to the first theory, *i.e.,* the theory the Seventh Circuit held that this Court ruled on, the Seventh Circuit affirmed this Court's holding that individuals have a constitutional right for the police to provide care for their serious medical conditions if they are in custody. *See id.* (citing *Farmer v. Brennan,* 511 U.S. 825 (1994); *Estelle v. Gamble,* 429 U.S. 97 (1976); *Ortiz v. Chicago,* 656 F.3d 523 (7th Cir. 2011); *Cobige v. Chicago,* 651 F.3d 780 (7th Cir. 2011)). Indeed, the Seventh Circuit noted that Individual Defendants did not challenge this premise; rather, they challenged the causation of Eilman's injury. *See id.* at 507 (describing the Individual Defendants' argument as being because Eilman's "condition was the same before her arrest as it was after her release. Eilman's injury came from what happened after her release, not from the manic episode while in custody"). The Seventh Circuit rejected that argument and held that:

> Causation is another factual issue not suited to resolution on an interlocutory appeal, however. It is not related to the question whether there is a clearly established right to medical care while in custody. Perhaps lack of causation could be so glaring that the plaintiff would not even have standing to present a particular claim for relief. But we cannot rule out the possibility that Paine could show that Eilman suffered some injury from the manic episode itself during the hours of her custody. More: the rape and brain injury might be traceable to the lack of care while Eilman was in custody. A psychiatrist called to the stationhouse might have administered Eilman's prescribed psychotropic medication, which she had failed to take. This might have enabled Eilman to protect herself after she was released. That plausible theory of causation cannot be rejected on this interlocutory appeal.

*Id.* Accordingly, the Seventh Circuit affirmed this Court's decision that Eilman had a clear right to receive medical care while she was in the custody of the police department. Furthermore, it noted

---

[7]The Seventh Circuit described the third theory to be that certain of the Individual Defendants "gratuitously put Eilman in danger by releasing her where and when they did, and in a mental state that left Eilman unable to protect herself." *Id.* This theory is not at issue in this motion.

that Eilman's injury could be traceable to her lack of care while in custody and cited an example of

how this lack of care could have caused Eilman's injuries.

With respect to the theory this Court purportedly did not discuss, the Seventh Circuit held

that there was no clearly established constitutional right to be kept in custody, beyond the time when

release otherwise would occur, so that medical care can be provided. *See id.* at 509. In reaching this

conclusion, the Seventh Circuit noted that "[i]f the police arrest someone for public drunkenness and

discover that he needs dialysis and a liver transplant, they need not extend the custody so that he can

received medical care at public expense; the state can let him go in the condition in which he was

found." *Id.* at 507-08. As another example, the Seventh Circuit noted that "when the appropriate

medical care is a warm bed. Persons stopped on suspicion of intoxication don't have a 'right to be

detained' until sober, lest they come to harm while drunk." *Id.* at 508. It further stated that Paine

did not cite, and it could not find, "any decision establishing a right to be held in custody pending

medical treatment (or even a medical problem's self-resolution, as with the clearance of alcohol from

the blood)." *Id.* However, it conceded that "when the police do take someone into custody, prevent

him from getting medical care, and thus cause his condition to deteriorate, there is a constitutional

problem–at least when the medical condition is serious and officers are deliberately indifferent to

the problem." *Id.*

Additionally, the Seventh Circuit described a number of policy reasons for why there should

be no constitutional right to have custody extended. Specifically, they found it would conflict with

the right to be released on bail as promptly as possible and could significantly increase the period

of time people are in custody, which in turn would increase the costs to the City. *See id.* at 508-09.

### C.      Law of the Case and the Motion to Strike

24

Before the Court turns to the substantive issues presented by the Individual Defendants' motion, it is compelled to address two procedural issues raised in Paine's response. In her response, Paine argues that the Individual Defendants' motion is barred by the law-of-the-case doctrine. (Doc. 862 at 3-5.) In addition, she moves to strike the Individual Defendants' statement of undisputed facts for failing to comply with Local Rule 56.1. (*Id.* at 5-7.) Neither of these contentions warrant denial of the motion.

As described above, the law of the case doctrine "is a rule of practice, based on sound policy that, when an issue is once litigated and decided, that should be the end of the matter." *Gertz,* 680 F.2d at 532 (citing *Barrett v. Baylor,* 457 F.2d 119, 123 (7th Cir. 1972) (further citation omitted). However, the law of the case doctrine is a flexible doctrine that should yield when there is a "compelling reason, such as a change in, or clarification of, law that makes clear that the earlier ruling was erroneous." *United States v. Harris,* 531 F.3d 507, 513 (7th Cir. 2008). Moreover, as described above, the Seventh Circuit held in *Whitford* that a "district court may, in its discretion, allow a party to renew a previously denied summary judgment motion or file successive motions, particularly if good reasons exist." *See* 63 F.3d at 530. A good reason includes an intervening change in the controlling law. *See id.* In this case, the Individual Defendants' contend that the Seventh Circuit's decision in *Paine* changes whether a genuine issue of material fact exists as to the issue of causation on the failure to provide medical care. While for the reasons set forth below the Court disagrees with the Individual Defendants, the Court believes they had a good faith basis to bring their motion based on the Seventh Circuit's statement in *Paine*.

The Court also denies Paine's motion to strike the Individual Defendant's "Statement of Undisputed Facts." Paine contends that the Individual Defendants' statement should be stricken

25

because: (1) the statement was not a separate document, it was merely incorporated into the motion; (2) the facts cited refer to the previously filed 56.1 statements but fail to cite the specific fact contained within those 56.1s that new statement relies upon; and (3) the statement cites to Rule 56.1 statements that were previously filed by the City, not by the Individual Defendants.  (Doc. 862 at 5-7.)  Under Local Rule 56.1, any party moving for summary judgment must submit a statement of material facts as to which that party contends there is no genuine issue.  District courts are given great discretion to require strict compliance with Rule 56.1.  *See Cichon v. Exelon Generation Company, L.L.C.,* 401 F.3d 803, 809 (7th Cir. 2005) (internal citations omitted).

Paine is correct that the Individual Defendants' "Statement of Undisputed Facts" does not comport with Rule 56.1.  However, in an attempt to streamline this litigation, the Court had allowed the parties to rely on their previously submitted 56.1 statements in bringing these motion.  Therefore, it excused technical non-compliance with Local Rule 56.1 on this motion.  The short "Statement of Undisputed Facts" incorporated in the Individual Defendants' motion contained proper citations to the record.  The facts cited were all previously submitted to the Court pursuant to proper Rule 56.1 statements.  While it would have been helpful for the Individual Defendants to cross-reference the facts cited with where those facts were specifically located in the previous 56.1 statements, the Court does not believe this failure warrants striking that portion of the Individual Defendants' motion.  Indeed, Paine's argument is slightly disingenuous considering she relied on previously submitted Rule 56.1 statements in opposing the City's ADA motion for summary judgment.  In telling the Court why she did not need to submit a new Rule 56.1 statement, Paine argued that "[t]he overriding question is whether the testimony and evidence to which Plaintiff now points is in fact already in the record, and it is.  Rather than killing another forest full of trees to set forth all of the cited facts,

26

Plaintiff respectfully submits that reference to Document 535 is more conducive to efficiency and judicial economy." (Doc. 867, at 8-9, n.3). The Court agrees. Since all the facts cited are already in the record, the Court will not punish either party for their technical non-compliance with Rule 56.1 on this motion. Accordingly, in reaching its decision the Court considers both the Statement of Undisputed Facts submitted by the Individual Defendants and Paine's responses to those facts.

### D. Paine has Presented Sufficient Evidence to Create a Genuine Issue of Material Fact as to Whether the Individual Defendants' Failure to Provide Medical Care was the Actual and Proximate Cause of Her Injuries

In their renewed motion, the Individual Defendants argue that the Seventh Circuit held they are entitled to qualified immunity on the theory of causation upon which Paine relies because the Seventh Circuit held that a detainee has no right to be held in custody pending medical treatment, and thus a detainee may not sue for the police's failure to keep them in custody beyond the time when release otherwise would occur so that medical care can be provided. Because of this holding, according to the Individual Defendants, Paine can only avoid the doctrine of qualified immunity on her failure to provide medical care claim if she can establish evidence that onsite treatment, *i.e.* treatment at the Second District lockup, could have prevented the harm that eventually befell Eilman. The Individual Defendants contend that Eilman failed to adduce any evidence that the failure to provide her with medical care at the Second District lockup could have prevented the harm because Paine's experts testified that: (1) treatment of mania generally takes between 7 and 20 days (ID Undisp. Facts, ¶ 2); and (2) appropriate medical care would have required hospital admission, Eilman could not have been treated at the Second District lockup. (*Id.* at ¶ 3.) In other words, the Individual Defendants argue that under the Seventh Circuit's holding in *Paine,* the failure to refer Eilman for psychiatric evaluation at a hospital is insufficient to establish causation because it would

27

necessarily require extending custody, which is not an established right and is shielded by the doctrine of qualified immunity.

However, the Individual Defendants overstate the Seventh Circuit's holding in *Paine.* In *Paine,* the Seventh Circuit unambiguously stated that Eilman's "rape and brain injury might be traceable to the lack of care while Eilman was in custody." *Paine,* 678 F.3d at 507. It also found that this Court, in its February 22, 2010 Opinion, discussed Eilman's right to medical care in custody and affirmed the Court's ruling on this theory of liability. *See id.* at 506 ("The first theory is the one the district judge discussed: the right to medical care in custody."). While the Seventh Circuit opined that Paine could show causation by establishing that a psychiatrist called to the police station could have administered Eilman's prescribed psychotropic medication, which would have enabled her to protect herself after her release, the Seventh Circuit did not hold this was the only method by which Paine could establish causation.

Actual causation exists where an injury would not have occurred but for a defendant's conduct. *See Hibma v. Odegaard,* 769 F.2d 1147, 1155 (7th Cir. 1985). In its February 22, 2010 Opinion, this Court found that Paine presented sufficient evidence to raise a genuine issue of material fact as to whether Eilman would not have been injured absent Defendants' failure to provide medical care. *See Paine,* 689 F. Supp. 2d at 1078-79. Specifically, the Court relied on the testimony of Paine's expert, Dr. Dvoskin, and his opinion that if Eilman had been taken to a mental health facility and evaluated, she probably would have been kept there, either voluntarily or involuntarily. *Id.* at 1078. Moreover, he opined that if the hospital released Eilman, she likely would have been given a discharge plan to account for her personal safety, and someone would have likely come to pick her up and assist her in remaining safe. *Id.* As a result, the Court found that Dvoskin's

28

testimony sufficiently established a genuine issue of material fact as to whether Eilman would not have been released on her own and later violently injured if the Individual Defendants had provided her access to psychiatric care.

The fact that Eilman does not have a constitutional right to have custody extended to receive medical treatment does not change this ruling. The Individual Defendants have not identified any facts or evidence that suggests if Eilman were taken to the hospital she would necessarily have to remain in custody. Indeed, Dvoskin's opinion establishes that if Eilman were taken to the hospital she could have been released from custody but would have been safe because she would have been given a discharge plan to account for her personal safety. (Def. 56.1 Reply ¶ 461; Pl. 56.1 Resp. ¶ 368.) Dvoskin also opined that if Eilman were provided treatment at the hospital, it would have made an effort to talk to Eilman about where she would go and would arrange for her to leave in a safe manner. (Pl. 56.1 Resp. ¶ 378.) There is no evidence to establish that the implementation of a discharge plan requires the extension of custody.

Moreover, the Individual Defendants' argument rests entirely on the premise that Eilman's condition was the same before her arrest as it was after her release. If this were not the case, the Individual Defendant's argument would be meritless because the Seventh Circuit clearly held that "[d]oubtless when the police do take someone into custody, prevent him from getting medical care, fail to supply replacement for that care, and thus cause his condition to deteriorate, there is a constitutional problem." *Paine,* 678 F.3d at 508. However, Paine has also presented evidence that creates a genuine issue of material fact as to whether Eilman's mental condition deteriorated during custody because another of her experts, Dr. Nelson, opined that her psychiatric condition continued to worsen from the time her mania began in March and April 2006 through May 7, 2006. (Pl. 56.1

29

Resp. ¶¶ 371.)  As a result, Paine has presented sufficient evidence for a jury to reasonably conclude that the Individual Defendants' failure to provide medical care to Eilman by taking her for a psychiatric evaluation at a hospital was the proximate cause of the subsequent sexual assault and brain injury Eilman suffered.  Accordingly, the Individual Defendants' Motion for Summary Judgment on Claims that they Failed to Provide Medical Care to Christina Eilman While in Custody is denied.

### III.   Defendant Officer Pamela Smith's Motion for an Order Barring Plaintiff from Pursuing an "Augmented Danger" Claim Against Her at Trial

In its April 26, 2012 opinion, the Seventh Circuit held that Defendant Pamela Smith was potentially liable under both Paine's "failure-to-treat" theory and Paine's "augmented-danger-on-release" theory of liability.  *Paine,* 678 F.3d at 512.  However, Officer Smith now asserts that she can not be liable under an "augmented-danger-on-release" theory of liability because Paine never previously asserted such a claim against her and to let Paine do so now would be unduly prejudicial. (Doc. 833.)

In drafting her Third Amended Complaint, which is the operative complaint, Paine asserted forty numbered and labeled counts.  Each of these counts generally contained a specific claim for relief, based on a specific theory of liability, against a specific defendant.  For example, in Count XXXIII Paine asserted a "1983 Action Against Officer Pauline Heard for Deliberate Indifference to Medical Needs."  (Doc. 431 at 87.)  In Count XXXIV, Paine asserted a "'Deshaney' Action Against Officer Pauline Heard."  (*Id.* at 88.)[8] The only specific count in the Third Amended Complaint that

---

[8] *Deshaney v. Winnebago County Department of Social Services,* 489 U.S. 189 (1989) holds that the Constitution does not create a right to be protected from criminal predators.  However, subsequent decisions have found that *Deshaney* does not extend to protect state actors who needlessly create risks of harm.  Rather, if a state actor creates a risk of harm, they violate the constitution by depriving persons of life, liberty or property without process.  *See Paine,* 678 F.3d at 510; *White v. Rochford,* 592 F.2d 381 (7th Cir. 1979); *Wood v. Ostrander,* 879 F.2d 583 (9th Cir. 1989).

pertains to Officer Smith is Count XXVIII, which is entitled "1983 Action Against Officer Pamela Smith for Deliberate Indifference to Medical Needs." (*Id.* at 77.) This count contains the following relevant allegations:

> During the afternoon of May 8, 2006, Officer Pamela Smith, while working as a front desk officer at the Second District, received a telephone call from Kathy Paine, Christina's mother, inquiring about Christina. During the course of said telephone conversation, Kathy Paine disclosed she was worried about Christina's release because Christina suffered bipolar disorder, a psychiatric condition, and did not wish Christina to be merely released if she was in fact suffering a psychiatric episode.

> Notwithstanding Kathy Paine's disclosure of said information on May 8, 2006, Officer Smith deliberately and with utter and conscious disregard for Christina's safety failed to interview or otherwise investigate Christina's behavior in the lock-up recognizing Christina had a psychiatric history, was from California and unfamiliar with Chicago, whose mother expressed grave concern by her release and knew would be released into one of Chicago's highest crime neighborhoods.

> Further, notwithstanding said information, on May 8, 2006, Officer Pamela Smith thereafter prepared Christina's personal recognizance bond which led to the unfettered release of Christina from police custody instead of transporting Christina to a mental health facility or, alternatively, contacting Kathy Paine regarding Christina's imminent release.

> Officer Pamela Smith deliberately and with utter and conscious disregard for her safety, prepared Christina's bond and allowed Christina to be released from the Second District Station into a dangerous high crime environment while she knew Christina may have been undergoing a severe psychiatric episode with actual knowledge that Christina was unfamiliar with her surroundings and was at particular risk of harm

> At all time relevant hereto, Officer Pamela Smith acted with deliberate indifference to Christina's constitutional rights and with willful disregard for the safety and well-being of Christina.

(*Id.* at 78.)

Based on these substantive allegations, Paine clearly stated a claim against Officer Smith for a violation of Section 1983 based on the augmented danger theory of liability. The Seventh Circuit has held that a plaintiff has a claim under Section 1983 where a state actor, without justification,

increases a person's risk of harm. *See Paine,* 678 F.3d at 510. Paine alleged that Officer Smith increased Eilman's risk of harm by releasing her into a dangerous situation. Specifically, Paine knew that Eilman was bipolar, was suffering a manic episode, was not from Chicago, was young, was Caucasian, and she coordinated Eilman's release into an area of Chicago with the highest rate of sexual assault in the city. She assisted in placing Eilman into a situation that, according to Judge Easterbrook, was the equivalent of releasing Eilman "into the lions' den at the Brookfield Zoo." *Paine,* 678 F.3d at 510. These allegations are sufficient, under Fed. R. Civ. P. 8(a), to state a claim for a violation of Section 1983 based on an augmented danger theory of liability. The fact that Paine's augmented danger Section 1983 claim is contained within the same count as her failure to treat Section 1983 claim does not mean she failed to plead an augmented danger Section 1983 claim. *See* Fed. R. Civ. P. 8(d)(2) ("A party may set out 2 or more statements of a claim or defense alternatively or hypothetically, either in a single count or defense or in separate ones."); *see also Peterson v. McGladrey & Pullen, LLP,* 676 F.3d 594, 597 (7th Cir. 2011). Accordingly, Paine's Third Amended Complaint, which was filed in 2008, stated a claim against Officer Smith for violating Section 1983 by needlessly increasing Eilman's risk of harm.

As a result, Officer Smith's motion is baseless. Contrary to her assertions, Officer Smith has, since 2008, had an opportunity to develop defenses to an augmented danger claim or to move for summary judgment on this claim. Her failure to do so is not the Court's concern. While it would have been preferable for Paine to specifically number her augmented danger claim against Officer Smith, like she did for Officer Heard, this failure does not mean she failed to plead the claim. Moreover, this failure did not prejudice Officer Smith. In reaching its decision, the Seventh Circuit specifically considered whether Officer Smith should be entitled to qualified immunity on the

augmented danger theory of liability on summary judgment and found that she should not.  *See Paine,* 678 F.3d at 512.  Thus, even if she had specifically moved for summary judgment on this claim, that motion would have been denied.   Accordingly, Officer Smith's motion is denied.  Furthermore, the Court sees no need for Paine to amend her complaint at this juncture.

## CONCLUSION AND ORDER

For the reasons stated above, the City's renewed Motion for Summary Judgment on Paine's ADA claim is denied.  The Individual Defendants' renewed Motion for Summary Judgment on Claims that they Failed to Provide Medical Care to Eilman while in Custody is denied.  Paine's Motion to Strike the City's and the Individual Defendants' summary judgment motions is denied as moot. Officer Pamela Smith's Motion to Bar Plaintiff from Pursuing an "Augmented Danger" Claim at Trial is denied.  Paine's Counter-Motion for Leave to Amend Her Complaint Against Officer Smith is denied as moot.

_____
Virginia M. Kendall
United States District Court Judge
Northern District of Illinois

Date: December 28, 2012

33